UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

WASHINGTON STATE INVESTMENT     :   Civil Action No.
BOARD,     :
    :   COMPLAINT FOR VIOLATIONS OF THE
                 Plaintiff,     :   SECURITIES EXCHANGE ACT OF 1934
    :   AND STATE COMMON AND
      vs.     :   STATUTORY LAW
    :
ODEBRECHT S.A., CONSTRUTORA     :
NORBERTO ODEBRECHT S.A. and     :
ODEBRECHT FINANCE LTD.,     :
    :
                 Defendants.     :
    :
———————————————————— x   <u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..............................................................................................1

II.     JURISDICTION AND VENUE ........................................................................3

III.    PARTIES ..........................................................................................................5

        A.      Plaintiff ................................................................................................5

        B.      Defendants ...........................................................................................6

IV.     DEFENDANTS' UNDISCLOSED KICKBACK AND BRIBERY SCHEME .................8

        A.      The "Department of Bribery" ...............................................................8

        B.      Defendants' Corrupt Practices in Brazil ................................................9

        C.      Defendants' Corrupt Practices Outside Brazil ......................................10

        D.      Defendants' Obstruction of Justice ......................................................11

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS .....................................12

        A.      The 2012 Notes Offering Memorandum..............................................12

        B.      The 2013 Notes Offering Memoranda ................................................14

        C.      The 2014 Notes Offering Memorandum...............................................16

        D.      Defendants' False Financial Statements ..............................................19

                1.      CNO Failed to Accrue a Liability for the Foreseeable Financial
                        Costs Arising from the Bribery Scheme ...................................21

                2.      CNO Failed to Disclose the Nature and Range of the Foreseeable,
                        Expected Costs that Would Likely Be Incurred as a Result of
                        Defendants' Bribery Scheme ...................................................22

                3.      CNO Improperly Failed to Separately Distinguish and Disclose
                        Contract Revenue Obtained as a Result of Its Massive Illegal
                        Bribery Activity from Other Contract Revenue..........................23

                4.      CNO Improperly Failed to Recognize, Classify or Adequately
                        Disclose Material Amounts of Concealed Funds and Illegal Bribes ........24

**Page**

E.    False Financial Statements Included in Defendants' 7.125% Notes
      Offering Memorandum ...................................................................................25

      1.    CNO's 2009 and 2010 Annual Consolidated Financial Statements ..........25

      2.    CNO's 2011 Annual Consolidated Financial Statements .........................25

      3.    CNO's First Quarter 2012 Consolidated Interim Financial
            Statements .........................................................................................27

F.    False Financial Statements Included in Defendants' Offering Memoranda
      for the 4.375% Notes and 8.25% Notes .........................................................28

      1.    CNO's 2010 and 2011 Annual Consolidated Financial Statements ..........28

      2.    CNO's 2012 Annual Consolidated Financial Statements .........................28

G.    False Financial Statements Included in Defendants' Offering
      Memorandum for the 5.25% Notes ................................................................29

      1.    CNO's 2011 and 2012 Annual Consolidated Financial Statements ..........29

      2.    CNO's 2013 Annual Consolidated Financial Statements .........................30

      3.    CNO's First Quarter 2014 Consolidated Interim Financial
            Statements .........................................................................................31

H.    Defendants' Repeated Denials and Fraudulent Concealment of Their
      Kickback and Bribery Scheme .....................................................................32

VI.    SUBSEQUENT DISCLOSURES CONFIRM DEFENDANTS' FRAUDULENT
       SCHEME ...........................................................................................................41

VII.   LOSS CAUSATION.................................................................................................46

VIII.  PLAINTIFF'S RELIANCE PRESUMED THROUGH THE FRAUD-ON-THE-
       MARKET DOCTRINE ...........................................................................................49

IX.    PLAINTIFF'S DIRECT RELIANCE ON DEFENDANTS' FALSE AND
       MISLEADING STATEMENTS.................................................................................50

X.     NO SAFE HARBOR ................................................................................................52

XI.    COUNTS.................................................................................................................52

**Page**

XII.    PRAYER FOR RELIEF ..................................................................................60

XIII.   DEMAND FOR JURY TRIAL .......................................................................60

Plaintiff Washington State Investment Board ("WSIB" or "Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of documents created and/or published by Odebrecht S.A. ("Odebrecht") and Construtora Norberto Odebrecht S.A. ("CNO"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, testimony by people involved in the wrongdoing alleged herein, releases, media reports and other public statements about the Company and the December 21, 2016 plea agreement between Odebrecht and the United States Attorney for the Eastern District of New York (the "Plea Agreement").  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.      **INTRODUCTION**

1.      Defendant Odebrecht, through various subsidiaries, including CNO, is the largest engineering and construction firm in Latin America, and one of the largest in the world.  Defendant CNO primarily engages in the construction of large-scale infrastructure and other public projects such as highways, railways, power plants, bridges, tunnels and airports.  The vast majority of these projects are awarded to contractors through a public bidding process overseen by public officials.

2.      For years, Odebrecht highlighted its expertise, knowledge of local markets, reputation and business relationships as providing it with key advantages over its competition in securing bids to win lucrative government contracts and published financial results commensurate with its status, including in the offering documents that it used to issue bonds to Plaintiff and other investors through its Odebrecht Finance Ltd. ("Odebrecht Finance") subsidiary.  Between October 22, 2012 and February 4, 2015, Plaintiff purchased 163 million units of bonds through four different bond offerings based in large part on Odebrecht's and CNO's financial results, which were included in the

offering memoranda.[1]  The offering memoranda even emphasized that Odebrecht secured its contracts through a "competitive bidding process."  But unbeknownst to the public or the Company's investors, the secret to Odebrecht's success and its financial results was not its negotiating prowess or capabilities, but instead a massive bribery and kickback scheme involving hundreds of millions of dollars in illicit payments that it used to secure its government contracts.

3.       In the offering memoranda and each time CNO issued financial results, defendants concealed the true nature of how Odebrecht secured its business.  The unprecedented scale of Odebrecht's corrupt practices began to be exposed in connection with Brazil's "Operation Car Wash" investigation, which ultimately uncovered a vast criminal network used to funnel massive sums of money from companies such as Brazilian oil giant Petróleo Brasileiro S.A. – Petrobras ("Petrobras") and Odebrecht into the hands of corrupt corporate and political insiders.  These criminal activities were so pervasive at the Company that the U.S. Department of Justice would later refer to a hidden Odebrecht "business unit" as the "Department of Bribery" because the unit was responsible for systematically paying hundreds of millions of dollars to government officials and political parties to secure government contracts.  In total, defendants paid nearly $800 million in bribes in connection with 100 projects in 12 countries in exchange for ill-gotten benefits of more than $3.3 billion.[2]

4.       The Operation Car Wash investigation did not initially focus on Odebrecht, but rather on Petrobras.  Even after certain individuals associated with Odebrecht began to be implicated in potential wrongdoing, including the arrest on June 19, 2015 of Odebrecht's Chief Executive Officer

---

[1]    The Notes include the following securities issued by defendant Odebrecht Finance: (i) 7.125% notes due 2042 (the "7.125% Notes"); (ii) 4.375% notes due 2025 (the "4.375% Notes"); (iii) 8.25% notes due 2018 (the "8.25% Notes"); and (iv) 5.25% notes due 2029 (the "5.25% Notes") (collectively, the "Notes").

[2]    Unless otherwise noted, all "$" denominated figures are in U.S. dollars.

- 2 -

("CEO"), Marcelo Odebrecht, defendants attempted to obstruct the investigation and engaged in a months-long misinformation campaign designed to distort and bury the facts and to continue to mislead investors and the public as to the true nature and scope of the Company's business activities.

5.     Now, Marcelo Odebrecht has been convicted of corruption and money laundering and sentenced to more than 19 years in prison.[3]   Other top Company officials have been similarly implicated, and Odebrecht itself has pled guilty to violations of the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA") and agreed to pay $2.6 billion in penalties – which was reduced from $4.5 billion because of Odebrecht's inability to pay that amount – as part of the largest-ever global foreign bribery resolution.  This guilty plea means that Odebrecht misrepresented that CNO's earnings, revenues and profits were derived from legitimate business practices when in fact they were the product of illegitimate business practices and systemic graft.  As defendants' misdeeds have come to light over time, the Notes have plummeted in value, causing Plaintiff tens of millions of dollars in losses and damages under applicable law.

## II.     JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) and U.S. state common and statutory law.

7.     This Court has jurisdiction over this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §§1331, 1332 and 1367.  Irrevocable liability was incurred in the United States in connection with Plaintiff's purchases of the Notes.

8.     Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in

---

[3]     This sentence was subsequently reduced pursuant to a plea bargain in which Marcelo Odebrecht agreed to provide evidence to authorities investigating the Company.

this District and defendants Odebrecht Finance and CNO have consented, through the offering memoranda, to venue in this District:

> The Issuer and the Guarantor have irrevocably submitted to the non-exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, City and State of New York for the purposes of any action or proceeding arising out of or related to the Notes, the Guaranty or the Indenture.  The Issuer and the Guarantor have irrevocably waived, to the fullest extent permitted by law, any objection which it may have to the laying of the venue of such action or proceeding brought in such a court and any claim that any such action or proceeding brought in such a court has been brought in an inconvenient forum and any right to which it may be entitled on account of place of residence or domicile.

9.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails and interstate telephone communications.

10.      Defendants each have sufficient minimum contacts within New York to make the exercise of jurisdiction over them by New York federal courts consistent with traditional notions of fair play and substantial justice.  Defendants maintain offices in New York, marketed and sold the Notes in New York and to New York investors, disseminated false and misleading statements into New York, and carried out the kickback and bribery scheme alleged herein in part in New York.  In fact, defendant Odebrecht entered into the Plea Agreement in New York.  In that agreement, Odebrecht admitted to transferring money from several New York-based bank accounts to offshore accounts, with the funds then being used in part to make bribe payments to foreign officials.  Indeed, as stated in the Plea Agreement, Odebrecht "caused numerous illicit payments to be made from United States-based bank accounts to perpetuate its bribe scheme in Brazil."  Defendants Odebrecht Finance and CNO also specifically consented to jurisdiction and venue in this Court for any actions "arising out of or related to" the Notes in the offering memoranda and stated specifically that they would not contest jurisdiction in this Court.

- 4 -

11.     Jurisdiction over Odebrecht is also consistent with traditional notions of fair play and substantial justice because Odebrecht operated through the subsidiaries that consented to jurisdiction and venue in any state or federal court in this District.  These subsidiaries were Odebrecht's agents, instrumentalities or alter egos.  As alleged herein, defendant Odebrecht was an actor in the entire business of Odebrecht Finance, exercised control of Odebrecht Finance's daily operations, treated Odebrecht Finance as a dummy corporation, commingled its funds with Odebrecht Finance's, used Odebrecht Finance as a vehicle to perpetrate fraud, failed to capitalize Odebrecht Finance adequately, and operated Odebrecht Finance for the benefit of defendants Odebrecht and CNO, and not for the benefit of Odebrecht Finance itself.  Similarly, Odebrecht had 100% control over CNO and admitted in its Plea Agreement to causing wire transfers to be made from several New York-based accounts held by CNO to accounts that had been created in offshore entities.

## III.     PARTIES

### A.     Plaintiff

12.     Plaintiff Washington State Investment Board ("WSIB" or "Plaintiff") is a state agency responsible for the prudent investment and management of public trust and public employee retirement funds.  It invests for 17 retirement plans that benefit public employees, teachers, school employees, law enforcement officers, firefighters and judges.  There are approximately 700,000 participants in the plans.  WSIB also manages investments for 18 other public funds that support or benefit industrial insurance, colleges and universities, developmental disabilities and wildlife protection, and the agency manages a public employee deferred compensation program that supplements other retirement benefits.  WSIB was created and operates under the provisions of Chapter 43.33A of the Revised Code of Washington ("RCW").  Plaintiff purchased the Notes pursuant to the offering memoranda and was damaged by defendants' failure to disclose the truth about defendants' financial results and the manner in which defendants secured business.

- 5 -

13.     From October 2012 until February 2015, Plaintiff purchased Odebrecht bonds, including: (i) the 7.125% Notes; (ii) the 4.375% Notes; (iii) the 8.25% Notes; and (iv) the 5.25% Notes.  On information and belief, title passed to Plaintiff when the Notes were transferred to the account of Plaintiff's custodian at DTC in New York.  Plaintiff's custodian is State Street Bank and Trust Company, One Lincoln Street, Boston, Massachusetts 02111.

### B.     Defendants

14.     Defendant Odebrecht is a holding company headquartered in Brazil that, through various subsidiaries and operating entities, conducts business in construction, engineering, infrastructure, chemicals, utilities and real estate businesses in Brazil and throughout 27 other countries, including the United States.  It is the parent of defendants CNO and Odebrecht Finance and controls their activities, including the issuance of the Notes and these defendants' representations to investors.  Through its various subsidiaries, Odebrecht has operated in the United States for over a quarter of a century, with such achievements as the construction of Miami International Airport terminals, rehabilitation of the Herbert Hoover Dike, widening of the Sam Houston Tollway in Texas, and of upgrading the Port of Miami.

15.     Defendant CNO is a wholly-owned subsidiary of defendant Odebrecht and is the largest construction and engineering business in Latin America, and one of the largest in the world. Defendant CNO primarily engages in the construction of large-scale infrastructure and other public works projects, including the construction of highways, railways, power plants, bridges, tunnels, subways, buildings, port facilities, dams, manufacturing and processing plants, as well as mining and industrial facilities.  The offering documents for each offering stated specifically that CNO "currently guarantee[s]" all of Odebrecht Finance's debt with third parties, including the Notes. Although CNO began in Brazil, its focus has increasingly shifted to obtaining construction for public facilities in other countries.

- 6 -

16.     Defendant Odebrecht Finance is incorporated under the laws of the Cayman Islands. Odebrecht Finance is a wholly-owned subsidiary of defendant Odebrecht and was created for the purpose of raising money from investors through the issuance of bonds, including the Notes and depended on CNO to make payments on the Notes as the offering memoranda explained:

> The issuer's ability to make payments on the notes depends on its receipt of payments from us.
>
>     The issuer's principal business activity is to act as a financing vehicle for Odebrecht's activities and operations.  The issuer has no substantial assets, and accordingly, holders of the notes must rely on our cash flow from operations to pay amounts due in connection with the notes.  The ability of the issuer to make payments of principal, interest and any other amounts due on the notes is contingent on its receipt from us of amounts sufficient to make these payments, and, in turn, on our ability to make these payments.  In the event that we are unable to make such payments for any reason, the issuer will not have sufficient resources to satisfy its obligations under the indenture governing the notes.

17.     Odebrecht Finance has no real assets of its own, with its only listed assets being long-term "receivables" from defendant Odebrecht, or various Odebrecht-related entities.  In fact, the offering memoranda acknowledged that "to fund its activities, the Company relies on the operational structure of ODB and its operations depend on the remittance of funds from ODB and from other related parties of the Odebrecht Organization."

18.     As described in the offering memorandum for the 7.125% Notes, the entire amounts raised by selling the Notes were transferred from Odebrecht Finance to CNO and other Odebrecht subsidiaries.  As a result, CNO was the guarantor of the bonds issued by Odebrecht Finance, and the offering memoranda used to sell these bonds to investors relied primarily upon defendant CNO's reported financial results and business prospects.  Odebrecht Finance issued billions of dollars in face value in notes from 2010 through 2014, each of which was guaranteed by defendant CNO.

19.     Immediately following the sale to investors of each of the 7.125% Notes, the 8.25% Notes, 5.25% Notes, 4.375% Notes and various other offerings, defendant Odebrecht Finance

- 7 -

conveyed all or virtually all of the proceeds from such sales to defendants CNO and Odebrecht, receiving nothing of equivalent value in return.

## IV.    DEFENDANTS' UNDISCLOSED KICKBACK AND BRIBERY SCHEME

20.    Unbeknown to Plaintiff, between 2001 and 2016, defendants paid approximately *$788 million* in bribes to government officials in Brazil and at least 11 other countries in Central and South America and Africa in order to improperly influence the award of more than 100 large construction contracts to defendants.  The ill-gotten benefit of these contracts amounted to approximately *$3.336 billion* for defendants.

### A.    The "Department of Bribery"

21.    To further their bribery scheme, defendants created and funded an elaborate, secret financial structure that operated to account for and disburse corrupt bribe payments to, and for the benefit of, government officials and political parties.  Central to this system of corruption, in or about 2006, defendants established a standalone division within defendant CNO called the Division of Structured Operations, which effectively functioned as a "Department of Bribery" for defendant Odebrecht and its related entities.  The department was put under the control of Hilberto Silva.

22.    To conceal its activities, the Division of Structured Operations utilized an entirely separate and off-book communications system called "Drousys," which allowed members of the Division of Structured Operations to communicate with one another and with outside financial operators and other co-conspirators about the bribes through the use of secure emails and instant messages, utilizing code names and passwords.  In addition, defendants maintained a detailed "shadow budget" through a computer system known as "MyWebDay" that tracked payments, payment requests and other bribe-related information.

23.    To further conceal the Company's criminal conduct, the Division of Structured Operations managed and distributed funds that Odebrecht never recorded on its balance sheet.  These

unrecorded funds were generated by Odebrecht through a variety of methods, including, but not limited to: (i) standing overhead charges collected from subsidiaries; (ii) overcharges and fees that were attributed as legitimate to service providers and subcontractors but not included in project budgets; (iii) undeclared retainers and success fees for the purchase of company assets; and (iv) self-insurance and self-guarantee transactions.

24.     Once generated, unrecorded funds were funneled by the Division of Structured Operations to a series of offshore entities that were not included in either CNO's or Odebrecht's financial statements as related entities.  Defendants used these offshore entities to further the bribery scheme and to conceal and disguise improper payments made to, or for the benefit of, government officials and political parties in various countries.

25.     Disbursements of these unrecorded funds were made by financial operators who acted on defendants' behalf.  Payments were made to secret account beneficiaries and *doleiros*, who delivered the payments in cash both inside and outside Brazil in packages or in suitcases at locations predetermined by the beneficiaries of the funds or via wire transfer through one or more offshore entities.

**B.     Defendants' Corrupt Practices in Brazil**

26.     Beginning at least as early as 2003 through approximately 2016, defendants paid $349 million in bribes to various Brazilian officials and political parties in order to secure an improper advantage in obtaining lucrative public construction contracts within the country.  In return, defendants obtained financial benefits exceeding $1.9 billion from these illegally obtained contracts.

27.     According to the agreed-upon facts in Odebrecht's Plea Agreement, beginning in or about 2004, defendants CNO and Odebrecht conspired with other construction companies to evaluate and divide up future contracts for Brazilian oil company Petrobras.  Once it was agreed

among these entities which company or companies would be responsible for a particular project, and at what price, it was agreed that only the predetermined company would present a qualifying bid, and that the other entities would present proposals to ensure that the predetermined company would win the contract. In this manner, these entities rotated available Petrobras contracts between them.

28.     For example, in or about October 2010, defendant Odebrecht bid for and won a Petrobras contract for the provision of various environmental and security certification services that were necessary for various activities that Petrobras undertook abroad. In order to win the contract, Odebrecht agreed to pay more than $40 million in bribes to certain political parties from its Division of Structured Operations using unrecorded funds in connection with the project, some of which were paid directly to specific government officials.[4]

29.     In addition to corrupt payments used to secure contracts with Petrobras, defendants paid bribes to political parties, individual candidates and other government officials at the local, regional and national levels in Brazil with unrecorded funds from the Division of Structured Operations in order to secure additional business.

30.     For example, between approximately 2010 and 2014, defendants, through the Division of Structured Operations, made approximately $20 million in bribery payments in order to secure continued work on a transportation project. Defendant Odebrecht profited by approximately $184 million from this project.

**C.     Defendants' Corrupt Practices Outside Brazil**

31.     It is undisputed that between approximately 2001 and 2016, defendants paid illicit bribes of about $439 million to foreign officials and political parties in various countries outside of Brazil, including Angola, Argentina, Colombia, the Dominican Republic, Ecuador, Guatemala,

---

[4]     The examples alleged in this complaint are not meant to be exhaustive, but rather to illustrate how the bribery and kickback scheme perpetrated by defendants operated.

Mexico, Mozambique, Panama, Peru and Venezuela, in order to secure an improper advantage to obtain and retain public construction projects in those countries.  Defendants benefitted by more than $1.4 billion as a result of these corrupt payments.

32.     Typically, defendants used the Division of Structured Operations to execute the corrupt payments using unrecorded funds, either: (i) in cash in the country in question; or (ii) by deposits into accounts indicated by the ultimate beneficiaries or their intermediaries.  Again, these payments were not recorded on the balance sheet of defendants Odebrecht or CNO.

### D.     Defendants' Obstruction of Justice

33.     In or about 2014, Brazilian law enforcement authorities began an initially covert investigation into corruption related to Petrobras, called Lava Jato, or "Operation Car Wash."  This investigation originally focused on Petrobras, the partially state-owned oil and energy company.  After commencing in Brazil, investigations into Petrobras were launched in the United States and Switzerland.

34.     Defendants have admitted that, after becoming aware of these investigations, they sought to conceal or destroy evidence of their criminal activities and hinder the investigations by, *inter alia*: (i) directing employees to delete records that might reveal illegal activities; (ii) bribing foreign officials to prevent their compliance with requests for information and documents from investigators; (iii) destroying the ability to access the MyWebDay platform containing evidence of defendants' misconduct; (iv) ordering their employees to take steps to evade authorities, including by moving aspects of the Division of Structured Operations outside of Brazil; and (v) making numerous false and misleading statements denying defendants' participation in the bribery and kickback scheme, undermining the validity of the investigations and misrepresenting salient facts to investors and the public.

35.     With Plaintiff and other investors unaware of this undisclosed bribery and kickback scheme, defendants misrepresented CNO's financial results and future prospects until at least December 1, 2016 in order to sell billions of dollars of bonds to Plaintiff and other investors.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

36.     The Notes were initially sold in private offerings pursuant to offering memoranda (the "Offering Memoranda").  These memoranda contained defendant CNO's financial results, including reported net income in the many hundreds of millions or billions of dollars per year.  These memoranda also represented that the majority of CNO's revenues came from engineering and construction of large public works projects, touting CNO's expertise, knowledge of local markets, reputation and business relationships as providing it with key advantages over its competition in securing bids to win lucrative government contracts.  Defendants also misrepresented CNO's financial results and future prospects in other public statements made available to Plaintiff, other investors, analysts, and ratings agencies, including on defendant CNO's website

### A.     The 2012 Notes Offering Memorandum

37.     Defendants began soliciting investors to buy the 7.125% Notes in or about June 2012. In connection with these efforts, defendants issued an offering memorandum that contained numerous representations regarding defendant CNO's financial results, financial statements, business, operations, risks and prospects (the "2012 OM").  Plaintiff purchased a significant amount of the 7.125% Notes based upon the false and misleading financial statements contained in the 2012 OM, as well as other similar false and misleading statements made by defendants.

38.     The 2012 OM stated that the "main competitive strengths" that allowed defendant CNO to achieve its financial results included its "Leadership Position" as "the largest engineering and construction company in Latin America as measured by . . . revenues" and its expertise and ability to win large public contracts through competitive bidding processes, stating in pertinent part:

- 12 -

*We obtain contracts for new projects primarily through competitive bidding* in response to solicitations by government agencies, public announcements by private-sectors entities, invitations when short-listed for private projects and, to a lesser extent, through direct negotiation.  The volume of work generally available in the market at the time of the bid, the size of our backlog at the time, the location and complexity of the project to be executed and the level of competition for the project are all factors that may affect our competitiveness in a particular bidding process.

*        *        *

We are the largest engineering and construction company in Latin America as measured by 2010 revenues.  *Most of our ongoing construction projects were awarded through a competitive bidding process*.  While *price generally is the most important factor that determines whether we are awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships*. . . . [W]e believe that *we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities*.

*        *        *

*We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons*.  First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids.  Second, our decentralized management approach has generally allowed us to effectively manage our projects.  Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.[5]

39.    The statements referenced above in ¶¶37-38 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known by defendants or recklessly disregarded by them:

---

[5]    Here, as elsewhere, emphasis has been added  unless otherwise indicated.

(a)     over the course of more than a decade, defendants and their operatives had paid hundreds of millions of dollars in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)     CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

(c)     CNO did not secure contracts through a "competitive bidding process," but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)     CNO's financial statements and disclosures included in the 2012 OM were false and misleading as alleged at ¶¶46-69;

(e)     as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)     as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects, and the unsustainability of its historical financial results if the truth were revealed.

**B.     The 2013 Notes Offering Memoranda**

40.     Defendants began soliciting investors to buy the 4.375% Notes and the 8.25% Notes in or about April 2013.  In connection with these efforts, defendants issued two substantially similar offering memoranda that contained numerous representations regarding defendant CNO's financial results, business, operations, risks and prospects (the "2013 OMs").  Plaintiff purchased a significant amount of the 4.375% Notes and the 8.25% Notes based upon the false and misleading financial

statements contained in the 2013 OMs, as well as other similar false and misleading statements made by defendants.

41.     The 2013 OMs stated that the "main competitive strengths" that allowed defendant CNO to achieve its results included its "Leadership Position" as "the largest engineering and construction company in Latin America as measured by . . . gross revenues" and its expertise and ability to win large public contracts through competitive bidding processes, stating in pertinent part:

> ***We obtain contracts for new projects primarily through competitive bidding*** in response to solicitations by government agencies, public announcements by private-sectors entities, invitations when short-listed for private projects and, to a lesser extent, through direct negotiation. The volume of work generally available in the market at the time of the bid, the size of our backlog at the time, the location and complexity of the project to be executed and the level of competition for the project are all factors that may affect our competitiveness in a particular bidding process.
>
> \*        \*        \*
>
> We are the largest engineering and construction company in Latin America as measured by 2011 revenues. ***Most of our ongoing construction projects were awarded through a competitive bidding process***. While ***price generally is the most important factor*** that determines whether we will be awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships. . . . [W]e believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.
>
> \*        \*        \*
>
> ***We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons***. First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids. Second, our decentralized management approach has generally allowed us to effectively manage our projects. Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.

42.     The statements referenced above in ¶¶40-41 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known by defendants or recklessly disregarded by them:

(a)     over the course of more than a decade, defendants and their operatives had paid hundreds of millions of dollars in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)     CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

(c)     CNO did not secure contracts through a "competitive bidding process" where price was the "most important" factor, but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)     CNO's financial statements and disclosures included in the 2013 OMs were false and misleading as alleged at ¶¶46-61, 70-74;

(e)     as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)     as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects, and the unsustainability of its historical financial results if the truth were revealed.

### C.     The 2014 Notes Offering Memorandum

43.     Defendants began soliciting investors to buy the 5.25% Notes in or about June 2014. In connection with these efforts, defendants issued an offering memorandum that contained

numerous representations regarding defendant CNO's financial results, business, operations, risks and prospects (the "2014 OM"). Plaintiff purchased a significant amount of the 5.25% Notes based upon the false and misleading financial statements contained in the 2014 OM, as well as other similar false and misleading statements made by defendants.

44.     The 2014 OM stated that the "main competitive strengths" that allowed defendant CNO to achieve its results included its "Leadership Position" as "the largest engineering and construction company in Latin America as measured by . . . gross revenues" and its expertise and ability to win large public contracts through competitive bidding processes, stating in pertinent part:

> ***We obtain contracts for new projects primarily through competitive bidding*** in response to solicitations by government agencies, public announcements by private-sectors entities, invitations when short-listed for private projects and, to a lesser extent, through direct negotiation. The volume of work generally available in the market at the time of the bid, the size of our backlog at the time, the location and complexity of the project to be executed and the level of competition for the project are all factors that may affect our competitiveness in a particular bidding process.

*     *     *

> We are the largest engineering and construction company in Latin America as measured by 2013 revenues. Most of our ongoing construction projects were awarded through a competitive bidding process. While price generally is the most important factor that determines whether we will be awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships. . . . [W]e believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.

*     *     *

> ***We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons***. First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids. Second, our decentralized management approach has generally allowed us to manage our projects effectively. Third, our projects are often eligible

- 17 -

for funding from the Brazilian government for service exports and from multilateral financial institutions.

45.     The statements referenced above in ¶44 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known by defendants or recklessly disregarded by them:

(a)     over the course of more than a decade, defendants and their operatives had paid hundreds of millions of dollars in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)     CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

(c)     CNO did not secure contracts through a "competitive bidding process" where price was the "most important" factor, but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)     CNO's financial statements and disclosures included in the 2014 OM were false and misleading as alleged at ¶¶46-61, 75-83;

(e)     as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)     as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects, and the unsustainability of its historical financial results if the truth were revealed.

###### D.     Defendants' False Financial Statements

46.     Defendants' 2012, 2013 and 2014 Offering Memoranda and other materials made available to Plaintiff, other investors, analysts and rating agencies included CNO's consolidated interim and annual financial statements for periods no later than 2009 to 2015.  These financial statements were false when issued as they failed to properly account for or disclose the revenue, expenses, hidden assets, liabilities and ill-gotten gains directly arising from defendants' fraudulent bribery scheme in violation of Brazilian generally accepted accounting principles ("GAAP").[6]

47.     As discussed below, defendants were obligated to prepare and present their consolidated quarterly and annual financial statements distributed to current and potential investors in compliance with GAAP.  Indeed defendants asserted that CNO's financial statements were prepared in accordance with GAAP.  For example, the 2014 OM for the 5.25% Notes falsely asserted that the financial statements included in the 2014 OM were prepared and presented in accordance with Brazilian GAAP:

### PRESENTATION OF FINANCIAL AND OTHER INFORMATION

*        *        *

*CNO Financial Statements*

We maintain our books and records in *reais*.

---

[6]     GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Brazilian accounting practices are established by Brazilian corporate law.  The corporate law in effect at all relevant times required both public and private Brazilian companies to prepare their financial statements in accordance with local accounting standards issued by the Brazilian Accounting Pronouncements Committee (*Comitê de Pronunciamentos Contábeis*) or the CPC, which promulgates its accounting standards using the prefix "CPC."  CPCs must be in compliance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board.  CPCs are thus, in substance, translations of IFRS standards into Portuguese.  Financial statements filed with either the Securities Exchange Commission of Brazil or the U.S. Securities and Exchange Commission that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

***We prepare our consolidated financial statements in accordance with accounting practices adopted in Brazil, or Brazilian GAAP, which are based on***:

- Brazilian Law No. 6,404/76, as amended by Brazilian Law No. 9,457/97, Brazilian Law No. 10,303/01, Brazilian Law No. 11,638/07 and by Provisional Measure No. 449/08, which we refer to collectively as the Brazilian Corporate Law;

- the rules and regulations of the Brazilian Securities Commission (*Comissão de Valores Mobiliários*), or the CVM;

- the accounting standards issued by the Brazilian Institute of Independent Auditors (*Instituto dos Auditores Independentes do Brasil*), or IBRACON, and the Brazilian Federal Accounting Council (*Conselho Federal de Contabilidade*), or the CFC; and

- the accounting standards issued by the Brazilian Accounting Standards Committee (*Comitê de Pronunciamentos Contábeis - CPC*), or the CPC.

48.     Defendants made substantially identical assertions about compliance with Brazilian GAAP in the 2012 OM and 2013 OMs.  Additionally, Defendants' repeated the assertion that CNO's consolidated financial statements were prepared and presented in accordance with Brazilian GAAP in the actual notes to CNO's consolidated financial statements at December 31, 2011:

> The consolidated financial statements have been prepared and are being presented in accordance with accounting practices adopted in Brazil, including the pronouncements issued by the Brazilian Accounting Pronouncements Committee ("CPC").

49.     Defendants also made the same or substantially the same disclosure in the notes to each of defendant Odebrecht Finance's and CNO's interim quarterly and annual financial statements contained in each of the four Notes offerings in the 2012 OM, 2013 OMs and 2014 OM, or made available to Plaintiff, other investors, analysts and rating agencies, including on defendant CNO's website.

50.     Each of these assertions in ¶¶47-49 above regarding compliance with Brazilian GAAP were false when made.  As described below, each of defendants' relevant period financial statements included in the 2012 OM, 2013 OMs and 2014 OM and other materials made available to

Plaintiff, other investors, analysts and rating agencies, including on defendant CNO's website, were not presented in accordance with Brazilian GAAP, and were materially false and misleading for the following reasons.

### 1. CNO Failed to Accrue a Liability for the Foreseeable Financial Costs Arising from the Bribery Scheme

51.     Defendant CNO improperly failed to accrue a provision in its public 2009 through 2015 interim and annual financial statements for the clearly foreseeable and estimable financial obligations arising from its ongoing illegal bribery scheme, including the probable material financial disgorgements, penalties, fines and legal costs, in violation of Brazilian GAAP. As alleged above at ¶¶3, 5, 20, between 2001 and 2016, defendants paid nearly $800 million in bribes to government officials to secure as much as $3 billion in construction contracts. Facing penalties as high as $12 billion in the United States alone, defendants settled with the U.S. government for $2.6 billion. These amounts were quantitatively and qualitatively material to analysts, investors and rating agencies.

52.     Defendants' bribery conduct was unlawful, and the criminal, civil and financial consequences for this illegal behavior were knowable and within an estimable range of possible negative outcomes throughout the period the conduct occurred. Brazilian GAAP's CPC *Conceptual Structure for the Preparation and Presentation of the Financial Statements*, ¶37, specifically states that some liabilities can only be measured using a high degree of estimation. In Brazil, these liabilities are described as a "provision" in accounting parlance. Brazilian *Technical Pronouncement CPC 25 Provisions, Contingent Liabilities and Assets*, ¶¶12-19, 25, 36, 39, require that a provision must be recognized by a charge against income when, after considering all the available evidence: (1) it is probable that a present obligation for a past event or conduct exists; (2) which will more likely than not require a future disbursement to settle the obligation; and (3) a reasonable estimate of

the required disbursement to settle the obligation can be made after weighing all possible outcomes or ranges of outcomes.

53.     Defendants' illegal bribery conduct, as admitted in the Plea Agreement, constituted a crime and thus created a probable legal obligation that carried a knowable and estimable range of possible civil, criminal and financial penalties and consequences.  Moreover, by the time defendants issued the 2012 OM, it was highly probable that future contingencies for such financial penalties would have a material adverse impact on CNO's future results of operations and financial condition. CNO however, violated CPC 25 by failing to accrue a provision, with a simultaneous charge against income, in its publicly disseminated interim and annual 2009 through 2015 financial statements for the foreseeable and estimable material financial obligations arising from its ongoing illegal bribery scheme.

### 2.     CNO Failed to Disclose the Nature and Range of the Foreseeable, Expected Costs that Would Likely Be Incurred as a Result of Defendants' Bribery Scheme

54.     Defendant CNO improperly failed to disclose in the notes to its 2009 through 2015 publicly disseminated interim and annual financial statements the nature of its illegal bribery scheme, along with the clearly foreseeable and estimable expected financial costs that would likely be incurred to settle the legal and financial consequences of this conduct, as required by Brazilian GAAP.

55.     In addition to requiring the accrual of a "provision" in the financial statements by a charge against income for defendants' estimated legal penalties, fines and costs associated with the illegal bribery scheme as described in ¶5 above, Brazilian GAAP, including CPC 25, ¶¶84-85, also requires a separate disclosure be made describing the provision in the notes to the financial statements.  The disclosure must include: (1) a brief description of the nature of the provision or contingent liability, including an expected timeline during which disbursement will be made to settle

- 22 -

the obligation; and (2) an indication of any uncertainties related to the value or amount of settlement of the liability, including the main assumptions adopted relating to future events.

56.     Notably, even if an entity accrues no provision because it does not believe a current or past event or conduct has risen to the level of creating a present obligation, or the entity cannot create a sufficiently reliable estimate of the future disbursement necessary to settle an obligation, CPC 25, ¶¶86-89, still requires disclosure of the "contingent liability" in the notes to the financial statements.  Such disclosure includes a brief description of the nature of the contingent liability, the estimate of its financial effect, and an indication of any uncertainties related to value or timing of any anticipated disbursement to settle the claim.  CNO however, violated CPC 25 by failing to disclose any information regarding the corruption scheme or the likely legal and associated financial impact of its illegal bribery scheme in any of its publicly disseminated financial statement footnotes for interim or annual periods from 2009 through 2015.

> **3.     CNO Improperly Failed to Separately Distinguish and Disclose Contract Revenue Obtained as a Result of Its Massive Illegal Bribery Activity from Other Contract Revenue**

57.     Defendant CNO improperly failed to separately present or disclose the material amounts of foreign and domestic contract revenue it obtained as a result of its illegal corruption and bribery activities from its normal recurring contract revenue.  As alleged herein, defendants found it necessary to provide material amounts of illegal bribes in order to secure many of the lucrative contracts CNO was awarded.  Moreover, a probable consequence of the discovery of these bribes could (and did) lead to particular governments or governmental agencies restricting further contract work for CNO.

58.     Brazilian GAAP, including the CPC-00, *Conceptual Structure for the Preparation and Presentation of the Financial Statements*, states that it is common practice to present and disclose different types of revenue separately in order to assist investors in assessing the ability of a

business to generate cash in the future and distinguish revenues that arise in the normal course of the entity's business from revenues stemming from contingent activities that may not be repeated on a regular basis.

59.     It would have been highly material to investors, analysts and rating agencies in assessing CNO's ability to generate future cash flows to have understood that a material portion of the company's contract revenue had been secured through corruption and illegal bribes.  As such, investors, analysts and rating agencies would not necessarily have expected contract revenue levels obtained via fraudulent means to represent a reliable level of future revenue.  By failing to separately classify or disclose contract revenues obtained via bribes and corruption, CNO violated Brazilian GAAP.

> **4.     CNO Improperly Failed to Recognize, Classify or Adequately Disclose Material Amounts of Concealed Funds and Illegal Bribes**

60.     Defendant CNO improperly failed to recognize, classify or adequately disclose material amounts of concealed, illegal expenses for the hundreds of millions of dollars in illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on particular material contracts.  By concealing these costs and keeping the funds to pay them off-books, as alleged at ¶¶22-25, CNO violated Brazilian GAAP, including the CPC's *Basic Conceptual Pronouncement CPC 00, and CPC 17, Construction Contracts*, which require that assets and expenses directly associated with generating particular contract revenue must be reflected in the books and records of the entity and must be simultaneously recognized in the income statement in the same period as the revenue.  Given the material nature of these illegal expenses, Brazilian GAAP also required disclosure of such illegal expenses in the notes to the financial statements.  CNO violated Brazilian GAAP by concealing these funds and expenses "off-books," and by failing to disclose the practice in the notes to the financial statements.

61.     Defendants' improper accounting and lack of disclosure described in ¶¶51-60 above caused the CNO consolidated financial statements, among others from 2009 to 2016, referenced below to be false and misleading.

### E.     False Financial Statements Included in Defendants' 7.125% Notes Offering Memorandum

#### 1.     CNO's 2009 and 2010 Annual Consolidated Financial Statements

62.     Defendant CNO's annual financial statements for the year ended December 31, 2010, originally dated March 2011, were included in the 7.125% Notes offering memorandum and made available to Plaintiff, investors, analysts and ratings agencies, including on defendant CNO's website.  These financial statements reported revenues of more than $9.7 billion and net income of more than $734 million for the year ended December 31, 2010, and included a re-presentation of the 2009 annual financial statements for comparative purposes.

63.     The 2009 and 2010 reported financial statements were materially false and misleading when issued because, as described above at ¶¶51-60, defendants: (1) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (2) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (3) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

#### 2.     CNO's 2011 Annual Consolidated Financial Statements

64.     Defendant CNO's annual financial statements for the year ended December 31, 2011, originally dated March 6, 2012, were included in the 7.125% Notes offering memorandum and made

available to Plaintiff, investors, analysts and ratings agencies, including on defendant CNO's website. These financial statements reported revenues of more than $11.4 billion and net income of more than $489 million for the year ended December 31, 2011. The 2011 annual financial statements also included a re-presentation of the 2010 annual financial statements for comparative purposes.

65.     These reported 2011 and 2010 annual financial statements were materially false and misleading when issued because, as described above at ¶¶51-60, defendants: (1) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (2) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (3) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

66.     The notes to the December 31, 2011 annual financial statements also misleadingly described the status of CNO's credit ratings by the main credit rating agencies:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

67.     This disclosure was materially false and misleading when made in that it omitted and failed to disclose that the "consecutive upgrades" that defendant CNO touted were achieved only by concealing defendants' bribery scheme from the ratings agencies. Had the ratings agencies been aware of the existence and the extent of defendants' bribery scheme, and the amount of revenues and net income that were directly attributable to this scheme, CNO would never have obtained the disclosed "consecutive upgrades" and, in fact, would have been downgraded significantly, as

demonstrated by the sharp downgrades defendant CNO later received when its bribery scheme was made public.

### 3.    CNO's First Quarter 2012 Consolidated Interim Financial Statements

68.    Defendant CNO's interim quarterly consolidated financial statements for the three months ended March 31, 2012 were included in the 7.125% Notes offering memorandum and made available to Plaintiff, investors, analysts and ratings agencies, including on defendant CNO's website.  These financial statements reported revenues of more than $2.9 billion and net income of more than $205 million for the quarter ended March 31, 2012.  The first quarter 2012 quarterly financial statements also included a re-presentation of the first quarter 2011 financial statements for comparative purposes.

69.    These reported first quarter 2012 and 2011 interim quarterly financial statements were materially false and misleading when issued because, as described above at ¶¶51-60, defendants: (1) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (2) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (3) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

F.    **False Financial Statements Included in Defendants' Offering Memoranda for the 4.375% Notes and 8.25% Notes**

1.    **CNO's 2010 and 2011 Annual Consolidated Financial Statements**

70.    Defendant CNO's annual financial statements for the years ended December 31, 2010 and 2011, described in ¶¶64-67 above, were also included in the 4.375% and 8.25% Notes' offering memoranda and made available to Plaintiff, investors, analysts and ratings agencies, including on defendant CNO's website.  These financial statements were materially false and misleading when republished in the 4.375% and 8.25% Notes offering memoranda for the same reasons set forth in ¶¶64-67 above.

2.    **CNO's 2012 Annual Consolidated Financial Statements**

71.    Defendant CNO's annual financial statements for the year ended December 31, 2012 were included in the 4.375% and 8.25% Notes offering memoranda and made available to Plaintiff, investors, analysts and ratings agencies, including on defendant CNO's website.  These financial statements repeated revenues exceeding $14 billion for 2012, and net income of $457 million.  The 2012 annual financial statements also included a re-presentation of the 2011 annual financial statements for comparative purposes.

72.    These reported 2012 and 2011 annual financial statements were materially false and misleading when issued because, as described above at ¶¶51-60, defendants: (1) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (2) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity, from other contract revenue, in violation of  Brazilian GAAP; and (3) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal

bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

73.     The notes to CNO's 2012 consolidated the financial statements also disclosed ratings upgrades and investment grade credit ratings from each of the three major ratings agencies:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.
>
> . . . In May 2012, the rating agency Standard & Poor's assigned a BBB-rating on a global scale and a and br AAA on the national scale.

74.     The footnote pointed out that CNO had now secured investment grade ratings from all three major credit rating agencies.  This disclosure was materially false and misleading when made in that it omitted and failed to disclose that the "consecutive upgrades" to investment grade ratings that CNO touted were achieved only by concealing defendants' bribery scheme from the ratings agencies.  Had the ratings agencies been aware of the existence and the extent of defendants' bribery scheme, and the amount of revenues and net income that were directly attributable to this scheme, CNO would never have obtained the disclosed "consecutive upgrades" and, in fact, would have been downgraded significantly, as demonstrated by the sharp downgrades defendant CNO later received when its bribery scheme was made public.

**G.     False Financial Statements Included in Defendants' Offering Memorandum for the 5.25% Notes**

**1.     CNO's 2011 and 2012 Annual Consolidated Financial Statements**

75.     Defendant CNO's annual financial statements for the years ended December 31, 2012 and 2011, described in ¶¶64-67, 71-74 above, were also included in the 5.25% Notes' offering memorandum and made available to Plaintiff, investors, analysts and ratings agencies, including on defendant CNO's website.  These financial statements were materially false and misleading when

republished in the 5.25% Notes' offering memorandum for the same reasons set forth in ¶¶64-67, 71-74 above.

## 2.    CNO's 2013 Annual Consolidated Financial Statements

76.    Defendant CNO's annual financial statements for the year ended December 31, 2013, originally dated February 28, 2014, were included in the 5.25% Notes offering memorandum and made available to Plaintiff, investors, analysts and ratings agencies, including on defendant CNO's website.  These financial statements reported revenues of more than $13.7 billion for the year, and net income of more than $723 million.  The 2013 annual financial statements also included a re-presentation of the 2012 annual financial statements for comparative purposes.

77.    These reported 2013 and 2012 annual financial statements were materially false and misleading when issued because, as described above at ¶¶51-60, defendants: (1) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (2) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of  Brazilian GAAP; and (3) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

78.    The notes to the 2013 annual financial statements also described CNO's credit ratings by the main credit rating agencies:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

> In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and Aa1.br on the Brazilian national scale.  In May 2012, the rating agency Standard & Poor's assigned

a BBB- rating on the global scale and br AAA on the national scale.  In September 2013, the rating agency Fitch Ratings assigned a BBB investment grade rating on the global scale and AAA on the Brazilian national scale.

79.     These disclosures were materially false and misleading in that they omitted and failed to disclose that the ratings touted by CNO were achieved only by concealing defendants' bribery scheme from the ratings agencies.  Had the ratings agencies been aware of the existence and the extent of defendants' bribery scheme, and the amount of revenues and net income that were directly attributable to this scheme, CNO would never have obtained the disclosed "consecutive upgrades" and, in fact, would have been downgraded significantly, as demonstrated by the sharp downgrades defendant CNO later received when its bribery scheme was made public.

### 3.     CNO's First Quarter 2014 Consolidated Interim Financial Statements

80.     CNO's financial statements for the three-month period ended March 31, 2014 were included in the 5.25% Notes offering memorandum and made available to Plaintiff, investors, analysts and ratings agencies, including on defendant CNO's website.  CNO's March 31, 2014 financial statements reported revenues of more than $3.1 billion and net income of more than $302 million for the quarter ended March 31, 2014.  The first quarter 2014 quarterly financial statements also included a re-presentation of the first quarter 2013 financial statements for comparative purposes, which reported revenues of more than $2.8 billion and net income of more than $467 million for the quarter ended March 31, 2013.

81.     These first quarter 2014 and 2013 interim financial statements were materially false and misleading when issued because, as described above at ¶¶51-60, defendants: (1) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (2) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their

massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (3) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

82.    The Notes to CNO's first quarter 2014 financial statements also described CNO's credit ratings by the main credit rating agencies:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

> In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and Aa1.br on the Brazilian national scale. In May 2012, the rating agency Standard & Poor's assigned a BBB- rating on the global scale and br AAA on the national scale. In September 2013, the rating agency Fitch Ratings assigned a BBB investment grade rating on the global scale and AAA on the Brazilian national scale. In May 2014, the rating agency Standard & Poor's upgraded Company's Credit Risk from BBB- to BBB on the global scale, maintaining the br AAA on the national scale.

83.    These disclosures were materially false and misleading in that they omitted and failed to disclose that the credit ratings touted by defendant CNO were achieved only by concealing defendants' bribery scheme from the ratings agencies.  Had the ratings agencies been aware of the existence and the extent of defendants' bribery scheme, and the amount of revenues and net income that were directly attributable to this scheme, CNO would never have obtained the disclosed "consecutive upgrades" and, in fact, would have been downgraded significantly, as demonstrated by the sharp downgrades defendant CNO later received when its bribery scheme was made public.

### H.    Defendants' Repeated Denials and Fraudulent Concealment of Their Kickback and Bribery Scheme

84.    The police investigations into political corruption and bribery that came to be known as Operation Car Wash initially focused on Brazil's semi-public oil company, Petrobras.  As part of defendants' obstructionist activities to fraudulently conceal their role in the matters under

investigation, as detailed in ¶¶33-34, defendants repeatedly denied in public statements any part in illegal activities or wrongdoing by their employees.  As a result, Plaintiff and other investors were not aware of the true nature and scope of defendants' illegal activities until the revelation of Odebrecht's Plea Agreement in December 2016.

85.    On June 19, 2015, the same day Brazilian police arrested Marcelo Odebrecht (the former CEO of Odebrecht), defendant CNO issued a statement calling related warrants "unnecessary," since "the company and its executives have always been available to the authorities to cooperate with the investigation since the beginning of the operation Lava Jato."  This press release was false and misleading because, as CNO was aware, defendants and their employees had not been cooperating with, and, in fact were seeking to obstruct, the investigation, including by: (i) directing employees to delete records that might reveal illegal activities and to move certain illicit operations overseas in order to evade detection; (ii) making multi-million dollar payments to a governmental official in Antigua in order to prevent documents that would prove Odebrecht's guilt from being provided to international authorities; and (iii) intentionally destroying encryption keys necessary to access evidence stored in defendants' email system.

86.    Three days later, on June 22, 2015, defendant Odebrecht issued a press release to "express[] its indignation" at the arrest of Marcelo Odebrecht and other executives, claiming that his arrest was "illegal" and "completely unnecessary":

> The Odebrecht Group, for respecting for its Clients, Partners, Investors, Financial Institutions, Suppliers, Users of its Services, Friends and Team Members, hereby expresses its indignation at the arrest of five of its executives and the search and seizure warrants served last Friday (June 19) at some of our subsidiaries as part of the 14th stage of Operation Lava Jato ("Car Wash"; a Brazilian corruption scandal involving alleged payoffs and the state-owned oil giant Petrobras).

> The court order approving the arrest of our executives and the search and seizure warrants demonstrates that, since the beginning of Lava Jato over a year ago, the Federal Police have not presented, as alleged in the court order, any new evidence

that justifies the forceful measures taken, which *were completely unnecessary and for that very reason, illegal*.

87.      The June 22, 2015 press release continued by claiming that the only information marshalled by authorities "reflects a clear misinterpretation of the facts," and provided a detailed refutation claiming the evidence showed innocent conduct.  The release also defended Odebrecht's internal investigation and cooperation with authorities, and cast the Company as the victim of overzealous prosecutors who had violated the law, stating in pertinent part:

> Furthermore, the statement in the court order that Odebrecht Group companies did not conduct an internal investigation of the alleged irregularities **is completely untrue**.  All of our companies have and apply a **Code of Conduct and a Compliance System that are effective and widely publicized**, completely aligned with Brazilian and international anti-corruption legislation.  An example of this practice was Braskem´ publication of a Material Fact notice on April 2, 2015.

> Regarding payments allegedly made by Constructora Internacional del Sur, Odebrecht reiterates that none of its subsidiaries have or have ever had any ties with or made any payment to that company.

> Odebrecht denies having participated in any cartel.  **There are no cartels in the contracting process, which is controlled entirely by the client**, as is the case with Petrobras, which has always set its own budgets and standards for technical-financial assessment and performance.

> In addition, the **Odebrecht Group never hindered the investigations in any way**.  To the contrary, its executives have always made themselves available to authorities to provide any clarifications. In fact, four of the five arrested executives had traveled to the headquarters of the Federal Police in Brasília and provided testimony in the course of the Lava Jato investigations conducted by the Superior Court of Justice and the Federal Supreme Court. They have also furnished all requested documents and formally offered to testify before the Federal Court in the State of Paraná – **testimony that they were never invited to provide, but which certainly would have clarified all of the points raised**.

> Although we are deeply perplexed and indignant regarding what has occurred, we will not stop fighting. Our business model, based on principles of delegation and decentralization, ensures that our 15 business areas and over 100 subsidiaries, are fully and independently led by our executives and their teams, and will continue to operate normally to fulfill our obligations, as we have always done in a manner as has been recognized during our more than 70-year history, half of which includes international operations.

This is our commitment to our Clients, Partners, Investors, Financial Institutions, Suppliers, the Users of our Services and the Communities in the 21 countries where we operate. We maintain our strong conviction that our more than 160,000 Members will remain even more united by our corporate culture and by the bonds of trust that unite us, maintaining their pride to be part of the Odebrecht Group.

Finally, at this time, we express our unrestricted solidarity and **support for the families of our executives who unjustly have lost their constitutional right to freedom**. We will continue to work together in defense of our Team Members, and will continue to be even more available to the authorities, cooperating fully so that all of these issues are clarified quickly, convinced that the truth will come out and that justice will prevail, because we believe that the recent events resulted from misinformation and misinterpretation.

(Emphasis in original.)

88.     These statements were materially false and misleading when made because defendants had, in fact: (i) attempted to impede the investigations, as detailed in ¶¶33-34; (ii) conspired to rig the market for public works contracts; and (iii) perpetrated a massive bribery and kickback scheme as a central component of their business.

89.     On June 24, 2015, defendant Odebrecht issued another press release to once again "express[] its indignation," this time claiming that its CEO Marcelo Odebrecht did not direct employees to delete records that might reveal Odebrecht's illegal activities:

> ***Therefore there is nothing in Marcelo Odebrecht's note to suggest that any illegality has been committed.***  Besides being uncharacteristic of the executive, it would make no sense to suggest "destroying" (not the contents, as intended, but literally, as interpreted the police authority) emails that were seized during the operation conducted in November 2014, which were widely investigated and made public.  Destroying something that is already in the custody of the PF and Judge Sergio Moro makes no sense.  In other words, the term "destroy" must have a different meaning.
>
> Finally, Odebrecht regrets that an attempt was made to create a procedural issue regarding an expression that was clearly taken out of context.  Through a petition and personal contact, the company's lawyers have attempted to show the police that it makes no sense to raise suspicions about the subject, but unfortunately they have opted to publicize it and lend a whiff of scandal to a note that merely contains a client's instructions to his lawyers – thereby violating the [confidential] relationship that the law guarantees to all Brazilian citizens.

- 35 -

90.     Defendant Odebrecht issued a second press release on June 24, 2015, entitled "Note of Clarification," which maintained that Marcelo Odebrecht's arrest was "manifestly illegal" and that Odebrecht had not attempted to impede the ongoing investigations against it:

> Odebrecht would like to clarify that there are false rumors circulating that its executives have threatened authorities and public officials, as well as the future of the Brazilian Republic, in response to the investigations of Operation Lava Jato ["Car Wash"; a Brazilian corruption scandal involving payoffs and the state-owned oil giant Petrobras].

> It is **untrue**, for example, that the CEO of Odebrecht SA, Marcelo Odebrecht, linked the future "of the Republic" to the arrest warrant issued against him, a warrant this manifestly illegal.

> Similarly, it is also a **complete fiction** that the Chairman of the Board of Directors of Odebrecht SA, Emílio Odebrecht, warned that more cells would be required to hold politicians whom he would denounce in Brazil and abroad.

> ***The Odebrecht Group and its executives have never hindered the ongoing investigations in any way and have always been available to the authorities to provide information***.  Odebrecht remains at the authorities' disposal to help ensure that these matters are cleared up quickly, convinced that the truth will come out and that justice will prevail.

91.     Similarly, on July 16, 2015, defendant Odebrecht issued a statement that Marcelo Odebrecht's attorneys had acted with "transparency" and in "good faith," and that the police interpretation of a note sent by Marcelo Odebrecht "is completely wrong."  The next day, Odebrecht issued another press release stating, "Since the investigation involving Odebrecht began in October of last year, the group's managers and employees have always put themselves at the authorities' disposal to shed light on the facts being investigated."

92.     On July 21, 2015, defendant Odebrecht issued a press release stating that the police's "distorted interpretations of [Marcelo Odebrecht's] personal notes . . . were taken out of context and are so anachronistic that they are completely illogical."   The release continued: "Odebrecht especially repudiates the intent of attributing to the CEO of its holding company alleged intentions inferred through speculative reasoning with the clear objective of extending his imprisonment,

which, like that of the other executives who work or formerly worked at Odebrecht, is completely illegal and abusive."

93.    On July 24, 2015, Odebrecht issued a press release once again claiming that Marcelo Odebrecht's detention was unjustified and illegal:

> Odebrecht considers that the charges filed today by the Federal Prosecution Office (MPF) of the state of Paraná mark the starting point of the work of the defense. Now the legal counsel can discover the allegations made against the executives under investigation and analyze the set of documents presented by the prosecution, which will finally enable the due exercise of the right to defense.

> However, the allegations made this afternoon by the MPF in such a way as to scandalously capture the media spotlight do not justify, under any circumstances, the continuation of the arbitrary and illegal detention of the chief executive officer of the Odebrecht Group, Marcelo Odebrecht, and of four former executives. Much less does it justify the surprising declaration of a new preventive detention, revoking the previous one, in a clear move to annul the effects of the petition for habeas corpus filed at the Superior Court of Justice (STJ).

94.    The statements in ¶¶89-93 were materially false and misleading when made, as defendants had, in fact, attempted to impede the investigations, as detailed in ¶¶33-34.

95.    On July 28, 2015, defendant Odebrecht issued a press release admitting that CNO's offices and the home of one of its executives had been searched by authorities, but falsely claimed that it "has never taken part in offering or paying kickbacks for contracts with any public or private client":

> Construtora Norberto Odebrecht clarifies that it was the target of a search and seizure procedure at its head offices in Rio de Janeiro this morning (Tuesday, July 28, 2015) and at the home of one of its executives, which was conducted coercively, in order to make a deposition at the Federal Police offices in Rio de Janeiro.

> All of our executives and the company have always been available to the authorities to provide clarification and present documents within the domain of Operation Lava Jato ["Car Wash"] investigations, with the measures adopted on this date being unjustifiable.

> ***CNO reaffirms that it has never taken part in offering or paying kickbacks for contracts with any public or private client***, which obviously includes

Eletronuclear. Therefore, it does not acknowledge the allegations made by a whistle blower as true, which were made in order to obtain his freedom, on account of a pre-trial detention, and does not have any commitment to the truth.

96.     On October 5, 2015, defendant Odebrecht issued a press release stating that internal emails released by police that had been portrayed in a negative light by news media in Brazil "are merely a record of the company's legitimate and natural institutional activities and its participation in debates on strategic projects for the country – in the countries in which it operates, especially as an investor."

97.     On October 30, 2015, defendant Odebrecht issued a press release maintaining that it was "absolutely clear" that Marcelo Odebrecht was innocent and that his imprisonment was "absolutely illegal," stating in pertinent part:

> Marcelo Odebrecht testified today to provide clarifications to the judge regarding accusations against him made by the Federal Prosecutor's Office of Paraná (MPF-PR).
>
> In a written statement to the judge, ***Marcelo vehemently refuted the allegations made by the prosecution. After all the evidence and testimony were collected, it was absolutely clear that Marcelo had no involvement whatsoever in the facts stated by the prosecution***.
>
> When asked by the Federal Prosecutor's Office and the judge in charge of the case, none of the "informants" and witnesses brought by the prosecution reported any participation by Marcelo in the alleged irregularities.
>
> Furthermore, Marcelo regretted the absolutely illegal imprisonment he has been subjected to for more than 130 days. There are no subsisting grounds for this extreme measure restricting his freedom.
>
> In fact, all the allegations that served as grounds for Marcelo's arrest have already been disproved:
>
> •  An alleged deposit in Barusco's account, denied by the task force itself;
>
> •  An email between the company's executives, which was fully clarified in Pedro Barusco's testimony to the same judge yesterday;

- 38 -

- And the notes made by Marcelo for himself, which do not constitute a crime but are merely absolutely personal observations on matters that Marcelo learned about through the media.

As such, ***we are confident of not only his acquittal in this criminal proceeding*** but also the repeal of his detention through the writ of habeas corpus, which is awaiting the decision of the Superior Court of Justice.

98.    On November 13, 2015, defendant Odebrecht issued a press release consisting of a notice that it had published in various newspapers that day.  This notice again forcefully maintained defendants' innocence:

**Odebrecht Notice**

Odebrecht voices its indignation with the undue exposure of its team members and those that maintain relations with the company due to the many leaks of documents, personal data and confidential information extracted from the investigation involving some of its executives or former executives.

***During the course of this investigation, many of these incomplete documents, data and information, often lacking context, have been released to the media in a distorted and mystifying manner, confusing the public opinion, generating erroneous conclusions and raising unfounded suspicions of facts and people that have no relation to Operation Car Wash.***

Recent news on donations by Construtora Norberto Odebrecht to Fundação iFHC is a clear example of this regrettable and abusive practice that has become a routine part of this investigation, despite formal complaints to competent authorities in an effort to stem their occurrence.

***Reports from the investigation that were presented with the pretext of revealing suspicious acts are nothing more than bank extracts of donations by the Odebrecht group company to the Foundation in question in the form of institutional support.***

The fact that Construtora Norberto Odebrecht provided support to Fundação iFHC, as well as other institutions in Brazil and overseas, is no secret, and is in fact a part of the institutional policy of the Odebrecht Group.  ***Both Construtora Norberto Odebrecht and the entities it supports always confirm these relations as a legitimate and common practice among dozens of other companies.***

***Odebrecht deplores the illegitimate exposure to which it continues to be exposed and the inconveniences caused to people affected by these clearly illegal leaks***, which have no other objective than to expose the Odebrecht group and its team members to public shaming, fostering an unfavorable public opinion of the group, its

executives and former executives currently under criminal investigation within Operation Car Wash.

Odebrecht hopes that level heads prevail in leading the investigation and the respect of the rights and guarantees of all citizens, including those under investigation, is unconditional.

99.     On December 10, 2015, Odebrecht issued a press release entitled "Marcelo Odebrecht formally resigns from Odebrecht S.A." This press release announced that Marcelo Odebrecht had formally resigned from his post as CEO of the Company, but continued to maintain his innocence:

After 6 months in detention and given the developments in his court case, Marcelo Odebrecht yesterday decided to formally resign from his post as President and CEO of Odebrecht S.A., as well as the chairmanship of Braskem, Odebrecht Oil & Gas, Odebrecht Real Estate Developments and Odebrecht Environmental.

The Board of Odebrecht S.A. has officialized the appointment of Newton de Souza, who will continue as President and CEO of Odebrecht S.A. and Chairman of the abovementioned companies.

Odebrecht believes that Marcelo's unjust and unnecessary preventive detention will be revoked, which will enable him to devote himself to his family and concentrate on his defense. *Odebrecht has full confidence that at the end of the current legal proceedings, Marcelo Odebrecht's innocence will be officially recognized*.

100.    The statements in ¶¶95-99 were materially false and misleading when made because defendants had, in fact, committed illegal acts, including: (i) attempting to impede the investigations, as detailed in ¶¶33-34; (ii) conspiring to rig the market for public works contracts; and (iii) perpetrating a massive bribery and kickback scheme as a central component of their business.

101.    Defendants' campaign of misinformation was successful in that it prolonged the concealment of their fraud and their role in the bribery and kickback scheme several months after the existence of Operation Car Wash and allegations of potential misconduct involving Odebrecht employees began to be publicly disclosed. Even fixed-income analysts who specialized in evaluating the performance and risks associated with Odebrecht debt remained misled by defendants' misrepresentations and denials. For example, on September 14, 2015, UBS fixed

income analysts issued a research report on Odebrecht's debt titled "Defusing concerns." The report maintained a stable outlook on bonds issued by the Company, such as the Notes, noting that management was "refuting key concerns" and CNO continued to produce "[s]trong results."

## VI.  SUBSEQUENT DISCLOSURES CONFIRM DEFENDANTS' FRAUDULENT SCHEME

102.    On December 1, 2016, Odebrecht finally issued a press release entitled "Odebrecht Apologizes for its Mistakes," belatedly admitting its misconduct and the falsity of its prior denials:

> Odebrecht acknowledges its participation in illicit actions in its business activities.

> It does not matter that we gave in to external pressure.  Nor is it relevant that there are behaviors that the private and public sectors must resist and correct in their relationships.

> What matters is that we acknowledge our involvement.  We were complicit and did not fight these practices, as we should have.

> This was a grave error.  We violated our own principles and transgressed against the values of honesty and ethics.

> We will not let this happen again.

> Odebrecht apologizes, particularly for its failure not to have acted sooner.

> Odebrecht's ability to manage and execute that is recognized by our clients, the competency and commitment of our professionals, and the quality of our products and services should have been the basis for avoiding these mistakes.

> Odebrecht has learned from these mistakes and is evolving.

> We are committed, with great conviction, to reform.

103.    On December 21, 2016, defendant Odebrecht entered into a Plea Agreement with the United States Attorney for the Eastern District of New York.  Pursuant to the Plea Agreement, Odebrecht: (i) pleaded guilty to violating the anti-bribery provisions of the FCPA; (ii) agreed to an independent compliance monitor to oversee its operations; and (iii) agreed to pay a criminal penalty of $2.6 billion as part of the largest anti-bribery resolution in history.

104.    The Plea Agreement also included a 23-page "Statement of Facts" outlining the scope and nature of defendants' bribery and kickback scheme.  Defendant Odebrecht stipulated and agreed that the entire Statement of Facts is true and accurate:

> The following Statement of Facts is incorporated by reference as part of the Plea Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Eastern District of New York (the "EDNY") and the defendant Odebrecht S.A. ***Odebrecht S.A. hereby agrees and stipulates that the following information is true and accurate***.  Odebrecht S.A. admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.

105.    Defendant Odebrecht further agreed that it would not challenge any portion of the Statement of Facts in any public statement, including this or any other court proceedings:

> ***The Defendant expressly agrees that it shall not***, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant to ***make any public statement, in litigation or otherwise***, contradicting the acceptance of responsibility by the Defendant set forth above, or the facts described in the Information and the Statement of Facts. . . . The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the Statement of Facts ***provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts***.

106.    The Statement of Facts provided significant detailed information regarding defendants' bribery and kickback scheme.  Specifically, defendants, together with their co-conspirators, knowingly and willfully conspired and agreed with others to provide hundreds of millions of dollars in illegal payments to political candidates and parties to secure an improper advantage in order to obtain and retain business in various countries around the world.  In total, defendants paid approximately ***$788 million*** in bribes in association with 100 projects in 12 countries in exchange for ill-gotten benefits of approximately ***$3.336 billion***.

107.    In Brazil, defendants were behind approximately $349 million in bribes paid to various government officials and political parties to secure lucrative public construction contracts.

In return, defendants obtained financial benefits exceeding $1.9 billion from the illicitly obtained construction contracts.

108.    For example, defendants (through CNO's Division of Structured Operations) made payments totaling more than $20 million to several Brazilian officials, including a high-level elected official in Brazil, in exchange for their assistance in ensuring defendants' continued work on a large public transportation project in Brazil.  Defendants profited by approximately $184 million from this project.

109.    Similarly, between 2011 and 2014, defendants (through CNO's Division of Structured Operations) paid bribes of approximately $9.7 million to a "high-level official within the legislative branch of government in Brazil" in exchange for that official's assistance in securing the continuation of a construction project in Rio de Janeiro, from which defendants profited by approximately $142 million.

110.    In addition, the Statement of Facts also set forth, in great detail, hundreds of millions of dollars in bribes paid to officials of the following countries outside of Brazil, which reveals the global extent of the bribery and kickback scheme and the fact that defendant CNO's entire global operations were threatened and may not be sustainable:

- *Angola*.  Between 2006 and 2013, defendants paid more than $50 million in bribes to government officials in Angola in order to secure public works contracts. Defendants realized benefits of approximately $261.7 million as the result of these bribes.

- *Argentina*.  Between 2007 and 2014, defendants paid more than $35 million in bribes (directly and indirectly) from defendant CNO's Division of Structured Operations to government officials in Argentina related to at least three public infrastructure projects for which defendants were awarded contracts, resulting in approximately $278 million in benefits to defendants.

- *Colombia*.  Between 2009 and 2014, defendants (through defendant CNO's Division of Structured Operations) paid more than $11 million in bribes to government officials that illicitly caused defendants to be awarded public construction contracts generating more than $50 million in revenues to defendants.

- ***The Dominican Republic***.  Between 2001 and 2014, defendants paid more than $92 million in bribes to government officials and intermediaries working on their behalf to secure public construction contracts in the Dominican Republic, thereby obtaining illicit benefit of more than $163 million.

- ***Ecuador***.  Between 2007 and 2016, defendants paid more than $33.5 million in bribes to government officials in Ecuador, realizing benefits of more than $116 million.

- ***Guatemala***.  Between 2013 and 2015, defendants paid approximately $18 million in bribes to government officials in Guatemala, including an $11.5 million payment to a governmental official representing a percentage of the value of a governmental construction contract the official steered to defendants in exchange for the bribe.

- ***Mexico***.  Between 2010 and 2014, defendants paid corrupt Mexican government officials approximately $10.5 million in bribes in order to secure public works contracts, including a $6 million bribe to an official of Pemex, Mexico's state-owned petroleum company, in exchange for the official's assistance in winning a contract. Defendants received benefits of more than $39 million from these bribes.

- ***Mozambique***.  Between 2011 and 2014, Odebrecht paid approximately $900,000 in bribes to government officials in Mozambique.

- ***Panama***.  Between 2010 and 2014, defendants paid more than $59 million in bribes to Panamanian government officials, obtaining contracts worth more than $175 million from these bribes.

- ***Peru***. Between 2005 and 2014, defendants paid approximately $29 million in bribes to government officials in Peru, receiving benefits of more than $143 million in return.

- ***Venezuela***.  Between 2005 and 2016, defendants paid approximately $98 million in bribes to Venezuelan officials in order to obtain and retain public works contracts.

111.    The Statement of Facts also described the lengths that defendants went to in order to try and hide their misconduct.  For example, after defendants became aware of the investigations being performed by Brazil, the United States and Switzerland, they sought to conceal or destroy evidence of their criminal activities, including by directing Odebrecht employees to delete records that might reveal illegal activities.

112.    Similarly, in or about mid-2015, an executive of the Division of Structured Operations within defendant CNO attended a meeting in Miami, Florida with a government official

from Antigua and an intermediary. In order to conceal defendants' corrupt activities, the executive agreed to pay the government official a bribe of $4 million to refrain from providing various banking documents to international investigators that would have contained evidence of the bribery and kickback scheme. Thereafter, another employee of the Division of Structured Operations made three payments of one million Euros to secure this corrupt deal.

113.    Further, in January 2016, after Lava Jato and the investigations by the United States and Swiss authorities were well known to defendants, employees and/or agents of defendants intentionally destroyed physical encryption keys that were needed to access the MyWebDay system, which contained evidence relating to the bribery and kickback scheme.

114.    Following revelations in the Plea Agreement that defendants' kickback and bribery scheme had extended across Odebrecht's business operations in several countries in Central and South America and Africa, authorities launched and/or intensified numerous investigations in those countries in early 2017. By mid-2017, prominent politicians, including several former heads of state, were under investigation in connection with the corruption scandal, even as authorities in Brazil continued to broaden the corruption probe and make numerous high-profile arrests and indictments there.

115.    On September 14, 2017, the BBC published an exposé on the Odebrecht scandal entitled "Politicians worldwide suspected as bribery scandal unfolds." According to the article, politicians under investigation or implicated in the scandal included almost a third of Brazil's government ministers, two ex-presidents of Peru, the current president of Venezuela, the president of Panama, the vice president of Ecuador, the prime minister of Antigua and Barbuda, and the former vice-minister of transport for Colombia, among many others. The Company has also been forced to forfeit contracts in a number of countries, been barred from doing business in others, and has been

asked to pay tens of millions of dollars in compensation.  In addition, the Company has lost more than half of its workforce and its revenues have plummeted by 35% since the scandal began.

## VII.    LOSS CAUSATION

116.    As detailed herein, defendants engaged in a scheme to deceive Plaintiff and the market and a course of conduct that artificially inflated the price of the Notes and operated as a fraud or deceit on Plaintiff by failing to disclose and misrepresenting the adverse facts detailed herein.

117.    Defendant CNO's reported financial results and future business prospects were based upon its illicit (and undisclosed) business plan of widespread bribery of public officials in exchange for lucrative public construction contracts.

118.    Throughout the period during which Plaintiff purchased its Notes, the prices of these securities were artificially inflated as a result of defendants' materially false and misleading statements and omissions as alleged herein.  Defendants' false and misleading statements and omissions had the intended effect and caused the Notes to trade at artificially inflated prices during the period in which Plaintiff purchased the Notes.  The Notes could not have been issued, or would have been sold at dramatically lower prices had investors been aware of defendants' bribery scheme.

119.    Because Plaintiff was unaware that defendants' representations identified above were false and misleading (and that defendants omitted to disclose that their financial results were achieved through a widespread bribery scheme), Plaintiff paid an artificially inflated and unreasonable price for its purchases of the Notes.

120.    The truth behind defendants' various false statements and material omissions was gradually revealed to the market in a series of corrective disclosures, causing Plaintiff to suffer enormous losses.  The following non-exhaustive examples of partial corrective disclosures caused the price of the Notes to decline sharply in value as the prior artificial inflation came out of the Notes:

(a)     Initial Disclosures Regarding International Bribery.  On February 23, 2016, news sources reported the shocking news that defendants' bribery scheme appeared not to be confined to Brazil, but that defendants had apparently also sought to bribe public officials in Peru and Argentina.  This was the first indication that defendants' bribery scheme was not limited to Brazil, but may have also impacted their international contracts.  In response, the market price of the 5.25% Notes purchased by Plaintiff dropped in value by over 8.2%.  Similarly, the market price of the 7.125% Notes purchased by Plaintiff decreased by over 5%.  Also in reaction to the news, the market price of the 4.375% Notes that had been purchased by Plaintiff declined by over 3.3%.

(b)     Odebrecht Downgraded by Fitch.  On March 1, 2016, credit rating agency Fitch Ratings Inc. ("Fitch") devalued the Notes by downgrading Odebrecht debt, including the Notes, to BB from BBB- on a negative outlook.  A press release issued by Fitch explaining the reasons for the downgrade stated that "Fitch believes the reputational damage from the Lava-Jato scandal" would "erode OEC's capacity to replace backlog."  In addition, the release stated that the reputational damage "has reduced Odebrecht group's ability to access debt and capital markets."

(c)     Odebrecht's Cooperation with Prosecutors.  The 4.375% Notes that had been purchased by Plaintiff declined in market value by over 14.7% as a result of the March 22, 2016 and March 23, 2016 disclosures that: (i) Brazilian police were targeting Odebrecht in their corruption investigation; (ii) numerous Odebrecht employees had been arrested by Brazilian police for their roles in the bribery scheme; and (iii) Odebrecht's employees would cooperate with prosecutors and turn "state's evidence" in exchange for reduced jail time.  In response to these disclosures, the market price of the 4.375% Notes declined to a last price of 44.268 on March 24, 2016, down from a last price of 51.937 on March 21, 2016.  Similarly, the market price of the 7.125% Notes purchased

by Plaintiff decreased by over 13.7%.  Also in reaction to the news, the market price of the 5.25%

Notes that had been purchased by Plaintiff declined by over 14.3%.

        (d)      <u>Odebrecht Downgraded by Fitch and Moody's</u>.  On May 3, 2016, Fitch once

again devalued the Notes by downgrading Odebrecht debt, including the Notes, to B from BB with a

negative ratings watch.  A press release issued by Fitch explaining the reasons for the downgrade

stated that the ratings action "reflects the prolonged uncertainty of any potential impact on OEC's

credit profile stemming from the investigations on the corruption scandal."  That same day, Moody's

also announced a downgrade of Odebrecht debt, including the Notes, from Ba2 to B2.  A press

release issued by Moody's explaining the reasons for the downgrade stated that the ratings action

"was prompted by increased credit risk and rising financial constraints for OEC as a result of the

evolving corruption investigations in the country, with potential monetary fines and other business

sanction affecting the Company's liquidity and operating sustainability."  In response, the market

price of the 5.25% Notes purchased by Plaintiff dropped in value by 19.4%.  Similarly, the market

price of the 7.125% Notes purchased by Plaintiff decreased by nearly 14%.  Also in reaction to the

news, the market price of the 4.375% Notes that had been purchased by Plaintiff declined by nearly

22%.

        (e)      <u>Odebrecht Downgraded by Moody's</u>.  On August 22, 2016, Moody's

devalued the Notes by downgrading Odebrecht debt, including the Notes, to B3 from B2.  A press

release issued by Moody's explaining the reasons for the downgrade cited "Moody's perception of

increased credit risk for OEC, due to the company's evolving liquidity and reputational risks amid

business uncertainties and the unfavorable environment for infrastructure investments in Latin

America."  The release also noted that Odebrecht's "competitive edge has been severely challenged

by the ongoing corruption allegations" and that the "prolonged investigation procedures resulted in weaker investor's sentiment and more limited funding availability to the group's projects."

121.    As a result of its purchases of the Notes, Plaintiff suffered an enormous economic loss and damages.

122.    As alleged above, the declines in the prices of the Notes after the corrective disclosures came to light were a direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed publicly.  The timing and magnitude of the price declines in the Notes negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

## VIII.   PLAINTIFF'S RELIANCE PRESUMED THROUGH THE FRAUD-ON-THE-MARKET DOCTRINE

123.    To the extent available, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that the markets for the Notes were efficient markets for the following reasons, among others:

(a)    the Notes met the requirements for listing and were listed and actively traded on the Euro MTF Market of the Luxemburg Stock Exchange, an efficient market;

(b)    Odebrecht and CNO regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)    Defendants were followed by fixed income analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of

their respective brokerage firms, as well as credit rating agencies who wrote similar reports on defendants' debt.  These reports were publicly available and entered the public marketplace.

124.    As a result of the foregoing, the market for the Notes digested current information regarding defendants from all publicly available sources and reflected such information in the prices of the Notes.

125.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding their business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' omissions set forth above, that requirement is satisfied here.

## IX.    PLAINTIFF'S DIRECT RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS

126.    Plaintiff's allegations regarding direct reliance relate only to its claims where reliance is an element of the claim and where the presumption of reliance is unavailable.

127.    Plaintiff purchased the Notes between October 2012 and February 2015.  Plaintiff employed internal investment managers to manage its investment portfolios and make investment decisions on its behalf.  Throughout the time that Plaintiff purchased the Notes, Plaintiff's internal investment managers undertook security-specific research to identify companies in which to invest. As part of this research, Plaintiff's investment managers reviewed and analyzed issuers' businesses, financial statements and disclosures, balance sheets, income statements, assets, liabilities, earnings,

profitability, risks, prospects and management/governance characteristics.  Plaintiff's investment managers made their investment decisions based on this market research and analysis.

128.    Plaintiff's internal investment managers employed their ordinary investment research and analysis in determining whether to invest in the Notes.  This research and analysis included a review of the financial statements of Odebrecht and CNO, which were included in the Offering Memoranda and made available by defendants in other public statements, including on defendants Odebrecht's and CNO's websites.  As part of this analysis, Plaintiff's investment managers directly relied upon the information made publicly available by defendants.  In particular, in making the decision to purchase the Notes, Plaintiff's investment managers relied upon the financial statements included in Odebrecht's annual and quarterly financial filings for the years ended December 31, 2010, December 31, 2011, December 31, 2012, December 31, 2013 and December 31, 2014, including the Company's statements regarding its earnings, assets, liabilities, business and risks, among other statements.

129.    Plaintiff's internal investment managers relied on defendants' statements as being materially complete and not omitting material information, including information regarding defendants' financial condition, compliance with applicable laws and regulations, and whether defendants' financial results were the product of legitimate business practices.  Plaintiff and Plaintiff's investment managers did not know, and in the exercise of reasonable diligence could not have known, that defendants' statements, as detailed herein, were materially false and misleading and/or materially incomplete when deciding to purchase, sell or hold the Notes.

130.    Defendants' false and/or misleading statements had a material influence on Plaintiff's investment in the Notes.  These material misstatements caused Plaintiff to purchase the Notes following defendants' issuance of the false and misleading statements complained of herein.

## X.     NO SAFE HARBOR

131.    The statutory safe harbor and the common law "bespeaks caution" doctrine provided for forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this complaint.  None of the specific statements pleaded herein were identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that any safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false.

## XI.     COUNTS

### COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

132.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

133.    Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations of fact and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon Plaintiff.

135.   Plaintiff acquired the Notes issued by Odebrecht Finance without knowledge that the defendants had misstated or omitted material facts.  In acquiring the Notes, Plaintiff relied directly or indirectly on the false and misleading statements and omissions made by the defendants.

136.   Plaintiff would not have purchased the Notes issued by Odebrecht Finance at the prices it paid, or at all, if Plaintiff had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and omissions.

137.   As a direct and proximate result of the defendants' wrongful conduct as alleged herein, Plaintiff suffered damages in connection with its purchases of the Notes.

### COUNT II
### For Violation of §20(a) of the Exchange Act
### (Against Odebrecht and CNO)

138.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendants Odebrecht and CNO.

139.   Defendant Odebrecht was the corporate owner and parent of defendants Odebrecht Finance and CNO and had ultimate authority over their actions and those of their employees.  As such, defendant Odebrecht acted as a controlling person of defendants Odebrecht Finance and CNO and had the power and authority to cause these defendants to engage in the wrongful conduct complained of herein.

140.   Defendant CNO acted as the guarantor for the Notes and received the funds resulting from the sale of the Notes.  Further, the Offering Memoranda used to sell the bonds relied upon CNO's reported financial results.  Meanwhile, Odebrecht Finance was created without any legitimate assets, all for the benefit of CNO and Odebrecht.  As such, defendant CNO acted as a controlling person of defendant Odebrecht Finance and had the power and authority to cause Odebrecht Finance to engage in the wrongful conduct complained of herein.

141.     Defendants Odebrecht and CNO culpably participated in the misconduct as alleged herein.

142.     As a direct and proximate result of such conduct, defendants Odebrecht and CNO are liable pursuant to §20(a) of the Exchange Act.

### COUNT III
### For Violations of RCW §§21.20.010 and 21.20.430
### (Against All Defendants)

143.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

144.     As alleged herein, defendants, directly or indirectly, in the State of Washington, employed devices, schemes or artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices or courses of business that operated as a fraud or deceit upon Plaintiff.

145.     As alleged herein, defendants directly and indirectly employed and engaged in a scheme and artifice to defraud by participating in a continuous course of conduct to provide false information to Plaintiff and to conceal from Plaintiff material facts, as described herein.  Such misrepresentations and material omissions were made in connection with the sale of the Notes in the State of Washington.  Defendants engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

146.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the misrepresentations and omissions of material fact alleged herein were true and without omissions of any material fact and were not misleading.

- 54 -

147.     Plaintiff relies on the presumption of reliance to the extent available to it.  To the extent Plaintiff's direct reliance is applicable to this claim, Plaintiff reasonably relied on defendants' omissions and misstatements as detailed in ¶¶36-101.  Plaintiff and its agents did not know of the omissions and misstatements described above when Plaintiff acquired the Notes, and they could not in the exercise of reasonable diligence have known of the actual facts.  Plaintiff and its agents relied upon, among other things, statements made by or authorized by the defendants in the Offering Memoranda, which were incorporated into analyst reports and rating agency reports, and other statements made by defendants in making Plaintiff's investment decisions.

148.     As a direct and proximate result of defendants' violations of RCW §§21.20.010 and 21.20.430, Plaintiff suffered damages and is entitled to damages in an amount to be determined at trial.

149.     Defendants are jointly and severally liable to Plaintiff for damages in an amount to be determined at trial.

## COUNT IV
## Negligent Misrepresentations
## (Against All Defendants)

150.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

151.     Defendants made materially false and misleading statements, including, without limitation, those representations and omissions in the Offering Memoranda related to the offerings of the Notes, which were incorporated into analyst reports and rating agency reports, as well as press releases, financial statements and other disclosures made by defendants, as alleged herein.  These representations were false and misleading in that, among other reasons, defendant CNO's financial statements failed to disclose the kickback and bribery scheme as alleged herein.

152.    Defendants lacked reasonable grounds for believing these statements were true and not misleading.  Each defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the disclosures containing the material misrepresentations and omissions.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements made misleading, and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, defendants should have known of the material misstatements and omissions contained in their statements and also should have known of the omissions of material fact that were necessary to make the statements made therein not misleading.

153.    Defendants made these untrue statements of material fact knowing that Plaintiff and other investors were likely to reasonably rely on these statements in deciding whether or not to purchase the Notes.

154.    Plaintiff justifiably relied on defendants' misrepresentations.  At the time of the misrepresentations and omissions of material fact by defendants, Plaintiff and its agents were ignorant of the statements' falsity and believed them to be true.  If Plaintiff and/or its agents had been aware of the true facts, it would not have purchased or continued to hold the Notes and/or would have disposed of them.

155.    As a direct and proximate result of defendants' negligent misrepresentations and omissions, Plaintiff suffered damages in connection with its purchases of the Notes.

## COUNT V
## Fraud
## (Against All Defendants)

156.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

157.   Defendants made the false and misleading statements alleged herein, including omitting to provide information necessary to make their disclosures regarding defendants' financial results, business, operations, risks and prospects not misleading in light of the circumstances in which they were made.

158.   Defendants made these misrepresentations with the knowledge of the false and misleading nature of such statements.

159.   Defendants made these false statements with the intent to defraud.  Defendants fraudulently induced Plaintiff and other investors to purchase the Notes by: (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaging in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff.

160.   Plaintiff justifiably relied on defendants' misrepresentations as detailed in ¶¶36-101. Plaintiff purchased the Notes unaware of the falsity of defendants' representations and believed them to be true.  In reliance on defendants' representations, Plaintiff was induced to and did act as herein alleged, including by purchasing the Notes.  Plaintiff's reliance on defendants' false and misleading representations was justified because of defendants' misrepresentations and active concealment of the truth.

161.   Plaintiff would not have purchased the Notes at the prices it paid, or at all, or would not have continued to hold the Notes, if it had been aware of the truth regarding defendants' false and misleading statements.

162.    As a direct and proximate result of defendants' intentional misrepresentations and active concealment, Plaintiff suffered damages resulting from its reliance on defendants' false statements, misrepresentations and omissions.

163.    The wrongful acts of defendants were done maliciously, oppressively and fraudulently, and Plaintiff is therefore entitled to punitive and exemplary damages in an amount to be ascertained according to proof that is appropriate to punish or set an example of defendants.

## COUNT VI
### Conspiracy
### (Against All Defendants)

164.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

165.    By virtue of the conduct alleged herein, defendants intentionally formed and operated a conspiracy.  Each of the defendants committed overt wrongful acts done in furtherance of and pursuant to this conspiracy, including the issuance of false and misleading statements, creating and participating in a kickback and bribery scheme and other criminal acts, and selling securities, including the Notes, to Plaintiff and other investors on false and misleading pretenses.

166.    As a direct and proximate result of defendants' conspiracy, Plaintiff suffered damages.

## COUNT VII
### For Violations of N.Y. Debtor and Creditor Law §273
### (Against Defendants Odebrecht and CNO)

167.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendants Odebrecht and CNO.

168.    The Odebrecht Finance conveyances to defendants Odebrecht and CNO were made without fair consideration being made by defendants CNO and Odebrecht to Odebrecht Finance.

169.    The Odebrecht Finance conveyances rendered Odebrecht Finance insolvent with respect to its creditors, including Plaintiff.

## COUNT VIII
### For Violations of N.Y. Debtor and Creditor Law §276
### (Against Defendants Odebrecht and CNO)

170.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendants Odebrecht and CNO.

171.    The Odebrecht Finance conveyances to defendants Odebrecht and CNO were made with the actual intent to hinder, delay, or defraud either present or future creditors, including Plaintiff.

172.    The Odebrecht Finance conveyances to defendants Odebrecht and CNO were made without consideration, as defined in Article 10 of the New York Debtor and Creditor Law. Consequently, defendant Odebrecht Finance did not receive a fair consideration in exchange for the transfer.

173.    The Odebrecht Finance conveyances to defendants Odebrecht and CNO were made without good faith as defined in Article 10 of the New York Debtor and Creditor Law.

174.    Accordingly, the Odebrecht Finance conveyances to defendants Odebrecht and CNO were fraudulent pursuant to N.Y. Debtor and Creditor Law §276.

175.    As a result of the Odebrecht Finance conveyances to defendants Odebrecht and CNO, there are insufficient assets, if any, remaining in defendant Odebrecht Finance's possession to satisfy any judgment that Plaintiff may obtain against defendant Odebrecht Finance.

176.    As a result of the foregoing, defendants Odebrecht and CNO owe Plaintiff damages in an amount to be determined at trial.

**COUNT IX**
**For Violations of N.Y. Debtor and Creditor Law §276**
**(Against Defendants Odebrecht and CNO)**

177.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendants Odebrecht and CNO.

178.     Pursuant to N.Y. Debtor and Creditor Law §276-a, Plaintiff is entitled to recover its attorneys' fees and expenses incurred in prosecuting its claims under the New York Debtor and Creditor Law, §§273 and 276.

**XII.     PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Awarding compensatory damages in favor of Plaintiff against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     Rescission or a rescissory measure of damages;

C.     For punitive damages appropriate to punish or set an example of defendants;

D.     Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Such other and further relief as the Court may deem just and proper.

**XIII.     DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED:  October 20, 2017                    ROBBINS GELLER RUDMAN
                                                                  & DOWD LLP
                                                             SAMUEL H. RUDMAN


                                                             *s/ Samuel H. Rudman*
                                                         SAMUEL H. RUDMAN

- 60 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
DOUGLAS R. BRITTON
MATTHEW J. BALOTTA
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Counsel for Plaintiff