UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

WASHINGTON STATE INVESTMENT
BOARD,

                    Plaintiff,

     vs.

ODEBRECHT S.A., CONSTRUTORA
NORBERTO ODEBRECHT S.A.,
ODEBRECHT ENGENHARIA E
CONSTRUÇÃO S.A. and ODEBRECHT
FINANCE LTD.,

               Defendants.

———————————————————— x

:   Civil Action No. 1:17-cv-08118-PGG
:
:
:   AMENDED COMPLAINT FOR
:   VIOLATIONS OF THE SECURITIES
:   EXCHANGE ACT OF 1934 AND STATE
:   COMMON AND STATUTORY LAW
:
:
:
:
:
:
:
:
:
:   DEMAND FOR JURY TRIAL

1359489_1

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ........................................................................4

III.    PARTIES ...........................................................................................................15

      A.      Plaintiff ..................................................................................................15

      B.      Defendant Odebrecht, S.A. ....................................................................16

      C.      Defendant CNO ......................................................................................16

      D.      Defendant OEC .......................................................................................17

      E.      Defendant Odebrecht Finance ................................................................17

IV.     PLAINTIFF'S PURCHASES OF THE NOTES ..............................................18

V.      DEFENDANTS' UNDISCLOSED KICKBACK AND BRIBERY SCHEME ...............20

      A.      The "Bribe Department" .........................................................................21

      B.      Defendants' Corrupt Practices in Brazil ................................................23

      C.      Defendants' Corrupt Practices Outside Brazil .......................................24

      D.      Defendants' Obstruction of Justice ........................................................25

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ....................25

      A.      The 2012 7.125% Notes Offering Memorandum ...................................26

      B.      The 2013 4.375% Notes and 8.25% Notes Offering Memoranda .........28

      C.      The 2014 5.25% Notes Offering Memorandum .....................................30

      D.      Defendants Odebrecht's and CNO's False Financial Statements and
                 Disclosures .............................................................................................33

            1.      Odebrecht and CNO Failed to Accrue a Liability for the
                       Foreseeable Financial Costs Arising from the Bribery Scheme ...............35

            2.      CNO Failed to Disclose the Nature and Range of the Foreseeable,
                       Expected Costs that Would Likely Be Incurred as a Result of
                       Defendants' Bribery Scheme ...................................................................37

1359489_1

**Page**

3.     CNO Improperly Failed to Separately Distinguish and Disclose
       Contract Revenue Obtained as a Result of Defendants' Massive
       Illegal Bribery Activity from Other Contract Revenue ...........................38

4.     CNO Improperly Failed to Recognize, Classify or Adequately
       Disclose Material Amounts of Concealed Funds and Illegal Bribes .........39

E.   False Financial Statements Included in the 2012 7.125% Notes Offering
     Memorandum..................................................................................................40

     1.     CNO's 2009 and 2010 Annual Consolidated Financial Statements ..........40

     2.     CNO's 2011 Annual Consolidated Financial Statements..........................40

     3.     CNO's First Quarter 2012 Consolidated Interim Financial
            Statements .................................................................................................42

F.   False Financial Statements Included in Defendants' 2013 Offering
     Memoranda for the 4.375% Notes and 8.25% Notes.............................................43

     1.     CNO's 2010 and 2011 Annual Consolidated Financial Statements ..........43

     2.     CNO's 2012 Annual Consolidated Financial Statements..........................43

G.   False Financial Statements Included in Defendants' 2014 Offering
     Memorandum for the 5.25% Notes........................................................................44

     1.     CNO's 2011 and 2012 Annual Consolidated Financial Statements ..........44

     2.     CNO's 2013 Annual Consolidated Financial Statements..........................45

     3.     CNO's First Quarter 2014 Consolidated Interim Financial
            Statements .................................................................................................46

H.   Defendant Odebrecht's False Financial Disclosures .............................................48

     1.     Odebrecht's 2012 Annual Report .............................................................48

     2.     Odebrecht's 2014 Annual Report and Press Release.................................48

     3.     Odebrecht's 2015 Annual Report .............................................................49

I.   Defendants' Repeated Denials and Fraudulent Concealment of Their
     Kickback and Bribery Scheme..............................................................................50

- ii -

**Page**

VII.   SUBSEQUENT DISCLOSURES CONFIRM DEFENDANTS' FRAUDULENT
       SCHEME ...............................................................................................................60

VIII.  LOSS CAUSATION...............................................................................................65

IX.    RELIANCE.............................................................................................................68

       A.   Plaintiff's Direct Reliance on Defendants' False and Misleading
            Statements .................................................................................................68

       B.   Plaintiff Is Entitled to a Presumption of Reliance Because Defendants
            Concealed Material Adverse Information .................................................70

X.     OEC IS LIABLE AS CNO'S SUCCESSOR-IN-INTEREST ...............................70

       A.   OEC Is a Mere Continuation of CNO......................................................70

       B.   The Transfer of Business and Assets from CNO to OEC Was Fraudulent,
            Making OEC Liable as CNO's Successor ................................................74

XI.    NO SAFE HARBOR .............................................................................................75

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 (Against All
       Defendants)............................................................................................................76

COUNT II For Violation of §20(a) of the Exchange Act (Against Defendants Odebrecht,
       CNO and OEC)......................................................................................................77

COUNT III For Violation of the Washington State Securities Act, RCW §§21.20.010 and
       21.20.430(1) (Against All Defendants) ................................................................78

COUNT IV For Violations of the Washington State Securities Act, RCW §§21.20.010
       and 21.20.430(3) (Against Defendants Odebrecht and CNO)...............................79

COUNT V Negligent Misrepresentations (Against All Defendants) ...........................80

COUNT VI Fraud (Against All Defendants)................................................................82

COUNT VII Conspiracy (Against All Defendants).......................................................83

COUNT VIII For Violations of N.Y. Debtor and Creditor Law §273 (Against Defendants
       Odebrecht, CNO and OEC) ..................................................................................84

- iii -

**Page**

COUNT IX For Violations of N.Y. Debtor and Creditor Law §276 (Against Defendant OEC) ...................................................................................................................... 84

PRAYER FOR RELIEF ........................................................................................................ 85

DEMAND FOR JURY TRIAL ............................................................................................. 86

1359489_1

Plaintiff Washington State Investment Board ("WSIB" or "plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of documents created and/or published by Odebrecht S.A. ("Odebrecht" or the "Company") and its wholly-owned subsidiaries Odebrecht Engenharia e Construção S.A. ("Odebrecht Engineering and Construction" or "OEC") and Construtora Norberto Odebrecht S.A. ("CNO"), as well as regulatory filings and reports, securities analysts' reports and advisories about these companies, testimony by people involved in the wrongdoing alleged herein, releases, media reports and other public statements about these companies, and the December 21, 2016 plea agreement between Odebrecht, the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney for the Eastern District of New York (the "Plea Agreement").  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.      Defendant Odebrecht, through various subsidiaries, including wholly-owned OEC and CNO, is the largest engineering and construction firm in Latin America, and one of the largest in the world.  Defendants OEC and CNO primarily engage in the construction of large-scale infrastructure and other public projects such as highways, railways, power plants, bridges, tunnels and airports.  The vast majority of these projects are awarded to contractors through a public bidding process overseen by public officials.

2.      For years, Odebrecht highlighted its expertise, knowledge of local markets, reputation and business relationships as providing it, through CNO, with key advantages over its competition in securing bids to win lucrative government contracts and published financial results commensurate with its status, including CNO's financial statements in the offering documents that it used to issue

- 1 -

notes to plaintiff and other investors through its Odebrecht Finance Ltd. ("Odebrecht Finance") subsidiary.  Between June 21, 2012 and February 4, 2015, plaintiff purchased notes with a face value of over $100 million (the "Notes") through four different note offerings based in large part on Odebrecht's and CNO's financial results.[1]   The offering memoranda even emphasized that Odebrecht and CNO secured contracts through a "competitive bidding process," when, in truth, Odebrecht's and CNO's success, and their reported financial results, depended on a massive bribery and kickback scheme involving hundreds of millions of dollars in illicit payments that defendants used to secure government contracts.

3.      In the offering memoranda and each time Odebrecht and CNO issued financial results, defendants concealed the true nature of how Odebrecht and CNO secured business.  The unprecedented scale of Odebrecht's and CNO's corrupt practices began to be exposed in connection with Brazil's "Operation Car Wash" investigation, which ultimately uncovered a vast criminal network used to funnel massive sums of money from companies such as Odebrecht into the hands of corrupt corporate and political insiders.  These criminal activities were so pervasive at Odebrecht that the U.S. Department of Justice would later refer to a hidden Odebrecht "business unit" within Odebrecht's CNO subsidiary as the "Department of Bribery" because, as Odebrecht would admit in the Plea Agreement, it used the unit to systematically pay hundreds of millions of dollars to government officials and political parties to secure government contracts.  In total, defendants

---

[1]   The Notes include the following securities issued by defendant Odebrecht Finance and guaranteed by CNO: (i) 7.125% notes due 2042 (the "7.125% Notes"); (ii) 4.375% notes due 2025 (the "4.375% Notes"); (iii) 8.25% notes due 2018 (the "8.25% Notes"); and (iv) 5.25% notes due 2029 (the "5.25% Notes").

1359489_1

admittedly paid nearly $800 million in bribes in connection with 100 projects in 12 countries in exchange for ill-gotten benefits of more than $3.3 billion.[2]

4.      The Operation Car Wash investigation did not initially focus on Odebrecht, but rather on Petrobras.  Even after certain individuals associated with Odebrecht began to be implicated in potential wrongdoing, including the arrest on June 19, 2015 of Odebrecht's Chief Executive Officer ("CEO") Marcelo Odebrecht, defendants attempted to obstruct the investigation and engaged in a months-long misinformation campaign designed to distort and bury the facts and to continue to mislead investors and the public as to the true nature and scope of Odebrecht's and CNO's business activities.

5.      At the same time Odebrecht maintained its innocence, continuing to deny its bribery scheme, Odebrecht conducted a reorganization of its corporate structure.  CNO had long been the subsidiary that served as the umbrella organization for Odebrecht's construction activities – both in Brazil and abroad.  But on March 31, 2015, Odebrecht essentially changed the name of CNO to OEC, making OEC the new umbrella organization for all of Odebrecht's construction activities in Brazil and internationally.  Hoping to avoid liability worldwide by creating distance between its assets and its admitted corruption, Odebrecht has relegated CNO to consolidating projects in Brazil alone.

6.      Now, Marcelo Odebrecht has been convicted of corruption and money laundering and sentenced to more than 19 years in prison.[3]  Other top Company officials have been similarly implicated, and Odebrecht itself has pled guilty to violations of the anti-bribery provisions of the

---

[2]    Unless otherwise noted, all "$" denominated figures are in U.S. dollars.

[3]    This sentence was subsequently reduced pursuant to a plea bargain in which Marcelo Odebrecht agreed to provide evidence to authorities investigating the Company.

- 3 -

Foreign Corrupt Practices Act ("FCPA"), implicating its CNO subsidiary as an instrumentality in the scheme, and agreeing to pay $2.6 billion in penalties – which was reduced from $4.5 billion because of Odebrecht's inability to pay that amount – as part of the largest-ever global foreign bribery resolution.  Also as part of the guilty plea, Odebrecht accepted responsibility "for the acts of its affiliates, subsidiaries, officers, directors, employees, and agents," including CNO, and pled guilty so the U.S. government would "not file additional criminal charges against the Defendant or any of its direct or indirect subsidiaries or joint ventures," including CNO.  This guilty plea means that Odebrecht misrepresented that CNO's and Odebrecht's earnings, revenues and profits were derived from legitimate business practices and were true when, in fact, they were the product of admittedly illegitimate business practices and systemic graft by both Odebrecht and CNO, and thus admittedly false and misleading.  As defendants' misdeeds have come to light over time, the Notes have plummeted in value, causing plaintiff tens of millions of dollars in losses and damages under applicable law.

## II.     JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) and U.S. state common and statutory law.  In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails and interstate electronic and telephone communications, specifically to disseminate false and misleading statements to U.S. investors and to sell the Notes to plaintiff.

8.     Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in

this District and, as set forth in the offering memoranda, defendants Odebrecht Finance and CNO have consented to venue in this District:

> The Issuer [Odebrecht Finance] and the Guarantor [CNO] have irrevocably submitted to the non-exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, City and State of New York for the purposes of any action or proceeding arising out of or related to the Notes, the Guaranty or the Indenture. The Issuer [Odebrecht Finance] and the Guarantor [CNO] have irrevocably waived, to the fullest extent permitted by law, any objection which it may have to the laying of the venue of such action or proceeding brought in such a court and any claim that any such action or proceeding brought in such a court has been brought in an inconvenient forum and any right to which it may be entitled on account of place of residence or domicile.

9.        This Court has jurisdiction over this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §§1331, 1332 and 1367. Jurisdiction is also appropriate as defendants Odebrecht Finance and CNO have, as alleged in the preceding paragraph, consented to jurisdiction in this District. These defendants also have sufficient minimum contacts within the United States and New York to make the exercise of jurisdiction over them by New York federal courts consistent with traditional notions of fair play and substantial justice. As alleged further herein, these defendants marketed and sold the Notes in New York to U.S. investors, including plaintiff WSIB, disseminated false and misleading statements into New York, and carried out the kickback and bribery scheme alleged herein in part in New York using the U.S. banking system in New York. These defendants also agreed in the offering memoranda to maintain offices or an agency in Manhattan, specifically at 10 East 40th Street, 10th Floor, New York, New York 10016 "where notices to and demands upon the Issuer and the Guarantor in respect of the Indenture and the Notes may be served":

> As long as any Note remains outstanding, the Issuer and the Guarantor will at all times have an authorized agent in the Borough of Manhattan, City and State of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to the Notes. Service of process upon such agent and written notice of such service mailed or delivered to the party being joined in such

action or proceeding shall, to the extent permitted by law, be deemed in every respect effective service of process upon such party in any such legal action or proceeding. The Issuer and the Guarantor has each appointed National Corporate Research, Ltd., located at 10 East 40th Street, 10th Floor, New York, NY 10016 as its agent for service of process in any proceedings in the Borough of Manhattan, City and State of New York.[4]

10.    This Court also has jurisdiction over OEC as a successor-in-interest to CNO.  As alleged herein, there is overwhelming indicia that OEC was a mere continuation of CNO's former role, created to avoid liability and to distance Odebrecht from the misdeeds of its subsidiary (done at Odebrecht's direction).  In addition, due to the reorganization of Odebrecht's subsidiaries, including OEC and CNO, OEC became a guarantor of the Notes, thereby expressly assuming the liabilities of CNO.  The offering memoranda provides the following clause under the subheading "Limitation on Consolidation, Merger or Transfer of Assets":

(1)    The Guarantor shall not consolidate with or merge with or into, or convey, transfer or lease all or substantially all of its assets (on a consolidated basis) to, any Person, unless:

(A)    The resulting, surviving or transferee Person (if not the Guarantor) shall be a Person organized and existing under the laws of Brazil or the United States of America, any State thereof or the District of Columbia or any other country that is a member country of the European Union or of the Organization for Economic Co-operation and Development or any other country whose long-term foreign currency-denominated debt has an Investment Grade rating from either S&P or Moody's as of the effective date of such transaction, and *such Person shall expressly assume, by a supplement to the Indenture, executed and delivered to the Trustee, all obligations under the Guaranty and the Indenture*;

(B)    Immediately after giving effect to such transaction, no Event of Default will have occurred and be continuing; and

(C)    The Guarantor shall have delivered to the Trustee an officer's certificate and an opinion of counsel, each stating that such consolidation, merger or transfer and such supplement to the Indenture, if any, comply with the Notes and the Indenture.

---

[4]    *See, e.g.*, 4.375% Prospectus at 69, 80.

The Trustee will be entitled to conclusively rely on and will accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent set forth in clause (C) above, in which event it shall be conclusive and binding on the Holders.

11.     A June 1, 2015 UBS analyst report summarizes the reorganization and illustrates that OEC is now a guarantor of the bonds:

Construtora Norberto Odebrecht (CNO) which guarantees the bonds issued by Odebrecht Finance Ltd (OFL) reorganized its corporate structure as of 31-Mar-15. CNO is now the entity which consolidates Brazilian engineering and construction projects. Meanwhile, Odebrecht Global (OG) is the entity which consolidates international projects. Odebrecht Enenharia e Construcao (Odebrecht Engineering and Construction – OEC) is a holding company that will in turn consolidate CNO and OG. Effectively, OEC is what investors previously referred to as CNO. There is no direct effect on the ODBR bonds as the three entities, OEC, CNO and OG, are joint guarantors of the bonds issued by OFL.

Similarly, a June 3, 2015 press release by Fitch Ratings acknowledges that "OEC, CNO and [OG] provide solidary guarantee on Odebrecht Finance Limited (OFL) issuances."

12.     The consent to jurisdiction and venue by CNO, OEC and Odebrecht Finance is imputed to Odebrecht as Odebrecht operated through these subsidiaries, making them Odebrecht's agents, instrumentalities and alter egos. As alleged herein, defendant Odebrecht operated through Odebrecht Finance, which Odebrecht created as a dummy corporation for the sole purpose of siphoning funds out of the hands of investors, including WSIB and other U.S. investors. Odebrecht commingled its funds with Odebrecht Finance's, used Odebrecht Finance as a vehicle to perpetrate fraud, failed to capitalize Odebrecht Finance adequately, and operated Odebrecht Finance for the benefit of defendants Odebrecht and CNO, and not for the benefit of Odebrecht Finance itself. In fact, the Prospectus for the 7.125% Notes reveals that Odebrecht ultimately controlled the funds that Odebrecht Finance successfully siphoned from U.S. investors:

The net proceeds from the issue and sale of the notes are estimated to be approximately U.S.$392.3 million, after deducting certain expenses and commissions to be paid to the initial purchasers in connection with the offering. Odebrecht

- 7 -

1359489_1

Finance intends to use a portion of the net proceeds of this offering to redeem, repay or repurchase all of its 2017 notes, of which U.S.$112.8 million was outstanding as of March 31, 2012.  During the 12-month period commencing October 18, 2012, the 2017 notes may be redeemed, in whole or in part, at any time by Odebrecht Finance at 103.75% of their principal amount plus accrued interest.  We intend to use a portion of the net proceeds of this offering for general corporate purposes **and Odebrecht intends to use the remaining portion of the net proceeds of this offering for additional equity investments in OPI and OE**.

13.     Odebrecht Finance also depended on CNO and Odebrecht to make payments on the

Notes and to fund its activities, as the offering memoranda explained:

> The issuer's [Odebrecht Finance] ability to make payments on the notes depends on its receipt of payments from us [CNO].

> The issuer's [Odebrecht Finance] principal business activity is to act as a financing vehicle for Odebrecht's activities and operations.  The issuer [Odebrecht Finance] has no substantial assets, and accordingly, holders of the notes must rely on our [CNO] cash flow from operations to pay amounts due in connection with the notes.  The ability of the issuer [Odebrecht Finance] to make payments of principal, interest and any other amounts due on the notes is contingent on its receipt from us [CNO] of amounts sufficient to make these payments, and, in turn, on our [CNO] ability to make these payments.  In the event that we [CNO] are unable to make such payments for any reason, the issuer [Odebrecht Finance] will not have sufficient resources to satisfy its obligations under the indenture governing the notes.

*        *        *

> The Company's [Odebrecht Finance] only stockholder is Odebrecht S.A. ("ODB"), the ultimate parent company of the Odebrecht Organization, incorporated in Salvador, Brazil.

> In 2011, the Company [Odebrecht Finance] incurred losses of US$ 185,006 and, as of December 31, 2011, had accumulated losses of US$ 350,226, resulting in a net capital deficiency of US$ 185,226, as well as an excess of current liabilities over current assets of US$ 19,684.  **To fund its activities, the Company [Odebrecht Finance] relies on the operational structure of ODB and its operations depend on the remittance of funds from ODB and from other related parties of the Odebrecht Organization**, with which the Company has intercompany receivables of US$ 1,713,645 (2010 - US$ 1,592,564) (Note 4).[5]

---

[5]     *See, e.g.*, 7.125% Prospectus at 14, F-19.

14.     Immediately following the sale to investors of each of the 7.125% Notes, the 8.25% Notes, the 5.25% Notes, the 4.375% Notes and various other offerings, defendant Odebrecht Finance conveyed all or virtually all of the proceeds from such sales to defendants CNO and Odebrecht, receiving nothing of equivalent value in return.

15.     Similarly, Odebrecht committed the acts alleged herein directly through CNO, making CNO its agent, instrumentality and alter ego.  Odebrecht even admits in its Plea Agreement that CNO operated at its behest to carry out Odebrecht's bribery scheme that gave rise to its guilty plea and to this action, including by enabling Odebrecht to cause wire transfers to be made from several New York-based accounts held by CNO to accounts that had been created in offshore entities.   The Plea Agreement specifically states that Odebrecht pled guilty to accept the responsibility for the acts of CNO and to avoid further criminal charges against "any of its direct or indirect subsidiaries or joint ventures," including CNO:

> In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Fraud Section and EDNY agree that they will not file additional criminal charges against the Defendant or any of its direct or indirect subsidiaries or joint ventures relating to any of the conduct described in the Information or the Statement of Facts, except for the charges against Braskem S.A. specified in the Information and Plea Agreement between the Fraud Section and EDNY and Braskem S.A. filed on December 21, 2016 ("Braskem Plea Agreement").

16.     As set forth in the Plea Agreement, CNO was the operating arm of Odebrecht's criminal conduct.  In fact, Odebrecht admits specifically that "CNO housed a unit called the Division of Structured Operations" or the "bribe department" as the Department of Justice put it, and that this division "was created to allow *Odebrecht* to make unrecorded payments, many of which took the form of bribes to government officials in Brazil and abroad."  And as Odebrecht also admits, that is exactly what *it* used the "bribe department," and offshore shell companies established and managed by the "bribe department," for:

- 9 -

4.      Smith & Nash Engineering Company ("S&N"), an unaffiliated shell company based in the British Virgin Islands, was ***established and managed at the Division of Structured Operations***' direction.  S&N was used ***by Odebrecht*** to further the bribery scheme, and to conceal and disguise improper payments made to, and for the benefit of, foreign officials and foreign political parties in various countries.  S&N opened at least one offshore bank account (the "S&N Account") ***on behalf of Odebrecht***.  ***Odebrecht transferred money*** from various bank accounts, including several New York-based bank accounts (the "New York-based Accounts"), to the S&N Account.  The funds in the S&N Account were then used, in part, to make direct and indirect bribe payments to foreign officials.  A United States citizen and resident of New York and Florida was the authorized signatory on the S&N Account.

5.      Arcadex Corporation ("Arcadex") was an unaffiliated shell company incorporated in Belize.  Arcadex was ***established and managed at the Division of Structured Operations' direction*** and used ***by Odebrecht*** to further the bribery scheme, and to conceal and disguise improper payments made to, and for the benefit of, foreign officials and foreign political parties in various countries.  Arcadex opened at least one offshore bank account (the "Arcadex Account") ***on behalf of Odebrecht***.  ***Odebrecht transferred money*** from various bank accounts, including the New York-based Accounts, to the Arcadex Account.  The funds in the Arcadex Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

6.      Golac Projects and Construction Corporation ("Golac'') was an unaffiliated shell company incorporated in the British Virgin Islands.  Golac was ***established and managed at the Division of Structured Operations' direction*** and used ***by Odebrecht*** to further the bribery scheme, and to conceal and disguise corrupt payments made to, and for the benefit of, foreign officials and foreign political parties in various countries.  Golac opened at least one offshore bank account (the "Golac Account") ***on behalf of Odebrecht***.  ***Odebrecht transferred money*** from various bank accounts, including the New York-based Accounts, to the Golac Account.  The funds in the Golac Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

17.     CNO and Odebrecht were one and the same for purposes of the scheme.  In fact, as the Plea Agreement described it, these entities were interchangeable in operating a single united conspiracy:

Once generated, unrecorded funds were funneled ***by the Division of Structured Operations*** [at CNO] to a series of offshore entities that were not included on Odebrecht's balance sheet as related entities.  ***These entities were established and managed at the Division of Structured Operations' direction*** by beneficial owners who were compensated for opening and, in some cases, operating these entities.

1359489_1

> ***Odebrecht used these offshore entities to further the bribery scheme***, and to conceal and disguise improper payments made to, or for the benefit of: foreign officials, foreign political parties, foreign political party officials and foreign political candidates in various countries. Many of the transactions were layered through multiple levels of offshore entities and bank accounts throughout the world, often transferring the illicit funds through up to four levels of offshore bank accounts before reaching the final recipient. In this regard, members of the conspiracy sought to distance the origin of the funds from the final beneficiaries.

18.      While Odebrecht pled guilty, "admit[ting], accept[ing], and acknowledg[ing] that it is responsible for the acts of its officers, directors, employees, and agents as set forth [in the Plea Agreement]," the Plea Agreement also treated Odebrecht and CNO as one for purposes of undertaking remedial measures and implementing compliance and ethics programs in connection with Odebrecht's guilty plea:

> [T]he Defendant engaged in extensive remedial measures, including (i) terminating the employment of 51 individuals who participated in the misconduct described in the Statement of Facts, (ii) disciplining an additional 26 individuals who were engaged in the misconduct, including suspensions of up to a year and a half, significant financial penalties, and demotion to non-managerial, non-supervisory, non-decision making roles, for each of the 26 individuals, (iii) requiring individualized anti-corruption compliance and business ethics training for each of the 26 individuals, and requiring each to be subject to heightened oversight and day-to-day supervision, including ensuring that the independent compliance monitor described in Attachment D has full access and authority to evaluate the business activities and ongoing compliance of those individuals, (iv) creating a Chief Compliance Officer position that reports directly to the Audit Committee of the Board of Directors, (v) adopting heightened controls and anti-corruption compliance protocols, including hospitality and gift approval procedures, (vi) incorporating adherence to compliance principles into employee performance evaluation and compensation, (vii) increasing the number of employees dedicated to compliance by 50 percent; and (viii) more than doubling the resources devoted to compliance in 2016 and more than tripling the budget for 2017[.]

*      *      *

> 9.      The Defendant represents that it has implemented and will continue to implement a compliance and ethics program ***throughout its operations, including those of its affiliates, agents, and joint ventures***, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws.

- 11 -

19.     And in the Plea Agreement, Odebrecht entered into a broad disclosure agreement that bound its subsidiaries, including CNO, and consented to have any press releases or proposed public statements about the agreement by "any of its direct or indirect subsidiaries" reviewed by the Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of New York prior to their release:

> The Defendant shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, *those of its subsidiary companies and affiliates*, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Fraud Section and EDNY may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section and EDNY, upon request, any document, record or other tangible evidence about which the Fraud Section and EDNY may inquire of the Defendant.
>
> *             *             *
>
> The Defendant agrees that if it *or any of its direct or indirect subsidiaries or affiliates* over which the Defendant exercises control issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section and EDNY to determine ( a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section, EDNY and the Defendant; and (b) whether the Fraud Section and EDNY have any objection to the release or statement.

20.     Defendant Odebrecht also has sufficient minimum contacts within the United States and New York to make the exercise of jurisdiction over it by New York federal courts consistent with traditional notions of fair play and substantial justice. As alleged further herein, Odebrecht's agents, instrumentalities and alter egos marketed and sold the Notes in New York to siphon funds out of the United States from U.S. investors, including from plaintiff WSIB, disseminated false and misleading statements into New York, and carried out the kickback and bribery scheme alleged herein, in substantial part, in New York. In fact, Odebrecht has admitted in the Plea Agreement that *it* purposely and intentionally reached into New York on multiple occasions to pay bribes using the

- 12 -

U.S. banking system in New York, agreeing specifically that "***Odebrecht*** caused numerous illicit payments ***to be made from United States-based bank accounts*** to perpetuate its bribe scheme in Brazil":

> 4.      . . . S&N opened at least one offshore bank account (the "S&N Account") on behalf of Odebrecht. ***Odebrecht transferred money from various bank accounts, including several New York-based bank accounts*** (the "New York-based Accounts"), to the S&N Account. The funds in the S&N Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

> 5.      . . . Arcadex opened at least one offshore bank account (the "Arcadex Account") on behalf of Odebrecht. ***Odebrecht transferred money from various bank accounts, including the New York-based Accounts***, to the Arcadex Account. The funds in the Arcadex Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

> 6.      . . . Golac opened at least one offshore bank account (the "Golac Account") on behalf of Odebrecht. ***Odebrecht transferred money from various bank accounts, including the New York-based Accounts***, to the Golac Account. The funds in the Golac Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

*      *      *

> 37.      ***Odebrecht caused numerous illicit payments to be made from United States-based bank accounts to perpetuate its bribe scheme in Brazil***. For example, between at least December 2006 and December 2007, ***Odebrecht caused transfers totaling almost $40 million to be made from the New York-based Accounts*** to the S&N Account. Thereafter, in or between January and August 2011, Odebrecht used the S&N Account to make bribe payments, including paying approximately $3.5 million and almost 2 million Swiss Francs to the bank account of an offshore entity controlled by Brazilian Official l, then an executive at Petrobras.

> 38.      Similarly, in or about December 2009, ***Odebrecht caused transfers totaling approximately $20 million to be made from the New York-based Accounts*** to the Arcadex Account. Before and contemporaneously with the transfers from the New York-based Accounts, Odebrecht caused numerous money transfers to be made from the Arcadex Account to a second Arcadex account (the "Second Arcadex Account") that was used to make bribe payments, including an approximately $430,000 bribe payment to a bank account controlled by Brazilian Official 2, then an executive at Petrobras.

> 39.      Furthermore, in or about December 2008, ***Odebrecht caused transfers totaling almost $48 million to be made from the New York-based Accounts*** to the Golac Account. Thereafter, in or about and between December 2008 and July 2010,

- 13 -

Odebrecht caused transfers from the Golac Account to three unrelated accounts in Panama and Antigua from which approximately $10 million was transferred to the accounts of three then-Petrobras executives Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3.

21.     Jurisdiction over Odebrecht in this Court is also appropriate because of Odebrecht's extensive presence in the United States, as "the relevant contacts" for purposes of personal jurisdiction under the Exchange Act "are those with the United States as a whole." *In re Banco Bradesco S.A. Sec. Litig.*, No. 1:16-cv-4155-GHW, 2017 WL 4381407, at *28 (S.D.N.Y. Sept. 29, 2017). And as Odebrecht boasts on its own website, it has operated in the United States for over a quarter of a century, obtaining contracts from federal and county government entities. Odebrecht highlights that it even partners with governmental entities in the United States – "[o]ne of the company's main clients is Miami-Dade County," forming a "partnership [that] has existed since 1993" – and has contracted with the U.S. Army Corps of Engineers in New Orleans, Louisiana, to work on part of the Hurricane Storm Damage Risk Reduction System (HSDRRS), authorized and funded by the U.S. Congress after Hurricane Katrina. The detailed story of Odebrecht's extensive U.S. presence is summarized in part in an October 22, 2010 press release entitled "Odebrecht Consolidates its Operations in the United States":

Odebrecht arrived to U.S. soil after it won the public bid to build a stretch of the Metromover, Miami's above-ground subway. Soon after, in 1992, Odebrecht was responsible for building Route 56, a highway in the region of San Diego, California.

After these projects, the rhythm of the work continued to be intense. The following year, after winning the bid to work on the Santa Ana River chute, the company earned an important contract: The Seven Oaks Dam project in California, in the amount of US$ 168 million, with a construction period of 52 months. During this same year, 1993, the Company was responsible for the construction work on the Merrill Barber Bridge and the Golden Glades viaduct, which extends 2,464 meters to serve those who use the I-95 system . . . . Odebrecht was chosen to erect Garcon Point Bridge in Santa Rosa Bay, at the border between Florida and Alabama. . . . Odebrecht was responsible for the American Airlines Arena, a sports and cultural complex in Miami, where it competed for the contract with major U.S. companies. It

- 14 -

also built the Fortune House building, an apart hotel with 29 floors, the Ocean Steps building, with 15 residential floors, and the Ritz Carlton Key Biscayne Resort & Spa, a residential hotel project.

One of the company's main clients is Miami-Dade County . . . .   The partnership has existed since 1993, when the construction company was responsible for building the American Airlines cargo building.   Currently, Odebrecht is responsible for expanding the North Terminals of the Miami International Airport, building the lightweight vehicle that will run on the tracks (Mia Mover) and extending the subway (Airport Link).

The North Terminal Development Program, which involves investments of US$ 2.85 billion, is the center of a bigger venture, worth US$ 6.2 billion, called the "Capital Improvement Program."   Undertaken by Miami-Dade County, it was developed with aims of expanding and improving the aviation system.   The complete project includes 52 new gates, four train stations, new installations for the United States Immigration and Citizenship Services, 123 counters, 119 self-service kiosks, 72 federal inspection service posts and a new luggage system.

*          *          *

Odebrecht was also at the Orlando Airport, working on the North Transversal taxi strip and South Terminal Complex. The project also involved the construction of access ramps and new viaducts.

In New Orleans since 2006, Odebrecht won two new contracts in 2010 in the city.   In August, it signed a contract with the US Army Corps of Engineers to undertake preventive construction work for floods.   In May, the company began constructing four water pumping stations, with aims of preventing floods caused by hurricanes.   Recently, the company also delivered projects at Cataouatche Lake and in the region of Chalmette, work designed to reconstruct and fortify containment dikes.   The construction works are part of the Hurricane Storm Damage Risk Reduction System (HSDRRS), which consists of 250 different projects and involves total investments of US$ 15 billion.

## III.   PARTIES

### A.   Plaintiff

22.     Plaintiff Washington State Investment Board ("WSIB" or "plaintiff") is a state agency responsible for the prudent investment and management of public trust and public employee retirement funds.   It invests for 17 retirement plans that benefit public employees, teachers, school employees, law enforcement officers, firefighters and judges.   There are approximately 700,000

- 15 -

participants in the plans.  WSIB also manages investments for 18 other public funds that support or benefit industrial insurance, colleges and universities, developmental disabilities and wildlife protection, and the agency manages a public employee deferred compensation program that supplements other retirement benefits.  WSIB was created and operates under the provisions of Chapter 43.33A of the Revised Code of Washington ("RCW").  WSIB purchased the Notes pursuant to the offering memoranda and was damaged by defendants' failure to disclose the truth about defendants' financial results and the manner in which defendants secured business.  The specifics for each WSIB purchase at issue are alleged in §IV, *infra*.

### B.    Defendant Odebrecht, S.A.

23.    Defendant Odebrecht is a holding company headquartered in Brazil that, through various subsidiaries and operating entities, conducts business in construction, engineering, infrastructure, chemicals, utilities and real estate businesses in Brazil and throughout 27 other countries, including the United States.  It is the parent of defendants CNO, Odebrecht Finance and OEC, and controls their activities, including the issuance of the Notes and these defendants' representations to investors.

### C.    Defendant CNO

24.    Defendant CNO is a wholly-owned subsidiary of defendant Odebrecht, primarily engaging in the construction of large-scale infrastructure and other public works projects, including the construction of highways, railways, power plants, bridges, tunnels, subways, buildings, port facilities, dams, manufacturing and processing plants, as well as mining and industrial facilities.  The offering documents for each offering stated specifically that CNO "currently guarantee[s]" all of Odebrecht Finance's debt with third parties, including the Notes, and relies primarily upon defendant CNO's reported financial results and business prospects to sell bonds to investors.  Prior to

plaintiff's purchase of the Notes, CNO was the largest construction and engineering business in Latin America, and one of the largest in the world, with an increased focused on obtaining construction contracts outside of Brazil.  In March 2015, Odebrecht reorganized and changed the name of its overall construction operations from CNO to OEC.  Now, CNO is a subsidiary of OEC and focuses solely on projects within Brazil.

### D.    Defendant OEC

25.    Defendant OEC is a wholly-owned subsidiary of defendant Odebrecht, and is the successor of CNO as the holding company for Odebrecht's engineering and construction operations worldwide.  OEC was not in existence until January 27, 2014 and did not have its current name until February 2, 2015.  On March 31, 2015, OEC took over CNO's role as the consolidator of Odebrecht's construction subsidiaries.  Under OEC's control is CNO (consolidating operations in Brazil) and Odebrecht Engineering and Construction International (OECI), formerly known as Odebrecht Global.  Defendant OEC is a guarantor of the Notes bought by plaintiff.

### E.    Defendant Odebrecht Finance

26.    Defendant Odebrecht Finance is incorporated under the laws of the Cayman Islands. Odebrecht Finance is a wholly-owned subsidiary of defendant Odebrecht and was created for the sole purpose of raising money for Odebrecht and CNO through the issuance of bonds, including the Notes purchased by WSIB.

27.    Odebrecht Finance issued billions of dollars in face value in notes from 2010 through 2014.  And as described in the offering memorandum for the 7.125% Notes, the entire amounts raised by selling the Notes were transferred from Odebrecht Finance to CNO and Odebrecht.

## IV.     PLAINTIFF'S PURCHASES OF THE NOTES

28.     In reliance on the false and misleading statements alleged herein, and without knowledge of the material omissions alleged herein, WSIB purchased the following 8.25% Notes:

| Trade Date | Counterparty | Face Amount | Unit Price | Total Price | New Issue? |
|---|---|---|---|---|---|
| 4/17/2013 | Deutsche Bank Securities Inc. | R$40M | 99.498 | $19,885,680.02[6] | Yes |

29.     In reliance on the false and misleading statements alleged herein, and without knowledge of the material omissions alleged herein, WSIB purchased the following 7.125% Notes:

| Trade Date | Counterparty | Face Amount | Unit Price | Total Price | New Issue? |
|---|---|---|---|---|---|
| 6/21/2012 | Credit Suisse Securities LLC | $5M | 98.479 | $4,923,950.00 | Yes |
| 6/21/2012 | Credit Suisse Securities LLC | $10M | 98.479 | $9,847,900.00 | Yes |
| 10/22/2012 | BNP Paribas Securities Corp. | $5M | 116.266 | $5,813,300.00 | No |
| 10/22/2012 | BNP Paribas Securities Corp. | $10M | 116.266 | $11,626,600.00 | No |
| 10/22/2012 | BNP Paribas Securities Corp. | $10M | 116.266 | $11,626,600.00 | No |
| 8/30/2013 | Barclays Bank PLC | $3M | 90.000 | $2,700,000.00 | No |
| 2/2/2015 | Deutsche Bank Securities Inc. | $5M | 74.500 | $3,725,000.00 | No |
| 2/3/2015 | Deutsche Bank Securities Inc. | $8M | 74.750 | $5,980,000.00 | No |
| 2/3/2015 | Deutsche Bank Securities Inc. | $4M | 74.500 | $2,980,000.00 | No |
| 2/4/2015 | Deutsche Bank Securities Inc. | $3M | 74.250 | $2,227,500.00 | No |

30.     In reliance on the false and misleading statements alleged herein, and without knowledge of the material omissions alleged herein, WSIB purchased the following 4.375% Notes:[7]

---

[6]     The price for this purchase was based on the exchange rate that day from R$ to US$, due to the Notes being R$ denominated.

[7]     Between July 31, 2017 and August 9, 2017, WSIB sold 4.375% Notes with a face value of $40 million at unit prices between $40.00 and $41.00, for total proceeds of $16,137,500.00.  Transaction records identify Jefferies & Company, Inc. as the broker for the transactions.

- 18 -

| Trade Date | Counterparty | Face Amount | Unit Price | Total Price | New Issue? |
|---|---|---|---|---|---|
| 4/17/2013 | Deutsche Bank Securities Inc. | $45M | 98.851 | $44,482,950.00 | Yes |
| 4/17/2013 | Deutsche Bank Securities Inc. | $5M | 98.851 | $4,942,550.00 | Yes |

31.     In reliance on the false and misleading statements alleged herein, and without knowledge of the material omissions alleged herein, WSIB purchased the following 5.25% Notes:

| Trade Date | Counterparty | Face Amount | Unit Price | Total Price | New Issue? |
|---|---|---|---|---|---|
| 6/19/2014 | Citigroup Global Markets Inc. | $20M | 100.000 | $20,000,000.00 | Yes |
| 7/15/2014 | Morgan Stanley Co. Incorporated | $5M | 98.750 | $4,937,500.00 | No |

32.     For each Note purchase listed above, WSIB unconditionally communicated its commitment to purchase the Notes when a representative for WSIB confirmed pricing for those Notes from Olympia, Washington by placing telephone calls to the offices of one or more of the above-referenced parties in San Francisco, or elsewhere in the United States, for at least the above-indicated amount of the Notes, thereby incurring irrevocable liability to pay for the Notes from its custodial account at State Street Bank & Trust Co. ("State Street Bank"), headquartered in Boston, Massachusetts, and accepting delivery of the Notes, in amounts as high as those specified in the order.  At the latest, title to the Notes passed to WSIB in the United States when WSIB's staff in Olympia, Washington confirmed with staff from one or more of the above-referenced parties (also in the United States) that information on an internally created trade ticket was accurate and issued a release authorizing State Street Bank to debit the appropriate WSIB fund account, with a subsequent debit made from State Street Bank's DTC account (No. 997) in New York, New York, and accept delivery of the Notes into State Street's DTC account in New York, New York, for the account of the respective WSIB fund, thereby completing the settlement of the transaction.  Accordingly, each

of the above-listed purchases was a "domestic transaction" that took place within the United States because the transaction occurred within the United States.

33.     For the 4.375% Notes sales, WSIB followed a similar process.  It communicated its commitment to sell the Notes when a representative for WSIB placed sell orders on those Notes from Olympia, Washington by placing telephone calls to the offices of Jefferies & Company, Inc. ("Jefferies") in New York, or elsewhere in the United States, incurring irrevocable liability to sell the Notes from its custodial account at State Street Bank, headquartered in Boston, Massachusetts, and deliver the Notes, in amounts as high as those specified in the order, when pricing was confirmed with Jefferies.  Title to the Notes passed to WSIB in the United States when WSIB's staff in Olympia, Washington confirmed with staff from Jefferies (also in the United States) that information on an internally created trade ticket was accurate and issued a release authorizing State Street Bank to deliver the Notes from State Street Bank's DTC account in New York, New York, for the account of the respective WSIB fund, and to receive credit for the above-referenced amount to its DTC account in New York, New York, for the account of the respective WSIB fund, thereby completing the settlement of the transaction.  Accordingly, WSIB's sales of 4.375% Notes was a "domestic transaction" that took place within the United States because the transaction occurred within the United States.

## V.     DEFENDANTS' UNDISCLOSED KICKBACK AND BRIBERY SCHEME

34.     Plaintiff WSIB was unaware when it purchased these Notes that defendants were engaged in a massive widespread bribery scheme, paying approximately $788 million in bribes to government officials to improperly influence the award of more than 100 large construction contracts to defendants in Brazil and at least 11 other countries in Central and South America and Africa.  Defendants concealed their bribery scheme for years and failed to properly account for

- 20 -

$3.336 billion in ill-gotten benefits, making CNO's and Odebrecht's financial results false and misleading when made. Defendant Odebrecht has pled guilty to this bribery scheme – agreeing that it "is pleading guilty because it is guilty of the charges contained in the Information" – and specifically implicated defendant CNO as an instrumentality in the wrongful conduct as alleged below.

### A.   The "Bribe Department"

35.    To further their bribery scheme, defendants created and funded an elaborate, secret financial structure that operated to account for and disburse corrupt bribe payments to, and for the benefit of, government officials and political parties. Central to this system of corruption, in or about 2006, defendants established a standalone division within defendant CNO called the Division of Structured Operations, which effectively functioned as a "Department of Bribery" for defendant Odebrecht and its related entities. The department was put under the control of Hilberto Silva.

36.    According to a *Bloomberg* article entitled "No One Has Ever Made a Corruption Machine Like This One," Hilberto Silva and other individuals central to the scheme "were career Odebrecht men." In fact, "Silva had been at Odebrecht since the 1970s, mostly in finance. . . . His father knew Norberto [the founder of Odebrecht]; the Odebrechts used to have Silva's family over to their beach house." According to *Bloomberg*, before being "enshrined in the corporate flowchart as the Structured Operations Division," the new unit led by Silva "was assigned offices inside Odebrecht headquarters in Salvador and São Paulo." After the division received its official name, there was a revolving door between Odebrecht S.A. and the "Department of Bribery" at CNO. As detailed by *Bloomberg*, "[t]he department was supplemented, as needed, by a collection of Odebrecht employees and contractors with special skills – the accountant, for example, who set up

- 21 -

the web of front companies, and the computer programmers who designed and ran a secret messaging system."

37.    The Division of Structured Operations utilized an entirely separate and off-book communications system called "Drousys" in order to conceal its activities, which allowed members of the Division of Structured Operations to communicate with one another and with outside financial operators and other co-conspirators about the bribes through the use of secure emails and instant messages, utilizing code names and passwords.  In addition, defendants maintained a detailed "shadow budget" through a computer system known as "MyWebDay" that tracked payments, payment requests and other bribe-related information.

38.    To further conceal the Company's criminal conduct, the Division of Structured Operations managed and distributed funds that Odebrecht never recorded on its balance sheet.  These unrecorded funds were generated by Odebrecht through a variety of methods, including, but not limited to: (i) standing overhead charges collected from subsidiaries; (ii) overcharges and fees that were attributed as legitimate to service providers and subcontractors but not included in project budgets; (iii) undeclared retainers and success fees for the purchase of company assets; and (iv) self-insurance and self-guarantee transactions.

39.    Once generated, unrecorded funds were funneled by the Division of Structured Operations to a series of offshore entities that were not included in either CNO's or Odebrecht's financial statements as related entities.  Defendants used these offshore entities to further the bribery scheme and to conceal and disguise improper payments made to, or for the benefit of, government officials and political parties in various countries.

40.    Disbursements of these unrecorded funds were made by financial operators who acted on defendants' behalf.  Payments were made to secret account beneficiaries and *doleiros*, who

- 22 -

delivered the payments in cash both inside and outside Brazil in packages or in suitcases at locations predetermined by the beneficiaries of the funds or via wire transfer through one or more offshore entities.

### B.   Defendants' Corrupt Practices in Brazil

41.    Beginning at least as early as 2003 through approximately 2016, defendants paid $349 million in bribes to various Brazilian officials and political parties in order to secure an improper advantage in obtaining lucrative public construction contracts within the country.   In return, defendants obtained financial benefits exceeding $1.9 billion from these illegally obtained contracts.

42.    According to the agreed-upon facts in Odebrecht's Plea Agreement, beginning in or about 2004, defendants CNO and Odebrecht conspired with other construction companies to evaluate and divide up future contracts for Brazilian oil company Petrobras.   Once it was agreed among these entities which company or companies would be responsible for a particular project, and at what price, it was agreed that only the predetermined company would present a qualifying bid, and that the other entities would present proposals to ensure that the predetermined company would win the contract.   In this manner, these entities rotated available Petrobras contracts between them.

43.    For example, in or about October 2010, defendant Odebrecht bid for and won a Petrobras contract for the provision of various environmental and security certification services that were necessary for various activities that Petrobras undertook abroad.   In order to win the contract, Odebrecht agreed to pay more than $40 million in bribes to certain political parties from its Division

of Structured Operations using unrecorded funds in connection with the project, some of which were paid directly to specific government officials.[8]

44.     In addition to corrupt payments used to secure contracts with Petrobras, defendants paid bribes to political parties, individual candidates and other government officials at the local, regional and national levels in Brazil with unrecorded funds from the Division of Structured Operations in order to secure additional business.

45.     For example, between approximately 2010 and 2014, defendants, through the Division of Structured Operations, made approximately $20 million in bribery payments in order to secure continued work on a transportation project.  Defendant Odebrecht profited by approximately $184 million from this project.

### C.     Defendants' Corrupt Practices Outside Brazil

46.     Between approximately 2001 and 2016, defendants paid illicit bribes of about $439 million to foreign officials and political parties in various countries outside of Brazil, including Angola, Argentina, Colombia, the Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and Venezuela, in order to secure an improper advantage to obtain and retain public construction projects in those countries.  Defendants benefitted by more than $1.4 billion as a result of these corrupt payments.

47.     Typically, defendants used the Division of Structured Operations to execute the corrupt payments using unrecorded funds, either: (i) in cash in the country in question; or (ii) by deposits into accounts indicated by the ultimate beneficiaries or their intermediaries.  Again, these payments were not recorded on the balance sheet of defendants Odebrecht or CNO.

---

[8]   The examples alleged in this complaint are not meant to be exhaustive, but rather to illustrate how the bribery and kickback scheme perpetrated by defendants operated.

D.      **Defendants' Obstruction of Justice**

48.      In or about 2014, Brazilian law enforcement authorities began an initially covert investigation into corruption related to Petrobras, called Lava Jato, or "Operation Car Wash."  This investigation originally focused on Petrobras, the partially state-owned oil and energy company. After commencing in Brazil, investigations into Petrobras were launched in the United States and Switzerland.

49.      Defendants have admitted that, after becoming aware of these investigations, they sought to conceal or destroy evidence of their criminal activities and hinder the investigations by, *inter alia*: (i) directing employees to delete records that might reveal illegal activities; (ii) bribing foreign officials to prevent their compliance with requests for information and documents from investigators; (iii) destroying the ability to access the MyWebDay platform containing evidence of defendants' misconduct; (iv) ordering their employees to take steps to evade authorities, including by moving aspects of the Division of Structured Operations outside of Brazil; and (v) making numerous false and misleading statements denying defendants' participation in the bribery and kickback scheme, undermining the validity of the investigations and misrepresenting salient facts to investors and the public.

50.      With plaintiff and other investors unaware of this undisclosed bribery and kickback scheme, defendants misrepresented Odebrecht's and CNO's financial results and future prospects until at least December 1, 2016 in order to sell billions of dollars of notes to plaintiff and other investors.

VI.     **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

51.      The Notes were initially sold in private offerings pursuant to offering memoranda (the "Offering Memoranda").  These memoranda contained defendant CNO's financial results, including

- 25 -

reported net income in the many hundreds of millions or billions of dollars per year. These memoranda also represented that the majority of CNO's revenues came from engineering and construction of large public works projects, touting CNO's expertise, knowledge of local markets, reputation and business relationships as providing it with key advantages over its competition in securing bids to win lucrative government contracts. Defendants Odebrecht and CNO also misrepresented their financial results and future prospects in other public statements made available to plaintiff, other investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO, which these defendants published in English.

### A.   The 2012 7.125% Notes Offering Memorandum

52.   Defendants began soliciting investors to buy the 7.125% Notes in or about June 2012. In connection with these efforts, defendants CNO and Odebrecht Finance issued an offering memorandum that contained numerous representations regarding defendant CNO's financial results, financial statements, business, operations, risks and prospects (the "2012 OM"). Plaintiff purchased the 7.125% Notes based upon the false and misleading financial statements contained in the 2012 OM, as well as other similar false and misleading statements made by defendants.

53.   The 2012 OM described the bidding process for new projects as "competitive," in which "price generally is the most important factor that determines" whether CNO is awarded a contract. In a description of the reasons for CNO obtaining contracts, the vast bribery scheme was omitted entirely, stating in pertinent part:

> ***We obtain contracts for new projects primarily through competitive bidding***
> in response to solicitations by government agencies, public announcements by private-sectors entities, invitations when short-listed for private projects and, to a lesser extent, through direct negotiation. The volume of work generally available in the market at the time of the bid, the size of our backlog at the time, the location and complexity of the project to be executed and the level of competition for the project are all factors that may affect our competitiveness in a particular bidding process.

- 26 -

*        *        *

We are the largest engineering and construction company in Latin America as measured by 2010 revenues. ***Most of our ongoing construction projects were awarded through a competitive bidding process***. While ***price generally is the most important factor that determines whether we are awarded a contract through competitive bidding procedures,*** other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships. . . . [W]e believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.

*        *        *

***We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons***. First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids. Second, our decentralized management approach has generally allowed us to effectively manage our projects. Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.

54.     The statements referenced above in ¶¶52-53 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known by defendants or recklessly disregarded by them:

(a)     over the course of more than a decade, defendants and their operatives had paid hundreds of millions of dollars in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)     CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

- 27 -

(c)     CNO did not secure contracts through a "competitive bidding process" where price was the "most important" factor, but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)     CNO's financial statements and disclosures included in the 2012 OM were false and misleading, as alleged at ¶¶61-64 and 66-85;

(e)     as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)     as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects and the unsustainability of its historical financial results if the truth were revealed.

**B.     The 2013 4.375% Notes and 8.25% Notes Offering Memoranda**

55.     Defendants began soliciting investors to buy the 4.375% Notes and the 8.25% Notes in or about April 2013.  In connection with these efforts, defendants CNO and Odebrecht Finance issued two substantially similar offering memoranda that contained numerous representations regarding defendant CNO's financial results, business, operations, risks and prospects (the "2013 OMs").  Plaintiff purchased a significant amount of the 4.375% Notes and the 8.25% Notes based upon the false and misleading financial statements contained in the 2013 OMs, as well as other similar false and misleading statements made by defendants.

56.     The 2013 OMs described the bidding process for new projects as "competitive," in which "price generally is the most important factor that determines" whether CNO is awarded a

contract.  In a description of the reasons for CNO obtaining contracts, the vast bribery scheme was

omitted entirely, stating in pertinent part:

> ***We obtain contracts for new projects primarily through competitive bidding*** in response to solicitations by government agencies, public announcements by private-sectors entities, invitations when short-listed for private projects and, to a lesser extent, through direct negotiation.  The volume of work generally available in the market at the time of the bid, the size of our backlog at the time, the location and complexity of the project to be executed and the level of competition for the project are all factors that may affect our competitiveness in a particular bidding process.

> \*       \*       \*

> We are the largest engineering and construction company in Latin America as measured by 2011 revenues.  ***Most of our ongoing construction projects were awarded through a competitive bidding process***.  While ***price generally is the most important factor that determines whether we will be awarded a contract through competitive bidding procedures***, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships. . . .  [W]e believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.

> \*       \*       \*

> ***We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons***.  First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids.  Second, our decentralized management approach has generally allowed us to effectively manage our projects.  Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.

57.     The statements referenced above in ¶¶55-56 were materially false and misleading

when made because they failed to disclose the following adverse facts, which were known by

defendants or recklessly disregarded by them:

(a)     over the course of more than a decade, defendants and their operatives had paid hundreds of millions of dollars in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)     CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

(c)     CNO did not secure contracts through a "competitive bidding process" where price was the "most important" factor, but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)     CNO's financial statements and disclosures included in the 2013 OMs were false and misleading, as alleged at ¶¶61-64, 66-77 and 86-90;

(e)     as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)     as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects and the unsustainability of its historical financial results if the truth were revealed.

### C.     The 2014 5.25% Notes Offering Memorandum

58.     Defendants began soliciting investors to buy the 5.25% Notes in or about June 2014. In connection with these efforts, defendants CNO and Odebrecht Finance issued an offering memorandum that contained numerous representations regarding defendant CNO's financial results, business, operations, risks and prospects (the "2014 OM"). Plaintiff purchased a significant amount

1359489_1

of the 5.25% Notes based upon the false and misleading financial statements contained in the 2014

OM, as well as other similar false and misleading statements made by defendants.

59.     The 2014 OM described the bidding process for new projects as "competitive," in

which "price generally is the most important factor that determines" whether CNO is awarded a

contract.  In a description of the reasons for CNO obtaining contracts, the vast bribery scheme was

omitted entirely, stating in pertinent part:

> ***We obtain contracts for new projects primarily through competitive bidding***
> in response to solicitations by government agencies, public announcements by
> private-sectors entities, invitations when short-listed for private projects and, to a
> lesser extent, through direct negotiation.  The volume of work generally available in
> the market at the time of the bid, the size of our backlog at the time, the location and
> complexity of the project to be executed and the level of competition for the project
> are all factors that may affect our competitiveness in a particular bidding process.
>
> *        *        *
>
> We are the largest engineering and construction company in Latin America as
> measured by 2013 revenues.  ***Most of our ongoing construction projects were
> awarded through a competitive bidding process***.  While ***price generally is the most
> important factor that determines whether we will be awarded a contract through
> competitive bidding procedures***, other important factors in competitive bidding
> procedures include health, safety and environmental protection records, service
> quality, technological capacity and performance, as well as reputation, experience,
> access to funding sources and client relationships. . . .  [W]e believe that we have a
> competitive advantage with respect to other Brazilian engineering and construction
> companies as a result of our experience, reputation, capacity, efficiency, trained
> personnel, size, financial resources and technological capabilities.
>
> *        *        *
>
> ***We believe that we are able to make competitive bids in Brazil and internationally
> for three principal reasons***.  First, our engineering capabilities and experience
> enable us to accurately assess the nature and extent of the work required to complete
> our projects, to create efficient engineering plans and, on occasion, to offer more
> cost-effective alternatives to proposed plans of governmental authorities in
> invitations for bids.  Second, our decentralized management approach has generally
> allowed us to manage our projects effectively.  Third, our projects are often eligible
> for funding from the Brazilian government for service exports and from multilateral
> financial institutions.

1359489_1

60.     The statements referenced above in ¶¶58-59 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known by defendants  or recklessly disregarded by them:

(a)     over the course of more than a decade, defendants and their operatives had paid hundreds of millions of dollars in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)     CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

(c)     CNO did not secure contracts through a "competitive bidding process" where price was the "most important" factor, but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)     CNO's financial statements and disclosures included in the 2014 OM were false and misleading, as alleged at ¶¶61-64, 66-77 and 91-99;

(e)     as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)     as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects and the unsustainability of its historical financial results if the truth were revealed.

- 32 -

**D.     Defendants Odebrecht's and CNO's False Financial Statements and Disclosures**

61.     The 2012, 2013 and 2014 Offering Memoranda and other materials made available to plaintiff, other investors, analysts and ratings agencies included CNO's consolidated interim and annual financial statements for periods no later than 2009 to 2015.  In addition, defendant Odebrecht released financial information for 2005 to 2014.  These financial statements and disclosures were false when issued as they failed to properly account for or disclose the revenue, expenses, hidden assets, liabilities and ill-gotten gains directly arising from defendants' fraudulent bribery scheme in violation of Brazilian generally accepted accounting principles ("GAAP").[9]

62.     As discussed below, defendant CNO was obligated to prepare and present its consolidated quarterly and annual financial statements distributed to current and potential investors in compliance with GAAP.  Indeed, CNO asserted that its financial statements were prepared in accordance with GAAP.  For example, the 2014 OM for the 5.25% Notes falsely asserted that the financial statements included in the 2014 OM were prepared and presented in accordance with Brazilian GAAP:

---

[9]     GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Brazilian accounting practices are established by Brazilian corporate law.  The corporate law in effect at all relevant times required both public and private Brazilian companies to prepare their financial statements in accordance with local accounting standards issued by the Brazilian Accounting Pronouncements Committee (*Comitê de Pronunciamentos Contábeis*) or the CPC, which promulgates its accounting standards using the prefix "CPC."  CPCs must be in compliance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board.  CPCs are thus, in substance, translations of IFRS standards into Portuguese.  Financial statements filed with either the Securities and Exchange Commission of Brazil or the U.S. Securities and Exchange Commission that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

**PRESENTATION OF FINANCIAL AND OTHER INFORMATION**

\*       \*       \*

*CNO Financial Statements*

We maintain our books and records in *reais*.

***We prepare our consolidated financial statements in accordance with accounting
practices adopted in Brazil, or Brazilian GAAP, which are based on***:

- Brazilian Law No. 6,404/76, as amended by Brazilian Law No. 9,457/97,
  Brazilian Law No. 10,303/01, Brazilian Law No. 11,638/07 and by
  Provisional Measure No. 449/08, which we refer to collectively as the
  Brazilian Corporate Law;

- the rules and regulations of the Brazilian Securities Commission (*Comissão
  de Valores Mobiliários*), or the CVM;

- the accounting standards issued by the Brazilian Institute of Independent
  Auditors (*Instituto dos Auditores Independentes do Brasil*), or IBRACON,
  and the Brazilian Federal Accounting Council (*Conselho Federal de
  Contabilidade*), or the CFC; and

- the accounting standards issued by the Brazilian Accounting Standards
  Committee (*Comitê de Pronunciamentos Contábeis - CPC*), or the CPC.

63.    Defendant CNO made substantially identical assertions about compliance with

Brazilian GAAP in the 2012 OM and 2013 OMs.  Additionally, CNO repeated the assertion that its

consolidated financial statements were prepared and presented in accordance with Brazilian GAAP

in the actual notes to CNO's consolidated financial statements at December 31, 2011:

The consolidated financial statements have been prepared and are being
presented in accordance with accounting practices adopted in Brazil, including the
pronouncements issued by the Brazilian Accounting Pronouncements Committee
("CPC").

64.    Defendant CNO also made the same or substantially the same disclosure in the notes

to each of its interim quarterly and annual financial statements contained in each of the four Notes

offerings in the 2012 OM, 2013 OMs and 2014 OM, or made available to plaintiff, other investors,

analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.

- 34 -

65.     Similarly, in its 2014 Annual Report, Odebrecht made the assertion that the annual financial data it disclosed for 2009-2012 was "in accordance with the standards of the Brazilian Financial Accounting Standards Board (CPC)." And in its 2015 Annual Report, Odebrecht asserted that the financial data it disclosed for 2010-2012 was "in accordance with the norms of The Committee on Accounting Statements (CPC)."

66.     Each of these assertions in ¶¶62-65 above regarding compliance with Brazilian GAAP and the norms of the CPC were false when made. As described below, each of defendants' relevant period financial statements and disclosures, including in the 2012 OM, 2013 OMs and 2014 OM and in other materials made available to plaintiff, other investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO, which they published in English, were not presented in accordance with Brazilian GAAP or the norms of the CPC, and were materially false and misleading for the following reasons.

### 1.     Odebrecht and CNO Failed to Accrue a Liability for the Foreseeable Financial Costs Arising from the Bribery Scheme

67.     Defendant CNO improperly failed to accrue a provision in its financial statements and disclosures (including CNO's public 2009 through 2015 interim and annual financial statements) for the clearly foreseeable and estimable financial obligations arising from defendants' ongoing illegal bribery scheme, including the probable material financial disgorgements, penalties, fines and legal costs, in violation of Brazilian GAAP. Similarly, defendant Odebrecht violated Brazilian GAAP and the norms of the CPC when it consolidated CNO's false financial statements – which improperly lacked an accrual provision for the clearly foreseeable and estimable financial obligations arising from defendants' ongoing illegal bribery scheme – into its own consolidated financial statements and then reported certain of its own consolidated financial data based on defendant CNO's false financial statements. As alleged above at ¶¶3, 6 and 34, between 2001 and 2016, defendants paid nearly $800

- 35 -

million in bribes to government officials to secure as much as $3 billion in construction contracts. Facing penalties as high as $12 billion in the United States alone, defendants settled with the U.S. government for $2.6 billion. These amounts were quantitatively and qualitatively material to analysts, investors and ratings agencies.

68.     Defendants' bribery conduct was unlawful, and the criminal, civil and financial consequences for this illegal behavior were knowable and within an estimable range of possible negative outcomes throughout the period the conduct occurred. Brazilian GAAP's CPC *Conceptual Structure for the Preparation and Presentation of the Financial Statements*, ¶37, specifically states that some liabilities can only be measured using a high degree of estimation. In Brazil, these liabilities are described as a "provision" in accounting parlance. Brazilian *Technical Pronouncement CPC 25 Provisions, Contingent Liabilities and Assets*, ¶¶12-19, 25, 36 and 39, require that a provision must be recognized by a charge against income when, after considering all the available evidence: (1) it is probable that a present obligation for a past event or conduct exists; (2) which will more likely than not require a future disbursement to settle the obligation; and (3) a reasonable estimate of the required disbursement to settle the obligation can be made after weighing all possible outcomes or ranges of outcomes.

69.     Defendants' illegal bribery conduct, as alleged herein and as admitted in the Plea Agreement, constituted a crime and thus created a probable legal obligation that carried a knowable and estimable range of possible civil, criminal and financial penalties and consequences. Moreover, by the time defendants issued the 2012 OM, it was highly probable that future contingencies for such financial penalties would have a material adverse impact on CNO's future results of operations and financial condition. Odebrecht and CNO violated CPC 25 by failing to accrue a provision, with a simultaneous charge against income, in their financial statements and disclosures (including in

- 36 -

CNO's publicly disseminated interim and annual 2009 through 2015 financial statements) for the foreseeable and estimable material financial obligations arising from defendants' ongoing illegal bribery scheme.

2.      **CNO Failed to Disclose the Nature and Range of the Foreseeable, Expected Costs that Would Likely Be Incurred as a Result of Defendants' Bribery Scheme**

70.      Defendant CNO improperly failed to disclose as part of its financial disclosures (including in the notes to CNO's 2009 through 2015 publicly disseminated interim and annual financial statements) the nature of defendants' illegal bribery scheme, along with the clearly foreseeable and estimable expected financial costs that would likely be incurred to settle the legal and financial consequences of this conduct, as required by Brazilian GAAP.

71.      In addition to requiring the accrual of a "provision" in the financial statements by a charge against income for defendants' estimated legal penalties, fines and costs associated with the illegal bribery scheme as described in ¶¶67-69 above, Brazilian GAAP, including CPC 25, ¶¶84-85, also requires a separate disclosure be made describing the provision in the notes to the financial statements.  The disclosure must include: (1) a brief description of the nature of the provision or contingent liability, including an expected timeline during which disbursement will be made to settle the obligation; and (2) an indication of any uncertainties related to the value or amount of settlement of the liability, including the main assumptions adopted relating to future events.

72.      Notably, even if an entity accrues no provision because it does not believe a current or past event or conduct has risen to the level of creating a present obligation, or the entity cannot create a sufficiently reliable estimate of the future disbursement necessary to settle an obligation, CPC 25, ¶¶86-89, still requires disclosure of the "contingent liability" in the notes to the financial statements.  Such disclosure includes a brief description of the nature of the contingent liability, the

- 37 -

estimate of its financial effect, and an indication of any uncertainties related to value or timing of any anticipated disbursement to settle the claim. CNO violated CPC 25 by failing to disclose any information regarding the corruption scheme or the likely legal and associated financial impact of the illegal bribery scheme in any of its financial disclosures, including its publicly disseminated financial statement footnotes for interim or annual periods from 2009 through 2015.

### 3. CNO Improperly Failed to Separately Distinguish and Disclose Contract Revenue Obtained as a Result of Defendants' Massive Illegal Bribery Activity from Other Contract Revenue

73. Defendant CNO improperly failed to separately present or disclose the material amounts of foreign and domestic contract revenue it obtained as a result of its illegal corruption and bribery activities from its normal recurring contract revenue. As alleged herein, defendants found it necessary to provide material amounts of illegal bribes in order to secure many of the lucrative contracts Odebrecht and CNO were awarded. Moreover, a probable consequence of the discovery of these bribes could (and did) lead to particular governments or governmental agencies restricting further contract work for Odebrecht and CNO.

74. Brazilian GAAP, including the CPC-00, *Conceptual Structure for the Preparation and Presentation of the Financial Statements*, states that it is common practice to present and disclose different types of revenue separately in order to assist investors in assessing the ability of a business to generate cash in the future and distinguish revenues that arise in the normal course of the entity's business from revenues stemming from contingent activities that may not be repeated on a regular basis.

75. It would have been highly material to investors, analysts and ratings agencies in assessing CNO's ability to generate future cash flows to have understood that a material portion of the company's contract revenue had been secured through corruption and illegal bribes. As such,

- 38 -

investors, analysts and ratings agencies would not necessarily have expected contract revenue levels obtained via fraudulent means to represent a reliable level of future revenue. By failing to separately classify or disclose contract revenues obtained via bribes and corruption, CNO violated Brazilian GAAP.

### 4. CNO Improperly Failed to Recognize, Classify or Adequately Disclose Material Amounts of Concealed Funds and Illegal Bribes

76.     Defendant CNO improperly failed to recognize, classify or adequately disclose material amounts of concealed, illegal expenses for the hundreds of millions of dollars in illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on particular material contracts. By concealing these costs and keeping the funds to pay them off-books, as alleged at ¶¶37-40, CNO violated Brazilian GAAP, including the CPC's *Basic Conceptual Pronouncement CPC 00, and CPC 17, Construction Contracts*, which require that assets and expenses directly associated with generating particular contract revenue must be reflected in the books and records of the entity and must be simultaneously recognized in the income statement in the same period as the revenue. Given the material nature of these illegal expenses, Brazilian GAAP also required disclosure of such illegal expenses in the notes to the financial statements. CNO violated Brazilian GAAP by concealing these funds and expenses "off-books," and by failing to disclose the practice in the financial statements.

77.     Defendants' improper accounting and lack of disclosure described in ¶¶67-76 above caused the CNO consolidated financial statements, among others from 2009 to 2016, and Odebrecht's financial disclosures, referenced below to be false and misleading.

1359489_1

E.    **False Financial Statements Included in the 2012 7.125% Notes Offering Memorandum**

1.    **CNO's 2009 and 2010 Annual Consolidated Financial Statements**

78.    Defendant CNO's annual financial statements for the year ended December 31, 2010, originally dated March 2011, were included in the 7.125% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements reported revenues of more than $9.7 billion and net income of more than $734 million for the year ended December 31, 2010, and included a re-presentation of the 2009 annual financial statements for comparative purposes.

79.    The 2009 and 2010 reported financial statements were materially false and misleading when issued because, as described above at ¶¶67-76, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

2.    **CNO's 2011 Annual Consolidated Financial Statements**

80.    Defendant CNO's annual financial statements for the year ended December 31, 2011, originally dated March 6, 2012, were included in the 7.125% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements reported revenues of more than $11.4

- 40 -

billion and net income of more than $489 million for the year ended December 31, 2011.  The 2011 annual financial statements also included a re-presentation of the 2010 annual financial statements for comparative purposes.

81.      These reported 2011 and 2010 annual financial statements were materially false and misleading when issued because, as described above at ¶¶67-76, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of  Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

82.      The notes to the December 31, 2011 annual financial statements also misleadingly described the status of CNO's credit ratings by the main credit rating agencies:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

83.      This disclosure was materially false and misleading when made in that it omitted and failed to disclose that the "consecutive upgrades" that defendant CNO touted were achieved only by concealing defendants' bribery scheme from the ratings agencies.  Had the ratings agencies been aware of the existence and the extent of defendants' bribery scheme, and the amount of revenues and net income that were directly attributable to this scheme, CNO would never have obtained the disclosed "consecutive upgrades" and, in fact, would have been downgraded significantly, as

demonstrated by the sharp downgrades defendant CNO later received when its bribery scheme was made public.

### 3.   CNO's First Quarter 2012 Consolidated Interim Financial Statements

84.      Defendant CNO's interim quarterly consolidated financial statements for the three months ended March 31, 2012 were included in the 7.125% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements reported revenues of more than $2.9 billion and net income of more than $205 million for the quarter ended March 31, 2012.  The first quarter 2012 quarterly financial statements also included a re-presentation of the first quarter 2011 financial statements for comparative purposes.

85.      These reported first quarter 2012 and 2011 interim quarterly financial statements were materially false and misleading when issued because, as described above at ¶¶67-76, defendants: (1) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (2) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (3) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

**F.      False Financial Statements Included in Defendants' 2013 Offering Memoranda for the 4.375% Notes and 8.25% Notes**

**1.      CNO's 2010 and 2011 Annual Consolidated Financial Statements**

86.     Defendant CNO's annual financial statements for the years ended December 31, 2010 and 2011, described in ¶¶80-83 above, were also included in the 4.375% Notes and 8.25% Notes offering memoranda and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO. These financial statements were materially false and misleading when republished in the 4.375% Notes and 8.25% Notes offering memoranda for the same reasons set forth in ¶¶80-83 above.

**2.      CNO's 2012 Annual Consolidated Financial Statements**

87.     Defendant CNO's annual financial statements for the year ended December 31, 2012 were included in the 4.375% Notes and 8.25% Notes offering memoranda and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO. These financial statements repeated revenues exceeding $14 billion for 2012, and net income of $457 million. The 2012 annual financial statements also included a re-presentation of the 2011 annual financial statements for comparative purposes.

88.     These reported 2012 and 2011 annual financial statements were materially false and misleading when issued because, as described above at ¶¶67-76, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity, from other contract revenue, in violation of Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal

- 43 -

bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

89.     The notes to CNO's 2012 consolidated financial statements also disclosed ratings upgrades and investment grade credit ratings from each of the three major ratings agencies:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.

> . . . In May 2012, the rating agency Standard & Poor's assigned a BBB- rating on a global scale and a and br AAA on the national scale.

90.     The footnote pointed out that CNO had now secured investment grade ratings from all three major credit rating agencies. This disclosure was materially false and misleading when made in that it omitted and failed to disclose that the "consecutive upgrades" to investment grade ratings that CNO touted were achieved only by concealing defendants' bribery scheme from the ratings agencies. Had the ratings agencies been aware of the existence and the extent of defendants' bribery scheme, and the amount of revenues and net income that were directly attributable to this scheme, CNO would never have obtained the disclosed "consecutive upgrades" and, in fact, would have been downgraded significantly, as demonstrated by the sharp downgrades CNO later received when its bribery scheme was made public.

### G.     False Financial Statements Included in Defendants' 2014 Offering Memorandum for the 5.25% Notes

#### 1.     CNO's 2011 and 2012 Annual Consolidated Financial Statements

91.     Defendant CNO's annual financial statements for the years ended December 31, 2012 and 2011, described in ¶¶80-83 and 87-90 above, were also included in the 5.25% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO. These financial statements were materially false

and misleading when republished in the 5.25% Notes offering memorandum for the same reasons set forth in ¶¶80-83 and 87-90 above.

## 2.     CNO's 2013 Annual Consolidated Financial Statements

92.     Defendant CNO's annual financial statements for the year ended December 31, 2013, originally dated February 28, 2014, were included in the 5.25% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements reported revenues of more than $13.7 billion for the year, and net income of more than $723 million.  The 2013 annual financial statements also included a re-presentation of the 2012 annual financial statements for comparative purposes.

93.     These reported 2013 and 2012 annual financial statements were materially false and misleading when issued because, as described above at ¶¶67-76, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of  Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

94.     The notes to the 2013 annual financial statements also described CNO's credit ratings by the main credit rating agencies:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.
>
> In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and Aa1.br on the

- 45 -

Brazilian national scale.  In May 2012, the rating agency Standard & Poor's assigned a BBB- rating on the global scale and br AAA on the national scale.  In September 2013, the rating agency Fitch Ratings assigned a BBB investment grade rating on the global scale and AAA on the Brazilian national scale.

95.     These disclosures were materially false and misleading in that they omitted and failed to disclose that the ratings touted by CNO were achieved only by concealing defendants' bribery scheme from the ratings agencies.  Had the ratings agencies been aware of the existence and the extent of defendants' bribery scheme, and the amount of revenues and net income that were directly attributable to this scheme, CNO would never have obtained the disclosed "consecutive upgrades" and, in fact, would have been downgraded significantly, as demonstrated by the sharp downgrades defendant CNO later received when its bribery scheme was made public.

**3.     CNO's First Quarter 2014 Consolidated Interim Financial Statements**

96.     CNO's financial statements for the three-month period ended March 31, 2014 were included in the 5.25% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  CNO's March 31, 2014 financial statements reported revenues of more than $3.1 billion and net income of more than $302 million for the quarter ended March 31, 2014.  The first quarter 2014 quarterly financial statements also included a re-presentation of the first quarter 2013 financial statements for comparative purposes, which reported revenues of more than $2.8 billion and net income of more than $467 million for the quarter ended March 31, 2013.

97.     These first quarter 2014 and 2013 interim financial statements were materially false and misleading when issued because, as described above at ¶¶67-76, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii)

- 46 -

improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of  Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

98.    The notes to CNO's first quarter 2014 financial statements also described CNO's credit ratings by the main credit rating agencies:

> The Company's credit has been monitored and analyzed by the main credit rating agencies for many years and, since its first rating, the Company has obtained consecutive upgrades on both the local and global scales.
>
> In December 2009, the rating agency Moody's started to cover the Company, and assigned a Baa3 investment grade rating on the global scale and Aa1.br on the Brazilian national scale. In May 2012, the rating agency Standard & Poor's assigned a BBB- rating on the global scale and br AAA on the national scale. In September 2013, the rating agency Fitch Ratings assigned a BBB investment grade rating on the global scale and AAA on the Brazilian national scale. In May 2014, the rating agency Standard & Poor's upgraded Company's Credit Risk from BBB- to BBB on the global scale, maintaining the br AAA on the national scale.

99.    These disclosures were materially false and misleading in that they omitted and failed to disclose that the credit ratings touted by CNO were achieved only by concealing defendants' bribery scheme from the ratings agencies.  Had the ratings agencies been aware of the existence and the extent of defendants' bribery scheme, and the amount of revenues and net income that were directly attributable to this scheme, CNO would never have obtained the disclosed "consecutive upgrades" and, in fact, would have been downgraded significantly, as demonstrated by the sharp downgrades CNO later received when its bribery scheme was made public.

- 47 -

### H.    Defendant Odebrecht's False Financial Disclosures

#### 1.    Odebrecht's 2012 Annual Report

100.    Defendant Odebrecht made numerous disclosures of financial performance and data in its 2012 Annual Report, which was made available to plaintiff, investors, analysts and ratings agencies, including on defendant Odebrecht's website, in English.  For example, the Annual Report disclosed EBITDA (earnings before interest, taxes, depreciation and amortization) of nearly $3.8 billion in 2011.  The report also disclosed the following results for Odebrecht in 2011: gross revenue of over $37.8 billion; net profit of $24 million; total assets of over $51 billion; and nearly $9.6 billion in shareholder's equity.

101.    The statements referenced above in ¶100 were materially false and misleading when made because, as described above at ¶¶67-69, defendant Odebrecht improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to defendants' ongoing illegal bribery scheme, when it consolidated CNO's false financial statements into its own consolidated financial statements, in violation of Brazilian GAAP and the CPC, and presented its own consolidated financial data based on the underlying false financial statements.

#### 2.    Odebrecht's 2014 Annual Report and Press Release

102.    Defendant Odebrecht made numerous disclosures of financial data in its 2014 Annual Report, which was made available to plaintiff, investors, analysts and ratings agencies, including on Odebrecht's website, in English.  For example, these disclosures reported gross revenues of more than $24 billion for 2009, more than $32 billion for 2010, over $37 billion for 2011, nearly $41 billion for 2012 and over $41 billion for 2013.  The Annual Report also reported that, for 2013, Odebrecht had nearly $61 billion in assets, EBITDA of over $4.8 billion, net profit of $210 million and shareholder's equity of more than $7.8 billion.  The Annual Report includes a note stating that

"[t]he numbers for 2012, 2011, 2010, and 2009 (restated) are in accordance with the standards of the Brazilian Financial Accounting Standards Board (CPC)."

103.    Defendant Odebrecht also disclosed financial data through a press release on April 24, 2014, entitled "Odebrecht S.A. revenue grows 16% to R$ 96.9 billion in 2013," which was made available to plaintiff, investors, analysts and ratings agencies, including on defendant Odebrecht's website, in English.  It stated in pertinent part:

> Odebrecht S.A., the holding company that controls the businesses and companies of the Odebrecht Organization, disclosed today its consolidated balance sheet for 2013.  Gross revenue stood at R$ 96.9 billion, increasing 16% from R$ 83.5 billion in 2012.  EBITDA (earnings before interest, taxes, depreciation and amortization) reached R$ 11.4 billion, up 41% from the previous year.  In 2013, the Odebrecht Organization companies paid R$ 4.9 billion in taxes.  The Organization also retained its position as the company that creates the most direct jobs in Brazil and abroad, with a total headcount of 175,000, 127,000 of which in Brazil.
>
> Odebrecht S.A. recorded net income of R$ 490.7 million in 2013, reversing the R$ 1.5 billion loss recorded in 2012.  This turnaround was achieved despite the R$ 1.3 billion loss incurred by Odebrecht Agroindustrial, which was severely affected by the crisis sweeping Brazil's ethanol industry.

104.    The statements referenced above in ¶¶102-103 were materially false and misleading when made because, as described above at ¶¶67-69, defendant Odebrecht improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, defendants' ongoing illegal bribery scheme, in violation of Brazilian GAAP and the CPC, when it consolidated CNO's false financial statements into its own consolidated financial statements, and presented its own consolidated financial data based on the underlying false financial statements.

### 3.    Odebrecht's 2015 Annual Report

105.    Defendant Odebrecht made numerous disclosures of financial data in its 2015 Annual Report, which was made available to plaintiff, investors, analysts and ratings agencies, including on defendant Odebrecht's website, in English.  For example, the Annual Report disclosed gross revenue

- 49 -

of nearly $46 billion for 2014, and also reported that Odebrecht had EBITDA of over $6 billion, net profit of $211 million and shareholder's equity of more than $6.4 billion in 2014.  The Annual Report also included EBITDA from 2010 to 2013, reporting EBITDA of over $3.7 billion in 2010, nearly $3.8 billion in 2011, over $3.9 billion in 2012 and over $4.8 billion in 2013.  The Annual Report includes a note falsely stating that "[t]he figures for the years 2010, 2011 and 2012 (reproduced) are in accordance with the norms of The Committee on Accounting Statements (CPC)."

106.    The statements referenced above in ¶105 were materially false and misleading when made because, as described above at ¶¶67-69, defendant Odebrecht improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, defendants' ongoing illegal bribery scheme, in violation of Brazilian GAAP and the CPC, when it consolidated CNO's false financial statements into its own consolidated financial statements, and presented its own consolidated financial data based on the underlying false financial statements.

## I.      Defendants' Repeated Denials and Fraudulent Concealment of Their Kickback and Bribery Scheme

107.    The police investigations into political corruption and bribery that came to be known as Operation Car Wash initially focused on Brazil's semi-public oil company, Petrobras.  As part of defendants' obstructionist activities to fraudulently conceal their role in the matters under investigation, as detailed in ¶¶48-49, defendants repeatedly denied in public statements any part in illegal activities or wrongdoing by their employees.  As a result, defendants continued to mislead plaintiff and other investors about the true nature and scope of defendants' illegal activities.

108.    On October 2, 2014, defendant Odebrecht issued a press release, which stated in pertinent part:

Odebrecht vehemently denies having made any payment or deposit to any alleged account belonging to any officer or former officer of Petrobras. Odebrecht has had service contracts with Petrobras for decades, all of which signed on in accordance with the public bidding law.

109.    The statement referenced above in ¶108 was materially false and misleading when made because, as described above at ¶¶34-50, Odebrecht had in fact made illegal payments to Petrobras officers and had signed numerous contracts that violated the law and rigged the public bidding process.

110.    On May 1, 2015, Odebrecht released a public letter signed by Marcelo Odebrecht (the former CEO of Odebrecht), in which Mr. Odebrecht responded to a news report based on a complaint filed by Brazil's Federal Public Prosecutor's Office. According to Mr. Odebrecht:

> Because they have not managed to convict us in the courts, I get the distinct impression that they are trying to incriminate us in the media, constantly trying to tarnish our image in an attempt to implicate us in false accusations of corruption . . . .

111.    The statement referenced above in ¶110 was materially false and misleading when made because, as described above at ¶¶34-50, Odebrecht had participated in a massive scheme of corruption and bribery.

112.    On June 19, 2015, the same day Brazilian police arrested Marcelo Odebrecht, defendant CNO issued a statement calling related warrants "unnecessary," since "the company and its executives have always been available to the authorities to cooperate with the investigation since the beginning of the operation Lava Jato." This press release was false and misleading because, as CNO was aware, defendants and their employees had not been cooperating with, and, in fact were seeking to obstruct, the investigation, including by: (i) directing employees to delete records that might reveal illegal activities and to move certain illicit operations overseas in order to evade detection; (ii) making multi-million dollar payments to a governmental official in Antigua in order to prevent documents that would prove Odebrecht's guilt from being provided to international

- 51 -

authorities; and (iii) intentionally destroying encryption keys necessary to access evidence stored in defendants' email system.

113.    Three days later, on June 22, 2015, defendant Odebrecht issued a press release to "express[] its indignation" at the arrest of Marcelo Odebrecht and other executives, claiming that his arrest was "illegal" and "completely unnecessary":

> The Odebrecht Group, for respecting for its Clients, Partners, Investors, Financial Institutions, Suppliers, Users of its Services, Friends and Team Members, hereby expresses its indignation at the arrest of five of its executives and the search and seizure warrants served last Friday (June 19) at some of our subsidiaries as part of the 14th stage of Operation Lava Jato ("Car Wash"; a Brazilian corruption scandal involving alleged payoffs and the state-owned oil giant Petrobras).

> The court order approving the arrest of our executives and the search and seizure warrants demonstrates that, since the beginning of Lava Jato over a year ago, the Federal Police have not presented, as alleged in the court order, any new evidence that justifies the forceful measures taken, which *were completely unnecessary and for that very reason, illegal*.

114.    The June 22, 2015 press release continued by claiming that the only information marshalled by authorities "reflects a clear misinterpretation of the facts," and provided a detailed refutation claiming the evidence showed innocent conduct. The release also defended Odebrecht's internal investigation and cooperation with authorities, and cast the Company as the victim of overzealous prosecutors who had violated the law, stating in pertinent part:

> Furthermore, the statement in the court order that Odebrecht Group companies did not conduct an internal investigation of the alleged irregularities *is completely untrue*. All of our companies have and apply a *Code of Conduct and a Compliance System that are effective and widely publicized*, completely aligned with Brazilian and international anti-corruption legislation. An example of this practice was Braskem´ [sic] publication of a Material Fact notice on April 2, 2015.

> Regarding payments allegedly made by Constructora Internacional del Sur, Odebrecht reiterates that none of its subsidiaries have or have ever had any ties with or made any payment to that company.

> Odebrecht denies having participated in any cartel. *There are no cartels in the contracting process, which is controlled entirely by the client*, as is the case with

- 52 -

Petrobras, which has always set its own budgets and standards for technical-financial assessment and performance.

In addition, the ***Odebrecht Group never hindered the investigations in any way***. To the contrary, its executives have always made themselves available to authorities to provide any clarifications. In fact, four of the five arrested executives had traveled to the headquarters of the Federal Police in Brasília and provided testimony in the course of the Lava Jato investigations conducted by the Superior Court of Justice and the Federal Supreme Court. They have also furnished all requested documents and formally offered to testify before the Federal Court in the State of Paraná – ***testimony that they were never invited to provide, but which certainly would have clarified all of the points raised***.

Although we are deeply perplexed and indignant regarding what has occurred, we will not stop fighting. Our business model, based on principles of delegation and decentralization, ensures that our 15 business areas and over 100 subsidiaries, are fully and independently led by our executives and their teams, and will continue to operate normally to fulfill our obligations, as we have always done in a manner as has been recognized during our more than 70-year history, half of which includes international operations.

This is our commitment to our Clients, Partners, Investors, Financial Institutions, Suppliers, the Users of our Services and the Communities in the 21 countries where we operate. We maintain our strong conviction that our more than 160,000 Members will remain even more united by our corporate culture and by the bonds of trust that unite us, maintaining their pride to be part of the Odebrecht Group.

Finally, at this time, we express our unrestricted solidarity and ***support for the families of our executives who unjustly have lost their constitutional right to freedom***. We will continue to work together in defense of our Team Members, and will continue to be even more available to the authorities, cooperating fully so that all of these issues are clarified quickly, convinced that the truth will come out and that justice will prevail, because we believe that the recent events resulted from misinformation and misinterpretation.

(Emphasis in original.)

115.    These statements referenced above in ¶¶112-114 were materially false and misleading when made because defendants had, in fact: (i) attempted to impede the investigations, as detailed in ¶¶48-49; and (ii) conspired to rig the market for public works contracts and perpetrated a massive bribery and kickback scheme as a central component of their business, as detailed in ¶¶34-50.

- 53 -

116.    On June 24, 2015, defendant Odebrecht issued another press release to once again "express[] its indignation," this time claiming that its CEO Marcelo Odebrecht did not direct employees to delete records that might reveal Odebrecht's illegal activities:

> *Therefore there is nothing in Marcelo Odebrecht's note to suggest that any illegality has been committed*.  Besides being uncharacteristic of the executive, it would make no sense to suggest "destroying" (not the contents, as intended, but literally, as interpreted the police authority) emails that were seized during the operation conducted in November 2014, which were widely investigated and made public.  Destroying something that is already in the custody of the PF and Judge Sergio Moro makes no sense.  In other words, the term "destroy" must have a different meaning.
>
> Finally, Odebrecht regrets that an attempt was made to create a procedural issue regarding an expression that was clearly taken out of context.  Through a petition and personal contact, the company's lawyers have attempted to show the police that it makes no sense to raise suspicions about the subject, but unfortunately they have opted to publicize it and lend a whiff of scandal to a note that merely contains a client's instructions to his lawyers – thereby violating the [confidential] relationship that the law guarantees to all Brazilian citizens.

117.    Defendant Odebrecht issued a second press release on June 24, 2015, entitled "Note of Clarification," which maintained that Marcelo Odebrecht's arrest was "manifestly illegal" and that Odebrecht had not attempted to impede the ongoing investigations against it:

> Odebrecht would like to clarify that there are false rumors circulating that its executives have threatened authorities and public officials, as well as the future of the Brazilian Republic, in response to the investigations of Operation Lava Jato ["Car Wash"; a Brazilian corruption scandal involving payoffs and the state-owned oil giant Petrobras].
>
> It is *untrue*, for example, that the CEO of Odebrecht SA, Marcelo Odebrecht, linked the future "of the Republic" to the arrest warrant issued against him, a warrant this manifestly illegal.
>
> Similarly, it is also a *complete fiction* that the Chairman of the Board of Directors of Odebrecht SA, Emílio Odebrecht, warned that more cells would be required to hold politicians whom he would denounce in Brazil and abroad.
>
> *The Odebrecht Group and its executives have never hindered the ongoing investigations in any way and have always been available to the authorities to provide information*.  Odebrecht remains at the authorities' disposal to help ensure

- 54 -

that these matters are cleared up quickly, convinced that the truth will come out and that justice will prevail.

118.    Similarly, on July 16, 2015, defendant Odebrecht issued a statement that Marcelo Odebrecht's attorneys had acted with "transparency" and in "good faith," and that the police interpretation of a note sent by Marcelo Odebrecht "is completely wrong." The next day, Odebrecht issued another press release stating: "Since the investigation involving Odebrecht began in October of last year, the group's managers and employees have always put themselves at the authorities' disposal to shed light on the facts being investigated."

119.    On July 21, 2015, defendant Odebrecht issued a press release stating that the police's "distorted interpretations of [Marcelo Odebrecht's] personal notes . . . were taken out of context and are so anachronistic that they are completely illogical." The release continued: "Odebrecht especially repudiates the intent of attributing to the CEO of its holding company alleged intentions inferred through speculative reasoning with the clear objective of extending his imprisonment, which, like that of the other executives who work or formerly worked at Odebrecht, is completely illegal and abusive."

120.    Also on July 21, 2015, *Reuters* published an article entitled "Peru sending prosecutors to Brazil as corruption probe goes regional," reporting that "Peruvian prosecutors [were] chasing allegations that surfaced in the local press last month, citing Brazilian police reports, of bribes paid by construction executives to inflate the cost of a highway linking Brazil's Amazon rainforest to Pacific ports." While the Peruvian attorney general "declined to name suspects in the initial eight-month inquiry," "[t]he highway was built by several of Brazil's biggest construction firms, including local divisions of Odebrecht, Camargo Correa, Andrade Gutierrez and Queiroz Galvao." The article reported statements made by Odebrecht:

- 55 -

Odebrecht [and two of the other construction companies] **denied in statements that they had any part in alleged corruption in Brazil or Peru.**

Odebrecht's Peruvian spokesman, Fernán Altuve, said **the company "will let (investigators) turn the house upside down and check under every cushion if necessary, because it is sure the work was done correctly**."

Odebrecht added in its statement that bribery allegations for the Peruvian highway project were focused on a stretch of the route that the company did not take part in.

121.     On July 24, 2015, Odebrecht issued a press release once again claiming that Marcelo Odebrecht's detention was unjustified and illegal:

Odebrecht considers that the charges filed today by the Federal Prosecution Office (MPF) of the state of Paraná mark the starting point of the work of the defense.  Now the legal counsel can discover the allegations made against the executives under investigation and analyze the set of documents presented by the prosecution, which will finally enable the due exercise of the right to defense.

However, the allegations made this afternoon by the MPF in such a way as to scandalously capture the media spotlight do not justify, under any circumstances, the continuation of the arbitrary and illegal detention of the chief executive officer of the Odebrecht Group, Marcelo Odebrecht, and of four former executives.  Much less does it justify the surprising declaration of a new preventive detention, revoking the previous one, in a clear move to annul the effects of the petition for habeas corpus filed at the Superior Court of Justice (STJ).

122.     These statements referenced above in ¶¶116-121 were materially false and misleading when made because defendants had, in fact: (i) attempted to impede the investigations, as detailed in ¶¶48-49; and (ii) conspired to rig the market for public works contracts and perpetrated a massive bribery and kickback scheme as a central component of their business, as detailed in ¶¶34-50.

123.     On July 28, 2015, defendant Odebrecht issued a press release admitting that CNO's offices and the home of one of its executives had been searched by authorities, but falsely claimed that it "has never taken part in offering or paying kickbacks for contracts with any public or private client":

Construtora Norberto Odebrecht clarifies that it was the target of a search and seizure procedure at its head offices in Rio de Janeiro this morning (Tuesday,

- 56 -

July 28, 2015) and at the home of one of its executives, which was conducted coercively, in order to make a deposition at the Federal Police offices in Rio de Janeiro.

All of our executives and the company have always been available to the authorities to provide clarification and present documents within the domain of Operation Lava Jato ["Car Wash"] investigations, with the measures adopted on this date being unjustifiable.

*CNO reaffirms that it has never taken part in offering or paying kickbacks for contracts with any public or private client*, which obviously includes Eletronuclear. Therefore, it does not acknowledge the allegations made by a whistle blower as true, which were made in order to obtain his freedom, on account of a pre-trial detention, and does not have any commitment to the truth.

124.     On October 5, 2015, defendant Odebrecht issued a press release stating that internal emails released by police that had been portrayed in a negative light by news media in Brazil "are merely a record of the company's legitimate and natural institutional activities and its participation in debates on strategic projects for the country – in the countries in which it operates, especially as an investor."

125.     On October 30, 2015, defendant Odebrecht issued a press release maintaining that it was "absolutely clear" that Marcelo Odebrecht was innocent and that his imprisonment was "absolutely illegal," stating in pertinent part:

Marcelo Odebrecht testified today to provide clarifications to the judge regarding accusations against him made by the Federal Prosecutor's Office of Paraná (MPF-PR).

In a written statement to the judge, *Marcelo vehemently refuted the allegations made by the prosecution. After all the evidence and testimony were collected, it was absolutely clear that Marcelo had no involvement whatsoever in the facts stated by the prosecution*.

When asked by the Federal Prosecutor's Office and the judge in charge of the case, none of the "informants" and witnesses brought by the prosecution reported any participation by Marcelo in the alleged irregularities.

Furthermore, Marcelo regretted the absolutely illegal imprisonment he has been subjected to for more than 130 days. There are no subsisting grounds for this extreme measure restricting his freedom.

- 57 -

In fact, all the allegations that served as grounds for Marcelo's arrest have already been disproved:

- An alleged deposit in Barusco's account, denied by the task force itself;

- An email between the company's executives, which was fully clarified in Pedro Barusco's testimony to the same judge yesterday;

- And the notes made by Marcelo for himself, which do not constitute a crime but are merely absolutely personal observations on matters that Marcelo learned about through the media.

As such, ***we are confident of not only his acquittal in this criminal proceeding*** but also the repeal of his detention through the writ of habeas corpus, which is awaiting the decision of the Superior Court of Justice.

126.    On November 13, 2015, defendant Odebrecht issued a press release consisting of a notice that it had published in various newspapers that day.  This notice again forcefully maintained defendants' innocence:

**Odebrecht Notice**

Odebrecht voices its indignation with the undue exposure of its team members and those that maintain relations with the company due to the many leaks of documents, personal data and confidential information extracted from the investigation involving some of its executives or former executives.

***During the course of this investigation, many of these incomplete documents, data and information, often lacking context, have been released to the media in a distorted and mystifying manner, confusing the public opinion, generating erroneous conclusions and raising unfounded suspicions of facts and people that have no relation to Operation Car Wash***.

Recent news on donations by Construtora Norberto Odebrecht to Fundação iFHC is a clear example of this regrettable and abusive practice that has become a routine part of this investigation, despite formal complaints to competent authorities in an effort to stem their occurrence.

***Reports from the investigation that were presented with the pretext of revealing suspicious acts are nothing more than bank extracts of donations by the Odebrecht group company to the Foundation in question in the form of institutional support***.

The fact that Construtora Norberto Odebrecht provided support to Fundação iFHC, as well as other institutions in Brazil and overseas, is no secret, and is in fact a

- 58 -

part of the institutional policy of the Odebrecht Group. ***Both Construtora Norberto Odebrecht and the entities it supports always confirm these relations as a legitimate and common practice among dozens of other companies***.

***Odebrecht deplores the illegitimate exposure to which it continues to be exposed and the inconveniences caused to people affected by these clearly illegal leaks***, which have no other objective than to expose the Odebrecht group and its team members to public shaming, fostering an unfavorable public opinion of the group, its executives and former executives currently under criminal investigation within Operation Car Wash.

Odebrecht hopes that level heads prevail in leading the investigation and the respect of the rights and guarantees of all citizens, including those under investigation, is unconditional.

127.   On December 10, 2015, Odebrecht issued a press release entitled "Marcelo Odebrecht formally resigns from Odebrecht S.A." This press release announced that Marcelo Odebrecht had formally resigned from his post as CEO of the Company, but continued to maintain his innocence:

After 6 months in detention and given the developments in his court case, Marcelo Odebrecht yesterday decided to formally resign from his post as President and CEO of Odebrecht S.A., as well as the chairmanship of Braskem, Odebrecht Oil & Gas, Odebrecht Real Estate Developments and Odebrecht Environmental.

The Board of Odebrecht S.A. has officialized the appointment of Newton de Souza, who will continue as President and CEO of Odebrecht S.A. and Chairman of the abovementioned companies.

Odebrecht believes that Marcelo's unjust and unnecessary preventive detention will be revoked, which will enable him to devote himself to his family and concentrate on his defense. ***Odebrecht has full confidence that at the end of the current legal proceedings, Marcelo Odebrecht's innocence will be officially recognized***.

128.   The statements in ¶¶123-127 were materially false and misleading when made because defendants had, in fact, committed illegal acts, including: (i) attempting to impede the investigations, as detailed in ¶¶48-49; and (ii) conspiring to rig the market for public works contracts and perpetrating a massive bribery and kickback scheme as a central component of their business, as detailed in ¶¶34-50.

- 59 -

129.    Defendant Odebrecht's campaign of misinformation was successful in that it prolonged the concealment of its fraud and its role in the bribery and kickback scheme several months after the existence of Operation Car Wash and allegations of potential misconduct involving Odebrecht employees began to be publicly disclosed.  Even fixed-income analysts who specialized in evaluating the performance and risks associated with Odebrecht debt remained misled by defendants' misrepresentations and denials.  For example, on September 14, 2015, UBS fixed-income analysts issued a research report on Odebrecht's debt entitled "Defusing concerns."  The report maintained a stable outlook on notes issued by the Company, such as the Notes, noting that management was "refuting key concerns" and CNO continued to produce "[s]trong results."

## VII.    SUBSEQUENT DISCLOSURES CONFIRM DEFENDANTS' FRAUDULENT SCHEME

130.    On December 1, 2016, Odebrecht issued a press release entitled "Odebrecht Apologizes for its Mistakes," finally and belatedly admitting its misconduct and the falsity of its prior denials:

> Odebrecht acknowledges its participation in illicit actions in its business activities.
>
> It does not matter that we gave in to external pressure.  Nor is it relevant that there are behaviors that the private and public sectors must resist and correct in their relationships.
>
> What matters is that we acknowledge our involvement.  We were complicit and did not fight these practices, as we should have.
>
> This was a grave error.  We violated our own principles and transgressed against the values of honesty and ethics.
>
> We will not let this happen again.
>
> Odebrecht apologizes, particularly for its failure not to have acted sooner.
>
> Odebrecht's ability to manage and execute that is recognized by our clients, the competency and commitment of our professionals, and the quality of our products and services should have been the basis for avoiding these mistakes.

Odebrecht has learned from these mistakes and is evolving.

We are committed, with great conviction, to reform.

131.     On December 21, 2016, defendant Odebrecht entered into the Plea Agreement. Pursuant to the Plea Agreement, Odebrecht: (i) pleaded guilty to violating the anti-bribery provisions of the FCPA; (ii) agreed to an independent compliance monitor to oversee its operations; and (iii) agreed to pay a criminal penalty of $2.6 billion as part of the largest anti-bribery resolution in history.

132.     The Plea Agreement also included a 23-page "Statement of Facts" outlining the scope and nature of defendants' bribery and kickback scheme.  Defendant Odebrecht stipulated and agreed that the entire Statement of Facts is true and accurate:

> The following Statement of Facts is incorporated by reference as part of the Plea Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Eastern District of New York (the "EDNY") and the defendant Odebrecht S.A. ***Odebrecht S.A. hereby agrees and stipulates that the following information is true and accurate***.  Odebrecht S.A. admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.

133.     Defendant Odebrecht further agreed that it would not challenge any portion of the Statement of Facts in any public statement, including this or any other court proceedings:

> ***The Defendant expressly agrees that it shall not***, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant to ***make any public statement, in litigation or otherwise***, contradicting the acceptance of responsibility by the Defendant set forth above, or the facts described in the Information and the Statement of Facts. . . . The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the Statement of Facts ***provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts***.

134.     The Statement of Facts provided significant detailed information regarding defendants' bribery and kickback scheme.  Specifically, defendants, together with their co-

conspirators, knowingly and willfully conspired and agreed with others to provide hundreds of millions of dollars in illegal payments to political candidates and parties to secure an improper advantage in order to obtain and retain business in various countries around the world.  In total, defendants agreed that they paid approximately *$788 million* in bribes in association with 100 projects in 12 countries in exchange for ill-gotten benefits of approximately *$3.336 billion*.

135.    In Brazil, defendants were behind approximately $349 million in bribes paid to various government officials and political parties to secure lucrative public construction contracts. In return, defendants obtained financial benefits exceeding $1.9 billion from the illicitly obtained construction contracts.

136.    For example, defendants (through CNO's Division of Structured Operations) made payments totaling more than $20 million to several Brazilian officials, including a high-level elected official in Brazil, in exchange for their assistance in ensuring defendants' continued work on a large public transportation project in Brazil.  Defendants profited by approximately $184 million from this project.

137.    Similarly, between 2011 and 2014, defendants (through CNO's Division of Structured Operations) paid bribes of approximately $9.7 million to a "high-level official within the legislative branch of government in Brazil" in exchange for that official's assistance in securing the continuation of a construction project in Rio de Janeiro, from which defendants profited by approximately $142 million.

138.    In addition, the Statement of Facts also set forth, in great detail, hundreds of millions of dollars in bribes paid to officials of the following countries outside of Brazil, which reveals the global extent of the bribery and kickback scheme and the fact that defendant CNO's entire global operations were threatened and may not be sustainable:

- 62 -

- ***Angola***.  Between 2006 and 2013, defendants paid more than $50 million in bribes to government officials in Angola in order to secure public works contracts. Defendants realized benefits of approximately $261.7 million as the result of these bribes.

- ***Argentina***.  Between 2007 and 2014, defendants paid more than $35 million in bribes (directly and indirectly) from defendant CNO's Division of Structured Operations to government officials in Argentina related to at least three public infrastructure projects for which defendants were awarded contracts, resulting in approximately $278 million in benefits to defendants.

- ***Colombia***.  Between 2009 and 2014, defendants (through defendant CNO's Division of Structured Operations) paid more than $11 million in bribes to government officials that illicitly caused defendants to be awarded public construction contracts generating more than $50 million in revenues to defendants.

- ***The Dominican Republic***.  Between 2001 and 2014, defendants paid more than $92 million in bribes to government officials and intermediaries working on their behalf to secure public construction contracts in the Dominican Republic, thereby obtaining illicit benefit of more than $163 million.

- ***Ecuador***.  Between 2007 and 2016, defendants paid more than $33.5 million in bribes to government officials in Ecuador, realizing benefits of more than $116 million.

- ***Guatemala***.  Between 2013 and 2015, defendants paid approximately $18 million in bribes to government officials in Guatemala, including an $11.5 million payment to a governmental official representing a percentage of the value of a governmental construction contract the official steered to defendants in exchange for the bribe.

- ***Mexico***.  Between 2010 and 2014, defendants paid corrupt Mexican government officials approximately $10.5 million in bribes in order to secure public works contracts, including a $6 million bribe to an official of Pemex, Mexico's state-owned petroleum company, in exchange for the official's assistance in winning a contract. Defendants received benefits of more than $39 million from these bribes.

- ***Mozambique***.  Between 2011 and 2014, Odebrecht paid approximately $900,000 in bribes to government officials in Mozambique.

- ***Panama***.  Between 2010 and 2014, defendants paid more than $59 million in bribes to Panamanian government officials, obtaining contracts worth more than $175 million from these bribes.

- ***Peru***. Between 2005 and 2014, defendants paid approximately $29 million in bribes to government officials in Peru, receiving benefits of more than $143 million in return.

- **Venezuela**.  Between 2005 and 2016, defendants paid approximately $98 million in bribes to Venezuelan officials in order to obtain and retain public works contracts.

139.    The Statement of Facts also described the lengths that defendants went to in order to try and hide their misconduct.  For example, after defendants became aware of the investigations being performed by Brazil, the United States and Switzerland, they sought to conceal or destroy evidence of their criminal activities, including by directing Odebrecht employees to delete records that might reveal illegal activities.

140.    Similarly, in or about mid-2015, an executive of the Division of Structured Operations within defendant CNO attended a meeting in Miami, Florida with a government official from Antigua and an intermediary.  In order to conceal defendants' corrupt activities, the executive agreed to pay the government official a bribe of $4 million to refrain from providing various banking documents to international investigators that would have contained evidence of the bribery and kickback scheme.  Thereafter, another employee of the Division of Structured Operations made three payments of one million Euros to secure this corrupt deal.

141.    Further, in January 2016, after Lava Jato and the investigations by the United States and Swiss authorities were well known to defendants, employees and/or agents of defendants intentionally destroyed physical encryption keys that were needed to access the MyWebDay system, which contained evidence relating to the bribery and kickback scheme.

142.    Following revelations in the Plea Agreement that defendants' kickback and bribery scheme had extended across Odebrecht's business operations in several countries in Central and South America and Africa, authorities launched and/or intensified numerous investigations in those countries in early 2017.  By mid-2017, prominent politicians, including several former heads of state, were under investigation in connection with the corruption scandal, even as authorities in

Brazil continued to broaden the corruption probe and make numerous high-profile arrests and indictments there.

143.     On September 14, 2017, the BBC published an exposé on the Odebrecht scandal entitled "Politicians worldwide suspected as bribery scandal unfolds."  According to the article, politicians under investigation or implicated in the scandal included almost a third of Brazil's government ministers, two ex-presidents of Peru, the current president of Venezuela, the president of Panama, the vice president of Ecuador, the prime minister of Antigua and Barbuda, and the former vice-minister of transport for Colombia, among many others.  The Company has also been forced to forfeit contracts in a number of countries, been barred from doing business in others, and has been asked to pay tens of millions of dollars in compensation.  In addition, the Company has lost more than half of its workforce and its revenues have plummeted by 35% since the scandal began.

## VIII.   LOSS CAUSATION

144.     As detailed herein, defendants engaged in a scheme to deceive plaintiff and the market and a course of conduct that artificially inflated the value of the Notes and that enabled Odebrecht to pay rates to plaintiff for the Notes that were not commensurate with Odebrecht's and CNO's true risk.  As a result of the fraudulent conduct that defendants concealed, plaintiff is unable to sell its Notes at par and continues to receive interest at rates that do not adequately reflect Odebrecht's true risk.

145.     Defendants Odebrecht's and CNO's reported financial results and future business prospects were based upon their illicit (and undisclosed) business plan of widespread bribery of public officials in exchange for lucrative public construction contracts.  Throughout the period during which plaintiff purchased its Notes, the prices of those Notes were artificially inflated as a result of defendants' materially false and misleading statements and omissions as alleged herein.

- 65 -

Defendants' false and misleading statements and omissions had the intended effect and caused the Notes to be valued at artificially inflated prices during the period in which plaintiff purchased the Notes and enabled Odebrecht and CNO to raise funds, including from plaintiff, at yields that were far below the companies' risk profile.  Plaintiff would not have purchased the Notes, or at least not at the prices at which it paid, had defendants disclosed their bribery scheme and the effect of that scheme on their financial results.  Plaintiff was unaware that defendants' representations identified above were false and misleading and that defendants omitted to disclose that their financial results were achieved through a widespread bribery scheme, and paid artificially inflated and unreasonable prices for the Notes that it purchased.

146.    A series of disclosures relating to defendants' bribery scheme demonstrate a causal link between defendants' fraudulent scheme and plaintiff's losses.  Indeed, as the truth behind defendants' various false statements and material omissions was gradually revealed to the market in a series of corrective disclosures, the value of those Notes dropped to levels more commensurate with Odebrecht's and CNO's true risk profile.  The following non-exhaustive examples show how the artificial inflation came out of the Notes as they dropped in value as the market learned about the truth behind and the sheer magnitude and breadth of defendants' fraudulent scheme:

(a)    Disclosures Regarding International Bribery.  On February 23, 2016, news sources reported that investigators had evidence that defendants' bribery scheme not only reached the highest levels of power in Brazil, but also in other countries, as specific leaders on the national stage of Peru and Argentina were implicated.  For example, in an article entitled "Brazil police probe possible Odebrecht bribes to Peru president," *Reuters* reported that Peruvian president Ollanta Humala was suspected of accepting bribes from Odebrecht, after documents seized from Marcelo Odebrecht cited "Program OH," containing the president's initials.  *Reuters* also reported that a

- 66 -

Brazilian federal prosecutor announced that "investigators had evidence Odebrecht had bribed officials abroad, including a former transportation secretary in Argentina."

(b)    <u>Odebrecht Downgraded by Fitch</u>.  On March 1, 2016, credit rating agency Fitch Ratings Inc. ("Fitch") downgraded Odebrecht debt, including the Notes, to BB from BBB- on a negative outlook, thereby allowing the market to assess its true market value.  A press release issued by Fitch explaining the reasons for the downgrade stated that "Fitch believes the reputational damage from the Lava-Jato scandal" would "erode OEC's capacity to replace backlog."  The release also stated that the reputational damage "has reduced Odebrecht group's ability to access debt and capital markets."

(c)    <u>Odebrecht's Cooperation with Prosecutors</u>.  On March 22, 2016, Odebrecht confirmed that the Federal Police had "served arrest, detainment and search and seizure warrants in the offices and homes of Group Members in some Brazilian cities," and that Odebrecht had "given its full assistance to the ongoing investigations, and [was] cooperating by providing the information required."  In another press release on March 22, 2016, Odebrecht stated that "[t]he evaluations and reflections made by our shareholders and executives have led Odebrecht to decide on definitive collaboration with Operation Lava Jato investigations."

(d)    <u>Odebrecht Downgraded by Fitch and Moody's</u>.  On May 3, 2016, Fitch once again downgraded Odebrecht debt, including the Notes, to B from BB with a negative ratings watch, thereby allowing the market to further assess its true market value.  Fitch's press release explaining the reasons for the downgrade stated that the ratings action "reflects the prolonged uncertainty of any potential impact on OEC's credit profile stemming from the investigations on the corruption scandal."  Moody's Investor Service ("Moody's") downgraded Odebrecht debt the same day, including the Notes, from Ba2 to B2.  Moody's press release explaining the reasons for the

- 67 -

downgrade stated that the ratings action "was prompted by increased credit risk and rising financial constraints for OEC as a result of the evolving corruption investigations in the country, with potential monetary fines and other business sanction affecting the Company's liquidity and operating sustainability."

147.    As a result of the market learning about defendants' bribery scheme and the magnitude and breadth of that scheme, the market prices for the Notes collapsed, falling by as much as 48% in less than three months.  The market's devaluation of the Notes after the corrective disclosures came to light were a direct result of the true nature and extent of defendants' fraudulent misrepresentations and omissions being revealed publicly.  The timing and magnitude of the market's reaction negates any inference that the losses suffered by plaintiff were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to defendants' fraudulent conduct.  As a result of the fraudulent conduct that defendants concealed, plaintiff is unable to sell its Notes at par and continues to receive interest at rates that did not adequately reflect Odebrecht's and CNO's true risks.

## IX.    RELIANCE

### A.    Plaintiff's Direct Reliance on Defendants' False and Misleading Statements

148.    Plaintiff's allegations regarding direct reliance relate only to its claims where reliance is an element of the claim and where the presumption of reliance is unavailable.

149.    Plaintiff purchased the Notes between June 2012 and February 2015.  At all times, plaintiff acted through its internal investment managers, who managed the investment portfolios. Throughout the time that plaintiff purchased the Notes, plaintiff undertook issuer-specific research to identify companies in which to invest.  As part of this research, plaintiff reviewed and analyzed issuers' businesses, financial statements and disclosures, including, but not limited to, the issuers'

- 68 -

balance sheets, income statements, assets, liabilities, earnings, profitability, risks, prospects and management.  Plaintiff made its investment decisions based on this market research and analysis.

150.    Plaintiff employed its customary investment research and analysis in determining whether to invest in the Notes.  This research and analysis included a review of the financial statements and/or disclosures of defendants Odebrecht and CNO, which were either included in the Offering Memoranda and/or made available by defendants in other public statements, including on the websites of Odebrecht and CNO.  As part of this analysis, plaintiff directly relied upon the information made publicly available by defendants.  In particular, in making the decision to purchase the Notes, plaintiff relied upon the financial information disclosed by defendant Odebrecht and on the financial statements included in defendant CNO's annual and quarterly financial filings for the years ended December 31, 2010, December 31, 2011, December 31, 2012, December 31, 2013 and December 31, 2014, including the Company's statements regarding its earnings, assets, liabilities, business and risks, among other statements.

151.    Plaintiff relied on defendants' statements as being materially complete and not omitting material information, including information regarding defendants' financial condition, compliance with applicable laws and regulations, and whether defendants' financial results were the product of legitimate business practices.  Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that defendants' statements, as detailed herein, were materially false and misleading and/or materially incomplete when deciding to purchase, sell or hold the Notes.

152.    Defendants' false and/or misleading statements had a material effect on plaintiff's investment in the Notes.  These material misstatements caused plaintiff to purchase the Notes following defendants' issuance of the false and misleading statements complained of herein.

- 69 -

B.      **Plaintiff Is Entitled to a Presumption of Reliance Because Defendants Concealed Material Adverse Information**

153.    A presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding their business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' omissions set forth above, that requirement is satisfied here.

X.      **OEC IS LIABLE AS CNO'S SUCCESSOR-IN-INTEREST**

154.    As detailed in ¶¶10-11, defendant OEC expressly became a guarantor of the Notes purchased by plaintiff and assumed the liabilities of defendant CNO under the offering memoranda of the Notes.  On this basis alone, OEC is liable as CNO's successor-in-interest.  OEC is also liable for CNO's fraudulent actions because the creation of OEC and the reorganization of Odebrecht's subsidiaries were nothing more than a name change and continuation of CNO's business, undertaken to defraud Odebrecht's creditors, as alleged below.

A.      **OEC Is a Mere Continuation of CNO**

155.    The creation of OEC, and its rise to power as the umbrella organization for all of Odebrecht's engineering and construction activities, was but a continuation of CNO's business.  Just like CNO before it, OEC was created as a privately held company, wholly owned by Odebrecht.  OEC described its own birth in its 2016 Annual Report:

        Although the Group started its operations in the engineering and construction sector in the 1940s, Odebrecht Engineering & Construction S.A. was founded only on January 27, 2014.  Its corporate name was changed on February 2, 2015.  Today,

- 70 -

OEC is a privately held entity, part of Odebrecht S.A., based in São Paulo.  OEC is an integral subsidiary of Odebrecht S.A., and on March 31, 2015 became the direct controller of Construtora Norberto Odebrecht S.A. (CNO) and Odebrecht Engineering and Construction International (OECI), formerly known as Odebrecht Global S.A. (ODB Global).

156.    Despite admitting that OEC was founded in 2014, OEC's annual report, in fact,

adopts the history of CNO for the description of its own historical background:

> Odebrecht Engineering and Construction (OEC) was founded in 1944 and since then has been recognized for its innovative use of advanced construction methods.  Its first project was the Itacaré Pier, in the South of Bahia.
>
> In the 1970s, OEC started its national expansion and delivered largescale projects.  Already during that period, the company celebrated more than 500 Contracts all over Brazil and worked to qualify for the application of special technologies such as the ones required for the construction of subway lines, nuclear plants, large airports, and bridges.  The main highlights from that time are the Antonio Carlos Jobim International Airport (Galeão) – RJ, the Federal University of Rio de Janeiro – RJ, the Colombo Salles Bridge – SC, the Deputado Darcy Castello de Mendonça Bridge (Third Bridge) – ES, and the renovation of the Amazonas Theatre – AM.  During that period, OEC started the expansion of its processes, its business diversification, and its internationalization.
>
> In 1981, OEC merged with the São Paulo company CBPO – Companhia Brasileira de Projetos e Obras, becoming one of the main construction companies in the country.  In 1986, the Técnica Nacional de Engenharia (TENENGE) was incorporated, increasing its ability to offer integrated engineering, construction, and industrial assembly services.

157.    OEC has also adopted CNO's financial position, including its assets.  According to a

May 27, 2015 press release from Moody's, announcing that Moody's was assigning a credit rating to

OEC for the first time while also withdrawing its rating of CNO, OEC's credit profile going forward

would be "essentially mirroring CNO's."  The press release provided:

> The Baa3/Aa1.br issuer ratings assigned to OEC reflects the consolidated economic, financial and business profile of CNO up to March, 31 2015, before the execution of a corporate reorganization strategy that will lead to the separation of the group's domestic and international businesses of engineering and construction.  OEC is a newly created holding company, fully owned by Odebrecht S.A. (unrated), that will be consolidating CNO and virtually all of its former businesses, essentially mirroring CNO's previous credit profile.

- 71 -

158.    Similarly, on June 3, 2015, Fitch announced that it was withdrawing its ratings of CNO "as CNO is undergoing reorganization."  According to the announcement, Fitch was beginning its coverage and rating of OEC, which "is now the holding company and 100% direct parent of CNO and Odebrecht Global S.A."  Throughout the press release, Fitch made clear that OEC was a continuation of CNO:

KEY RATINGS DRIVERS

OEC's 'BBB' rating reflects its consolidated robust financial profile, strong and consistent track record of operations at CNO, as well as its leading position in the engineering and construction sector in Latin America.  The ratings also incorporate the resilience of CNO's margins, as demonstrated during the last quarters. OEC's credit profile benefits from CNO's successful track record in raising funds to lengthen its comfortable debt amortization profile.  Fitch expects that OEC will continue to maintain a conservative capital structure and strong liquidity for the next few years.  On a standalone basis OEC does not have debt outstanding.

*        *        *

Robust Backlog and Resilient Margins

OEC benefits from CNO's successful track record in renewing its backlog which was robust at USD33.9 billion by the end of 2014, equivalent to 2.4 years of revenues.  OEC's backlog has moderate concentration; its 10 largest projects have accounted for 46% of its total backlog in the same period.

Fitch expects the company to sustain its consolidated EBITDA margin in the range of 9% to 10% during the next few years.  CNO's 2014 margins were robust at 10% and in line with the industry's average.  The company has demonstrated a resilience to cost pressure in Brazil, as it benefits from the geographical diversification of its contracts.

Reduced Net Leverage

OEC's adjusted net leverage should remain conservative and below 1.0x in the next few years.  CNO had a positive net cash position at the end of 2014 while its total adjusted leverage was 2.6x, in line with Fitch's expectations.  As of Dec. 31, 2014, CNO's total adjusted debt reached BRL8.5 billion, including BRL8.0 billion of off-balance-sheet guarantees, compared with adjusted debt of BRL8 billion, including the BRL7.4 billion of off-balance-sheet guarantees, in Dec. 31, 2013.  Off-balance-sheet debt increased due to the BRL depreciation in the period as most of it is USD-denominated.

*     *     *

LIQUIDITY

OEC is expected to sustain CNO's historically strong liquidity position and to benefits from a lengthened debt maturity profile.  As of Dec. 31, 2014, cash and equivalents of CNO were BRL11.8 billion, enough to cover its short-term adjusted debt of BRL340 million by 35x.  OEC's financial flexibility is enhanced by an unused USD1 billion standby credit facility and proven access to debt markets.

Fitch estimates OEC to sustain strong free cash flow (FCF) in the next few years, supported by the sound cash flow from operations (CFFO).  In 2014, CNO's CFFO of BRL6.1 billion covered capital expenditures of BRL1 billion, and dividends of BRL743 million leading to a positive FCF of BRL4.3 billion.

159.    Analysts also illustrated that OEC's finances were a mere continuation of CNO's.

According to a June 1, 2015 UBS analyst report, "[e]ffectively, OEC is what investors previously

referred to as CNO" and was "previously known as CNO."  Analysts at UBS illustrated that OEC's

results, credit ratings and management expectations were a continuation of CNO's:

OEC results are comparable to the previous CNO results, and the three credit rating agencies announced that the OEC rating is the same as that of CNO. Management expects similar consolidated revenues in BRL terms for FY15 as FY14 (BRL32.5 bn) and stable EBITDA margin in the mid-to-high 9% range (implying 9.5-9.9% vs 9.7% FY14).

160.    Similarly, analysts at BTGPactual considered CNO and OEC to be one and the same,

as illustrated by its reporting of each entity's financials.  In its June 1, 2015 report regarding

Odebrecht E&C (*i.e.*, OEC), BTGPactual included figures for OEC's assets for 2011 through 2014.

The yearly figures listed for OEC for 2011 to 2013 were the same as those previously listed for

CNO.  In addition, the June 1, 2015 report from BTGPactual listed three of the four Notes purchased

by plaintiff as "Odebrecht E&C Corporate Bonds," listing the number outstanding, ratings, price and

additional data for the 7.125% Notes, 5.25% Notes and 4.375% Notes bought by plaintiff.

- 73 -

B.     **The Transfer of Business and Assets from CNO to OEC Was Fraudulent, Making OEC Liable as CNO's Successor**

161.    With the reorganization of Odebrecht's subsidiaries changing little but the name of its umbrella organization for its engineering and construction business, and with CNO facing investigations from numerous governments at the time of the reorganization, the purpose of the reorganization was simple – to avoid liability to the extent possible.  As the investigations were becoming public, and even as Odebrecht denied any wrongdoing, it knew that itself and CNO would face hefty penalties for their misdeeds, along with diminished business opportunities.  In such a setting, Odebrecht knew that the assets available at CNO would be put in jeopardy.  In order to have the best chance at protecting these assets, Odebrecht took the unprecedented step of dethroning CNO and placing newly created OEC in charge of Odebrecht's original bread and butter – the engineering and construction business.  UBS, in its June 1, 2015 report, refers to OEC as "previously known as CNO," and in a June 3, 2015 report even alludes to the reorganization's purpose of sheltering assets in the newly created OEC:

> [T]here is the possibility that following the corporate reorganization, that the international subsidiary remains protected from possible punishment.  Even in an attempt by the government (if Odebrecht is found guilty of wrongdoing) to collect from OEC's total global revenues, we believe the case would be fought in the courts for a long period of time.

162.    Numerous facts lead to the conclusion that the transfer of business and assets to OEC was fraudulent.  To begin with, there is no indication that *any* consideration, let alone adequate or fair consideration, was provided by OEC in exchange for the business and assets it received from CNO.  Rather, the reorganization was merely a transfer of assets and business from one of Odebrecht's holding companies to another, with Odebrecht controlling the property both before and after the conveyance, like a person transferring money from her checking account right to her own savings account.  And because OEC has merely taken CNO's place as the consolidator of the entire

- 74 -

engineering and construction business, the entities involved in the reorganization not only share a close relationship with each other but are essentially one and the same.  Further, the reorganization was highly unusual in that CNO was the flagship company from which the larger Odebrecht holding company was born, only to be hastily pushed aside at the same time defendants' bribery scheme was beginning to unravel.

163.    CNO knew and intended that the transfers to OEC would leave CNO with insufficient funds to pay back the debts owed to creditors, including plaintiff.  Indeed, despite the fact that CNO had guaranteed over $1.6 billion in the Notes purchased by plaintiff, it nevertheless transferred its business and assets to OEC.  In addition, because CNO had outstanding debts at the time of transfer and no consideration was provided, CNO is presumed to be insolvent and plaintiff was thereby injured and prejudiced as a result of the transfers.

## XI.    NO SAFE HARBOR

164.    The statutory safe harbor and the common law "bespeaks caution" doctrine provided for forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this complaint.  None of the specific statements pleaded herein were identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that any safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false.

- 75 -

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

165.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

166.     Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations of fact and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

167.     Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon plaintiff.

168.     Plaintiff acquired the Notes issued by Odebrecht Finance without knowledge that defendants had misstated or omitted material facts.  In acquiring the Notes, plaintiff relied directly or indirectly on the false and misleading statements and omissions made by defendants.

169.     Plaintiff would not have purchased the Notes issued by Odebrecht Finance at the prices it paid, or at all, if plaintiff had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and omissions.

170.     As a direct and proximate result of defendants' wrongful conduct as alleged herein, plaintiff suffered damages in connection with its purchases of the Notes.

171.     By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for violations of §10(b) of the Exchange Act and Rule 10b-5.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**(Against Defendants Odebrecht, CNO and OEC)**

172.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendants Odebrecht, CNO and OEC.

173.     Defendant Odebrecht was the corporate owner and parent of defendants Odebrecht Finance and CNO and had ultimate authority over their actions and those of their employees.  As such, defendant Odebrecht acted as a controlling person of defendants Odebrecht Finance and CNO and had the power and authority to cause these defendants to engage in the wrongful conduct complained of herein.

174.     Defendant CNO acted as the guarantor for the Notes and received the funds resulting from the sale of the Notes.  Further, the Offering Memoranda used to sell the Notes relied upon defendant CNO's reported financial results.  Meanwhile, defendant Odebrecht Finance was created without any legitimate assets, all for the benefit of defendants CNO and Odebrecht.  As such, defendant CNO acted as a controlling person of defendant Odebrecht Finance and had the power and authority to cause defendant Odebrecht Finance to engage in the wrongful conduct complained of herein.

175.     Defendants Odebrecht and CNO culpably participated in the misconduct as alleged herein.

176.     As a direct and proximate result of such conduct, defendants Odebrecht and CNO are liable pursuant to §20(a) of the Exchange Act.

177.     By operation of law as a successor to CNO, defendant OEC is jointly and severally liable with defendants Odebrecht and CNO for violation of §20(a) of the Exchange Act.

**COUNT III**
**For Violation of the Washington State Securities Act, RCW §§21.20.010 and 21.20.430(1)**
**(Against All Defendants)**

178.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

179.    As alleged herein, defendants are liable as sellers of the Notes because they substantially contributed to the sales of the Notes.  Defendant Odebrecht Finance was the issuer of the Notes, defendant CNO was the guarantor of the Notes, and defendants Odebrecht and CNO were direct beneficiaries of the funds derived through the Notes.  Defendant Odebrecht created defendant Odebrecht Finance for the purpose of the sales of the Notes.

180.    As alleged herein, defendants, directly or indirectly, in the State of Washington, employed devices, schemes or artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices or courses of business that operated as a fraud or deceit upon plaintiff.

181.    As alleged herein, defendants directly and indirectly employed and engaged in a scheme and artifice to defraud by participating in a continuous course of conduct to provide false information to plaintiff and to conceal from plaintiff material facts, as described herein.  Such misrepresentations and material omissions were made in connection with the sale of the Notes in the State of Washington.  Defendants engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 78 -

182.    None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the misrepresentations and omissions of material fact alleged herein were true and without omissions of any material fact and were not misleading.

183.    Plaintiff relies on the presumption of reliance to the extent available to it.  To the extent plaintiff's direct reliance is applicable to this claim, plaintiff reasonably relied on defendants' omissions and misstatements as detailed in ¶¶51-129.  Plaintiff and its agents did not know of the omissions and misstatements described above when plaintiff acquired the Notes, and they could not in the exercise of reasonable diligence have known of the actual facts.  Plaintiff and its agents relied upon, among other things, statements made by or authorized by defendants in the Offering Memoranda, which were incorporated into analyst reports and rating agency reports, and other statements made by defendants in making plaintiff's investment decisions.

184.    As a result of defendants' primary violations of RCW §21.20.010, each of them are liable to plaintiff, jointly and severally, for the relief specified in RCW §21.20.430(1), including rescission or damages, interest and attorneys' fees.

185.    By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for violations of RCW §21.20.010, for the relief specified in RCW §21.20.430(1).

## COUNT IV
### For Violations of the Washington State Securities Act, RCW §§21.20.010 and 21.20.430(3)
### (Against Defendants Odebrecht and CNO)

186.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

187.    Defendant Odebrecht was the corporate owner and parent of defendants Odebrecht Finance and CNO and had ultimate authority over their actions and those of their employees.  As

- 79 -

such, defendant Odebrecht acted as a controlling person of defendants Odebrecht Finance and CNO and had the power and authority to cause these defendants to engage in the wrongful conduct complained of herein.

188.    Defendant CNO acted as the guarantor for the Notes and received the funds resulting from the sale of the Notes.  Further, the Offering Memoranda used to sell the Notes relied upon defendant CNO's reported financial results.  Meanwhile, defendant Odebrecht Finance was created without any legitimate assets, all for the benefit of defendants CNO and Odebrecht.  As such, defendant CNO acted as a controlling person of defendant Odebrecht Finance and had the power and authority to cause defendant Odebrecht Finance to engage in the wrongful conduct complained of herein.

189.    Pursuant to RCW §21.20.430(3), and by virtue of their status as control persons, defendants Odebrecht and CNO are liable to plaintiff, jointly and severally with and to the same extent as defendant Odebrecht Finance, for the relief specified in RCW §21.20.430(1), including rescission or damages, interest and attorneys' fees.

190.    By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with defendants Odebrecht and CNO for violations of RCW §21.20.010, for the relief specified in RCW §21.20.430(3).

### COUNT V
### Negligent Misrepresentations
### (Against All Defendants)

191.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

192.    Defendants made materially false and misleading statements, including, without limitation, those representations and omissions in the Offering Memoranda related to the offerings of

the Notes, which were incorporated into analyst reports and rating agency reports, as well as press releases, financial statements and other disclosures made by defendants, as alleged herein.  These representations were false and misleading in that, among other reasons, defendant CNO's financial statements failed to disclose the kickback and bribery scheme as alleged herein.

193.    Defendants lacked reasonable grounds for believing these statements were true and not misleading.  Each defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the disclosures containing the material misrepresentations and omissions.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements made misleading, and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, defendants should have known of the material misstatements and omissions contained in their statements and also should have known of the omissions of material fact that were necessary to make the statements made therein not misleading.

194.    Defendants made these untrue statements of material fact knowing that plaintiff and other investors were likely to reasonably rely on these statements in deciding whether or not to purchase the Notes.

195.    Plaintiff justifiably relied on defendants' misrepresentations.  At the time of the misrepresentations and omissions of material fact by defendants, plaintiff and its agents were ignorant of the statements' falsity and believed them to be true.  If plaintiff and/or its agents had been aware of the true facts, they would not have purchased or continued to hold the Notes and/or would have disposed of them.

196.    As a direct and proximate result of defendants' negligent misrepresentations and omissions, plaintiff suffered damages in connection with its purchases of the Notes.

- 81 -

197.     By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for negligent misrepresentations.

**COUNT VI**
**Fraud**
**(Against All Defendants)**

198.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

199.     Defendants made the false and misleading statements alleged herein, including omitting to provide information necessary to make their disclosures regarding defendants' financial results, business, operations, risks and prospects not misleading in light of the circumstances in which they were made.

200.     Defendants made these misrepresentations with the knowledge of the false and misleading nature of such statements.

201.     Defendants made these false statements with the intent to defraud.  Defendants fraudulently induced plaintiff and other investors to purchase the Notes by: (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaging in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff.

202.     Plaintiff justifiably relied on defendants' misrepresentations as detailed in ¶¶148-153. Plaintiff purchased the Notes unaware of the falsity of defendants' representations and believed them to be true.  In reliance on defendants' representations, plaintiff was induced to and did act as herein alleged, including by purchasing the Notes.  Plaintiff's reliance on defendants' false and misleading

- 82 -

representations was justified because of defendants' misrepresentations and active concealment of the truth.

203.    By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for fraud.

204.    Plaintiff would not have purchased the Notes at the prices it paid, or at all, or would not have continued to hold the Notes, if it had been aware of the truth regarding defendants' false and misleading statements.

205.    As a direct and proximate result of defendants' intentional misrepresentations and active concealment, plaintiff suffered damages resulting from its reliance on defendants' false statements, misrepresentations and omissions.

206.    The wrongful acts of defendants were done maliciously, oppressively and fraudulently, and plaintiff is therefore entitled to punitive and exemplary damages in an amount to be ascertained according to proof that is appropriate to punish or set an example of defendants.

**COUNT VII**
**Conspiracy**
**(Against All Defendants)**

207.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

208.    By virtue of the conduct alleged herein, defendants intentionally formed and operated a conspiracy.  Each of the defendants committed overt wrongful acts done in furtherance of and pursuant to this conspiracy, including the issuance of false and misleading statements, creating and participating in a kickback and bribery scheme and other criminal acts, and selling securities, including the Notes, to plaintiff and other investors on false and misleading pretenses.

209.    As a direct and proximate result of defendants' conspiracy, plaintiff suffered damages.

210.    By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for conspiracy.

## COUNT VIII
### For Violations of N.Y. Debtor and Creditor Law §273
### (Against Defendants Odebrecht, CNO and OEC)

211.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendants Odebrecht, CNO and OEC.

212.    The conveyances from defendant Odebrecht Finance to defendants Odebrecht and CNO were made without fair consideration being made by defendants CNO and Odebrecht to Odebrecht Finance.

213.    The conveyances from defendant Odebrecht Finance to defendants Odebrecht and CNO rendered Odebrecht Finance insolvent with respect to its creditors, including plaintiff.

214.    By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for violation of N.Y. Debtor and Creditor Law §273.

## COUNT IX
### For Violations of N.Y. Debtor and Creditor Law §276
### (Against Defendant OEC)

215.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendant OEC.

216.    Defendant CNO conveyed assets to defendant OEC.

217.    The conveyances from defendant CNO to defendant OEC were made without fair consideration.

- 84 -

218.    The assets that defendant CNO conveyed to defendant OEC had value out of which plaintiff could have satisfied its claims.

219.    The conveyances from defendant CNO to defendant OEC, which were directed by defendant Odebrecht, were made with the actual intent to hinder, delay, or defraud either present or future creditors, including plaintiff.  In particular, defendant OEC has not identified any consideration given for defendant CNO's assets, let alone consideration that would adequately compensate defendant CNO for the totality of its international operating assets.  At the same time, the reorganization was simply a shifting of assets within the same organization with essentially the same name, leaving those assets within the control of (and to benefit) defendant Odebrecht itself and, indirectly, defendant CNO.  Defendant CNO's assets have thus been depleted, while analysts are reporting that the reorganization protects defendant CNO from possible punishment and, at a minimum, will enable defendants to fight the case "in the courts for a long period of time."  When these facts are added to the unusual timing and circumstances surrounding the reorganization, as alleged at ¶¶5, 25 and 154-163, defendant CNO's conveyance to defendant OEC was made with the requisite intent to defraud.

220.    As a result of the foregoing, defendants Odebrecht, CNO and OEC owe plaintiff damages in an amount to be determined at trial.

221.    Pursuant to N.Y. Debtor and Creditor Law §276-a, plaintiff is entitled to recover its attorneys' fees and expenses incurred in prosecuting its claims under N.Y. Debtor and Creditor Law §§273 and 276.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

- 85 -

A.      Awarding compensatory damages in favor of plaintiff against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.      Rescission or a rescissory measure of damages;

C.      For punitive damages appropriate to punish or set an example of defendants;

D.      Awarding plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED:  February 1, 2018                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            DOUGLAS R. BRITTON
                                            MATTHEW J. BALOTTA


                                            s/ DOUGLAS R. BRITTON
                                            DOUGLAS R. BRITTON

                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101-8498
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)
                                            dougb@rgrdlaw.com
                                            mbalotta@rgrdlaw.com

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)
                                            srudman@rgrdlaw.com

- 86 -

1359489_1

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER C. GOLD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
cgold@rgrdlaw.com

Attorneys for Plaintiff

- 87 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 1, 2018.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dougb@rgrdlaw.com

- 88 -

# Mailing Information for a Case 1:17-cv-08118-PGG Washington State Investment Board v. Odebrecht S.A. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew James Balotta**
  mbalotta@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Douglas R. Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com

- **Michael Barry Carlinsky**
  michaelcarlinsky@quinnemanuel.com,michael-carlinsky-9816@ecf.pacerpro.com

- **Christopher Chagas Gold**
  cgold@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **Jacob J Waldman**
  jacobwaldman@quinnemanuel.com,jacob-waldman-7206@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)