UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WASHINGTON STATE INVESTMENT BOARD, <br><br> Plaintiff, <br><br> - against - <br><br> ODEBRECHT S.A, CONSTRUTORA NORBERTO ODEBRECHT S.A., ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A., and ODEBRECHT FINANCE LTD., <br><br> Defendants. | **MEMORANDUM OPINION & ORDER** <br><br> 17 Civ. 8118 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

   This is a securities fraud action arising out of a massive bribery scandal.  Plaintiff Washington State Investment Board has sued Odebrecht, S.A., a Brazilian corporation, and three of its subsidiaries for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5, Section 20(a) of the Securities Exchange Act, Washington state law, and New York state law.

   Defendants Construtora Norberto Odebrecht S.A., Odebrecht Engenharia E Construção S.A., and Odebrecht Finance Ltd. ("Defendants") have moved to dismiss pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  (Dkt. No. 47)  For the reasons stated below, Defendants' motion to dismiss will be granted in part and denied in part.

## BACKGROUND[1]

### I. PARTIES

Plaintiff Washington State Investment Board (the "Board") "is a state agency responsible for the prudent investment and management of public trust and public employee retirement funds."  (Am. Cmplt. (Dkt. No. 35) ¶ 22)

Defendant Odebrecht "is a holding company headquartered in Brazil that, through various subsidiaries and operating entities, conducts business in construction, engineering, infrastructure, chemicals, utilities and real estate . . . in Brazil and throughout 27 other countries, including the United States."  (Id. ¶ 23)

Defendant Construtora Norberto Odebrecht S.A. ("Norberto") is "a wholly-owned subsidiary of Defendant Odebrecht, primarily engaging in the construction of large-scale infrastructure and other public works projects" around the world.  (Id. ¶ 24)

Defendant Odebrecht Finance Ltd. is a Cayman Islands corporation that "is a wholly-owned subsidiary of defendant Odebrecht and was created for the sole purpose of raising money for Odebrecht and [Norberto] through the issuance of bonds . . . ."  (Id. ¶ 26)  Odebrecht Finance and Norberto solicited investors through public statements and offering memoranda. (See id. ¶¶ 51-53, 55-56, 58-59)

On March 31, 2015, Odebrecht reorganized, and Defendant Odebrecht Engenharia e Construção S.A. ("Engenharia") "took over [Norberto's] role as the consolidator of Odebrecht's construction subsidiaries."  (Id. ¶ 25)  Norberto is currently a subsidiary of Engenharia that "focuses solely on projects within Brazil."  (Id. ¶ 24)  Before March 2015,

---

[1]  The following facts are drawn from the Amended Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

Norberto was the guarantor for Odebrecht Finance's debt – including certain notes purchased by Plaintiff – and Odebrecht Finance "relie[d] primarily upon [D]efendant [Norberto's] reported financial results and business prospects to sell bonds to investors."  (Id.)  Engenharia has since become "a guarantor of the Notes bought by [P]laintiff."  (Id. ¶ 25)

## II.   FACTS

### A.   Defendants' Alleged Scheme

In 2006, Defendants created "a standalone division within [D]efendant [Norberto] called the Division of Structured Operations," which was utilized to conceal communications and the movement of funds in furtherance of a massive international bribery scheme.  (Id. ¶ 34-40)  During the bribery scheme, Defendants paid "approximately $788 million in bribes to government officials to improperly influence the award of more than 100 large construction contracts to [D]efendants in Brazil and at least 11 other countries in Central and South American and Africa," bringing in $3.336 billion in improperly accounted for ill-gotten gains.  (Id. ¶ 34)

Defendants' illicit activities did not begin with the creation of the Division of Structured Operations.  From "2003 to approximately 2016, [D]efendants paid $349 million in bribes to various Brazilian officials and political parties in order to secure an improper advantage in obtaining lucrative public construction contracts . . . ."  (Id. ¶ 41)  Similarly, "[b]etween approximately 2001 and 2016, [D]efendants paid illicit bribes of about $439 million to foreign officials and political parties in various countries outside of Brazil," including in North America, South America, and Africa.  (Id. ¶ 46)

"In or about 2014, Brazilian law enforcement authorities began an initially covert investigation into corruption related to Petrobras, called Lava Jato . . . . This investigation originally focused on Petrobras, the partially state-owned oil and energy company."  (Id. ¶ 48)

As the Lava Jato investigation began, Defendants deleted records of their illegal activity, bribed officials to prevent their cooperation with investigators, and made "numerous false and misleading statements denying [D]efendants' participation in the bribery and kickback scheme, undermining the validity of the investigations and misrepresenting salient facts to investors and the public."  (Id. ¶¶ 48-49)

As part of this effort, on October 2, 2014, Odebrecht issued a press release denying any improper payments to Petrobras.  (Id. ¶ 108)  And on May 1, 2015, Marcelo Odebrecht – then Odebrecht's chief executive officer – publicly stated that corruption allegations against the company were "false."  (Id. ¶ 110)  On June 19, 2015, Defendant Norberto issued a press release stating that it was cooperating with the Lava Jato investigation.  (Id. ¶ 112)  At that time, however, Norberto was directing employees to delete records, bribe government officials in Antigua, and destroy encryption keys necessary to access evidence.  (Id.)  Until at least December 10, 2015, Odebrecht continued to issue press releases denying corruption allegations, claiming innocence, and professing cooperation with the Lava Jato investigation.  (Id. ¶¶ 113-127)

On December 21, 2016, Odebrecht pleaded guilty in the U.S. District Court for the Eastern District of New York to conspiring to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA").  In connection with its guilty plea, Odebrecht agreed to pay a fine of $2.6 billion.  (Id. ¶¶ 6, 15; Britton Decl., Ex. C (Plea Agreement) (Dkt. No. 29-3) ¶¶ 3, 21)  In its plea agreement with the U.S. Department of Justice, Odebrecht admitted to using a business unit within Norberto – the "Division of Structured Operations" – to pay "nearly $800 million in bribes in connection with 100 projects in 12 countries in exchange for ill-gotten benefits of more than $3.3 billion."  (Am. Cmplt. (Dkt. No. 35) ¶¶ 3, 16; Plea Agreement (Dkt.

4

No. 29-3), Attachment B (Statement of Facts) ¶¶ 19-23)  As part of Odebrecht's guilty plea, it "accepted responsibility 'for the acts of its affiliates, subsidiaries, officers, directors, employees, and agents,' including [Norberto], and pled guilty so the U.S. government would 'not file additional criminal charges against [Odebrecht] or any of its direct or indirect subsidiaries or joint ventures,' including [Norberto]."  (Am. Cmplt. (Dkt. No. 35) ¶¶ 6, 15; Plea Agreement (Dkt. No. 29-3) ¶¶ 14-15)

### B.    Plaintiff's Purchases of Odebrecht Finance Notes

During the bribery scheme, Defendants – acting through Odebrecht Finance – marketed to investors notes (the "Notes").  (Am. Cmplt. (Dkt. No. 35) ¶ 2)  "The Notes include the following securities issued by defendant Odebrecht Finance and guaranteed by [Norberto]: (i) 7.125% notes due 2042 (the '7.125% Notes'); (ii) 4.375% notes due 2012 (the '4.375% Notes'); (iii) 8.25% notes due 2018 (the '8.25% Notes'); and (iv) 5.25% notes due 2029 (the '5.25% Notes')."  Plaintiff purchased more than $100 million of the Notes between June 21, 2012 and February 4, 2015.  (Id. ¶¶ 2, 28-31)

Defendants "began soliciting investors to buy the 7.125% Notes" in about June 2012.  (Id. ¶ 52)  "In connection with these efforts, Defendants [Norberto] and Odebrecht Finance issued an offering memorandum."  (Id.)  The 2012 offering memorandum contains Defendants' financial results and statements, and advises that "price generally is the most important factor" in the "competitive" bidding processes that Norberto engages in to win construction contracts.  (Id. ¶ 53)  The 2012 offering memorandum does not disclose Defendants' bribery scheme.  (Id.)

Norberto's 2009, 2010, and 2011 annual financial statements are included in the 2012 offering memorandum, and they likewise do not disclose Defendants' bribery scheme.  (Id.

¶¶ 78-81)  Norberto's 2011 annual financial statement touts "consecutive upgrades" of Norberto's credit by "the main credit rating agencies."  (Id. ¶ 82)

The 2012 offering memorandum also includes Norberto's first quarter 2012 interim quarterly consolidated financial statement.  (Id. ¶ 84)  This financial statement also does not disclose Defendants' bribery scheme.  (Id. ¶ 85)

Odebrecht's 2012 Annual Report – which was not included with the 2012 offering memorandum but which was then available on Odebrecht's website in English – discusses Odebrecht's financial results but does not disclose Defendants' bribery scheme.  (Id. ¶¶ 100-101)

In ten transactions between June 21, 2012 and February 4, 2015, Plaintiff purchased 7.125% Notes with a face value of $63 million from Credit Suisse Securities LLC, BNP Paribas Securities Corp., Barclays Bank PLC, and Deutsche Bank Securities Inc.  (Id. ¶ 29) For these and all subsequent Notes purchases, Plaintiff acted through its "internal investment managers," who "undertook issuer-specific research to identify companies in which to invest." (Id. ¶ 149)  In connection with this research, Plaintiff's investment managers consulted "financial information disclosed by defendant Odebrecht and [] financial statements included in defendant [Norberto's] annual and quarterly financial filings . . . ."  (Id. ¶ 150)

Defendants "began soliciting investors to buy the 4.375% Notes and the 8.25% Notes" in about April 2013.  (Id. ¶ 55)  Defendants Norberto and Odebrecht Finance again issued offering memoranda containing financial results and statements.  (Id.)  These 2013 offering memoranda were "substantially similar" to the 2012 offering memorandum.  (Id.)  As with the 2012 offering memorandum, the 2013 offering memoranda state that "price generally is the most important factor" in the "competitive" bidding processes that Norberto engages in to win

construction contracts.  (Id. ¶ 56)  The 2013 offering memoranda do not disclose Defendants'
bribery scheme.  (Id.)

    The 2013 offering memoranda contain the 2010 and 2011 Norberto financial
statements, along with Norberto's 2012 annual consolidated financial statement.  None of these
documents disclose Defendants' bribery scheme.  (Id. ¶¶ 86-88)  The 2012 financial statement
touts "consecutive upgrades" to Norberto's credit rating, and asserts that all "major credit rating
agencies" have now given Norberto "investment grade ratings."  (Id. ¶¶ 89-90)

    On April 17, 2013, Plaintiff purchased 8.25% Notes with a face value of 40
million Brazilian dollars from Deutsche Bank Securities Inc., the price of which was
approximately $19.9 million "based on the exchange rate that day from [Brazilian dollars] to
[U.S. dollars], due to the Notes being [Brazilian dollar] denominated."  (Id. ¶ 28)  That same day,
Plaintiff purchased 4.375% Notes with a face value of $50 million from Deutsche Bank
Securities Inc.  (Id. ¶ 30)

    Defendants "began soliciting investors to buy the 5.25% Notes" in about June
2014.  (Id. ¶ 58)  Defendants Norberto and Odebrecht Finance issued an offering memorandum
which contained financial results and statements.  (Id.)  As with the previously discussed offering
memoranda, the 2014 offering memorandum states that "price generally is the most important
factor" in the "competitive" bidding processes that Norberto engages in to win construction
contracts.  The 2014 offering memorandum does not disclose Defendants' bribery scheme.  (Id.
¶¶ 58-59)  The 2014 offering memorandum contains the 2011 and 2012 Norberto financial
statements previously discussed, along with Norberto's 2013 annual consolidated financial
statement and first quarter 2014 interim financial statement.  None of these documents disclose

Defendants' bribery scheme, and the 2013 and 2014 statements tout Norberto's credit rating. (Id. ¶¶ 91-98)

The 2012, 2013, and 2014 offering memoranda, and the financial statements, all state that Norberto's financial statements are presented in accordance with Brazilian GAAP. (Id. ¶¶ 63-64)

Odebrecht's 2014 and 2015 annual reports – which are not included in any of the offering memoranda at issue but which were all available at the time on Odebrecht's website in English – discuss Odebrecht's financial results but do not disclose Defendants' bribery scheme. (Id. ¶¶ 102-106) Both the 2014 and 2015 reports assert that they have been prepared in accordance with Brazilian GAAP. (Id. ¶¶ 102, 105)

On June 19, 2014, Plaintiff purchased 5.25% Notes with a face value of $20 million from Citigroup Global Markets Inc. On July 15, 2014, Plaintiff purchased 5.25% Notes with a face value of $5 million from Morgan Stanley Co. Incorporated. (Id. ¶ 31)

C.     **Disclosure of Defendants' Bribery Scheme**

Beginning on February 23, 2016, a series of disclosures regarding Odebrecht's misconduct and the Lava Jato investigation began to emerge. (Id. ¶ 146) Reuters reported that Peru's president was "suspected of accepting bribes from Odebrecht," and "a Brazilian federal prosecutor announced that 'investigators had evidence Odebrecht had bribed officials abroad . . . .'" (Id.) On March 1, 2016, Fitch Ratings Inc. "downgraded Odebrecht debt, including the Notes," because Fitch believed that "'the reputational damage from the Lava-Jato scandal' would 'erode [Engenharia's] capacity to replace backlog,'" and "the reputational damage 'ha[d] reduced Odebrecht [G]roup's ability to access debt and capital markets." (Id.) Fitch downgraded Odebrecht's debt again on May 3, 2016, because of "the prolonged

uncertainty of any potential impact on [Engenharia's] credit profile stemming from the investigations on the corruption scandal." (Id.)  Moody's Investor Service downgraded Odebrecht's debt that same day for similar reasons.  (Id.)

The value of Plaintiff's Notes has declined precipitously, at one point falling by 48% in less than three months.  (Id. ¶ 147)  Plaintiff asserts that it is unable to sell its Notes at par or obtain interest reflective of the Notes' true risk.  (Id. ¶ 144)

## III.   PROCEDURAL HISTORY

The Complaint was filed on October 20, 2017 (Cmplt. (Dkt. No. 1)), and the Amended Complaint was filed on February 1, 2018.  (Am. Cmplt. (Dkt. No. 35))  The Amended Complaint includes the following causes of action:

(1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 as against all Defendants (id. ¶¶ 165-71);

(2) violation of Section 20(a) of the Exchange Act as against Odebrecht, Norberto, and Engenharia (id. ¶¶ 172-77);

(3) violation of the Washington State Securities Act, RCW Sections 21.20.010 and 21.20.430(1), as against all Defendants (id. ¶¶ 178-85);

(4) violation of the Washington State Securities Act, RCW Sections 21.20.010 and 21.20.430(3), as against Odebrecht and Norberto (id. ¶¶ 186-90);

(5) negligent misrepresentation – with no state law specified – as against all Defendants (id. ¶¶ 191-97);

(6) fraud – with no state law specified – as against all Defendants (id. ¶¶ 198-206);

(7) conspiracy – with no state law specified – as against all Defendants (id. ¶¶ 207-10);

(8) violation of N.Y. Debtor and Creditor Law, Section 273, as against Odebrecht, Norberto, and Engenharia (id. ¶¶ 211-14); and

(9) violation of N.Y. Debtor and Creditor Law, Section 276, as against Engenharia.  (Id. ¶¶ 215-21)

On September 21, 2018, this Court granted Plaintiff's motion to serve Defendant

Odebrecht through its then-counsel, Quinn Emanuel Urquhart & Sullivan.  (Dkt. No. 55)

Defendants Norberto, Engenharia, and Odebrecht Finance have moved to dismiss the Amended

Complaint.  (Dkt. No. 47)

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the

complaint," Kassner, 496 F.3d at 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead

Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable

inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir.

2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests."  Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,

507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice [to

establish entitlement to relief]."  Iqbal, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).  Moreover, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).  A court may also consider "legally required public disclosure documents filed with the SEC." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

### B.      Securities Fraud Pleading Standards

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012).  First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).  In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d at 383.

The heightened pleading requirement under Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, 493 F.3d at 99 (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)).  Pursuant to Rule 9(b), a securities

fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"   Rombach, 355 F.3d at 170 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976))).  "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged.").  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 324.

## II.   FEDERAL SECURITIES FRAUD CLAIMS

Defendants contend that Plaintiff's Sections 10(b) and 20(a) claims should be dismissed for multiple reasons.  The Court addresses each argument in turn.

A.     **Statute of Limitations**

Defendants first argue that Plaintiff's Sections 10(b) and 20(a) claims are time-

barred.  (Def. Br. (Dkt. No. 48) at 17)[2]

1.     **Applicable Law**

"[A] private right of action that involves a claim of fraud, deceit, manipulation, or

contrivance in contravention of a regulatory requirement concerning the securities laws . . . may

be brought not later than the earlier of . . . 2 years after the discovery of the facts constituting the

violation; or . . . 5 years after such violation."  28 U.S.C. § 1658.

> [T]he limitations period in § 1658(b)(1) begins to run once the plaintiff did
> discover or a reasonably diligent plaintiff would have "discover[ed]" the facts
> constituting the violation – whichever comes first.  In determining the time at
> which "discovery" of those "facts" occurred, terms such as "inquiry notice" and
> "storm warnings" may be useful to the extent that they identify a time when the
> facts would have prompted a reasonably diligent plaintiff to begin investigating.

Merck & Co. v. Reynolds, 559 U.S. 633, 653 (2010).  "[T]he reasonably diligent plaintiff has not

'discovered' one of the facts constituting a securities fraud violation until he can plead that fact

with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss."  City of Pontiac

Gen. Employees' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011).  "Until the plaintiff

has uncovered – or a reasonably diligent plaintiff would have uncovered – enough information

about the defendant's knowledge or intent to satisfy this pleading standard, he has not

'discovered' the fact of scienter, and the statute of limitations cannot begin to run."  Id.

2.     **Analysis**

The Complaint was filed on October 20, 2017.  Accordingly, for this action to be

timely, Plaintiff must not have discovered Defendants' knowing participation in the bribery

---

[2]  All references to page numbers in this Order are as reflected in this District's Electronic Case
Files ("ECF") system.

scheme before October 20, 2015.  Defendants argue, however, that public events and filings that

occurred "no later than late[-]2014" provided Plaintiff with sufficient information to permit it to

plead federal securities fraud violations.  (Def. Br. (Dkt. No. 48) at 18)  Defendants cite the

following:  (1) "[b]eginning no later than October 20, 2014, a steady drumbeat of news reports"

about Odebrecht's involvement in the bribery scheme and Brazilian investigations into

Odebrecht; (2) a May 21, 2015 complaint against Petrobras "alleging that Odebrecht was a major

participant in the bribery and kickback cartel"; and (3) the June 29, 2015 arrest of Odebrecht

Chief Executive Officer Marcelo Odebrecht, which was followed by announcements of

additional investigations and a drop in the price of certain Notes.  (Id. at 18-26)

   Although these events may have alerted Plaintiff to the underlying bribery

scheme, Plaintiff correctly notes that Defendants "do not point to any particulars about

[Norberto, Odebrecht Finance, or Engenharia] specifically."  (Pltf. Opp. Br. (Dkt. No. 50) at 27)

Instead, all of the above-mentioned events relate to Odebrecht or its CEO.

   As discussed above, it is Defendants' burden to show how these events did alert

or should have alerted Plaintiff to discover facts "with sufficient detail and particularity" to

demonstrate each element of the alleged violations, including the scienter of each Defendant.

City of Pontiac, 637 F.3d at 175.  The events cited by Defendants are no more than "storm

warnings," however.  While they "may be useful," see Merck, 559 U.S. at 653, these events do

not disclose information concerning Defendants' scienter, and thus plainly do not trigger the

statute of limitations.

   Defendants contend, however, that DoubleLine Capital LP v. Odebrecht Finance,

Ltd., 323 F. Supp. 3d 393 (S.D.N.Y. 2018) ("DoubleLine I"), "supports Defendants' argument

that [Plaintiff's] federal claims are time-barred."  (Def. Sept. 6, 2018 Ltr. (Dkt. No. 53) at 2).

In <u>DoubleLine I</u>, the court found that "[t]he misleading nature of [Norberto's

financial] statement[s] . . . had already been revealed by the news reports immediately following

Marcelo Odebrecht's [June 2015] arrest." <u>DoubleLine I</u>, 323 F. Supp. 3d at 458.  This statement

was made in the context of loss causation, however.  With respect to scienter, the <u>DoubleLine I</u>

court found that news articles in the months before Marcelo Odebrecht's arrest

> may have been sufficient to trigger inquiry notice, but they do not provide the
> who, what, where, when, and how that securities fraud plaintiffs must plead.  The
> articles show that Odebrecht was being investigated for potential fraud but do not
> provide details regarding the specific bribes that were paid, the date on which they
> were paid, or the identities of the officers or directors of the Defendant companies
> that were responsible for those payments or who knew of those payments.

<u>Id.</u> at 437-38.

The <u>DoubleLine I</u> court did not resolve the issue of scienter with respect to

Marcelo Odebrecht's June 29, 2015 arrest, however, because the complaint in that case was filed

on June 16, 2017, and so the relevant date for statute of limitations purposes was June 16, 2015.

<u>Id.</u> at 433.  But the <u>DoubleLine I</u> court's analysis underscores why Marcelo Odebrecht's arrest

did not disclose sufficient information regarding Defendants' scienter to trigger the statute of

limitations.  <u>See id.</u> at 438.

For the reasons stated above, the Court concludes that Marcelo Odebrecht's arrest

and the related news coverage were not sufficient to permit Plaintiff to plead a securities fraud

claim against Defendants with particularity, including as to Defendants' scienter.  Accordingly,

Defendants' motion to dismiss Plaintiff's federal securities fraud claims on statute of limitations

grounds will be denied.

B.   **Loss Causation**

Defendants next argue that Plaintiff's federal securities fraud claims should be dismissed because Plaintiff has not "allege[d] [that] any of these market events corrected a prior misstatement or even caused Note values to decline. . . ."  (Def. Br. (Dkt. No. 48) at 26)

1.   **Applicable Law**

"Loss causation has been analogized to the tort law concept of proximate cause in that the injury sustained by the plaintiff must be a foreseeable result of a material misrepresentation or omission."  In re Winstar Communications, 01 CV 3014(GBD), 2006 WL 473885, at *13 (S.D.N.Y. Feb. 27, 2006) (citing Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d. Cir. 2003)).  "[T]o establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d. Cir. 2005) (quoting Suez Equity Investors, L.P. v. Toronto–Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis omitted)).  "Otherwise, the loss in question was not foreseeable."  Id. at 173.

> Plaintiffs' burden is not a heavy one.  The complaint must simply give Defendants "some indication" of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations. . . . [W]here the question, at bottom, is one of intervening events – a consideration properly analyzed under proximate cause – the chain of causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.

Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 187 (2d Cir. 2015) (internal quotations and citations omitted).

A plaintiff may plead loss causation "either by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or

(b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."  Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232-33 (2d Cir. 2014) (internal quotation marks and citations omitted).

### 2.    **Analysis**

Here, Plaintiff has alleged a "series of disclosures relating to defendants' bribery scheme" that demonstrate causation:  (1) February 23, 2016 news reports that the scheme "not only reached the highest levels of power in Brazil, but also in other countries"; (2) a March 1, 2016 credit rating downgrade; (3) Odebrecht March 22, 2016 press releases confirming that search warrants had been executed at the Brazilian offices and homes of Odebrecht employees, that Odebrecht "had 'given its full assistance to the ongoing investigations,'" and that Odebrecht had "'decide[d] on definitive collaboration with'" the investigations; and (4) a May 3, 2016 credit rating downgrade.  (Am. Cmplt. (Dkt. No. 35) ¶ 146)  Plaintiff further alleges that, "[a]s a result of the market learning about defendants' bribery scheme and the magnitude and breadth of that scheme, the market prices for the Notes collapsed, falling by as much as 48% in less than three months."  (Id. ¶ 147)  Plaintiff argues that these disclosures are sufficient "under both 'corrective disclosures' and 'materialization of the risk' theories."  (Pltf. Opp. Br. (Dkt. No. 50) at 31)

Defendants argue, however, that Plaintiff's assertion of loss causation is "vague" and "conclusory."  Defendants note that "on February 23, 2016 – when the Notes were already trading below 50% of par . . . [–] reports of the scheme's reach across Latin America and beyond had been public for months."  (Def. Br. (Dkt. No. 48) at 27)  As to the credit rating downgrades, Defendants argue that they cannot constitute corrective disclosures, because no "'new material information was revealed by the downgrade.'"  (Id. at 29 (quoting In re Manulife Fin. Corp. Sec.

Litig., 276 F.R.D. 87, 104 (S.D.N.Y. 2011)))  As to the March 22, 2016 press releases,

Defendants argue that "Plaintiff does not plead what, if anything, these events disclosed or

corrected about previous alleged misstatements of which the market was not already aware. . . ."

(Id. at 28)  Finally, Defendants argue that Plaintiff "do[es] not even attempt to account for the

significant losses in value between Plaintiff's purchases of the Notes and the first alleged

'corrective disclosure,'" and likewise does not "account for the significant decline in value

between the March 22 and May 3, 2016 'corrective disclosures' – during which time the value of

the 7.125%, 5.25%, and 4.375% Notes fell by between approximately 30% and 37%."  (Id. at 30)

 The Court concludes that Defendants have not rebutted Plaintiff's claim that the

March 22, 2016 press releases both provided new information and caused a decline in the Notes'

value.  As to new information, the timeline set forth in the Complaint – which Defendants do not

dispute – indicates that Odebrecht's press releases between July 28, 2015 and December 10,

2015 largely deny allegations of a bribery scheme.  (Am. Cmplt. (Dkt. No. 35) ¶¶ 123-27)  But in

the March 22, 2016 press releases, Odebrecht states that it is in "definitive collaboration" with

authorities.  (Id. ¶ 146)  This is new material information, because it suggests a greater likelihood

that Odebrecht had in fact committed the alleged acts of bribery.

 Plaintiff has also plausibly alleged that the February 23, 2016 news reports

provide new information to the market as to the extent of Defendants' involvement in the bribery

scheme.

 As to causation, Plaintiff has alleged a decline "by as much as 48% in less than

three months" following the February 23, 2016 news reports, and has pled that the losses were

not "caused by changed market conditions, macroeconomic or industry factors, or company-

specific facts unrelated to defendants' fraudulent conduct."  (Id. ¶ 147)  Defendants argue that

the February 23, 2016 news reports are merely "two squibs of information identifying the

president of Peru and a former Argentinian 'transportation secretary,'" the materiality of which

Plaintiff fails to allege.  (Def. Reply Br. (Dkt. No. 52) at 13)  But Plaintiffs allege that these news

reports revealed that the bribery scheme "not only reached the highest levels of power in Brazil,

but also in other countries, as specific leaders on the national stage of Peru and Argentina were

implicated."  (Am. Cmplt. (Dkt. No. 35) ¶ 146)  Defendants do not contend that the international

reach of the scheme was plausibly known, and so the February 23, 2016 news reports are

plausibly material to the subsequent decline in the value of the Notes.

        As to the March 22, 2016 press releases, Defendants concede that the value of the

Notes "fell by between approximately 30% and 37%" in the six weeks after these releases were

issued (Def. Br. (Dkt. No. 48) at 30), and have offered no alternative explanation for the decline,

instead relying on the notion that there was no disclosure and "thus no cause at all . . . [for] the

substantial drop in trading prices during the six-week period between March 22 and May 3,

2016."  (Def. Reply Br. (Dkt. No. 52) at 13)  However, these press releases plainly constitute a

disclosure, and accordingly all the elements of loss causation are met.

        Defendants also cite DoubleLine I on the issue of loss causation, noting the

court's finding that Marcelo Odebrecht's arrest "'let the cat out of the bag[,]' . . . and [thus]

'[s]ubsequent reports merely confirmed what the market already knew.'"  (Def. Sept. 6, 2018

Ltr. (Dkt. No. 53) at 2 (quoting DoubleLine I, 323 F. Supp. 3d at 459))  As Plaintiff notes,

however, the DoubleLine I plaintiff "allege[d] nothing regarding any further decline in the value

of the Notes after th[e] date [of Odebrecht's plea agreement]."  DoubleLine I, 323 F. Supp. 3d at

459.  Here, by contrast, Plaintiff has alleged specific and undisputed losses following the

additional disclosures in February and March 2016.  These allegations suffice to permit the Court

to find that these disclosures are corrective disclosures.

The Court concludes that Plaintiff has met its "not heavy" burden to allege a

causal link between its losses and the February and March 2016 disclosures.

### C.  <u>Alleged Failure to State a Claim Against Odebrecht Finance and Engenharia</u>

Defendants contend that Plaintiff has not "attribute[d] any alleged misstatements"

to Odebrecht Finance and Engenharia, and thus has not stated a Section 10(b) claim against these

Defendants.  (Def. Br. (Dkt. No. 48) at 31)  In response, Plaintiff states that, as to Engenharia, it

has pled only a successor liability claim.  (<u>See</u> Pltf. Opp. Br. (Dkt. No. 50) at 34-35)

Accordingly, this Court considers the issue of attribution only as to Odebrecht Finance, and the

issue of successor liability only as to Engenharia.

### 1.  <u>Legal Standard</u>

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that

the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in

connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that

the plaintiff's reliance was the proximate cause of its injury."  <u>ATSI Commc'ns</u>, 493 F.3d at 105

(citing <u>Lentell</u>, 396 F.3d at 172); <u>see</u> <u>also</u> <u>San Leandro Emergency Med. Grp. Profit Sharing Plan</u>

<u>v. Philip Morris Co.</u>, 75 F.3d 801, 808 (2d Cir. 1996) ("To state a cause of action under section

10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted

a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff

injury.").

## 2. __Odebrecht Finance as Maker of Misstatements__

Defendants argue that the only alleged misstatements involving Odebrecht Finance are the offering memoranda issued by Norberto and Odebrecht Finance.  (Def. Br. (Dkt. No. 48) at 30-31)  These memoranda, however, "express[ly] attribut[e] their contents solely to [Norberto], which 'accept[s] responsibility' for them."  (Id. at 31)

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed.

Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142-43 (2011).

Plaintiff argues, however, that there can be more than one "maker" of a statement (Pltf. Opp. Br. (Dkt. No. 50) at 34 (citing Carpenters Pension, 56 F. Supp. 3d at 558)), and that Odebrecht Finance "made it '"necessary or inevitable"' that any falsehood [would] be contained in the statement."  (Id. (quoting Janus, 564 U.S. at 144))  In Janus, however, the Supreme Court instructed that "attribution within a statement" – which here is indisputably to Norberto – "is strong evidence that a statement was made by – and only by – the party to whom it is attributed." Janus, 564 U.S. at 142-43.  And in Carpenters Pension, the court found that settlement agreements – which the defendants had entered into with the Commodity Futures Trading Commission and the Department of Justice regarding the same misstatements at issue in the lawsuit -– treated those defendants as "makers" of those misstatements.  See Carpenters Pension, 56 F. Supp. 3d at 559.

Here, by contrast, Plaintiff has merely alleged that Odebrecht Finance's name is printed at the top of the offering memoranda.  Indeed, Plaintiff later contends that Odebrecht

Finance "was essentially a shell company controlled by [Norberto] and Odebrecht." (Pltf. Opp. Br. (Dkt. No. 50) at 35) Plaintiff cannot credibly contend both that Odebrecht Finance was a paper entity totally controlled by Norberto and Odebrecht, and that it determined the contents of the offering memoranda, especially when it is plain from the offering memoranda that Norberto is the attributed speaker.

Faced with a nearly identical set of factual allegations, the DoubleLine I court held that, under Janus, it could not find that Odebrecht Finance "was a maker of [Norberto's] financial statements contained in the offering memoranda." DoubleLine I, 323 F. Supp. 3d at 452.

This Court concludes that Norberto and not Odebrecht Finance made the alleged misstatements in the offering memoranda. Accordingly, Plaintiff's claims against Odebrecht Finance for violation of Section 10(b) of the Exchange Act will be dismissed.

### 3.   Engenharia's Successor Liability

Plaintiff contends that Engenharia is a "mere continuation of [Norberto]" and thus is liable as Norberto's successor. (Pltf. Opp. Br. (Dkt. No. 50) at 36) Defendants argue, however that Engenharia "cannot be a successor to [Norberto] because, as Plaintiff pleads, [Norberto] continues to operate the entire Brazilian segment of Odebrecht's construction business." (Def. Br. (Dkt. No. 48) at 32)

> The mere continuation exception applies where "it is not simply the business of the original corporation which continues, but the corporate entity itself[,]" and there is a "common identity of directors, stockholders, and the existence of only one corporation at the completion of the transfer." . . . "[T]he underlying theory of the exception is that [ ] if [a] corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability."

Silverman Partners LP v. Verox Grp., No. 08 Civ. 3103 (HB), 2010 WL 2899438, at *5 (S.D.N.Y. July 19, 2010) (first quoting Colon v. Multi-Pak Corp., 477 F. Supp. 2d 620, 626-27,

then quoting Societe Anonyme Dauphitex v. Schoenfelder Corp., No. 07 Civ. 489 (RWS), 2007 WL 3253592, at *6) (S.D.N.Y. Nov. 2, 2007) (third and fourth alterations in original) (internal quotation marks and citation omitted).

       The "mere continuation" exception applies where the seller transfers "not only its assets, but also business location, employees, management and good will" to the successor. McDarren v. Marvel Entm't Group, Inc., No. 94 Civ. 910 (LMM), 1995 WL 214482, at *8 (S.D.N.Y. Apr. 11, 1995). "'[T]he successor issue is "highly fact-specific" and typically cannot be determined as a matter of law.'"  In re General Motors LLC Ignition Switch Litig., No. 14 MD 2543 (JMF), 2017 WL 6509256, at * 7 (S.D.N.Y. Dec. 19, 2017) (quoting Commercial Lubricants, LLC v. Safety-Kleen Sys., Inc., 14-CV-7483 (MKB), 2017 WL 3432073, at *21 (E.D.N.Y. Aug. 8, 2017) (quoting Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 703 (2d Cir. 2009))).

       Although Defendants argue that Norberto continued operating a line of business, courts in this District have repeatedly held that the continued existence of the predecessor corporation is not dispositive of a mere continuation claim.  See, e.g., In re General Motors LLC Ignition Switch Litig., 2017 WL 6509256, at *8 (denying defendant summary judgment on plaintiffs' mere continuation claim where (1) there was continuity of "personnel, management, physical location, assets and general business operations"; (2) predecessor corporation co-existed with successor corporation for two years; but (3) predecessor company was dissolved by the time of litigation); McDarren, 1995 WL 214482, at *2, *8 (denying defendant summary judgment on plaintiff's mere continuation claim where there was continuity of "business location, employees, management and good will," and predecessor corporation was "no longer actively involved in the toy business"); Societe Anonyme, 2007 WL 3253592, at *5-7 (denying motion to dismiss

mere continuation claim where there was continuity of ownership, location, personnel and management, and predecessor existed as a "shell corporation" with no assets); Kidz Cloz, Inc. v. Officially For Kids, Inc., No. 00 Civ. 6270 (DC), 2002 WL 1586877, at *5 (S.D.N.Y. July 17, 2002) (denying motion to dismiss mere continuation successor liability claim where the predecessor corporation survived the asset transfer); Tommy Lee Handbags Mfg. Ltd. v. 1984 Corp., 971 F. Supp. 2d 368, 380 (S.D.N.Y. 2013) (denying motion to dismiss mere continuation successor liability claim where plaintiff did not allege dissolution of the predecessor corporation); Time Warner Cable, Inc. v. Networks Grp., LLC, No. 09 Civ. 10059 (DC), 2010 WL 3563111, at *7 (S.D.N.Y. Sept. 9, 2010) (denying motion to dismiss mere continuation successor liability claim where the predecessor corporation continued to exist).

These cases make clear that a mere continuation successor liability claim can survive where (1) there is continuity of ownership, management, location, personnel, and goodwill; and (2) the predecessor corporation is in some way fundamentally altered by the asset transfer, such as where the predecessor corporation no longer operates as a business or is left with few or no assets.

Here, Plaintiff alleges that Engenharia "adopted [Norberto's] financial position, including its assets," citing a credit agency press release stating that Engenharia "will be consolidating [Norberto] and virtually all of its former businesses, essentially mirroring [Norberto's] previous credit profile." (Am. Cmplt. (Dkt. No. 35) ¶ 157) Given these allegations, Engenharia may in fact be a "mere continuation" of Norberto, as Norberto was fundamentally altered by the reorganization, and it appears that the vast majority of its operations continued on in the corporate form of Engenharia.

Given Engenharia's potential liability as a successor, Defendants' other argument – that Engenharia did not act with scienter (see Def. Br. (Dkt. No. 48) at 31) – is irrelevant, as Engenharia can be held liable if Norberto acted with scienter.  Defendants do not dispute that Plaintiff has adequately pled that Norberto acted with scienter.

Defendants' motion to dismiss Plaintiff's Section 10(b) claim against Engenharia will be denied.

### D.   <u>Control Person Liability</u>

As to Plaintiff's Section 20(a) claim, Defendants argue that Plaintiff has not adequately pled control person liability as to Engenharia and Norberto.  (<u>Id.</u> at 33)

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  <u>ATSI Communications</u>, 493 F3d at 108.  Plaintiff contends that Engenharia's "control person liability stems from its liability as [Norberto's] successor."  (Pltf. Opp. Br. (Dkt. No. 50) at 38)  The issue that remains is whether Plaintiff has adequately pled control person liability as to Norberto.

Plaintiff argues that "Odebrecht's guilty plea shows that it controlled [Norberto]," and that "both Odebrecht and [Norberto] . . . had the ability to control [Odebrecht Finance]."  (<u>Id.</u> at 38)  Norberto's liability as a control person thus turns on whether there was a primary violation by the controlled person – Odebrecht Finance.

As the Court explained above, however, Plaintiff has not alleged a primary violation by Odebrecht Finance, because it has not pled facts demonstrating that Odebrecht Finance was the maker of the alleged misstatements in the offering memoranda.  Accordingly,

25

neither Norberto nor Engenharia – Norberto's alleged successor – has control person liability, and Plaintiff's Section 20(a) claims against Norberto and Engenharia will be dismissed.

      E.    **Actionable Misstatements**

      Defendants contend that Plaintiff has not pled actionable misstatements by Norberto.  (Def. Br. (Dkt. No. 48) at 35)

      The Amended Complaint alleges that Defendants' offering memoranda "described the bidding process for new [construction] projects as 'competitive,'" without disclosing the bribery scheme.  (Am. Cmplt. (Dkt. No. 35) ¶¶ 52-60)  Plaintiff further alleges that Norberto and Odebrecht were subject to Brazilian generally accepted accounting principles ("GAAP") – which are "issued by the Brazilian Accounting Pronouncements Committee (Comitê de Pronunciamentos Contábeis) or the CPC" (Id. ¶ 61 & n. 9) – and that Norberto's financial disclosures "failed to properly account for or disclose the revenue, expenses, hidden assets, liabilities and ill-gotten gains directly arising from defendants' fraudulent bribery scheme in violation of Brazilian [GAAP]."  (Id. ¶¶ 61-99)

      "'[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'"  Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)).  "Such a duty may arise when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading."  Id. (citation and internal quotation marks omitted) (alteration in original).

      Defendants contend that there are no actionable misstatements here because (1) "adherence to GAAP is subjective, especially concerning the treatment of liabilities for potential

future losses" (Def. Br. (Dkt. No. 48) at 35); and (2) "there is no duty to disclose uncharged criminal conduct." (Def. Reply Br. (Dkt. No. 52) at 16)

### 1.   Alleged GAAP Violations

Plaintiff contends that "[i]ntentional or reckless GAAP violations state a viable §10(b) claim . . . ." (Pltf. Opp. Br. (Dkt. No. 50) at 39 (citing Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp., 951 F. Supp. 2d 479, 495 (S.D.N.Y. 2013))) In Oklahoma Firefighters, the court held that where intentional or reckless GAAP violations "are coupled with evidence of 'corresponding fraudulent intent,'" "they [are] sufficient to state an actionable claim." Oklahoma Firefighters, 951 F. Supp. 2d at 495 (quoting Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996)).

Plaintiff contends that fraudulent intent is adequately pled here, noting that "since defendants pled guilty to the underlying scheme, [their] state of mind is not at issue." (Pltf. Opp. Br. (Dkt. No. 50) at 40) Odebrecht's guilty plea to the underlying bribery scheme does not demonstrate that the misstatements in the offering memoranda were made with fraudulent intent, however.

Plaintiff also seeks to distinguish Oklahoma Firefighter by arguing that that case, unlike the instant case, "involve[s] estimates [of loan loss reserves] versus objective facts." (Id.) The Oklahoma Firefighters court notes that "estimates of loan loss reserves are generally considered opinions . . . ." Oklahoma Firefighters, 951 F. Supp. 2d at 495.

Plaintiff alleges misstatements as to the following disclosures that it claims were required under Brazilian GAAP: (1) "an accrual provision for the clearly foreseeable and estimable financial obligations arising from defendants' ongoing illegal bribery scheme"; (2) "a separate disclosure . . . describing [this] provision in the notes to the financial statements"; (3)

"amounts of foreign and domestic contract revenue it obtained as a result of its illegal corruption and bribery activities"; and (4) "illegal expenses for the hundreds of millions of dollars in illegal bribes . . . ."  (Am. Cmplt. (Dkt. No. 35) ¶¶ 67, 71, 73, 76)

### a.   Accrual Provision

Plaintiff claims that CPC 25

require[s] that a provision must be recognized by a charge against income when, after considering all the available evidence:  (1) it is probable that a present obligation for a past event or conduct exists; (2) which will more likely than not require a future disbursement to settle the obligation; and (3) a reasonable estimate of the required disbursement to settle the obligation can be made after weighing all possible outcomes or ranges of outcomes.

(Id. ¶ 68)  Defendants "violated CPC 25 by failing to accrue a provision . . . for the foreseeable and estimable material financial obligations arising from defendants' ongoing illegal bribery scheme."  (Id. ¶ 69)

In this regard, Plaintiff notes that the June 2014 offering memorandum covers financial statements reflecting "2013 revenues" and earlier year revenues.  (Id. ¶¶ 58-59)  Indeed, the 2014 offering memorandum states that it includes "unaudited condensed interim consolidated financial statements as of March 31, 2014 and for the three months then ended," and "audited consolidated financial statements as at December 31, 2013 and for the year then ended . . . ."  (2014 Offering Memorandum (Dkt. No. 49-4) at 9)  Plaintiff further alleges that the "covert investigation into corruption related to Petrobras" began "[i]n or about 2014," after which Defendants "bec[ame] aware of these investigations" and engaged in certain obstructive activities.  (Am. Cmplt. (Dkt. No. 35) ¶¶ 48-50)

Plaintiff does not claim that Defendants were aware of this investigation by March 31, 2014, or even by June 27, 2014, however, when the 2014 offering memorandum was issued.  Indeed, Plaintiff acknowledges that the investigation that began in 2014 "did not initially

focus on Odebrecht."  (Id. ¶ 4)  Accordingly, Plaintiff has not pled facts demonstrating that a "present obligation" to disclose was "probable" by March or June 2014.  Instead, Plaintiff merely cites the fact that in late 2016, Odebrecht "pled guilty to the underlying [bribery] scheme [and accordingly Defendants'] state of mind is not at issue."  (Pltf. Opp. Br. (Dkt. No. 50) at 40) Plaintiff's allegations are not sufficient to meet the probability requirement under CPC 25.

This conclusion is consistent with DoubleLine I, in which the court held that "Plaintiffs' allegations do not even suggest that, by the end of any of the covered reporting periods, any evidence existed, much less was available to or known by any of Defendants, that it was probable that [Norberto] faced any obligation for the bribery scheme . . . ."  DoubleLine I, 323 F. Supp. 3d at 445.  While the statements at issue in DoubleLine I concern reporting years through 2011, the court's reasoning applies with equal force here, as the investigation of the bribery scheme began in 2014, and Plaintiff has pled that Defendants were first implicated in June 2015 (as the DoubleLine I court notes).  Id. at 446.

Plaintiff contends, however, that the DoubleLine I "court overlooked that adjudication was not necessary – Odebrecht pled guilty to the bribery scheme, including the use of offshore accounts and other clandestine activities confirming its contemporaneous knowledge that the bribes were illegal, and implicated [Norberto] in the scheme."  (Pltf. Sept. 10, 2018 Ltr. (Dkt. No. 54) at 3)  As to the accrual provision, however, the issue is not whether – as of Odebrecht's December 21, 2016 guilty plea – the company knew that it had committed wrongdoing.  Instead, the issue is whether a loss was probable when the financial reports were issued in 2014.

DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A., 413 F. Supp. 3d 187 (S.D.N.Y. 2019) ("DoubleLine II") is not to the contrary.  In DoubleLine II, the court

considered an amended complaint that contained additional allegations regarding annually escalating bribes, warnings of "financial suicide," and requests by Odebrecht's CEO that "members of the Structured Operations team . . . flee Brazil to avoid investigation."  DoubleLine II, 413 F. Supp. 3d at 208.  These allegations are not before this Court.

The Court concludes that Plaintiff has not pled facts sufficient to demonstrate that this alleged GAAP violation is an actionable misstatement.

### b.    Costs of a Contingent Liability

Plaintiff claims that CPC 25 requires that the earlier-described provision be accompanied by "a separate disclosure . . . in the notes to the financial statements" with "a brief description" and "an indication of any uncertainties . . . ."  (Am. Cmplt. (Dkt. No. 35) ¶ 71)  Plaintiff asserts that "even if an entity accrues no provision" it still must disclose a "'contingent liability'" in notes to the financial statements.  (Id. ¶ 72)  As discussed above with respect to the accrual provision, however, there is no such requirement where a plaintiff has not alleged that the investigation had begun at the time of the alleged misstatement.  See Gusinsky v. Barclays PLC, 944 F.Supp.2d 279, 290-91 (S.D.N.Y. 2013) (noting that for a contingent liability, "[a]t most, the disclosure obligation would arise when an investigation into the conduct began"), vacated in part on other grounds sub nom. Carpenters Pension, 750 F.3d 227; see also DoubleLine I, 323 F.3d at 446 (finding no GAAP violation in similar circumstances with respect to the 2012 offering memorandum).

The Court concludes that Plaintiff has not pled facts sufficient to demonstrate that this alleged GAAP violation is an actionable misstatement.

c.      **Contract Revenue**

Plaintiff asserts that CPC 00 "states that it is common practice to present and disclose different types of revenue separately," but that Norberto "improperly failed to separately present or disclose the material amounts of foreign and domestic contract revenue it obtained as a result of its illegal corruption and bribery activities from its normal recurring contract revenue."  (Am. Cmplt. (Dkt. No. 35) ¶¶ 73-74)

Plaintiff does not explain, however, which revenues were improperly reported and in what years.

As to bribes, Plaintiff alleges the following:  (1) "between approximately 2010 and 2014, defendants, through the Division of Structured Operations, made approximately $20 million in bribery payments in order to secure continued work on a transportation project. Defendant Odebrecht profited by approximately $184 million from this project."; (2) "[b]eginning at least as early as 2003 through approximately 2016, defendants paid $349 million in bribes"; (3) "in or about October 2010, defendant Odebrecht bid for and won a Petrobras contract . . . agree[ing] to pay more than $40 million in bribes"; and (4) "[b]etween approximately 2001 and 2016, defendants paid illicit bribes of about $439 million to foreign officials and political parties in various countries outside of Brazil . . . ."  (Id. ¶¶ 41-46)

Elsewhere in the Amended Complaint, Plaintiff describes a number of "illicit payments to be made from United States-based bank accounts to perpetuate its bribe scheme," including (1) "between at least December 2006 and December 2007 . . . almost $40 million"; (2) "between January and August 2011 . . . approximately $3.5 million and almost 2 million Swiss Francs"; (3) "in or about December 2009 . . . approximately $20 million"; (4) "[b]efore and contemporaneously with the [December 2009] transfers . . . approximately $430,000"; (5) "in or

about December 2008 . . . almost $48 million"; and (6) "between December 2008 and July 2010 . . . approximately $10 million."  (Id. ¶ 20)

Plaintiff does not allege "which illegally obtained contract revenues were reported in those financial statements and the corresponding bribe payments that should have been reported as expenses."  DoubleLine I, 323 F. Supp. 3d at 447.  In other words, despite the detailed allegations regarding the timing of certain bribes, there is no similar detail regarding the reported contract revenues that were incorrect.  Presented with similar facts, the court in DoubleLine I rejected a similar claim of GAAP-based misstatement, noting that "Plaintiffs fail to identify [what], if any, revenue [was] derived from unlawfully obtained contracts during the periods for which [Norberto's] financial figures were disclosed."  Id.

In DoubleLine II, the court found adequate new allegations in which "[p]laintiffs clearly indicate the five years in which the contract yielded revenue that ought to have been separately reported in [Norberto's] financial disclosures."  DoubleLine II, 413 F. Supp. 3d at 208-09.  No similar allegations are made here.

The Court concludes that Plaintiff has not pled sufficient facts to demonstrate that this alleged GAAP violation is an actionable misstatement.

### d.   Contract Expenses

Plaintiff alleges that CPC 00 and 17 of Brazilian GAAP "require that assets and expenses directly associated with generating particular contract revenue must be reflected in the books and records of the entity and must be simultaneously recognized in the income statement in the same period as the revenue."  (Am. Cmplt. (Dkt. No. 35) ¶ 76)  Plaintiff further alleges that here illegal expenses were "conceal[ed]" and funds used to pay the bribes were "ke[pt] . . . off-books" and accounted for in "a standalone division within defendant [Norberto] called the

Division of Structured Operations."  (Id. ¶¶ 35, 76)  As discussed above in connection with reported revenue, Plaintiff does not allege which contracts were associated with which bribes.

In DoubleLine II, the court found that this GAAP-related misstatement was adequately pled where the complaint "identifie[d] at least one $23 million payment in 2010 that [Norberto] made in 2010 to a specific individual to secure a construction contract for Brazil's Abreu e Lima Refinery."  DoubleLine II, 413 F. Supp. 3d at 209.  Here, Plaintiff does not tie any of the bribes to any particular contract.

The Court concludes that Plaintiff has not pled sufficient facts to demonstrate that this alleged GAAP violation is an actionable misstatement.

## 2.   Statements Regarding Competitive Bidding

Plaintiff has also alleged misstatements premised on Norberto's claim that it "obtained contracts through 'competitive bidding.'"  (Pltf. Opp. Br. (Dkt. No. 50) at 38 (citing Am. Cmplt. (Dkt. No. 35) ¶¶ 53-56, 58-59))

Defendants contend that these allegations do not plead actionable misstatements, because corporations generally have "no obligation to disclose 'uncharged, unadjudicated wrongdoing.'"  (Def. Br. (Dkt. No. 48) at 35 (quoting City of Pontiac, 752 F.3d at 184 (2d Cir. 2014)))

Plaintiff argues, however, that "disclosure is required if '"necessary . . . to make the statements made, in the light of the circumstances under which they were made, not misleading,"' and that "'[t]he illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose.'"  (Pltf. Opp. Br. (Dkt. No. 50) at 40 (quoting In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 675 (S.D.N.Y. 1990)))

Par Pharm involved misstatements regarding an alleged "competitive advantage in obtaining speedy FDA approvals." Par Pharm, 733 F. Supp. at 675-76. The statements at issue "extoll[ed] Par's ability to obtain FDA approvals, [] compar[ed] Par's success in this regard to other companies in the industry and to its own previous performance, and [] project[ed] continued success in obtaining rapid approvals . . . ." Plaintiffs alleged that, in reality, Par's success in obtaining "FDA product approvals [was] a consequence of participation in [a] bribery scheme." Id. at 677-78.

Here, Plaintiff alleges that, in several offering memoranda, Defendants describe a "competitive bidding process" that did not exist. (Am. Cmplt. (Dkt. No. 35) ¶¶ 53, 56, 59) Defendants asserted that they "obtain[ed] contracts for new projects primarily through competitive bidding," and that "[m]ost of [their] ongoing construction projects were awarded through a competitive bidding process" in which Defendants "have a competitive advantage . . . as a result of [their] experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities." (Id.) Defendants asserted that there were "three principal reasons" for their bidding success: "engineering capabilities and experience . . . to offer more cost effective alternatives"; "decentralized management"; and "eligib[ility] for funding from the Brazilian government." (Id.) Because each of these statements is prefaced with "[w]e believe," they constitute statements of opinion. (Id.)

A statement of opinion can constitute an actionable misstatement where "'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue,'" or – although the opinion expressed was "sincerely held and [the facts stated] otherwise true" – "the speaker omits information whose omission makes the statement misleading to a reasonable

investor."  Tongue v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016) (quoting Omnicare, Inc. v.

Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 186 (2015)).

Courts sometimes construe language expressing an opinion as inactionable

"puffery."  See, e.g., In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 647 (S.D.N.Y.

2017) ("The quintessential examples of such inactionable 'puffery' are general statements about

reputation, integrity, and compliance with ethical norms, particularly when such statements are

explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'") (citations and

quotations omitted).  "Whether a representation is 'mere puffery' depends, in part, on the context

in which it is made."  In Petrobras Sec. Litig., 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015).

Here, the statements about competitive bidding were made in reference to other

statements about an increasingly competitive business environment.  For example, the 2014

offering memorandum states:

> We also face competition from international construction companies in Brazil as a
> result of liberalization of Brazilian government rules that had previously limited
> foreign competitors. . . . While international firms are seeking to increase their
> presence in the Brazilian construction industry, we believe that domestic players
> benefit from better knowledge of local market practices, business relationships
> with local suppliers and labor, established client relationships and reputation and
> name recognition within the industry and Brazil. . . .

(2014 Offering Memorandum (Dkt. No. 49-4) at 79)

Norberto asserted that, faced with the challenge of foreign competition, it

maintained "a competitive advantage with respect to other Brazilian engineering and

construction companies as a result of [its] experience, reputation, capacity, efficiency, trained

personnel, size, financial resources and technological capabilities."  (Am. Cmplt. (Dkt. No. 35)

¶¶ 53, 56, 59)  Norberto articulated "three principal reasons" for this competitive advantage –

"engineering capabilities"; "decentralized management"; and "eligib[ility] for funding from the

Brazilian government" – but did not disclose the advantages conferred by its involvement in the bribery scheme.  (Id.)

These statements were made to reassure investors as to specific risks regarding international competition, and accordingly they cannot be dismissed as "mere puffery." Moreover, these statements "omit[] information" about Defendants' involvement in the bribery scheme, and thereby make "misleading to a reasonable investor" Defendants' other statements about competitive advantages.  Tongue, 816 F.3d at 210.  Faced with similar allegations regarding some of the same Notes and offering memoranda at issue here, the DoubleLine I court held that "an ordinary investor would be misled by the company's failure to disclose that an additional reason for its success was its illegal bribery scheme."  DoubleLine I, 323 F. Supp. 3d at 444.

This Court concludes that the alleged misstatements regarding Defendants' "competitive bidding" are actionable.

*       *       *       *

Defendants' motion to dismiss will be granted as to alleged misstatements premised on GAAP violations, but denied as to alleged misstatements premised on "competitive bidding."

## III.    <u>STATE LAW CLAIMS</u>

Defendants contend that Plaintiff's state law causes of action must be dismissed for a variety of reasons.  (Def. Br. (Dkt. No. 48) at 36-47)

### A.    <u>Reasonable Reliance</u>

Defendants argue that Plaintiff's negligent misrepresentation, common law fraud, and Washington State Securities Act claims must be dismissed because Plaintiff has not "plead reliance pursuant to Rule 9(b)."  (Def. Br. (Dkt. No. 48) at 36)  In order to meet Rule 9(b)'s

particularity standard, Plaintiff must plead "sufficient detail identifying who made a statement and when it was made, in addition to who heard the statement and if and when they subsequently invested . . . ." Gavin/Solmonese LLC v. D'Arnaud-Taylor, 68 F. Supp. 3d. 530, 540 (S.D.N.Y. 2014), aff'd, 639 Fed App'x 664 (2d. Cir. 2016).

Plaintiff pleads that it purchased the Notes through its "internal investment managers," who "undertook issuer-specific research," "reviewed and analyzed issuers' . . . financial statements and disclosures," and "relied upon . . . the financial statements included in defendant [Norberto's] annual and quarterly financial filings" for the period from 2010 to 2014. (Am. Cmplt. (Dkt. No. 35) ¶¶ 149-50)  For example, for the 8.25% Notes, Plaintiff alleges that it purchased its Notes through its "internal investment managers" on April 17, 2013, after Norberto and Odebrecht Finance issued the allegedly false and misleading statements in an offering memorandum.  (Id. ¶¶ 28, 55, 149)  Plaintiff also claims that it relied on allegedly misleading statements in 2011 and 2012 annual financial statements, and in the 2013 offering memoranda, in purchasing the 8.25% Notes, and identifies the information in those documents that was misleading.  (Id. ¶¶ 55-57, 87-90)  Plaintiff pleads similar allegations as to the other Notes, detailing when the Notes were offered with the misleading statements, what the misleading statements were and who made them, and when Plaintiff purchased each set of Notes through its internal investment managers.

Defendants argue that these allegations are "no more specific than the assertion in In re Bear Stearns that each purchase 'was in reliance on the specific misrepresentations and omissions identified in the Complaint . . . .'"  (Def. Br. (Dkt. No. 48) at 37 (quoting In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 995 F. Supp. 2d 291, 309 (S.D.N.Y. 2014), aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Companies L.L.C.,

829 F.3d 173 (2d Cir. 2016)))  Bear Stearns, however, involved the purchase of securities "over a year-long period," and plaintiff had "not identif[ied] a particular transaction that it allegedly made in reliance on the document or any other document."  Bear Stearns, 995 F. Supp. 2d at 309. Here, by contrast, the Notes were purchased pursuant to specific offering memoranda, and – as to each Note – Plaintiff has identified the misstatements that it allegedly relied on.[3]

As to the reasonableness of Plaintiff's alleged reliance, Defendants contend – solely as to Plaintiff's purchase of 7.125% Notes in February 2015 – that "the investigation into Odebrecht and Petrobras had been public since at least October 2014," and that accordingly Plaintiff's reliance was not reasonable.  (Def. Br. (Dkt. No. 48) at 38)  Plaintiff has alleged, however, that on October 2, 2014, Odebrecht issued a press release stating that it "vehemently denies having made any payment or deposit to any alleged account belonging to any officer or former officer of Petrobras."  (Am. Cmplt. (Dkt. No. 35) ¶ 108)  The Amended Complaint also cites a June 22, 2015 Odebrecht press release – issued after the execution of search warrants and certain high profile arrests – stating, "we believe that the recent events resulted from misinformation and misinterpretation."  (Id. ¶ 114)  Given that there is evidence that as of June 22, 2015, Defendants were still denying the existence of the bribery scheme, there is a fact issue

---

[3]  Defendants contend that Plaintiff falsely alleges that it relied on Norberto's 2014 annual report when purchasing certain Notes, arguing that the 2014 report was not available until after Plaintiff's final Note purchase.  (Def. Brf. (Dkt. No 48) at 37; Am. Cmplt. (Dkt. No. 35) ¶ 150) Defendants have misread Plaintiff's allegations.  The Amended Complaint states that Plaintiff, "relied . . . on the financial statements included in defendant [Norberto's] annual and quarterly financial filings for the years ended December 31, 2010, December 31, 2011, December 31, 2012, December 31, 2013 and December 31, 2014."  (Am. Cmplt. (Dkt. No. 35) at ¶ 150)  It is clear in context that Plaintiff is asserting that it relied on a statement for the first quarter of 2014. (See id. ¶ 96)  The first quarter 2014 statement was released with the 5.25% Notes offering memorandum.  Accordingly, it is plausible that Plaintiff relied on this statement in purchasing 5.25% Notes.  (Id.)

as to whether Plaintiff's reliance – in purchasing the 7.125% Notes in February 2015 – was reasonable.

DoubleLine I is not to the contrary.  (See Def. Sept. 6, 2018 Ltr. (Dkt. No. 53) at 2-3)  In DoubleLine I, plaintiffs "alleg[ed] only that they relied on 'many' and 'various' of the misstatements[,] . . . [did] not allege that they read or reviewed either of the [2011 or 2012] offering memoranda or that they read or reviewed [Norberto's] financial figures in its 2009 and 2010 financial statements[,] . . . [and] [pled] reliance on the alleged misstatements contained in [offering memoranda for Notes] . . . that they did not purchase. . . ."  Double Line I, 323 F. Supp. 3d at 463.  Here, by contrast, the Amended Complaint contains specific allegations regarding reliance on offering memoranda for each of the Notes that Plaintiff purchased.

The Court concludes that the Amended Complaint adequately pleads reliance. Accordingly, Defendants' motion to dismiss Plaintiff's negligent misrepresentation, common law fraud, and Washington State Securities Act claims on this ground will be denied as to Norberto and Engenharia.  Defendants' motion to dismiss will be granted as to Odebrecht Finance for the reasons discussed above in connection with Plaintiff's federal securities fraud claims.

## B.   Seller Liability for Secondary Market Purchases

Defendants argue that they are not liable as sellers under Section 21.20.430(1) of the Washington State Securities Act for purchases Plaintiff made on the secondary market.  (Def. Br. (Dkt. No. 48) at 38)  Section 21.20.430(1) imposes liability on any person "who offers or sells a security in violation of any provisions of RCW 21.20.010 . . . ."  Wash. Rev. Code Ann. § 21.20.430 (West).  Section 21.20.010 makes it "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they are made, not

misleading . . . ."  Wash. Rev. Code Ann. § 21.20.010 (West).

Whether a defendant is a seller under Section 21.20.430(1) depends on whether

the defendant is a "substantial contributive factor" in the sale.  That determination turns on three

factors:  "(1) the number of other factors which contribute to the sale and the extent of the effect

which they have in producing it; (2) whether the defendant's conduct has created a force or series

of forces which are in continuous and active operation up to the time of the sale, or has created a

situation harmless unless acted upon by other forces for which the actor is not responsible; and

(3) lapse of time."  Haberman v. Washington Public Power Supply Sys., 109 Wash. 2d 107, 131-

32 (1987) (en banc).  Under Washington law, it is clear that the "substantial contributive factor"

test "necessarily [presents] a question of fact . . . [that is] not easily resolved on the pleadings as

long as the complaint contains sufficient allegations."  FutureSelect Portfolio Mgmt., Inc. v.

Tremont Grp. Holdings, Inc., 180 Wash. 2d 954, 972 (2014) (internal quotation marks and

citation omitted).

Defendants argue, however, that Haberman must be read in light of Pinter v.

Dahl, 486 U.S. 622 (1988), which addresses the "federal analog" to Section 21.20.430(1).  (Def.

Reply Br. (Dkt. No. 52) at 20)  In Pinter, the Court held that "[b]eing merely a 'substantial

factor' in causing the sale of unregistered securities is not sufficient in itself to render a

defendant liable under § 12(1)" of the Securities Act.  Pinter, 486 U.S. at 654.

The proper interpretation of Section 21.20.430(1) presents a question of

Washington law, of course, and the Washington Supreme Court re-affirmed its "substantial

contributive factor" test a year after Pinter was decided.  See Hoffer v. State ("Hoffer II"), 113

Wash. 2d 148, 152 (1989) (en banc).  In Hoffer, the court "f[ou]nd the 'substantial contributive

factor' test persuasive in the context of [the Washington State Securities Act] even if the

Supreme Court does not in the federal setting." Hoffer, 113 Wash. 2d at 152.  And in

FutureSelect Portfolio Mgmt, 180 Wash. 2d at 971, the Washington Supreme Court held that "[a]

'seller' includes any party whose acts were a 'substantial contributive factor' to the sale."

> Accordingly, this Court will apply the "substantial contributive factor" test in

determining whether Defendants are sellers for purposes of secondary market purchases.

> Plaintiff contends that Defendants

> are liable as sellers of the Notes because they substantially contributed to the sales
> of the Notes.  Defendant Odebrecht Finance was the issuer of the Notes,
> defendant [Norberto] was the guarantor of the Notes, and defendants Odebrecht
> and [Norberto] were direct beneficiaries of the funds derived through the Notes.
> Defendant Odebrecht created [D]efendant Odebrecht Finance for the purpose of
> the sales of the Notes.

(Am. Cmplt. (Dkt. No. 35) ¶ 179)  Plaintiff further alleges that it "would not have purchased the

Notes, or at least not at the prices at which it paid, had defendants disclosed either [the] bribery

scheme [or] the effect of that scheme on their financial results."  (Id. ¶ 145)

> In FutureSelect, the court denied the defendant auditing firm's motion to dismiss

where plaintiff alleged that it would not have invested in the fund at issue had the fund not been

audited by defendant; that defendant knew that its audit would be used to solicit investors and

would be relied upon; and that defendant addressed its audit to a group that included plaintiff.

FutureSelect, 180 Wash. 2d at 971.

> The Court concludes that the Amended Complaint contains sufficient factual

allegations to support Plaintiff's claim that Defendants' actions were a substantial contributive

factor in its purchases of the Notes.  Defendants' motion to dismiss the Washington State

Securities Act claims on this ground will be denied.

C.      **Negligent Misrepresentation**

Under Washington law, "[l]iability for negligent misrepresentations is . . . limited to cases where (1) the defendant has knowledge of the specific injured party's reliance; or (2) the plaintiff is a member of a group that the defendant seeks to influence; or (3) the defendant has special reason to know that some member of a limited group will rely on the information." Haberman, 109 Wash. 2d at 162-63.

Here, Plaintiff alleges that "[t]he Notes were initially sold in private offerings pursuant to offering memoranda" that Plaintiff relied on in purchasing Notes.  "Defendants began soliciting investors to buy the [] Notes" at various points in time, including when Plaintiffs bought Notes.  (Am. Cmplt. (Dkt. No. 35) ¶¶ 51-52, 55, 58)  Plaintiff does not allege that it was directly solicited by Defendants.  Instead, Plaintiff contends in its opposition brief that it "was a member of a group that [D]efendants sought to influence."  (Pltf. Opp. Br. (Dkt. No. 50) at 45)

In connection with Plaintiff's negligent misrepresentation claim, both sides cite Hines v. Data Line Sys., Inc., 114 Wash. 2d 127, 132 (1990) (en banc), which involves a "sale of stock pursuant to a private placement memorandum."  In Hines, the court found that the law firm that had prepared the private placement memorandum was not liable, because at the time the memorandum was prepared "it contained no misstatement. . . ."  Hines, 114 Wash. 2d at 150. There was also no evidence that the law firm "intended this information to influence or reach a particular class distinct from the general investing public who would have access to the information and rely upon it."  Id. at 151.

Plaintiff cites Hines in support of its argument that it is sufficient to allege that defendant "'intended . . . to reach a particular class distinct from the general investing public . . . .'"  (Pltf. Opp. Br. (Dkt. No. 50) at 46 (quoting Hines, 114 Wash. 2d at 151))  Defendants

point out, however, that the <u>Hines</u> court rejects this theory of liability in the context of the private placement memorandum at issue in that case.  (Def. Reply Br. (Dkt. No. 52) at 21)

        Here, as discussed above, Plaintiff contends in its opposition brief that it "was a member of a group that [D]efendants sought to influence."  (Pltf. Opp. Br. (Dkt. No. 50) at 45)  Plaintiff cites to <u>Hoffer v. State</u> ("<u>Hoffer I</u>"), 110 Wash. 2d 415, 429 (1988) (<u>en banc</u>), for the proposition that "the 'limited group' requirement [is] satisfied where the defendant intend[s] 'to reach investors who [are] deciding whether to purchase bonds.'"  (Pltf. Opp. Br. (Dkt. No. 50) at 45-46 (quoting <u>Hoffer I</u>, 110 Wash. 2d at 429))  But in <u>Hoffer II</u> – issued upon reconsideration after the U.S. Supreme Court's decision in <u>Pinter</u> – the Washington Supreme Court notes that "certain sub-groups of the bondholders might have been singled out to receive the letter."  <u>Hoffer v. State</u>, 113 Wash. 2d 148, 153 (1989).  Although Plaintiff now claims in its opposition brief that it was "targeted" and is "a member of a specialized group" (Pltf. Opp. Br. (Dkt. No. 50) at 45), the Amended Complaint contains no such allegations.

        The assertions in Plaintiff's opposition brief are not sufficient to salvage the negligent misrepresentation claim in light of <u>Haberman</u> and <u>Hoffer II</u>.  Accordingly, Defendants' motion to dismiss Plaintiff's negligent misrepresentation claim will be granted.

### D.    <u>Fraudulent Conveyance</u>

        Defendants contend that Plaintiff's fraudulent conveyance claims under Sections 273 and 276 of the New York Debtor and Creditor Law must be dismissed.  (Def. Br. (Dkt. No. 48) at 43-47)

#### 1.    <u>Applicable Law</u>

        At all times relevant to the instant case, Section 273 of the New York Debtor and Creditor Law provided:  "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his

actual intent if the conveyance is made or the obligation is incurred without a fair consideration."
N.Y. Debt. & Cred. Law § 273 (McKinney) (2019).

Section 276 of the New York Debtor and Creditor Law provided:  "Every
conveyance made and every obligation incurred with actual intent, as distinguished from intent
presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to
both present and future creditors."  N.Y. Debt. & Cred. Law § 276 (McKinney) (2019).[4]

"A fraudulent transfer is not void, but voidable; thus, it can be ratified by a
creditor who is then estopped from seeking its avoidance. . . . Ratification is the act of knowingly
giving sanction or affirmance to an act which would otherwise be unauthorized and not binding
. . . . [R]atification may be express or implied, or may result from silence or inaction."  In re
Adelphia Recovery Tr., 634 F.3d 678, 691-92 (2d Cir. 2011) (internal citations and quotations
omitted).

### 2.  **Analysis**

Defendants argue that Plaintiff is barred from bringing a Section 273 claim
because in the offering memoranda Odebrecht Finance "disclosed it would transfer the Note
proceeds and/or how those proceeds would be used," and "further disclosed [Odebrecht
Finance's] limited capitalization and substantial debt."  (Def. Br. (Dkt. No. 48) at 43-44)

---

[4]  As of April 4, 2020, Section 273 provides:  "A transfer made or obligation incurred by a debtor
is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was
made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . .
with actual intent to hinder, delay or defraud any creditor of the debtor. . . ."  (N.Y. Debt. &
Cred. Law § 273 (McKinney)).  The former Section 276, which provided a separate cause of
action for "[e]very conveyance made and every obligation occurred with actual intent," see N.Y.
Debt. & Cred. Law § 276 (McKinney) (2019), was repealed effective April 4, 2020.  These
statutory changes do not affect the outcome of this case.

Plaintiff contends that Defendants' argument amounts to an affirmative defense of ratification, which on "a motion to dismiss may only be granted . . . when 'the facts supporting the defense appear on the face of the complaint," and "where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  (Pltf. Opp. Br. (Dkt. No. 50) at 47-48 (quoting McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004)))[5]

The disclosures on which Defendants rely are, however, quoted in the Amended Complaint:

> "During the 12-month period commencing October 18, 2012, the 2017 notes may be redeemed, in whole or in part, at any time by Odebrecht Finance at 103.75% of their principal amount plus accrued interest.  We intend to use a portion of the net proceeds of this offering for general corporate purposes and Odebrecht intends to use the remaining portion of the net proceeds of this offering for additional equity investments in [Odebrecht Participações e Investimentos S.A.] and [Odebrecht Energia S.A.]."

(Am. Cmplt. (Dkt. No. 35) ¶ 12 (quoting 7.125% Notes Prospectus (Dkt. No. 29-4) at 4))

The Amended Complaint also includes the following disclosures from the 2012 offering memorandum:

> "The issuer's [Odebrecht Finance's] ability to make payments on the notes depends on its receipt of payments from [Norberto].
>
> The issuer's [Odebrecht Finance's] principal business activity is to act as a financing vehicle for Odebrecht's activities and operations.  The issuer [Odebrecht Finance] has no substantial assets, and accordingly, holders of the notes must rely on [Norberto's] cash flow from operations to pay amounts due in connection with the notes.  The ability of the issuer [Odebrecht Finance] to make payments of principal, interest and any other amounts due on the notes is contingent on its receipt from [Norberto] of amounts sufficient to make these

---

[5]  McKenna's "no set of facts" standard did not survive Twombly and Iqbal.  See Gusler v. City of Long Beach, 823 F. Supp. 2d 98, 112 (E.D.N.Y. 2011) (citing McKenna and noting that under Twombly and Iqbal the "correct procedural standard for dismissal under Rule 12(b)(6) . . . is a showing that the plaintiff failed to plead sufficient facts 'to state a claim for relief that is plausible on its face'").

payments, and, in turn, on [Norberto's] ability to make these payments.  In the event that [Norberto is] unable to make such payments for any reason, the issuer [Odebrecht Finance] will not have sufficient resources to satisfy its obligations under the indenture governing the notes."

(Id. ¶ 13 (quoting 2012 Offering Memorandum (Dkt. No. 49-2) at 29))

Given these allegations, Plaintiff cannot plausibly allege that it was not aware, when it purchased the Notes, of Odebrecht Finance's undercapitalization or that the proceeds from the Notes would be disbursed to entities other than Odebrecht Finance.  These allegations are thus fatal to Plaintiff's Section 273 claim and, by extension, its Section 276 claim, both of which allege fraudulent transfers that are voidable.  See Adelphia Recovery Tr., 634 F.3d at 691-92.

E.    **Conspiracy**

Defendants contend that Plaintiff's conspiracy claim – which is brought under Washington law (Pltf. Opp. Br. (Dkt. No. 50) at 51) – must be dismissed for failure to state a claim.  (Def. Br. (Dkt. No. 48) at 47)

Under Washington law, a plaintiff alleging conspiracy must plead facts demonstrating that "(1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy."  Kische USA LLC v. Simsek, No. C16-0168JLR, 2016 WL 7212534, at *6 (W.D. Wash. Dec. 13, 2016) (internal quotation marks and citations omitted).

Defendants contend that Plaintiff has not alleged "that any Defendant formed an agreement with any other to make the alleged misstatements."  (Def. Br. (Dkt. No. 48) at 47) According to Defendants, the only agreement alleged in the Amended Complaint is that "[Norberto] and Odebrecht . . . agreed [with other construction companies] which company or

companies would be responsible for a particular project, and at what price, [and] that only the predetermined company would present a qualifying bid, and that the other entities would present proposals to ensure that the predetermined company would win the contract."  (Am. Cmplt. (Dkt. No. 35) ¶ 42)

Plaintiff argues, however, that Defendants made "a concerted effort to defraud investors" "by concealing their underlying bribery scheme from investors and acting in concert to shelter assets with the reorganization."  (Pltf. Opp. Br. (Dkt. No. 50) at 51)  But the Amended Complaint does not adequately allege any such agreement.  Accordingly, Plaintiff's conspiracy claim fails.

*       *       *       *

To summarize, Plaintiff's Section 10(b) claims will be dismissed as to Odebrecht Finance.  With respect to Norberto and Engenharia, Plaintiff's Section 10(b) claims will be limited to alleged misstatements centered on Defendants' "competitive bidding."  Plaintiff's Section 20(a) claims will be dismissed.  Plaintiff's state law claims for negligent misrepresentation, fraudulent conveyance under New York Creditor and Debtor Law §§ 273 and 276, and conspiracy will be dismissed.  Plaintiff's claims for common law fraud and violations of the Washington State Securities Act will be dismissed as to Odebrecht Finance.  As to Norberto and Engenharia, these claims will be limited to alleged misstatements centered on Defendants' "competitive bidding."

## **CONCLUSION**

Defendants' motion to dismiss will be granted in part and denied in part as set

forth above.  The Clerk of Court is directed to terminate the motion (Dkt. No. 47).

Dated: New York, New York
       May 20, 2020

                                                  SO ORDERED.

                                                  _____
                                                  Paul G. Gardephe
                                                  United States District Judge