UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ―――――――――――――――― x | |
| WASHINGTON STATE INVESTMENT BOARD, | Civil Action No. 1:17-cv-08118-PGG |
| Plaintiff, | SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND STATE COMMON AND STATUTORY LAW |
| vs. | |
| ODEBRECHT S.A., CONSTRUTORA NORBERTO ODEBRECHT S.A. and ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A., | |
| Defendants. | DEMAND FOR JURY TRIAL |
| ―――――――――――――――― x | |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF THE ALLEGATIONS ............................................................ 7

III.    JURISDICTION AND VENUE ....................................................................... 10

    A.    This Court Has Jurisdiction over This Action and Venue Is Properly Laid in This District ............................................................................................. 10

    B.    This Court Has Jurisdiction over CNO and OEC ....................................... 11

    C.    This Court Has Jurisdiction over Odebrecht – It Directed the Scheme to, and Carried out Much of the Scheme in, the United States ........................ 14

IV.     PARTIES ........................................................................................................ 30

    A.    Plaintiff ....................................................................................................... 30

    B.    Defendant Odebrecht ................................................................................... 31

    C.    Defendant CNO ........................................................................................... 31

    D.    Defendant OEC ........................................................................................... 32

    E.    Non-Party Odebrecht Finance .................................................................... 32

V.      PLAINTIFF'S PURCHASES OF THE NOTES ............................................ 33

VI.     DEFENDANTS' UNDISCLOSED KICKBACK AND BRIBERY SCHEME ............... 36

    A.    The "Bribe Department" .............................................................................. 36

    B.    Defendants' Corrupt Practices in Brazil ..................................................... 39

    C.    Defendants' Corrupt Practices Outside Brazil ............................................ 42

    D.    Defendants' Obstruction of Justice ............................................................. 46

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................... 47

    A.    The 2012 7.125% Notes Offering Memorandum ....................................... 48

    B.    The 2013 4.375% Notes and 8.25% Notes Offering Memoranda .............. 50

    C.    The 2014 5.25% Notes Offering Memorandum ......................................... 52

4812-1822-4322.v1

**Page**

D.    Defendants Odebrecht's and CNO's False Financial Statements and
      Disclosures ............................................................................................. 55

      1.    Odebrecht and CNO Failed to Accrue a Liability for the
            Foreseeable Financial Costs Arising from the Bribery Scheme ................ 57

      2.    CNO Failed to Disclose the Nature and Range of the Foreseeable,
            Expected Costs that Would Likely Be Incurred as a Result of
            Defendants' Bribery Scheme ....................................................................... 61

      3.    CNO Improperly Failed to Separately Distinguish and Disclose
            Contract Revenue Obtained as a Result of Defendants' Massive
            Illegal Bribery Activity from Other Contract Revenue ............................. 64

      4.    CNO Improperly Failed to Recognize, Classify or Adequately
            Disclose Material Amounts of Concealed Funds and Illegal Bribes ......... 66

F.    False Financial Statements Included in the 2012 7.125% Notes Offering
      Memorandum .......................................................................................... 71

      1.    CNO's 2009 and 2010 Annual Consolidated Financial Statements .......... 71

      2.    CNO's 2011 Annual Consolidated Financial Statements ........................... 72

      3.    CNO's First Quarter 2012 Consolidated Interim Financial
            Statements ................................................................................................. 72

G.    False Financial Statements Included in Defendants' 2013 Offering
      Memoranda for the 4.375% Notes and 8.25% Notes ................................ 73

      1.    CNO's 2010 and 2011 Annual Consolidated Financial Statements .......... 73

      2.    CNO's 2012 Annual Consolidated Financial Statements ........................... 73

H.    False Financial Statements Included in Defendants' 2014 Offering
      Memorandum for the 5.25% Notes .......................................................... 74

      1.    CNO's 2011 and 2012 Annual Consolidated Financial Statements .......... 74

      2.    CNO's 2013 Annual Consolidated Financial Statements ........................... 75

      3.    CNO's First Quarter 2014 Consolidated Interim Financial
            Statements ................................................................................................. 75

4812-1822-4322.v1

**Page**

I.    Defendant Odebrecht's False Financial Disclosures ..................................................76

    1.    Odebrecht's 2012 Annual Report ...............................................76

    2.    Odebrecht's 2014 Annual Report and Press Release ..................................77

    3.    Odebrecht's 2015 Annual Report ...............................................78

J.    Defendants' Repeated Denials and Fraudulent Concealment of Their Kickback and Bribery Scheme ..................................................79

VIII.    SUBSEQUENT EVENTS AND DISCLOSURES CONFIRM DEFENDANTS' FRAUDULENT SCHEME ..................................................89

IX.    LOSS CAUSATION ..................................................93

    A.    Corrective Disclosures ..................................................94

    B.    Materialization of the Risk ..................................................96

X.    RELIANCE ..................................................97

    A.    Plaintiff's Direct Reliance on Defendants' False and Misleading Statements ..................................................97

    B.    Plaintiff Is Entitled to a Presumption of Reliance Because Defendants Concealed Material Adverse Information ..................................................99

XI.    OEC IS LIABLE AS CNO'S SUCCESSOR-IN-INTEREST ..................................................99

XII.    NO SAFE HARBOR ..................................................103

- iii -

Plaintiff Washington State Investment Board ("WSIB" or "plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of documents created and/or published by Odebrecht S.A. ("Odebrecht" or the "Company") and its wholly-owned subsidiaries Odebrecht Engenharia e Construção S.A. ("Engenharia" or "OEC") and Construtora Norberto Odebrecht S.A. ("Norberto" or "CNO"), as well as regulatory filings and reports, securities analysts' reports and advisories about these companies, testimony by people involved in the wrongdoing alleged herein, releases, media reports and other public statements about these companies, and the December 21, 2016 plea agreement between Odebrecht, the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney for the Eastern District of New York (the "Plea Agreement"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    When plaintiff filed the amended complaint, Odebrecht had pled guilty to paying $788 million in bribes for revenue totaling $3.3 billion, acknowledging that it kept these payments off of its books and out of its financial statements when it sold $150 million in Odebrecht Finance Ltd. ("Odebrecht Finance") notes to plaintiff.[1] It turns out that $788 million in bribes was just the tip of the proverbial iceberg – and a small one at that. After Odebrecht pled guilty in the United States, investigations continued around the world and uncovered that the scheme was actually far larger than defendants originally admitted, with bribes paid to further the scheme actually totaling

---

[1]    The Notes include the following securities issued by Odebrecht Finance and guaranteed by CNO: (i) 7.125% notes due 2042 (the "7.125% Notes"); (ii) 4.375% notes due 2025 (the "4.375% Notes"); (iii) 8.25% notes due 2018 (the "8.25% Notes"); and (iv) 5.25% notes due 2029 (the "5.25% Notes").

a massive $3.3 billion.  Coincidently, Odebrecht has now admitted in its Answer to the Third Amended Complaint ("*DoubleLine* Answer") in *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, No. 1:17-cv-4576-GHW-BCM (S.D.N.Y.) (the "*DoubleLine* Action"), to concealing from plaintiff when selling it the Notes a bribery scheme larger than originally acknowledged, stating that "the amount of bribes paid was ***more than*** $788 million" and also that "CNO's financial statements did not disclose the bribery scheme."  Defendants have thus admitted to violating the federal securities laws and Washington State securities laws when selling the notes to plaintiff and to violating Brazilian Generally Accepted Accounting Principles ("GAAP").

2.    Importantly, Odebrecht has also now admitted that while it was engaging in one of the largest bribery schemes in history, it was in the United States actively promoting the Odebrecht Finance Notes to U.S. investors, giving this Court jurisdiction over Odebrecht.  Indeed, Odebrecht admitted in its *DoubleLine* Answer "that Odebrecht attended a conference in Miami in 2013 sponsored by J.P. Morgan and . . . that Odebrecht's Investor Relations executive was the person responding to investor questions regarding the Odebrecht Finance Notes."[2]  This is all this Court needs for jurisdiction.  In fact, in exercising jurisdiction over Odebrecht on these same facts, the court in *DoubleLine* recognized that "courts have exercised jurisdiction where 'an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders.'"  *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 218 (S.D.N.Y. 2019) (citation omitted).

3.    That is exactly what defendants, including Odebrecht, did in this case.  The scheme that Odebrecht concealed from plaintiff – a U.S. investor – was truly breathtaking.  Approximately

---

[2]    *DoubleLine* Answer, ¶92.

4812-1822-4322.v1

80 former Odebrecht employees have now testified that the scope of the bribery scheme was exponentially larger than Odebrecht originally admitted.  In fact, testimony from Hilberto Mascarenhas Alves da Silva Filho ("Mascarenhas") who was the head of the Division of Structured Operations (the "Bribe Department") revealed that Odebrecht's bribes actually totaled $3.3 billion over nine years between 2006 and 2014 ***and he put Marcelo Odebrecht, as Chief Executive Officer ("CEO") of Odebrecht, in the driver's seat of the bribery scheme***.  The bribes that Marcelo Odebrecht directed and to which Odebrecht had pled guilty – $788 million – were actually nearly matched in a single year, with Odebrecht paying $730 million in bribes in 2012 and $730 million again in 2013, alone:



4.    Documents that have been leaked are also filling in the gaps.[4]  Those leaked documents reveal additional details about the scheme, including the identities of the Odebrecht employees named anonymously as Employees 1-6 in the Plea Agreement, confirming that Marcelo

---

[3]    *See Odebrecht's tuition sector generated US$3.3 billion from 2006 to 2014, says whistleblower*, G1, Apr. 15, 2017, https://g1.globo.com/politica/operacao-lava-jato/noticia/setor-de-propinas-da-odebrecht-movimentou-us-33-bilhoes-de-2006-a-2014-diz-delator.ghtml (headings translated into English).

[4]    *See* Kevin G. Hall, Nora Gámez Torres & Antonio María Delgado, *They lived the good life in Miami – while helping run a multinational corruption machine*, Miami Herald, June 25, 2019 (updated June 26, 2019).

Odebrecht operated Odebrecht and its subsidiaries as his own personal fiefdom and that his directives put Odebrecht and its bribery scheme in the United States. With the leaked information, the Plea Agreement now reveals that Marcelo Odebrecht approved the bribes himself until 2009 and then directed the heads of Odebrecht's subsidiaries around the world to continue the scheme, while reporting back to him:

> Odebrecht Employee 2 [Mascarenhas] reported to Odebrecht Employee 1 [Marcelo Odebrecht], ***who was responsible for approving corrupt payments made by the Division of Structured Operations until approximately 2009, and who, thereafter, received updates of the payments made by the Division of Structured Operations***. After approximately 2009, ***Odebrecht Employee 1 [Marcelo Odebrecht] delegated the responsibility for approving the corrupt payments to*** the business leaders in Brazil and the ***various country leaders in other jurisdictions***.

5.       Mascarenhas's testimony also revealed that Marcelo Odebrecht demanded that Mascarenhas take over the Bribe Department, refusing to take no for an answer and commanding Mascarenhas to participate in the scheme:

> He [Mascarenhas] was the man to create and run the Odebrecht Structured Operations Sector, or SOE. When Marcelo told Mascarenhas what he expected from his subordinate, he was surprised to hear a "no" answer. Impositive, he explained that it was not a refusable invitation. "So, it's not an invitation, it's a command," replied Mascarenhas. "What's the difference?" Asked Marcelo. "A demand is much more expensive." The chief assured that Mascarenhas need not worry, that he would be well compensated. He then accepted the position."[5]

6.       It was Marcelo Odebrecht's decision that ultimately put the scheme in the United States. Mascarenhas testified that he told Marcelo Odebrecht that the bribe amounts had reached levels that would be "financial suicide," explaining that "[s]ince 2009 I alerted Marcelo (Odebrecht) that the volume of resources was growing brutally" and describing his reference to

---

[5]    Flávia Tavares, *Hilberto Mascarenhas: The corruption manager*, Ēpoca, Apr. 4, 2017, https://epoca.globo.com/politica/noticia/2017/04/hilberto-mascarenhas-o-gerente-da-corrupcao.html.

"suicide" as "[f]inancial suicide, suicide risk, suicide of security, suicide of everything." Nonetheless, Marcelo instructed him to continue – "'I warned Marcelo about these huge amounts several times. I said it was suicide, *but he told me to continue*.'"[6]

7.    He also instructed Mascarenhas to move the Department of Structured Operations out of Brazil, to avoid Brazilian prosecutors. According to Mascarenhas, "[t]he more the area [Division of Structured Operations] grew the more worried Marcelo became," testifying that "Marcelo insisted a lot, pressured the team to go very fast. They went in a hurry." Marcelo Odebrecht himself even testified that he told the Department that "'I think you all should go abroad to work because here, when you use the phone you will be scared, when you use the computer you will be afraid. You will be afraid your offices will be bugged . . . [a]nd you will fall asleep wondering whether the next day the police will come for you.'"[7] But Marcelo Odebrecht knew that all of this was necessary to report growing but false financial results – on which plaintiff relied when purchasing the Notes. Mascarenhas testified that "[Marcelo] knew we had to increase our illegal contributions if the company was going to grow."[8]

---

[6]    Anne Vigna, *Conglomerate That Paid Off A Government: Brazil's Odebrecht Scandal*, Le Monde *diplomatique*, Oct. 1, 2017.

[7]    Michael Smith, Sabrina Valle & Blake Schmidt, *No One Has Ever Made a Corruption Machine Like This One*, Bloomberg, June 8, 2017, https://www.bloomberg.com/news/features/2017-06-08/no-one-has-ever-made-a-corruption-machine-like-this-one.

[8]    Odebrecht's and CNO's financial results, and consequently its growth, were the drivers of plaintiff's decision to purchase the Notes and plaintiff relied on those results not knowing about the bribes that, according to Marcelo Odebrecht, were necessary to report growth. This testimony reveals that Marcelo Odebrecht and Odebrecht's officers knew that it was probable that "'the police will come for you'" and that Odebrecht and its subsidiaries would face serious legal trouble and financial loss – "financial suicide" as Mascarenhas put it to Marcelo Odebrecht – requiring Odebrecht and CNO to accrue for expenses relating to the bribery and to separately disclose the amount of revenue it obtained through the use of bribes as required under Brazilian GAAP. *See* ¶¶88-120. Defendants' acts to conceal the bribery scheme prohibited plaintiff from assessing

8.      There was a substantial nexus between Odebrecht and its scheme and the United States.  Not only did Odebrecht admit in the Plea Agreement to using the U.S. banking system for purposes of paying bribes, but Mascarenhas also testified that the Department of Structured Operations actually operated in the United States to further the scheme.  In fact, Mascarenhas testified that after Marcelo Odebrecht's directive he split the operations between the Dominican Republic and Miami, explaining that "we set up houses in Miami for the families and during the week the officers would work in the Dominican Republic.  Luiz Eduardo and Fernando were hired by Odebrecht General Service in Miami.  Fernando bought a house.  Luiz already had an apartment. . . .  I would go and spend time there, work in the Dominican Republic, stay in hotels in Miami and then go back home."[9]  Importantly, Odebrecht admits in the Plea Agreement that while these executives were operating in Miami, they moved criminal proceeds and committed other criminal acts while in Miami in furtherance of the scheme:

> Odebrecht and its employees and agents took a number of steps **while in the territory of the United States in furtherance of the corrupt scheme**.  For example, some of the offshore entities used by the Division of Structured Operations to hold and disburse unrecorded funds were established, owned and/or operated by individuals located in the United States.  In addition, at times during the conspiracy, individuals working in the Division of Structured Operations, including Odebrecht Employee 3 [Soares], Odebrecht Employee 4 [Migliaccio] and others, took steps in furtherance of the bribery scheme while located in the United States.  For example, in or about 2014 and 2015, while located in Miami, Florida, Odebrecht Employee 3 [Soares] and Odebrecht Employee 4 [Migliaccio] engaged in conduct related to certain projects in furtherance of the scheme, including meetings with other co-conspirators to plan actions to be taken in connection with the Division of Structured Operations, the movement of criminal proceeds and other criminal conduct.

---

Odebrecht's and CNO's financial condition as well as the value of the Notes in relation to Odebrecht's and CNO's true risk profile.

[9]      According to the *Miami Herald*, "Migliaccio said that Odebrecht moved him to Miami and purchased a luxury condominium."  *See* Hall et al., *supra*, n.4.

4812-1822-4322.v1

9.      The additional facts alleged herein demonstrate that Odebrecht and its CEO Marcelo Odebrecht orchestrated a massive scheme through its subsidiaries, including while in the United States, that was designed to, and did, mislead U.S. investors, including plaintiff, into infusing massive amounts of funds into an illegitimate operation. Defendants' admittedly undisclosed scheme made Odebrecht's and CNO's financial statements and defendants' statements about the purported "competitive bidding process" in which it successfully operated false and misleading.

## II.    SUMMARY OF THE ALLEGATIONS

10.     Defendant Odebrecht, through various subsidiaries, including wholly-owned OEC and CNO, is the largest engineering and construction firm in Latin America, and one of the largest in the world. Defendants OEC and CNO primarily engage in the construction of large-scale infrastructure and other public projects such as highways, railways, power plants, bridges, tunnels and airports. The vast majority of these projects are awarded to contractors through a public bidding process overseen by public officials.

11.     For years, Odebrecht highlighted its expertise, knowledge of local markets, reputation and business relationships as providing it, through CNO, with key advantages over its competition in securing bids to win lucrative government contracts, and it published financial results commensurate with its status, including CNO's financial statements in the offering documents that it used to issue notes to plaintiff and other investors through its Odebrecht Finance subsidiary. Between June 21, 2012 and February 4, 2015, plaintiff purchased notes with a face value of over $100 million through four different note offerings based in large part on Odebrecht's and CNO's financial results. The offering memoranda even emphasized that Odebrecht and CNO secured contracts through a "competitive bidding process," when, in truth, Odebrecht's and CNO's

- 7 -

success, and their reported financial results, depended on a massive bribery and kickback scheme that Odebrecht initially admitted involved hundreds of millions of dollars in illicit payments that defendants used to secure government contracts. Later revelations, however, put the amount of the bribes at $3.3 billion.

12.    In the offering memoranda and each time Odebrecht and CNO issued financial results, defendants concealed the true nature of how Odebrecht and CNO secured business. The unprecedented scale of Odebrecht's and CNO's corrupt practices began to be exposed in connection with Brazil's "Operation Car Wash" investigation, which ultimately uncovered a vast criminal network used to funnel massive sums of money from companies such as Odebrecht into the hands of corrupt corporate and political insiders. These criminal activities were orchestrated by Marcelo Odebrecht, as CEO of Odebrecht, and were so pervasive at Odebrecht that the U.S. Department of Justice would later refer to a hidden Odebrecht "business unit" within Odebrecht's CNO subsidiary as the "Department of Bribery" because, as Odebrecht would admit in the Plea Agreement, it used the unit to systematically pay hundreds of millions of dollars to government officials and political parties to secure government contracts. According to the Plea Agreement, defendants admittedly paid $788 million in bribes in connection with 100 projects in 12 countries in exchange for ill-gotten benefits of more than $3.3 billion. Odebrecht has now admitted in its Answer in the *DoubleLine* Action that "the amount of bribes paid was ***more than*** $788 million."[10]

13.    The Operation Car Wash investigation did not initially focus on Odebrecht, but rather on Petrobras. Even after certain individuals associated with Odebrecht began to be implicated in potential wrongdoing, including the arrest on June 19, 2015 of Odebrecht's CEO

---

[10]    Unless otherwise noted, all "$" denominated figures are in U.S. dollars.

4812-1822-4322.v1

Marcelo Odebrecht, defendants attempted to obstruct the investigation and engaged in a months-long misinformation campaign designed to distort and bury the facts and to continue to mislead investors and the public as to the true nature and scope of Odebrecht's and CNO's business activities.

14.    At the same time Odebrecht maintained its innocence, continuing to deny its bribery scheme, Odebrecht conducted a reorganization of its corporate structure.  CNO had long been the subsidiary that served as the umbrella organization for Odebrecht's construction activities – both in Brazil and abroad.  But on March 31, 2015, Odebrecht essentially changed the name of CNO to OEC, making OEC the new umbrella organization for all of Odebrecht's construction activities in Brazil and internationally.  Hoping to avoid liability worldwide by creating distance between its assets and its admitted corruption, Odebrecht has relegated CNO to consolidating projects in Brazil alone.

15.    Now, Marcelo Odebrecht has been convicted of corruption and money laundering and sentenced to more than 19 years in prison, which was subsequently reduced pursuant to a plea bargain in which Marcelo Odebrecht agreed to provide evidence to authorities investigating the Company.  Other top Company officials have been similarly implicated and have agreed to cooperate in exchange for leniency.  Odebrecht itself has pled guilty to violations of the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), implicating its CNO subsidiary as an instrumentality in the scheme, and agreeing to pay $2.6 billion in penalties – which was reduced from $4.5 billion because of Odebrecht's inability to pay that amount – as part of the largest-ever global foreign bribery resolution.  Also as part of the guilty plea, Odebrecht accepted responsibility "for the acts of its affiliates, subsidiaries, officers, directors, employees, and agents,"

including CNO, and pled guilty so the U.S. government would "not file additional criminal charges against the Defendant or any of its direct or indirect subsidiaries or joint ventures," including CNO.

16.    This guilty plea means that Odebrecht lied to plaintiff when it represented that it "obtain[ed] contracts for new projects primarily through competitive bidding" and that it misrepresented that CNO's and Odebrecht's earnings, revenues and profits were derived from legitimate business practices and were true when, in fact, they were the product of admittedly illegitimate business practices and systemic graft by both Odebrecht and CNO, were thus admittedly false and misleading, and violated Brazilian GAAP. As defendants' misdeeds have come to light over time, the Notes have plummeted in value, causing plaintiff tens of millions of dollars in losses and damages under applicable law.

## III.    JURISDICTION AND VENUE

### A.    This Court Has Jurisdiction over This Action and Venue Is Properly Laid in This District

17.    This Court has jurisdiction over this action pursuant to §27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa), and 28 U.S.C. §§1331, 1332 and 1367. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) and U.S. state common and statutory law. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails and interstate electronic and telephone communications, specifically to disseminate false and misleading statements to U.S. investors and to sell the Notes to plaintiff. In the Plea Agreement, Odebrecht admitted that it had used "the mails and means and instrumentalities of interstate commerce corruptly in furtherance of [the scheme]" "while in the

4812-1822-4322.v1

territory of the United States" and that it "underst[ood] that, to be guilty of this offense, the following essential elements of the offense must be satisfied":

> a. An unlawful agreement between two or more individuals to violate the FCPA existed; specifically, as a person or entity, *while in the territory of the United States, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of* an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of; (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the Defendant and its co-conspirators in obtaining and retaining business for and with, and directing business to, any person . . . .

18.    Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District and, as set forth in the offering memoranda, defendant CNO has consented to venue in this District:

> The Issuer [Odebrecht Finance] and the Guarantor [CNO] have irrevocably submitted to the non-exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, City and State of New York for the purposes of any action or proceeding arising out of or related to the Notes, the Guaranty or the Indenture.  The Issuer [Odebrecht Finance] and the Guarantor [CNO] have irrevocably waived, to the fullest extent permitted by law, any objection which it may have to the laying of the venue of such action or proceeding brought in such a court and any claim that any such action or proceeding brought in such a court has been brought in an inconvenient forum and any right to which it may be entitled on account of place of residence or domicile.

## B.    This Court Has Jurisdiction over CNO and OEC

19.    This Court has jurisdiction over CNO.  As alleged in the preceding paragraph, CNO has consented to jurisdiction in this District.  Defendant CNO also has sufficient minimum contacts

within the United States and New York to make the exercise of jurisdiction over it by New York federal courts consistent with traditional notions of fair play and substantial justice.  As alleged further herein, defendant CNO and non-party Odebrecht Finance marketed and sold the Notes in New York to U.S. investors, including plaintiff WSIB, disseminated false and misleading statements into New York, and carried out the kickback and bribery scheme alleged herein, in part, in New York using the U.S. banking system in New York.  Defendant CNO and non-party Odebrecht Finance also agreed in the offering memoranda to maintain offices or an agency in Manhattan, specifically at 10 East 40th Street, 10th Floor, New York, New York 10016, "where notices to and demands upon the Issuer and the Guarantor in respect of the Indenture and the Notes may be served":

> As long as any Note remains outstanding, the Issuer and the Guarantor will at all times have an authorized agent in the Borough of Manhattan, City and State of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to the Notes.  Service of process upon such agent and written notice of such service mailed or delivered to the party being joined in such action or proceeding shall, to the extent permitted by law, be deemed in every respect effective service of process upon such party in any such legal action or proceeding.  The Issuer and the Guarantor has each appointed National Corporate Research, Ltd., located at 10 East 40th Street, 10th Floor, New York, NY 10016 as its agent for service of process in any proceedings in the Borough of Manhattan, City and State of New York.[11]

20.    This Court also has jurisdiction over OEC as a successor-in-interest to CNO.  As alleged herein, there is overwhelming indicia that OEC was a mere continuation of CNO's former role, created to avoid liability and to distance Odebrecht from the misdeeds of its subsidiary (done at Odebrecht's direction).  In addition, due to the reorganization of Odebrecht's subsidiaries, including OEC and CNO, OEC became a guarantor of the Notes, thereby expressly assuming the

---

[11]    *See, e.g.*, 4.375% Prospectus at 69, 80.

liabilities of CNO.  The offering memoranda provides the following clause under the subheading

"Limitation on Consolidation, Merger or Transfer of Assets":

> (1)     The Guarantor shall not consolidate with or merge with or into, or convey, transfer or lease all or substantially all of its assets (on a consolidated basis) to, any Person, unless:

> (A)     The resulting, surviving or transferee Person (if not the Guarantor) shall be a Person organized and existing under the laws of Brazil or the United States of America, any State thereof or the District of Columbia or any other country that is a member country of the European Union or of the Organization for Economic Co-operation and Development or any other country whose long-term foreign currency-denominated debt has an Investment Grade rating from either S&P or Moody's as of the effective date of such transaction, and *such Person shall expressly assume, by a supplement to the Indenture, executed and delivered to the Trustee, all obligations under the Guaranty and the Indenture*;

> (B)     Immediately after giving effect to such transaction, no Event of Default will have occurred and be continuing; and

> (C)     The Guarantor shall have delivered to the Trustee an officer's certificate and an opinion of counsel, each stating that such consolidation, merger or transfer and such supplement to the Indenture, if any, comply with the Notes and the Indenture.

> The Trustee will be entitled to conclusively rely on and will accept such certificate and opinion as sufficient evidence of the satisfaction of the conditions precedent set forth in clause (C) above, in which event it shall be conclusive and binding on the Holders.

21.     A June 1, 2015 UBS analyst report summarizes the reorganization and illustrates

that OEC is now a guarantor of the bonds:

> Construtora Norberto Odebrecht (CNO) which guarantees the bonds issued by Odebrecht Finance Ltd (OFL) reorganized its corporate structure as of 31-Mar-15.  CNO is now the entity which consolidates Brazilian engineering and construction projects.  Meanwhile, Odebrecht Global (OG) is the entity which consolidates international projects.  Odebrecht Enenharia e Construcao (Odebrecht Engineering and Construction – OEC) is a holding company that will in turn consolidate CNO and OG.  Effectively, OEC is what investors previously referred to as CNO.  There is no direct effect on the ODBR bonds as the three entities, OEC, CNO and OG, are joint guarantors of the bonds issued by OFL.

Similarly, a June 3, 2015 press release by Fitch Ratings acknowledges that "OEC, CNO and [OG] provide solidary guarantee on Odebrecht Finance Limited (OFL) issuances."

  **C.**  **This Court Has Jurisdiction over Odebrecht – It Directed the Scheme to, and Carried out Much of the Scheme in, the United States**

  22.  Jurisdiction over Odebrecht in this Court is also appropriate because of Odebrecht's extensive presence in the United States, as "the relevant contacts" for purposes of personal jurisdiction under the Exchange Act "are those with the United States as a whole." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017). Odebrecht took active steps while in the United States to sell the Odebrecht Finance Notes to U.S. investors. **Odebrecht** has admitted in its Answer in the *DoubleLine* Action "that Odebrecht attended a conference in Miami in 2013 sponsored by J.P. Morgan and . . . that Odebrecht's Investor Relations executive was the person responding to investor questions regarding the Odebrecht Finance Notes."[12] **Odebrecht**'s actions while physically in the United States to participate in selling the Odebrecht Finance Notes to fraudulently siphon funds from U.S. investors constitute sufficient minimum contacts that make the exercise of jurisdiction over Odebrecht by this Court consistent with traditional notions of fair play and substantial justice. *See DoubleLine*, 413 F. Supp. 3d at 218 ("To enforce SEC regulations, courts have exercised jurisdiction where 'an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders.'") (quoting *SEC v. Straub*, 921 F. Supp. 2d 244, 256-57 (S.D.N.Y. 2013)).

  23.  This Court has jurisdiction over Odebrecht because it, and the scheme, had substantial contact with the United States. Marcelo Odebrecht, as the CEO of Odebrecht, was the driving force behind the bribery scheme and exerted complete control over Odebrecht's CNO

---

[12] *DoubleLine* Answer, ¶92.

subsidiary, making the decision that ultimately put the scheme in Miami, Florida. As an initial matter, Odebrecht committed the acts of bribery alleged herein directly through CNO, admitting in the Plea Agreement that "CNO housed a unit called the Division of Structured Operations" and that this division "was created to allow **Odebrecht** to make unrecorded payments, many of which took the form of bribes to government officials in Brazil and abroad," making CNO its agent, instrumentality and alter ego for jurisdiction purposes. An article in *Le Monde diplomatique* on October 1, 2017 even revealed testimony from Mascarenhas who detailed a top-down structure originating from **Odebrecht**. He testified that Marcelo Odebrecht directed and controlled the Department of Structured Operations and used Odebrecht's subsidiaries, especially its wholly-owned CNO subsidiary, to carry out the bribery scheme:

> The last head of the bribery department, Hilberto Mascarenhas, told the judges how Odebrecht's 'parallel payments' worked. The money passed through some 40 bank accounts, mostly in tax havens, and was transported by agents carrying bags of banknotes. '**Marcelo asked me [Mascarenhas] to set up the system in 2006. He knew we had to increase our illegal contributions if the company was going to grow**.'

> From 2006, all payment requests were handled by a purpose-built software program. **To avoid detection, payments were made not from Brazil but from Odebrecht subsidiaries abroad. The money passed through** tax havens (especially Panama, the British Virgin Islands, and Antigua and Barbuda) and **banks** in the UK, **the US**, Austria, Monaco and Switzerland. It was then transferred to accounts administered by agents who worked for Odebrecht, but were not paid by it. Finally, it arrived in Brazil through stockbrokers.

> \*        \*        \*

> '**I warned Marcelo about these huge amounts several times. I said it was suicide, but he told me to continue**,' Mascarenhas testified under a plea agreement. As the amount of bribes paid rose, so did the value of contracts secured. Parallel payments totaled $61m in 2006, $738m in 2013. Odebrecht's turnover rose from $11.4bn to $42.0bn. [13]

---

[13]  Vigna, *supra*, n.6.

24.    Investigations have revealed that Odebrecht had complete control over CNO, as well as its other subsidiaries.  Indeed, Marcelo Odebrecht authorized the bribes himself until 2009 and then delegated that responsibility to the heads of the Company's subsidiaries around the world.  In fact, Odebrecht admitted in the Plea Agreement that "[a]fter approximately 2009, Odebrecht Employee 1 [Marcelo Odebrecht] delegated the responsibility for approving the corrupt payments to the business leaders in Brazil and the various country leaders in the other jurisdictions."[14]  And an article in *Newsroom Panama* explained that "there were workers inside Odebrecht dedicated exclusively to processing the payment of bribes to politicians, among other authorities, who were directly authorized by the heads of the company."  Again, Odebrecht admitted as much in the Plea Agreement, stating that "[i]n or about and between 2008 and 2015, Odebrecht's corporate structure in Latin America was organized such that the senior-most country leaders reported to Odebrecht Employee 6 [Luiz Antonio Mameri], who was the Business Leader for Angola and the above-referenced countries in Latin America, except Venezuela."[15]  And for Venezuela, reports reveal that Odebrecht transferred the head of that country to the United States and made him the head of Odebrecht's subsidiary in Miami after he was forced out of Venezuela in connection with the bribery scheme – "[a] third troubled Odebrecht executive connected to Miami is the former

---

[14]    Plea Agreement Statement of Facts ("SOF"), ¶24.

[15]    SOF, ¶45 (footnote omitted).  The Plea Agreement confirms that "Odebrecht Employee 6 [Mameri] reported to Odebrecht Employee 1 [Marcelo Odebrecht] and was responsible for overseeing Odebrecht's Superintendent Directors, or country leaders, of Angola and several Latin America countries" and that "[a]s part of that supervision, Odebrecht Employee 6 [Mameri] approved many of the corrupt payments to foreign officials and foreign political parties outside of Brazil."  *Id.*, ¶12.  Soares testified that "[w]e had a system, the business leaders, that were the presidents of several companies within the group, had the power to approve payments, they transmitted the approval of a program to Mr. Ubiracy, who has been named some times, and he would write in the system this program and later payments related to this program were requested, and it was directed automatically to our sector to make the payment."

4812-1822-4322.v1

longtime head of Venezuela operations, Euzenando Azevedo. . . .  In Miami in 2015, Azevedo briefly became the boss of Neves, the longtime CEO of Odebrecht's main Miami subsidiary."[16]

25.    Odebrecht, through Marcelo Odebrecht, also dictated who participated in the scheme.  Mascarenhas testified that Marcelo Odebrecht even coerced him to head the Department of Structured Operations, instructed him to continue the scheme when he raised concerns about "financial suicide," and then directed him to move the Department outside of Brazil when he was worried about getting caught, which was a decision that landed the Division in Miami.  *See* ¶6, *supra*.[17]  Mascarenhas testified that "[t]he more the area [Division of Structured Operations] grew, the more worried Marcelo became" and that "Marcelo insisted a lot, pressured the team to go very fast.  They went in a hurry."  Marcelo Odebrecht himself even explained that he made the decision to transfer the department out of Brazil because the employees were "'scared'" that the "'police will come for you.'"  *See* ¶7, *supra*.

26.    And following Marcelo Odebrecht's directive, Mascarenhas moved the Department out of Brazil, splitting the operations between the Dominican Republic and the United States.  Mascarenhas remained in Brazil, while Soares and Migliaccio moved their families to Miami, getting cover jobs in Odebrecht's unit in Coral Gables, Florida.  According to a June 2019 article by the *Miami Herald*, these executives had taken refuge in South Florida from a gathering legal storm at home and, while in Florida, moved money through offshore shell companies to bank accounts in Switzerland and Panama:

---

[16]  The Miami subsidiary was also "instrumental in a joint request for U.S. Export-Import Bank loan guarantees in 2010 for Odebrecht S.A.'s work on Autopista del Coral, a private highway in the Dominican Republic that is referenced in many Drousys records."  Hall et al., *supra*, n.4.

[17]  Tavares, *supra*, n.5.

From a posh perch in South Florida, where they'd taken refuge from a gathering legal storm at home, two Brazilian executives labored in near anonymity, moving money through offshore shell companies to bank accounts in Switzerland and Panama.

The two men were cogs in a corrupt multi-national machine of breathtaking scope and efficiency, one built by Odebrecht S.A., the Brazilian construction conglomerate with a major Miami presence, to secretly shovel millions of dollars to politicians and bureaucrats and to skirt taxes. The critical role played by the two Miami-based executives in a sprawling scandal has remained under wraps. Until now.[18]

27.     Soares and Migliaccio, both now based in Miami, were instrumental to the scheme while in Miami. As the *Miami Herald* described it, "Fernando Migliaccio, based in Miami, was an important figure in Odebrecht's S.A.'s Division of Structured Operations," operating as the "treasurer of the parallel accounting system." And Soares, also "[w]hile based in Miami, . . . was a top official in Odebrecht S.A.'s Division of Structured Operations, aka the Bribery Division."[19] And Odebrecht made sure they enjoyed Miami. In fact, the *Miami Herald* reported that "Soares and Migliaccio lived prosperous lives in Miami, enjoying the use of expensive properties owned by anonymous shell companies . . . shunn[ing] mortgages, which are akin to fingerprints at a crime scene."[20] Migliaccio testified that "Odebrecht moved him to Miami and purchased a luxury condominium" in the Peninsula II high-rise in Aventura, Florida, with an assessed value of $830,409.[21] And "Soares had a higher profile, opting for a more luxurious condo . . . in the pricey Marquis building on Biscayne Boulevard near the MacArthur Causeway," which was purchased

---

[18]     *See* Hall et al., *supra*, n.4.

[19]     *Id.*

[20]     *Id.*

[21]     *Id.*

4812-1822-4322.v1

in a distress sale for $800,000 in 2011.[22]  Both condominiums were purchased using offshore shell companies.  The *Miami Herald*, based on its access to leaked documents, tied these purchases back to Odebrecht – "As in most things Odebrecht, the purchase was actually consummated using a shell company – in [Migliaccio's] case, one in the British Virgin Islands called Irana Finance Inc."[23]

28.    After moving, Soares and Migliaccio continued the bribery and kickback scheme from the United States.  As Odebrecht admitted in the *DoubleLine* Answer, these executives paid bribes from Miami and met with co-conspirators to further the scheme while in Miami:

> Defendants admit that, as reflected in the SOF, while Soares and Migliaccio were located in Miami, Florida, they "engaged in conduct related to certain projects in furtherance of the scheme, including meetings with other co-conspirators to plan actions to be taken in connection with the Division of Structured Operations, the movement of criminal proceeds and other criminal conduct". . . .[24]

29.    News reports have detailed some of the actions these executives took to further the scheme while in Miami.  *Bloomberg* reported that Mascarenhas hired a Miami lawyer who did the paperwork for shell companies used in the bribery scheme.[25]  And the *Miami Herald* reported that Soares had hired a Miami CPA in 2015 to create an LLC, "before literally disappearing":

> A search of Florida corporate records using that address shows Soares used Trust Advisers [sic] Corporation and its veteran owner, David Southwell, to create a company called Rolemia Funds LLC in February 2015.  In a phone interview, Southwell acknowledged Soares was his client, described him as "a really nice guy"

---

22    *Id.*

23    *Id.*

24    *DoubleLine* Answer, ¶87.

25    Smith et al., *supra*, n.7.

and said he used Southwell's services for taxes and corporate registrations before literally disappearing.[26]

30.    *Bloomberg* also reported on some of Migliaccio's activities in furtherance of the scheme while in Miami, explaining that Migliaccio had his assistant, Maria Lucia Tavares, who worked in Salvador, Brazil, travel to Miami on June 15, 2015, to meet with him to go over the numbers in detail.  He asked Tavares to fly up from Salvador to help sort it all out.  She took an overnight flight, brought with her dozens of spreadsheets chronicling illegal payments, printing them out to make them easier for her boss to review, and met with him the next day in Miami.[27]

31.    Odebrecht has also admitted that Soares sought to obstruct justice while in Miami. Soares met with Casroy James, an intermediary to Antiguan Prime Minister Gaston Browne, seeking to have him hide evidence of the scheme.  Soares agreed to pay $4 million to have him prevent Brazilian investigators from obtaining documents that had been subpoenaed from banks headquartered in Antigua that had been used by the Division of Structured Operations to "launder" bribe money to public officials.  Odebrecht's Plea Agreement admits that the meeting occurred, that it occurred in Miami, and that its purpose was to bribe the official into refraining from providing evidence to international authorities:

> Defendants admit that, as reflected in the SOF, a Division of Structured Operations executive "attended a meeting in Miami, Florida, with a consular official from Antigua and an intermediary to a high-level government official in Antigua," that Division of Structured Operations executive "requested that the high-level official refrain from providing to international authorities various banking documents that would reveal illicit payments made by the Division of Structured Operations on behalf of Odebrecht, and agreed to pay $4 million to the high-level official to refrain from sending the documents."[28]

---

[26]    Hall et al., *supra*, n.4.

[27]    *See* Smith et al., *supra*, n.7.

[28]    *DoubleLine* Answer, ¶88.

- 20 -

32.     Soares and Migliaccio were not the only executives involved in the bribery scheme that Odebrecht transferred to Miami.  According to the *Miami Herald*, "[a] third troubled Odebrecht executive connected to Miami is the former longtime head of Venezuela operations, Euzenando Azevedo," who was involved in paying bribes to Venezuelan officials, and was forced to relocate to Miami because of the bribery scheme.[29]  Odebrecht appointed Azevedo as the head of Odebrecht's Miami subsidiary.  The *Miami Herald* reported that "[i]n Miami in 2015, Azevedo briefly became the boss of Neves, the longtime CEO of Odebrecht's main Miami subsidiary" and that while a U.S. executive, "Azevedo oversaw a Houston highway project and Miami road improvements on State Road 836, also known as the Dolphin Expressway, and Krome Avenue (Southwest 177th Avenue)."[30]

33.     Defendant Odebrecht not only offered financial incentives to members of the Division of Structured Operations, including as alleged above, relocation expenses and other inducements, but funds from its bribery scheme were also used to purchase property in New York:

> Opaque offshore entities funneled hundreds of millions of dollars in secret payments through companies and banks in countries around the world, ***including the United States***, China, Switzerland, the Netherlands, the United Arab Emirates, Panama and Antigua.  ***In one instance, payments passed from Odebrecht through a company incorporated in the Bahamas to one with an address in the Dominican Republic, which later bought a $2 million apartment in midtown Manhattan***.[31]

34.     Importantly, Odebrecht admits in its Plea Agreement that CNO operated at its behest to carry out Odebrecht's bribery scheme that gave rise to its guilty plea and to this action, including by enabling Odebrecht to cause wire transfers to be made from several New York-based

---

[29]     *See* Hall et al., *supra*, n.4.

[30]     *Id*.

[31]     *Id*.

accounts held by CNO to accounts that had been created in offshore entities. The Plea Agreement specifically states that Odebrecht pled guilty to accept the responsibility for the acts of CNO and to avoid further criminal charges against "any of its direct or indirect subsidiaries or joint ventures," including CNO:

> In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Fraud Section and EDNY agree that they will not file additional criminal charges against the Defendant or any of its direct or indirect subsidiaries or joint ventures relating to any of the conduct described in the Information or the Statement of Facts, except for the charges against Braskem S.A. specified in the Information and Plea Agreement between the Fraud Section and EDNY and Braskem S.A. filed on December 21, 2016 ("Braskem Plea Agreement").

35.     Odebrecht has admitted the details of this scheme in the SOF, acknowledging that it used offshore shell companies established and managed by the "bribe department" to funnel bribes to foreign officials:

> 4.     Smith & Nash Engineering Company ("S&N"), an unaffiliated shell company based in the British Virgin Islands, was **established and managed at the Division of Structured Operations**' direction. S&N was used **by Odebrecht** to further the bribery scheme, and to conceal and disguise improper payments made to, and for the benefit of, foreign officials and foreign political parties in various countries. S&N opened at least one offshore bank account (the "S&N Account") **on behalf of Odebrecht**. **Odebrecht transferred money** from various bank accounts, including several New York-based bank accounts (the "New York-based Accounts"), to the S&N Account. The funds in the S&N Account were then used, in part, to make direct and indirect bribe payments to foreign officials. A United States citizen and resident of New York and Florida was the authorized signatory on the S&N Account.
>
> 5.     Arcadex Corporation ("Arcadex") was an unaffiliated shell company incorporated in Belize. Arcadex was **established and managed at the Division of Structured Operations' direction** and used **by Odebrecht** to further the bribery scheme, and to conceal and disguise improper payments made to, and for the benefit of, foreign officials and foreign political parties in various countries. Arcadex opened at least one offshore bank account (the "Arcadex Account") **on behalf of Odebrecht**. **Odebrecht transferred money** from various bank accounts, including the New York-based Accounts, to the Arcadex Account. The funds in the Arcadex Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

6.    Golac Projects and Construction Corporation ("Golac'') was an unaffiliated shell company incorporated in the British Virgin Islands. Golac was **established and managed at the Division of Structured Operations' direction** and used **by Odebrecht** to further the bribery scheme, and to conceal and disguise corrupt payments made to, and for the benefit of, foreign officials and foreign political parties in various countries. Golac opened at least one offshore bank account (the "Golac Account") **on behalf of Odebrecht**. **Odebrecht transferred money** from various bank accounts, including the New York-based Accounts, to the Golac Account. The funds in the Golac Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

36.    While Odebrecht pled guilty, "admit[ting], accept[ing], and acknowledg[ing] that it is responsible for the acts of its officers, directors, employees, and agents as set forth [in the Plea Agreement]," the Plea Agreement also treated Odebrecht and CNO as one for purposes of undertaking remedial measures and implementing compliance and ethics programs in connection with Odebrecht's guilty plea:

> [T]he Defendant engaged in extensive remedial measures, including (i) terminating the employment of 51 individuals who participated in the misconduct described in the Statement of Facts, (ii) disciplining an additional 26 individuals who were engaged in the misconduct, including suspensions of up to a year and a half, significant financial penalties, and demotion to non-managerial, non-supervisory, non-decision making roles, for each of the 26 individuals, (iii) requiring individualized anti-corruption compliance and business ethics training for each of the 26 individuals, and requiring each to be subject to heightened oversight and day-to-day supervision, including ensuring that the independent compliance monitor described in Attachment D has full access and authority to evaluate the business activities and ongoing compliance of those individuals, (iv) creating a Chief Compliance Officer position that reports directly to the Audit Committee of the Board of Directors, (v) adopting heightened controls and anti-corruption compliance protocols, including hospitality and gift approval procedures, (vi) incorporating adherence to compliance principles into employee performance evaluation and compensation, (vii) increasing the number of employees dedicated to compliance by 50 percent; and (viii) more than doubling the resources devoted to compliance in 2016 and more than tripling the budget for 2017[.]

> *    *    *

> 9.    The Defendant represents that it has implemented and will continue to implement a compliance and ethics program **throughout its operations, including those of its affiliates, agents, and joint ventures**, and those of its contractors and subcontractors whose responsibilities include interacting with

- 23 -

foreign officials or other activities carrying a high risk of corruption, designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws.

37.    And in the Plea Agreement, Odebrecht entered into a broad disclosure agreement that bound its subsidiaries, including CNO, and consented to have any press releases or proposed public statements about the agreement by "any of its direct or indirect subsidiaries" reviewed by the Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of New York prior to their release:

> The Defendant shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, *those of its subsidiary companies and affiliates*, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Fraud Section and EDNY may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section and EDNY, upon request, any document, record or other tangible evidence about which the Fraud Section and EDNY may inquire of the Defendant.

> *           *           *

> The Defendant agrees that if it *or any of its direct or indirect subsidiaries or affiliates* over which the Defendant exercises control issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section and EDNY to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section, EDNY and the Defendant; and (b) whether the Fraud Section and EDNY have any objection to the release or statement.

38.    Defendant Odebrecht also has further contacts within the United States and New York to make the exercise of jurisdiction over it by New York federal courts consistent with traditional notions of fair play and substantial justice.  As alleged further herein, Odebrecht's agents, instrumentalities and alter egos marketed and sold the Notes in New York to siphon funds out of the United States from U.S. investors, including from plaintiff WSIB, disseminated false and misleading statements into New York, and carried out the kickback and bribery scheme alleged

- 24 -

herein, in substantial part, in New York. In fact, Odebrecht has admitted in the Plea Agreement that *it* purposely and intentionally reached into New York on multiple occasions to pay bribes using the U.S. banking system in New York, agreeing specifically that "***Odebrecht*** caused numerous illicit payments ***to be made from United States-based bank accounts*** to perpetuate its bribe scheme in Brazil":[32]

> 4.      . . . S&N opened at least one offshore bank account (the "S&N Account") on behalf of Odebrecht. ***Odebrecht transferred money from various bank accounts, including several New York-based bank accounts*** (the "New York-based Accounts"), to the S&N Account. The funds in the S&N Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

> 5.      . . . Arcadex opened at least one offshore bank account (the "Arcadex Account") on behalf of Odebrecht. ***Odebrecht transferred money from various bank accounts, including the New York-based Accounts***, to the Arcadex Account. The funds in the Arcadex Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

> 6.      . . . Golac opened at least one offshore bank account (the "Golac Account") on behalf of Odebrecht. ***Odebrecht transferred money from various bank accounts, including the New York-based Accounts***, to the Golac Account. The funds in the Golac Account were then used, in part, to make direct and indirect bribe payments to foreign officials.

> *      *      *

> 37.      Odebrecht caused numerous illicit payments to be made from United States-based bank accounts to perpetuate its bribe scheme in Brazil. For example, between at least December 2006 and December 2007, Odebrecht caused transfers totaling almost $40 million to be made from the New York-based

---

[32] Odebrecht has argued that the Court should overlook its admission in the Plea Agreement that it paid bribes using the U.S. banking system because "the Plea Agreement . . . in fact provides only that 'Odebrecht' – an umbrella term for an unspecified number of unidentified entities and operating companies – caused the transfers," meaning Plaintiff fails to Plead that [Odebrecht S.A.] did so." ECF No. 58 at 2. Odebrecht's argument strains credibility. The Plea Agreement does define an entity under that "umbrella term" and it is "Odebrecht S.A." SOF, ¶1 ("Odebrecht S.A. was a Brazilian holding company that, through various operating entities (collectively "Odebrecht" or the "Company") . . . ."). And Odebrecht cannot hide behind the parent-subsidiary relationship since Marcelo Odebrecht directed Mascarenhas and CNO to make the payments and completely disregarded CNO's separate corporate existence – "'I warned Marcelo about these huge amounts several times. I said it was suicide, ***but he told me to continue***.'"

Accounts to the S&N Account. Thereafter, in or between January and August 2011, Odebrecht used the S&N Account to make bribe payments, including paying approximately $3.5 million and almost 2 million Swiss Francs to the bank account of an offshore entity controlled by Brazilian Official 1, then an executive at Petrobras.

38.     Similarly, in or about December 2009, **Odebrecht caused transfers totaling approximately $20 million to be made from the New York-based Accounts** to the Arcadex Account. Before and contemporaneously with the transfers from the New York-based Accounts, Odebrecht caused numerous money transfers to be made from the Arcadex Account to a second Arcadex account (the "Second Arcadex Account") that was used to make bribe payments, including an approximately $430,000 bribe payment to a bank account controlled by Brazilian Official 2, then an executive at Petrobras.

39.     Furthermore, in or about December 2008, **Odebrecht caused transfers totaling almost $48 million to be made from the New York-based Accounts** to the Golac Account. Thereafter, in or about and between December 2008 and July 2010, Odebrecht caused transfers from the Golac Account to three unrelated accounts in Panama and Antigua from which approximately $10 million was transferred to the accounts of three then-Petrobras executives Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3.

39.     The consent to jurisdiction and venue by CNO and OEC is also imputed to Odebrecht as Odebrecht operated through these subsidiaries, making them Odebrecht's agents, instrumentalities and alter egos. As alleged herein, defendant Odebrecht operated through Odebrecht Finance, which Odebrecht created as a dummy corporation for the sole purpose of siphoning funds out of the hands of investors, including WSIB and other U.S. investors. Defendants admitted in their Answer in the *DoubleLine* Action that "Odebrecht Finance is incorporated under the laws of the Cayman Islands, is a wholly-owned subsidiary of Odebrecht, and that its sole purpose was to raise money for CNO and Odebrecht through bond issuances."[33] The *Miami Herald* has reported on how Odebrecht utilized just this sort of offshore arrangement "to rig the game in its favor":

---

[33]     *DoubleLine* Answer, ¶54.

The company's use of offshore companies as a conduit for illicit cash has underscored anew their pernicious role in international commerce. Just as the Panama Papers tore back the veil that cloaked how the rich, corrupt and criminal used opaque shell companies to hide illicit fortunes, the Odebrecht leak has exposed how a multinational conglomerate can employ offshores to rig the game in its favor.[34]

40.     Odebrecht also commingled its funds with Odebrecht Finance's, used Odebrecht Finance as a vehicle to perpetrate fraud, failed to capitalize Odebrecht Finance adequately, and operated Odebrecht Finance for the benefit of defendants Odebrecht and CNO, and not for the benefit of Odebrecht Finance itself. In fact, the Prospectus for the 7.125% Notes reveals that Odebrecht ultimately controlled the funds that Odebrecht Finance successfully siphoned from U.S. investors:

The net proceeds from the issue and sale of the notes are estimated to be approximately U.S. $392.3 million, after deducting certain expenses and commissions to be paid to the initial purchasers in connection with the offering. Odebrecht Finance intends to use a portion of the net proceeds of this offering to redeem, repay or repurchase all of its 2017 notes, of which U.S. $112.8 million was outstanding as of March 31, 2012. During the 12-month period commencing October 18, 2012, the 2017 notes may be redeemed, in whole or in part, at any time by Odebrecht Finance at 103.75% of their principal amount plus accrued interest. We intend to use a portion of the net proceeds of this offering for general corporate purposes *and Odebrecht intends to use the remaining portion of the net proceeds of this offering for additional equity investments in OPI and OE*.

41.     Odebrecht Finance also depended on CNO and Odebrecht to make payments on the Notes and to fund its activities, as the offering memoranda explained:

The issuer's [Odebrecht Finance] ability to make payments on the notes depends on its receipt of payments from us [CNO].

The issuer's [Odebrecht Finance] principal business activity is to act as a financing vehicle for Odebrecht's activities and operations. The issuer [Odebrecht Finance] has no substantial assets, and accordingly, holders of the notes must rely on our [CNO] cash flow from operations to pay amounts due in connection with the notes. The ability of the issuer [Odebrecht Finance] to make payments of principal, interest and any other amounts due on the notes is contingent on its

---

[34]     *See* Hall et al., *supra*, n.4.

receipt from us [CNO] of amounts sufficient to make these payments, and, in turn, on our [CNO] ability to make these payments.  In the event that we [CNO] are unable to make such payments for any reason, the issuer [Odebrecht Finance] will not have sufficient resources to satisfy its obligations under the indenture governing the notes.

*       *       *

The Company's [Odebrecht Finance] only stockholder is Odebrecht S.A. ("ODB"), the ultimate parent company of the Odebrecht Organization, incorporated in Salvador, Brazil.

In 2011, the Company [Odebrecht Finance] incurred losses of US$ 185,006 and, as of December 31, 2011, had accumulated losses of US$ 350,226, resulting in a net capital deficiency of US$ 185,226, as well as an excess of current liabilities over current assets of US$ 19,684.  ***To fund its activities, the Company [Odebrecht Finance] relies on the operational structure of ODB and its operations depend on the remittance of funds from ODB and from other related parties of the Odebrecht Organization***, with which the Company has intercompany receivables of US$ 1,713,645 (2010 - US$ 1,592,564) (Note 4).[35]

42.    Immediately following the sale to investors of each of the 7.125% Notes, the 8.25% Notes, the 5.25% Notes, the 4.375% Notes and various other offerings, Odebrecht Finance conveyed all or virtually all of the proceeds from such sales to defendants CNO and Odebrecht, receiving nothing of equivalent value in return.

43.    Jurisdiction over Odebrecht is also appropriate because of its substantial presence in the United States.  As Odebrecht boasts on its own website, it has operated in the United States for over a quarter of a century, obtaining contracts from federal and county government entities. Odebrecht, in fact, highlights that it partners with governmental entities in the United States – "[o]ne of the company's main clients is Miami-Dade County," forming a "partnership [that] has existed since 1993" – and has contracted with the U.S. Army Corps of Engineers in New Orleans, Louisiana, to work on part of the Hurricane Storm Damage Risk Reduction System (HSDRRS),

---

[35]    *See, e.g.*, 7.125% Prospectus at 14, F-19.

authorized and funded by the U.S. Congress after Hurricane Katrina. Notably, Odebrecht's projects in the United States housed its co-conspirators. After Odebrecht's head of Venezuela operations Euzenando Azevedo was forced to relocate to Miami in connection with the bribery scheme and briefly became the boss of the longtime CEO of Odebrecht's main Miami subsidiary, he oversaw a Houston highway project and Miami road improvements on State Road 836, also known as the Dolphin Expressway, and Krome Avenue (Southwest 177th Avenue), while a U.S. executive.[36]

44.    The detailed story of Odebrecht's extensive U.S. presence is summarized in part in an October 22, 2010 press release entitled "Odebrecht Consolidates its Operations in the United States":

> Odebrecht arrived to U.S. soil after it won the public bid to build a stretch of the Metromover, Miami's above-ground subway. Soon after, in 1992, Odebrecht was responsible for building Route 56, a highway in the region of San Diego, California.

> After these projects, the rhythm of the work continued to be intense. The following year, after winning the bid to work on the Santa Ana River chute, the company earned an important contract: The Seven Oaks Dam project in California, in the amount of US$ 168 million, with a construction period of 52 months. During this same year, 1993, the Company was responsible for the construction work on the Merrill Barber Bridge and the Golden Glades viaduct, which extends 2,464 meters to serve those who use the I-95 system . . . . Odebrecht was chosen to erect Garcon Point Bridge in Santa Rosa Bay, at the border between Florida and Alabama. . . . Odebrecht was responsible for the American Airlines Arena, a sports and cultural complex in Miami, where it competed for the contract with major U.S. companies. It also built the Fortune House building, an apart hotel with 29 floors, the Ocean Steps building, with 15 residential floors, and the Ritz Carlton Key Biscayne Resort & Spa, a residential hotel project.

> One of the company's main clients is Miami-Dade County . . . . The partnership has existed since 1993, when the construction company was responsible for building the American Airlines cargo building. Currently, Odebrecht is responsible for expanding the North Terminals of the Miami International Airport,

---

[36]    *See* Hall et al., *supra*, n.4.

building the lightweight vehicle that will run on the tracks (Mia Mover) and extending the subway (Airport Link).

The North Terminal Development Program, which involves investments of US$ 2.85 billion, is the center of a bigger venture, worth US$ 6.2 billion, called the "Capital Improvement Program." Undertaken by Miami-Dade County, it was developed with aims of expanding and improving the aviation system. The complete project includes 52 new gates, four train stations, new installations for the United States Immigration and Citizenship Services, 123 counters, 119 self-service kiosks, 72 federal inspection service posts and a new luggage system.

*    *    *

Odebrecht was also at the Orlando Airport, working on the North Transversal taxi strip and South Terminal Complex. The project also involved the construction of access ramps and new viaducts.

In New Orleans since 2006, Odebrecht won two new contracts in 2010 in the city. In August, it signed a contract with the US Army Corps of Engineers to undertake preventive construction work for floods. In May, the company began constructing four water pumping stations, with aims of preventing floods caused by hurricanes. Recently, the company also delivered projects at Cataouatche Lake and in the region of Chalmette, work designed to reconstruct and fortify containment dikes. The construction works are part of the Hurricane Storm Damage Risk Reduction System (HSDRRS), which consists of 250 different projects and involves total investments of US$ 15 billion.

## IV.    PARTIES

### A.    Plaintiff

45.    Plaintiff Washington State Investment Board ("WSIB" or "plaintiff") is a state agency responsible for the prudent investment and management of public trust and public employee retirement funds. It invests for 17 retirement plans that benefit public employees, teachers, school employees, law enforcement officers, firefighters and judges. There are approximately 700,000 participants in the plans. WSIB also manages investments for 18 other public funds that support or benefit industrial insurance, colleges and universities, developmental disabilities and wildlife protection, and the agency manages a public employee deferred compensation program that supplements other retirement benefits. WSIB was created and operates

- 30 -

under the provisions of Chapter 43.33A of the Revised Code of Washington ("RCW"). WSIB purchased the Notes pursuant to the offering memoranda and was damaged by defendants' failure to disclose the truth about defendants' financial results and the manner in which defendants secured business. The specifics for each WSIB purchase at issue are alleged in §VI, *infra*.

**B.    Defendant Odebrecht**

46.    Defendant Odebrecht is a holding company headquartered in Brazil that, through various subsidiaries and operating entities, conducts business in construction, engineering, infrastructure, chemicals, utilities and real estate businesses in Brazil and throughout 27 other countries, including the United States. It is the parent of Odebrecht Finance and defendants CNO and OEC, and controls their activities, including the issuance of the Notes and these defendants' representations to investors.

**C.    Defendant CNO**

47.    Defendant CNO is a wholly-owned subsidiary of defendant Odebrecht, primarily engaging in the construction of large-scale infrastructure and other public works projects, including the construction of highways, railways, power plants, bridges, tunnels, subways, buildings, port facilities, dams, manufacturing and processing plants, as well as mining and industrial facilities. The offering documents for each offering stated specifically that CNO "currently guarantee[s]" all of Odebrecht Finance's debt with third parties, including the Notes, and relies primarily upon defendant CNO's reported financial results and business prospects to sell bonds to investors. Prior to plaintiff's purchase of the Notes, CNO was the largest construction and engineering business in Latin America, and one of the largest in the world, with an increased focus on obtaining construction contracts outside of Brazil. In March 2015, Odebrecht reorganized

- 31 -

and changed the name of its overall construction operations from CNO to OEC. Now, CNO is a subsidiary of OEC and focuses solely on projects within Brazil.

### D.    Defendant OEC

48.    Defendant OEC is a wholly-owned subsidiary of defendant Odebrecht, and is the successor of CNO as the holding company for Odebrecht's engineering and construction operations worldwide. OEC was not in existence until January 27, 2014 and did not have its current name until February 2, 2015. On March 31, 2015, OEC took over CNO's role as the consolidator of Odebrecht's construction subsidiaries. Under OEC's control is CNO (consolidating operations in Brazil) and Odebrecht Engineering and Construction International (OECI), formerly known as Odebrecht Global. Defendant OEC is a guarantor of the Notes bought by plaintiff.

### E.    Non-Party Odebrecht Finance

49.    Non-party Odebrecht Finance is incorporated under the laws of the Cayman Islands. Odebrecht Finance is a wholly-owned subsidiary of defendant Odebrecht and was created for the sole purpose of raising money for Odebrecht and CNO through the issuance of bonds, including the Notes purchased by WSIB. Defendants admitted in their Answer in the *DoubleLine* Action that "Odebrecht Finance is incorporated under the laws of the Cayman Islands, is a wholly-owned subsidiary of Odebrecht, and that its sole purpose was to raise money for CNO and Odebrecht through bond issuances."

50.    Odebrecht Finance issued billions of dollars in face value in notes from 2010 through 2014. And as described in the offering memorandum for the 7.125% Notes, the entire amounts raised by selling the Notes were transferred from Odebrecht Finance to CNO and Odebrecht.

- 32 -

## V.    PLAINTIFF'S PURCHASES OF THE NOTES

51.    In reliance on the false and misleading statements alleged herein, and without knowledge of the material omissions alleged herein, WSIB purchased the following 8.25% Notes:

| Trade Date | Counterparty | Face Amount | Unit Price | Total Price | New Issue? |
|---|---|---|---|---|---|
| 4/17/2013 | Deutsche Bank Securities Inc. | R$40M | 99.498 | $19,885,680.02 [37] | Yes |

52.    In reliance on the false and misleading statements alleged herein, and without knowledge of the material omissions alleged herein, WSIB purchased the following 7.125% Notes:

| Trade Date | Counterparty | Face Amount | Unit Price | Total Price | New Issue? |
|---|---|---|---|---|---|
| 6/21/2012 | Credit Suisse Securities LLC | $5M | 98.479 | $4,923,950.00 | Yes |
| 6/21/2012 | Credit Suisse Securities LLC | $10M | 98.479 | $9,847,900.00 | Yes |
| 10/22/2012 | BNP Paribas Securities Corp. | $5M | 116.266 | $5,813,300.00 | No |
| 10/22/2012 | BNP Paribas Securities Corp. | $10M | 116.266 | $11,626,600.00 | No |
| 10/22/2012 | BNP Paribas Securities Corp. | $10M | 116.266 | $11,626,600.00 | No |
| 8/30/2013 | Barclays Bank PLC | $3M | 90.000 | $2,700,000.00 | No |
| 2/2/2015 | Deutsche Bank Securities Inc. | $5M | 74.500 | $3,725,000.00 | No |
| 2/3/2015 | Deutsche Bank Securities Inc. | $8M | 74.750 | $5,980,000.00 | No |
| 2/3/2015 | Deutsche Bank Securities Inc. | $4M | 74.500 | $2,980,000.00 | No |
| 2/4/2015 | Deutsche Bank Securities Inc. | $3M | 74.250 | $2,227,500.00 | No |

---

[37]    The price for this purchase was based on the exchange rate that day from R$ to US$, due to the Notes being R$ denominated.

53.    In reliance on the false and misleading statements alleged herein, and without knowledge of the material omissions alleged herein, WSIB purchased the following 4.375% Notes:[38]

| Trade Date | Counterparty | Face Amount | Unit Price | Total Price | New Issue? |
|---|---|---|---|---|---|
| 4/17/2013 | Deutsche Bank Securities Inc. | $45M | 98.851 | $44,482,950.00 | Yes |
| 4/17/2013 | Deutsche Bank Securities Inc. | $5M | 98.851 | $4,942,550.00 | Yes |

54.    In reliance on the false and misleading statements alleged herein, and without knowledge of the material omissions alleged herein, WSIB purchased the following 5.25% Notes:

| Trade Date | Counterparty | Face Amount | Unit Price | Total Price | New Issue? |
|---|---|---|---|---|---|
| 6/19/2014 | Citigroup Global Markets Inc. | $20M | 100.000 | $20,000,000.00 | Yes |
| 7/15/2014 | Morgan Stanley Co. Incorporated | $5M | 98.750 | $4,937,500.00 | No |

55.    For each Note purchase listed above, WSIB unconditionally communicated its commitment to purchase the Notes when a representative for WSIB confirmed pricing for those Notes from Olympia, Washington by placing telephone calls to the offices of one or more of the above-referenced parties in San Francisco, or elsewhere in the United States, for at least the above-indicated amount of the Notes, thereby incurring irrevocable liability to pay for the Notes from its custodial account at State Street Bank & Trust Co. ("State Street Bank"), headquartered in Boston,

---

[38]   Between July 31, 2017 and August 9, 2017, WSIB sold 4.375% Notes with a face value of $40 million at unit prices between $40.00 and $41.00, for total proceeds of $16,137,500.00. Transaction records identify Jefferies & Company, Inc. ("Jefferies") as the broker for the transactions.

Massachusetts, and accepting delivery of the Notes, in amounts as high as those specified in the order. At the latest, title to the Notes passed to WSIB in the United States when WSIB's staff in Olympia, Washington confirmed with staff from one or more of the above-referenced parties (also in the United States) that information on an internally created trade ticket was accurate and issued a release authorizing State Street Bank to debit the appropriate WSIB fund account, with a subsequent debit made from State Street Bank's DTC account (No. 997) in New York, New York, and accept delivery of the Notes into State Street's DTC account in New York, New York, for the account of the respective WSIB fund, thereby completing the settlement of the transaction. Accordingly, each of the above-listed purchases was a "domestic transaction" that took place within the United States because the transaction occurred within the United States.

56.     For the 4.375% Notes sales, WSIB followed a similar process. It communicated its commitment to sell the Notes when a representative for WSIB placed sell orders on those Notes from Olympia, Washington by placing telephone calls to the offices of Jefferies in New York, or elsewhere in the United States, incurring irrevocable liability to sell the Notes from its custodial account at State Street Bank, headquartered in Boston, Massachusetts, and deliver the Notes, in amounts as high as those specified in the order, when pricing was confirmed with Jefferies. Title to the Notes passed to WSIB in the United States when WSIB's staff in Olympia, Washington confirmed with staff from Jefferies (also in the United States) that information on an internally created trade ticket was accurate and issued a release authorizing State Street Bank to deliver the Notes from State Street Bank's DTC account in New York, New York, for the account of the respective WSIB fund, and to receive credit for the above-referenced amount to its DTC account in New York, New York, for the account of the respective WSIB fund, thereby completing the settlement of the transaction. Accordingly, WSIB's sales of 4.375% Notes was a "domestic

transaction" that took place within the United States because the transaction occurred within the United States.

## VI.    DEFENDANTS' UNDISCLOSED KICKBACK AND BRIBERY SCHEME

57.    Plaintiff WSIB was unaware when it purchased these Notes that defendants were engaged in a massive widespread bribery scheme of historic proportions, paying approximately $3.3 billion in bribes from 2006 through 2014.  Defendants concealed their bribery scheme for years and failed to properly account for at least $3.336 billion in ill-gotten benefits, making CNO's and Odebrecht's financial results false and misleading when made.

### A.    The "Bribe Department"

58.    To further their bribery scheme, defendants created and funded an elaborate, secret financial structure that operated to account for and disburse corrupt bribe payments to, and for the benefit of, government officials and political parties.  Central to this system of corruption, in or about 2006, defendants established a standalone division within defendant CNO called the Division of Structured Operations, which effectively functioned as a "Department of Bribery" for defendant Odebrecht and its related entities.  Marcelo Odebrecht was the guiding force behind the Division, with Mascarenhas leading the day-to-day operations and working with other key people, including Soares (Mascarenhas' lieutenant), and Migliaccio (Mascarenhas's treasurer). Mascarenhas has testified that Marcelo Odebrecht directed and controlled the Department of Structured Operations to carry out the bribery scheme, explaining that "'*Marcelo asked me [Mascarenhas] to set up the system in 2006.  He knew we had to increase our illegal contributions if the company was going to grow.'*"  *Marcelo Odebrecht even directed Mascarenhas to continue paying bribes even after Mascarenhas warned him that the huge*

- 36 -

*escalating amounts of the bribes was suicide* – "'I warned Marcelo about these huge amounts several times.  I said it was suicide, *but he told me to continue*.'"

59.    According to a *Bloomberg* article entitled "No One Has Ever Made a Corruption Machine Like This One," Mascarenhas, Migliaccio and Soares "were career Odebrecht men." "[Mascarenhas] had been at Odebrecht since the 1970s, mostly in finance. . . .  His father knew Norberto [the founder of Odebrecht]; the Odebrechts used to have [Mascarenhas's] family over to their beach house."  Before being "enshrined in the corporate flowchart as the Structured Operations Division," the new unit led by Mascarenhas "was assigned offices inside Odebrecht headquarters in Salvador and São Paulo.  After the division received its official name, there was a revolving door between Odebrecht and the "Department of Bribery" at CNO.  As detailed by *Bloomberg*, "[t]he department was supplemented, as needed, by a collection of Odebrecht employees and contractors with special skills – the accountant, for example, who set up the web of front companies, and the computer programmers who designed and ran a secret messaging system."

60.    The Division of Structured Operations utilized an entirely separate and off-book communications system called "Drousys" in order to conceal its activities, which allowed members of the Division of Structured Operations to communicate with one another and with outside financial operators and other co-conspirators about the bribes through the use of secure emails and instant messages, utilizing code names and passwords.  In addition, defendants maintained a detailed "shadow budget" through a computer system known as "MyWebDay" that tracked payments, payment requests and other bribe-related information.

61.    To further conceal the Company's criminal conduct, the Division of Structured Operations managed and distributed funds that Odebrecht never recorded on its balance sheet.

- 37 -

These unrecorded funds were generated by Odebrecht through a variety of methods, including, but not limited to: (i) standing overhead charges collected from subsidiaries; (ii) overcharges and fees that were attributed as legitimate to service providers and subcontractors but not included in project budgets; (iii) undeclared retainers and success fees for the purchase of company assets; and (iv) self-insurance and self-guarantee transactions.

62.    Once generated, unrecorded funds were funneled by the Division of Structured Operations to a series of offshore entities that were not included in either CNO's or Odebrecht's financial statements as related entities.  Defendants used these offshore entities to further the bribery scheme and to conceal and disguise improper payments made to, or for the benefit of, government officials and political parties in various countries.

63.    Disbursements of these unrecorded funds were made by financial operators who acted on defendants' behalf.  Payments were made to secret account beneficiaries and *doleiros*, who delivered the payments in cash both inside and outside Brazil in packages or in suitcases at locations predetermined by the beneficiaries of the funds or via wire transfer through one or more offshore entities.

64.    The bribery scheme was material to Odebrecht's operations.  Marcelo Odebrecht admitted to prosecutors that between 0.5% and 2.0% of revenue was directed to illicit bribes:

> Year after year, Marcelo told prosecutors, 0.5 percent to 2 percent of revenue was directed to illicit payoffs, mainly to Brazilian politicians and executives of state companies, particularly the national oil producer, Petrobras.  Some years, said Marcelo, graft expenses neared 2 billion reais ($611 million).  It just depended on the demands of Odebrecht's political contacts.[39]

---

[39]    Smith et al., *supra*, n.7.

65.    Mascarenhas has put that number even higher, testifying that the bribes actually peaked at $730 million in each of the years 2013 and 2014.  The total amount of bribes paid through the Division of Structured Operations over a nine-year period was a shocking $3.3 billion:[40]

| Year | Bribes |
|------|--------|
| 2006 | $60 million |
| 2007 | $80 million |
| 2008 | $120 million |
| 2009 | $260 million |
| 2010 | $420 million |
| 2011 | $520 million |
| 2012 | $730 million |
| 2013 | $730 million |
| 2014 | $450 million |

## B.    Defendants' Corrupt Practices in Brazil

66.    Beginning at least as early as 2003 through approximately 2016, as admitted in the Plea Agreement, defendants paid $349 million in bribes to various Brazilian officials and political parties in order to secure an improper advantage in obtaining lucrative public construction contracts within the country.  In return, defendants obtained financial benefits exceeding $1.9 billion from these illegally obtained contracts.

67.    According to the agreed-upon facts in Odebrecht's Plea Agreement, beginning in or about 2004, defendants CNO and Odebrecht conspired with other construction companies to evaluate and divide up future contracts for Brazilian oil company Petrobras.  Once it was agreed among these entities which company or companies would be responsible for a particular project, and at what price, it was agreed that only the predetermined company would present a qualifying bid, and that the other entities would present proposals to ensure that the predetermined company

---

[40]    G1, *supra*, n.3.

would win the contract.  In this manner, these entities rotated available Petrobras contracts between them.

68.    The Plea Agreement details over $100 million in bribes paid to Petrobras executives to secure projects with Petrobras in Brazil pursuant to this scheme:

- "For example, in or about October 2010, Odebrecht bid for and won a Petrobras contract for the provision of various environmental and security certification services that were necessary for various activities that Petrobras undertook abroad. In order to win the contract, Odebrecht agreed to pay bribes that would be forwarded to Brazilian political parties.  Odebrecht Employee 5 met with certain of the Cartel Companies, all of which agreed that Odebrecht would get the contract; two of the Cartel Companies also agreed to provide proposals in such a way that would ensure that Odebrecht would win the bid.  Odebrecht directed more than $40 million to certain Brazilian political parties from its Division of Structured Operations using unrecorded funds in connection with the project; and certain of the funds were paid directly to specific government officials."[41]

- "Odebrecht caused numerous illicit payments to be made from United States-based bank accounts to perpetuate its bribe scheme in Brazil.  For example, between at least December 2006 and December 2007, Odebrecht caused transfers totaling almost $40 million to be made from the New York-based Accounts to the S&N Account.  Thereafter, in or between January and August 2011, Odebrecht used the S&N Account to make bribe payments, including paying approximately $3.5 million and almost 2 million Swiss Francs to the bank account of an offshore entity controlled by Brazilian Official l, then an executive at Petrobras."[42]

- "Similarly, in or about December 2009, Odebrecht caused transfers totaling approximately $20 million to be made from the New York-based Accounts to the Arcadex Account.  Before and contemporaneously with the transfers from the New York-based Accounts, Odebrecht caused numerous money transfers to be made from the Arcadex Account to a second Arcadex account (the "Second Arcadex Account") that was used to make bribe payments, including an approximately $430,000 bribe payment to a bank account controlled by Brazilian Official 2, then an executive at Petrobras."[43]

- "Furthermore, in or about December 2008, Odebrecht caused transfers totaling almost $48 million to be made from the New York-based Accounts to the Golac

---

[41] SOF, ¶36.

[42] SOF, ¶37.

[43] SOF, ¶38.

Account. Thereafter, in or about and between December 2008 and July 2010, Odebrecht caused transfers from the Golac Account to three unrelated accounts in Panama and Antigua from which approximately $10 million was transferred to the accounts of three then-Petrobras executives Brazilian Official 1, Brazilian Official 2 and Brazilian Official 3."[44]

69.    The Plea Agreement, as well as news reports and government investigations, have provided additional details regarding the bribery scheme's operation in Brazil, identifying recipients and amounts for numerous bribes to Brazilian governmental officials to obtain and retain other business in Brazil:

- "For example, Odebrecht made and caused to be made corrupt payments to Brazilian officials with unrecorded funds in order to secure a transportation project in Brazil. Odebrecht was not party of the original group of companies awarded the project, but ultimately purchased the rights to participate in the project. Subsequently, Odebrecht agreed to make payments to Brazilian Official 4, a high-level state elected official in Brazil, in exchange for Brazilian Official 4's assistance in ensuring Odebrecht's continued work on the project. Between approximately 2010 and 2014, Odebrecht, through the Division of Structured Operations, made payments in Brazilian reais (totaling more than $20 million) to Brazilian Official 4 and other foreign officials in connection with the project. Odebrecht profited approximately $184 million from the project."[45]

- Similarly, in or about 2011, Brazilian Official 5, a high-level official within the legislative branch of government in Brazil, requested that Odebrecht make payments to a political party in exchange for the party's influence to continue a construction project in Rio de Janeiro from which Odebrecht stood to benefit. In or about and between 2011 and 2014, Odebrecht, through the Division of Structured Operations, made payments in Brazilian reais (totaling approximately $9.7 million) to Brazilian Official 5, as did other companies involved in the project, in order to ensure future contributions to the project from certain government groups. Odebrecht profited approximately $ 142 million from the project."[46]

- Marcelo Odebrecht admitted to paying $4.15 million in cash to former President Luiz Inacio Lula da Silva between 2012 and 2013;

---

[44]    SOF, ¶39.

[45]    SOF, ¶41.

[46]    SOF, ¶42.

- Odebrecht executive Benedicto Barbosa da Silva Júnior ("Barbosa") admitted that Odebrecht paid over R$15 million in bribes to Rio de Janeiro's former mayor Eduardo Paes in 2012, in exchange for Odebrecht being favored for 2016 Olympic Games projects. Among the contracts obtained by Odebrecht was the contract to build the Olympic Village, the Olympic Park and a new subway line.

- As reported by *The Guardian*, Barbosa admitted that Cunha, a former speaker of parliament, "approached him with a very specific demand: he wanted 1.5% of the total value of the works being done at Porto Maravilha" to revitalize the historical harbor. Odebrecht paid Cunha R$9.7 million in 36 monthly payments between 2011 and 2014, and Barbosa admitted that Odebrecht agreed to pay "with the understanding it would have the backing of one of the most influential politicians in the country to assure the smooth transfer of public money to Odebrecht to be able to complete that specific venue."[47]

## C.    Defendants' Corrupt Practices Outside Brazil

70.    Odebrecht has also admitted to paying illicit bribes between approximately 2001 and 2016 of about $439 million to foreign officials and political parties in various countries outside of Brazil, including Angola, Argentina, Colombia, the Dominican Republic, Ecuador, Guatemala, Mexico, Mozambique, Panama, Peru and Venezuela, in order to secure an improper advantage to obtain and retain public construction projects in those countries. Defendants benefitted by more than $1.4 billion as a result of these corrupt payments.

71.    Typically, defendants used the Division of Structured Operations to execute the corrupt payments using unrecorded funds, either: (i) in cash in the country in question; or (ii) by deposits into accounts indicated by the ultimate beneficiaries or their intermediaries. Again, these payments were not recorded on the balance sheet of defendants Odebrecht or CNO. News reports and government investigations have provided details regarding the bribery scheme's operation

---

[47]    Jamil Chade, *Stadium deals, corruption and bribery: the questions at the heart of Brazil's Olympic and World Cup 'miracle'*, Guardian, Apr. 23, 2017, https://www.theguardian.com/sport/2017/apr/23/brazil-olympic-world-cup-corruption-bribery.

outside of Brazil, identifying recipients and amounts for numerous bribes to governmental officials and politicians in this manner throughout the world.

72.    For example, investigations by prosecutors in Peru have revealed the details of specific bribes, including amounts, recipients and the contracts involved.  Soares confirmed to prosecutors in Peru that Odebrecht paid bribes to ex-Peruvian officials in order to win the contract for the Lima Metro Project, and Antonio Carlos Nostre, former director of contracts at Odebrecht, told Peruvian prosecutors that Odebrecht had paid over $24 million in bribes for the work on Line 1 of the Lima Metro, which was awarded to the Tren Eléctrico consortium made up of Odebrecht and other companies.  For the first section of Line 1, Odebrecht paid $6.9 million, with $1.4 million delivered to former Vice Minister of Communications Jorge Cuba ("Cuba"), and $400,000 each to selection committee members Edwin Luyo ("Luyo") and Santiago Chau ("Chau").  For the second section of Line 1, Odebrecht paid over $17 million, with Cuba receiving $5 million, Luyo receiving $1 million, Chau receiving $400,000 and president of the selection committee Mariella Huerta also receiving $400,000.

73.    Along with the Lima Metro Project, Peruvian prosecutors have revealed that Odebrecht obtained work on the country's interoceanic highway by operating its bribery scheme. Former head of Odebrecht's operations in Peru, Jorge Barata, admitted to Peruvian prosecutors that Odebrecht paid a total of $31 million to ex-President Alejandro Toledo from 2006 until 2011 for the work on Sections 2 and 3 of Peru's interoceanic highway.  He also reportedly admitted that Odebrecht paid more than $4 million to Luis Nava, aide to ex-President Alan García, including $3 million to ensure that Odebrecht would hold the contract to build the interoceanic highway. Finally, Odebrecht admits to having paid bribes in relation to two other projects in Peru: Costa Verde – Callao, and Via de Evitamiento – Cusco.  Odebrecht admitted in the Plea Agreement that

- 43 -

it "realized benefits of more than $143 million as a result of [$29 million in] corrupt payments" "to government officials in Peru."[48]

74.    Details of defendants' corrupt practices in various other countries have also been revealed:

- *Colombia*.  Odebrecht paid $6.5 million to Vice Minister of Transport Gabriel Ignacio García Morales to be awarded the Ruta del Sol II Project.  The contract was signed in 2010, with a value of approximately $935 million, with Odebrecht holding a 62% interest, as part of a consortium.  In addition, Colombian prosecutors alleged that in 2012, Odebrecht agreed to pay $4.6 million to former Senator Otto Nicolás Bula to ensure Odebrecht won the contract for the Ocaña-Gamarra section of the Ruta de Sol road project, and Bula has since been sentenced to over five years in prison for his role in Odebrecht's bribery scheme.  Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $50 million as a result of [$11 million in] corrupt payments" "in Colombia in order to secure public works contracts."[49]

- *Venezuela*.  Odebrecht paid at least $142 million in bribes to high-ranking officials from 2011 to 2014, in order to obtain the contract for work on Caracas' metro system and other projects.  According to the *Miami Herald*, "[a]t least $92 million of that was funneled through an offshore company whose beneficiary is a Venezuelan man, Leopoldo Briceño Punceles, who has properties and businesses in Miami."[50]  In 2013, Odebrecht's chief of operations in Venezuela, Euzenando Azevedo, paid $35 million to then-presidential candidate Nicolás Maduro, which had been solicited "to continue enjoying its profitable contracts in his country."[51]  Odebrecht was awarded more than $4 billion in public works projects.  Odebrecht admitted in the Plea Agreement that "[i]n or about and between 2006 and 2015, Odebrecht made and caused to be made approximately $98 million in corrupt

---

[48]    SOF, ¶65.

[49]    SOF, ¶51.

[50]    Nora Gámez Torres, Kevin G. Hall & Joseph Poliszuk, *How the Chávez and Maduro regimes milked public projects for bribe money*, Miami Herald, June 27, 2019, https://www.miamiherald.com/news/state/florida/article231751528.html#:~:text=At%20least%2 0%2492%20million%20of,properties%20and%20businesses%20in%20Miami.

[51]    Antonio Maria Delgado, *Maduro demanded $50 million bribe from Odebrecht; ousted Venezuelan attorney general says*, Miami Herald, Feb. 28, 2018 (updated Mar. 1, 2018), https://www.miamiherald.com/news/nation-world/world/americas/venezuela/article202725689.html.

payments to government officials and intermediaries working on their behalf in Venezuela in order to obtain and retain public works contracts."[52]

- **Panama**. Odebrecht paid $59 million in bribes within Panama between 2010 and 2014. André Luiz Campos Rabello, the former head of Odebrecht's Panamanian operations testified that recipients of these funds included relatives of former Panamanian president Ricardo Martinelli. Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $175 million as a result of [$59 million in] corrupt payments" "to government officials and intermediaries working on their behalf in Panama in order to secure, among other things, public works contracts."[53]

- **Ecuador**. According to testimony given by José Conceição dos Santos, Odebrecht's former head of operations in Ecuador, Odebrecht paid Ecuador's ex-Vice President Jorge Glas ("Glas") $14.1 million in bribes between 2012 and 2016, in exchange for contracts that included the Manduriacu and Toachi Pilatón hydroelectric plants, the Pacific Refinery, the Pascuales–Cuenca Polyduct, and the Trasvase Daule Vinces water supply project. Specifically, Santos testified that Glas' uncle, Ricardo Rivera, acted as the middleman and informed Santos that "Glas needed to be paid 1 per cent of the cost of every public contract that the company was awarded within the purview of" the ministry that Glas coordinated at the time.[54] Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $116 million as a result of [$33.5 million in] corrupt payments" "to government officials in Ecuador."[55]

- **Mexico**. According to Luis Alberto de Meneses Weyll, Odebrecht's Chief Executive in Mexico, Odebrecht paid $10 million to Emilio Lozoya Austin, the former chairman of the state-owned oil company, in exchange for being favored for the Miguel Hidalgo Refinery's earthworks contract, worth $115 million, and for Salamanca Refinery contracts.[56] The payments began in 2012. Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $39 million as a result

---

[52] SOF, ¶68.

[53] SOF, ¶63.

[54] *International cooperation in the Odebrecht case: Ecuador*, Jota, May 29, 2019, https://www.jota.info/especiais/international-cooperation-in-the-odebrecht-case-ecuador-29052019.

[55] SOF, ¶55.

[56] *International cooperation in the Odebrecht case: Mexico*, Jota, May 29, 2019, https://www.jota.info/especiais/international-cooperation-in-the-odebrecht-case-mexico-2905201.

of [$10.5 million in] corrupt payments" "to government officials in Mexico in order to secure public works contracts."[57]

- ***Dominican Republic***.  Odebrecht paid bribes to businessman Ángel Rondón ("Rondón"), which were distributed to individuals in the Executive and Legislative Branches, in exchange for public contracts including the installation of the Hermanas Mirabal and Samaná aqueducts and Punta Catalina's thermoelectric plant.  Specifically, Odebrecht paid bribes to Rondón at the rate of 3% of the contracts' cost.  Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $163 million as a result of [$92 million in] corrupt payments" "to government officials and intermediaries working on their behalf in the Dominican Republic."[58]

- ***Guatemala***.  Government investigations have found that Odebrecht paid $17.9 million in bribes in exchange for the CA2 Occidente highway project in Guatemala, a project worth $300 million.  In order to obtain the contract for the rehabilitation and lane expansion of CA 2 Occidente, section Cocales -El Zarco- Coatepeque -Tecún Umán, which was awarded at the end of 2012, Odebrecht made illicit payments to ex-infrastructure minister Alejandro Jorge Sinibaldi Aparicio ("Sinibaldi"), former presidential candidate Manuel Antonio Baldizón ("Baldizón") and businessman Carlos Arturo Batres Gil ("Batres").  Specifically, data published by government investigators shows that in 2013, Sinibaldi received $5.765 million and Batres received $3.915 million.  In 2014, Sinibaldi received $5.68 million, Batres received $790,000 and Baldizón received $360,000.  And in 2015, Batres received $490,000, while Baldizón received $900,000.  Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $34 million as a result of [$18 million in] corrupt payments" "to government officials in Guatemala in order to secure public works contracts."[59]

**D.    Defendants' Obstruction of Justice**

75.    In or about 2014, Brazilian law enforcement authorities began an initially covert investigation into corruption related to Petrobras, called Lava Jato, or "Operation Car Wash." This investigation originally focused on Petrobras, the partially state-owned oil and energy company.

---

[57]    SOF, ¶59.

[58]    SOF, ¶53.

[59]    SOF, ¶57.

After commencing in Brazil, investigations into Petrobras were launched in the United States and Switzerland.

76.     Defendants have admitted that, after becoming aware of these investigations, they sought to conceal or destroy evidence of their criminal activities and hinder the investigations by, *inter alia*: (i) directing employees to delete records that might reveal illegal activities; (ii) bribing foreign officials to prevent their compliance with requests for information and documents from investigators; (iii) destroying the ability to access the MyWebDay platform containing evidence of defendants' misconduct; and (iv) making numerous false and misleading statements denying defendants' participation in the bribery and kickback scheme, undermining the validity of the investigations and misrepresenting salient facts to investors and the public.  In fact, as alleged herein at ¶¶7 and 98, Marcelo Odebrecht ordered employees at the Division of Structured Operations to take steps to evade authorities, including by moving the operations outside of Brazil and relocating its two principal officers to Florida.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

77.     With plaintiff and other investors unaware of the undisclosed bribery and kickback scheme, defendants misrepresented Odebrecht's and CNO's financial results and future prospects until at least December 1, 2016 in order to sell billions of dollars of Notes to plaintiff and other investors.

78.     The Notes were initially sold in private offerings pursuant to offering memoranda (the "Offering Memoranda").  These memoranda contained defendant CNO's financial results, including reported net income in the many hundreds of millions or billions of dollars per year. These memoranda also represented that the majority of CNO's revenues came from engineering and construction of large public works projects, touting CNO's expertise, knowledge of local

markets, reputation and business relationships as providing it with key advantages over its competition in securing bids to win lucrative government contracts. Defendants Odebrecht and CNO also misrepresented their financial results and future prospects in other public statements made available to plaintiff, other investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO, which these defendants published in English.

### A.    The 2012 7.125% Notes Offering Memorandum

79.     Defendants began soliciting investors to buy the 7.125% Notes in or about June 2012. In connection with these efforts, defendant CNO and non-party Odebrecht Finance issued an offering memorandum that contained numerous representations regarding defendant CNO's financial results, financial statements, business, operations, risks and prospects (the "2012 OM"). Plaintiff purchased the 7.125% Notes based upon the false and misleading financial statements contained in the 2012 OM, as well as other similar false and misleading statements made by defendants.

80.     The 2012 OM described the bidding process for new projects as "competitive," in which "price generally is the most important factor that determines" whether CNO is awarded a contract. In a description of the reasons for CNO obtaining contracts, the vast bribery scheme was omitted entirely, stating in pertinent part:

> **We obtain contracts for new projects primarily through competitive bidding** in response to solicitations by government agencies, public announcements by private-sectors entities, invitations when short-listed for private projects and, to a lesser extent, through direct negotiation. The volume of work generally available in the market at the time of the bid, the size of our backlog at the time, the location and complexity of the project to be executed and the level of competition for the project are all factors that may affect our competitiveness in a particular bidding process.

*        *        *

We are the largest engineering and construction company in Latin America as measured by 2010 revenues.  Most of our ongoing construction projects were awarded through a competitive bidding process.  While price generally is the most important factor that determines whether we are awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships. . . .  [W]e believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.

*     *     *

**We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons**.  First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids.  Second, our decentralized management approach has generally allowed us to effectively manage our projects.  Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.

81.     The statements referenced above in ¶¶79-80 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known by defendants or recklessly disregarded by them:

(a)     over the course of more than a decade, defendants and their operatives had paid more than $788 million in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)     CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

- 49 -

(c)    CNO did not secure contracts through a "competitive bidding process" where price was the "most important" factor, but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)    CNO's financial statements and disclosures included in the 2012 OM were false and misleading, as alleged at ¶¶88-91 and 93-126;

(e)    as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)    as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects and the unsustainability of its historical financial results if the truth were revealed.

**B.    The 2013 4.375% Notes and 8.25% Notes Offering Memoranda**

82.    Defendants began soliciting investors to buy the 4.375% Notes and the 8.25% Notes in or about April 2013.  In connection with these efforts, defendant CNO and non-party Odebrecht Finance issued two substantially similar offering memoranda that contained numerous representations regarding defendant CNO's financial results, business, operations, risks and prospects (the "2013 OMs").  Plaintiff purchased a significant amount of the 4.375% Notes and the 8.25% Notes based upon the false and misleading financial statements contained in the 2013 OMs, as well as other similar false and misleading statements made by defendants.

83.    The 2013 OMs described the bidding process for new projects as "competitive," in which "price generally is the most important factor that determines" whether CNO is awarded a

contract.  In a description of the reasons for CNO obtaining contracts, the vast bribery scheme was

omitted entirely, stating in pertinent part:

> **We obtain contracts for new projects primarily through competitive bidding** in response to solicitations by government agencies, public announcements by private-sectors entities, invitations when short-listed for private projects and, to a lesser extent, through direct negotiation.  The volume of work generally available in the market at the time of the bid, the size of our backlog at the time, the location and complexity of the project to be executed and the level of competition for the project are all factors that may affect our competitiveness in a particular bidding process.

*     *     *

> We are the largest engineering and construction company in Latin America as measured by 2011 revenues.  Most of our ongoing construction projects were awarded through a competitive bidding process.  While price generally is the most important factor that determines whether we will be awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships. . . .  [W]e believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.

*     *     *

> We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons.  First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids.  Second, our decentralized management approach has generally allowed us to effectively manage our projects.  Third, our projects are often eligible for funding from the Brazilian government for service exports and from multilateral financial institutions.

84.     The statements referenced above in ¶¶82-83 were materially false and misleading

when made because they failed to disclose the following adverse facts, which were known by

defendants or recklessly disregarded by them:

- 51 -

(a)    over the course of more than a decade, defendants and their operatives had paid more than $788 million in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)    CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

(c)    CNO did not secure contracts through a "competitive bidding process" where price was the "most important" factor, but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)    CNO's financial statements and disclosures included in the 2013 OMs were false and misleading, as alleged at ¶¶88-91, 93-120 and 127-129;

(e)    as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)    as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects and the unsustainability of its historical financial results if the truth were revealed.

### C.    The 2014 5.25% Notes Offering Memorandum

85.    Defendants began soliciting investors to buy the 5.25% Notes in or about June 2014.  In connection with these efforts, defendant CNO and non-party Odebrecht Finance issued an offering memorandum that contained numerous representations regarding defendant CNO's financial results, business, operations, risks and prospects (the "2014 OM").  Plaintiff purchased a

significant amount of the 5.25% Notes based upon the false and misleading financial statements contained in the 2014 OM, as well as other similar false and misleading statements made by defendants.

86.     The 2014 OM described the bidding process for new projects as "competitive," in which "price generally is the most important factor that determines" whether CNO is awarded a contract.  In a description of the reasons for CNO obtaining contracts, the vast bribery scheme was omitted entirely, stating in pertinent part:

> **We obtain contracts for new projects primarily through competitive bidding** in response to solicitations by government agencies, public announcements by private-sectors entities, invitations when short-listed for private projects and, to a lesser extent, through direct negotiation.  The volume of work generally available in the market at the time of the bid, the size of our backlog at the time, the location and complexity of the project to be executed and the level of competition for the project are all factors that may affect our competitiveness in a particular bidding process.
>
> *          *          *
>
> We are the largest engineering and construction company in Latin America as measured by 2013 revenues.  Most of our ongoing construction projects were awarded through a competitive bidding process.  While price generally is the most important factor that determines whether we will be awarded a contract through competitive bidding procedures, other important factors in competitive bidding procedures include health, safety and environmental protection records, service quality, technological capacity and performance, as well as reputation, experience, access to funding sources and client relationships. . . .  [W]e believe that we have a competitive advantage with respect to other Brazilian engineering and construction companies as a result of our experience, reputation, capacity, efficiency, trained personnel, size, financial resources and technological capabilities.
>
> *          *          *
>
> **We believe that we are able to make competitive bids in Brazil and internationally for three principal reasons.**  First, our engineering capabilities and experience enable us to accurately assess the nature and extent of the work required to complete our projects, to create efficient engineering plans and, on occasion, to offer more cost-effective alternatives to proposed plans of governmental authorities in invitations for bids.  Second, our decentralized management approach has generally allowed us to manage our projects effectively.  Third, our projects are often eligible

- 53 -

for funding from the Brazilian government for service exports and from multilateral financial institutions.

87.    The statements referenced above in ¶¶85-86 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known by defendants or recklessly disregarded by them:

(a)    over the course of more than a decade, defendants and their operatives had paid more than $788 million in bribes to corrupt government officials and political parties to secure lucrative public works contracts;

(b)    CNO's success did not result from its "experience," "reputation," "technological capabilities" or any other legitimate business reason, but rather from a vast bribery and kickback scheme;

(c)    CNO did not secure contracts through a "competitive bidding process" where price was the "most important" factor, but rather through collusion with co-conspirators to rig the market for public works contracts in the countries in which CNO operated;

(d)    CNO's financial statements and disclosures included in the 2014 OM were false and misleading, as alleged at ¶¶88-91, 93-120 and 130-134.

(e)    as a result of (a)-(d), above, CNO's financial results were artificially inflated, as they were not the product of legitimate business dealings or practices as represented to investors; and

(f)    as a result of (a)-(e), above, CNO was exposed to substantial undisclosed risks of civil and criminal prosecution and other liabilities, reputational damage, loss of business, diminished prospects and the unsustainability of its historical financial results if the truth were revealed.

### D.   Defendants Odebrecht's and CNO's False Financial Statements and Disclosures

88.     The 2012, 2013 and 2014 Offering Memoranda and other materials made available to plaintiff, other investors, analysts and ratings agencies included CNO's consolidated interim and annual financial statements for periods no later than 2009 to 2015.  In addition, defendant Odebrecht released financial information for 2005 to 2014.  These financial statements and disclosures were false when issued as they failed to properly account for or disclose the revenue, expenses, hidden assets, liabilities and ill-gotten gains directly arising from defendants' fraudulent bribery scheme in violation of Brazilian GAAP.[60]

89.     As discussed below, defendant CNO was obligated to prepare and present its consolidated quarterly and annual financial statements distributed to current and potential investors in compliance with GAAP.  Indeed, CNO asserted that its financial statements were prepared in accordance with GAAP.  For example, the 2014 OM for the 5.25% Notes falsely asserted that the financial statements included in the 2014 OM were prepared and presented in accordance with Brazilian GAAP:

---

[60]  GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Brazilian accounting practices are established by Brazilian corporate law.  The corporate law in effect at all relevant times required both public and private Brazilian companies to prepare their financial statements in accordance with local accounting standards issued by the Brazilian Accounting Pronouncements Committee (*Comitê de Pronunciamentos Contábeis*) or the CPC, which promulgates its accounting standards using the prefix "CPC."  CPCs must be in compliance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board.  CPCs are thus, in substance, translations of IFRS standards into Portuguese. Financial statements filed with either the Securities and Exchange Commission of Brazil or the U.S. Securities and Exchange Commission that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

*        *        *

### CNO Financial Statements

We maintain our books and records in *reais*.

*We prepare our consolidated financial statements in accordance with accounting practices adopted in Brazil, or Brazilian GAAP, which are based on*:

- Brazilian Law No. 6,404/76, as amended by Brazilian Law No. 9,457/97, Brazilian Law No. 10,303/01, Brazilian Law No. 11,638/07 and by Provisional Measure No. 449/08, which we refer to collectively as the Brazilian Corporate Law;

- the rules and regulations of the Brazilian Securities Commission (*Comissão de Valores Mobiliários*), or the CVM;

- the accounting standards issued by the Brazilian Institute of Independent Auditors (*Instituto dos Auditores Independentes do Brasil*), or IBRACON, and the Brazilian Federal Accounting Council (*Conselho Federal de Contabilidade*), or the CFC; and

- the accounting standards issued by the Brazilian Accounting Standards Committee (*Comitê de Pronunciamentos Contábeis - CPC*), or the CPC.

90.     Defendant CNO made substantially identical assertions about compliance with Brazilian GAAP in the 2012 OM and 2013 OMs.  Additionally, CNO repeated the assertion that its consolidated financial statements were prepared and presented in accordance with Brazilian GAAP in the actual notes to CNO's consolidated financial statements at December 31, 2011:

The consolidated financial statements have been prepared and are being presented in accordance with accounting practices adopted in Brazil, including the pronouncements issued by the Brazilian Accounting Pronouncements Committee ("CPC").

91.     Defendant CNO also made the same or substantially the same disclosure in the notes to each of its interim quarterly and annual financial statements contained in each of the four Notes offerings in the 2012 OM, 2013 OMs and 2014 OM, or made available to plaintiff, other

investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.

92.     Similarly, in its 2014 Annual Report, Odebrecht made the assertion that the annual financial data it disclosed for 2009-2012 was "in accordance with the standards of the Brazilian Financial Accounting Standards Board (CPC)."  And in its 2015 Annual Report, Odebrecht asserted that the financial data it disclosed for 2010-2012 was "in accordance with the norms of The Committee on Accounting Statements (CPC)."

93.     Each of the assertions in ¶¶89-92 above regarding compliance with Brazilian GAAP and the norms of the CPC were false when made.  As described below, each of defendants' relevant period financial statements and disclosures, including in the 2012 OM, 2013 OMs and 2014 OM and in other materials made available to plaintiff, other investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO, which they published in English, were not presented in accordance with Brazilian GAAP or the norms of the CPC, and were materially false and misleading for the following reasons.[61]

### 1.     Odebrecht and CNO Failed to Accrue a Liability for the Foreseeable Financial Costs Arising from the Bribery Scheme

94.     Defendant CNO improperly failed to accrue a provision in its financial statements and disclosures (including CNO's public 2009 through 2015 interim and annual financial statements) for the clearly foreseeable and estimable financial obligations arising from defendants'

---

[61]   On July 13, 2007, the Brazilian Securities Commission  (Comissão de Valores Mobiliários) ("CVM") issued Rule No. 457 requiring registrants to employ IFRS beginning in 2010.  While Brazilian GAAP does differ from U.S. GAAP in a few instances, Brazilian GAAP is largely identical to IFRS standards.  Although CNO's 2009 financial statements were governed by the CPC, and its 2010 and thereafter financial statements were governed by the IFRS standards, the standards are essentially identical and, as such, are analyzed interchangeably below.

ongoing illegal bribery scheme, including the probable material financial disgorgements, penalties, fines and legal costs, in violation of Brazilian GAAP. Similarly, defendant Odebrecht violated Brazilian GAAP and the norms of the CPC when it consolidated CNO's false financial statements – which improperly lacked an accrual provision for the clearly foreseeable and estimable financial obligations arising from defendants' ongoing illegal bribery scheme – into its own consolidated financial statements and then reported certain of its own consolidated financial data based on defendant CNO's false financial statements. As alleged above at ¶¶1, 66 and 70, between 2001 and 2016, defendants admitted that Odebrecht and CNO paid more than $788 million in bribes to government officials to secure as much as $3 billion in construction contracts and that "CNO's financial statements did not disclose the bribery scheme." Testimony from Mascarenhas puts the true amounts of the bribes at $3.3 billion. Facing penalties as high as $12 billion in the United States alone, defendants settled with the U.S. government for $2.6 billion. These amounts were quantitatively and qualitatively material to analysts, investors and ratings agencies. For example, the $12 billion penalty represented at least 300% of the net income that CNO reported for 2009 to 2013, combined.

95.    Defendants' bribery conduct was unlawful, and the criminal, civil and financial consequences for this illegal behavior were knowable and within an estimable range of possible negative outcomes throughout the period the conduct occurred. Brazilian GAAP's CPC *Conceptual Structure for the Preparation and Presentation of the Financial Statements*, ¶37, specifically states that some liabilities can only be measured using a high degree of estimation. In Brazil, these liabilities are described as a "provision" in accounting parlance. Brazilian *Technical Pronouncement CPC 25 Provisions, Contingent Liabilities and Assets*, ¶¶12-19, 25, 36 and 39, require that a provision must be recognized by a charge against income when, after considering all

the available evidence: (i) it is probable that a present obligation for a past event or conduct exists; (ii) which will more likely than not require a future disbursement to settle the obligation; and (iii) a reasonable estimate of the required disbursement to settle the obligation can be made after weighing all possible outcomes or ranges of outcomes.  Likewise, IFRS defines a contingent liability as "a possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the entity."  IAS 37, ¶10.  As with Brazilian GAAP, IFRS also requires an accrual of an expense related to the liability if the loss is "probable" and can be reasonably estimated.

96.     Defendants' illegal bribery conduct, as alleged herein and as admitted in the Plea Agreement, constituted a crime and thus created a probable legal obligation that carried a knowable and estimable range of possible civil, criminal and financial penalties and consequences. Moreover, by the time defendants issued the 2012 OM, it was highly probable that future contingencies for such financial penalties would have a material adverse impact on CNO's future results of operations and financial condition.  In fact, Mascarenhas testified that he repeatedly warned Marcelo Odebrecht that the bribe amounts had reached levels that would be "financial suicide," explaining that "[s]ince 2009 I alerted Marcelo (Odebrecht) that the volume of resources was growing brutally" while describing his reference to "suicide" as "[f]inancial suicide, suicide risk, suicide of security, suicide of everything."  Marcelo instructed him to continue even with these warnings – "'I warned Marcelo several times how astronomical these sums were.  It had become a real suicide, ***but his answer was to keep going***.'"

97.     The bribes grew exponentially larger thereafter, from $260 million in 2009 to a whopping $730 million in 2012.  And after a second consecutive year of paying $730 million in

bribes in 2013, Marcelo Odebrecht panicked. He instructed Mascarenhas to move the Department of Structured Operations out of Brazil specifically to evade authorities, testifying himself that "'I think you all should go abroad to work because here, when you use the phone you will be scared, when you use the computer you will be afraid. You will be afraid your offices will be bugged . . . [a]nd you will fall asleep wondering whether the next day the police will come for you.'" Mascarenhas described the chaotic scene, testifying that "[t]he more the area [Division of Structured Operations] grew the more worried Marcelo became" and explained that "Marcelo insisted a lot, pressured the team to go very fast. They went in a hurry." The executives involved in the scheme, including Odebrecht CEO Marcelo Odebrecht, thus knew that the sheer enormity of the bribes and their escalating nature could not evade the notice of regulators indefinitely, making it "financial suicide" and highly probable that, at a minimum, Odebrecht faced a range of possible civil, criminal and financial penalties and consequences of at least the amount of the bribes, reaching as high as $3.3 billion and probably many multiples of those bribes, and that these financial penalties would have a material adverse impact on CNO's future results of operations and financial condition.

98.     Odebrecht and CNO violated CPC 25 by failing to accrue a provision, with a simultaneous charge against income, in their financial statements and disclosures (including in CNO's publicly disseminated interim and annual 2009 through 2015 financial statements) for the foreseeable and estimable material financial obligations arising from defendants' ongoing illegal bribery scheme.

2.    **CNO Failed to Disclose the Nature and Range of the Foreseeable, Expected Costs that Would Likely Be Incurred as a Result of Defendants' Bribery Scheme**

99.    As alleged above, defendant CNO improperly failed to disclose as part of its financial disclosures (including in the notes to CNO's 2009 through 2015 publicly disseminated interim and annual financial statements) the nature of defendants' illegal bribery scheme, along with the clearly foreseeable and estimable expected financial costs that would likely be incurred to settle the legal and financial consequences of this conduct, as required by Brazilian GAAP.

100.    Notwithstanding this improper failure to accrue a provision for the clearly foreseeable and estimable material financial obligations arising from defendants' ongoing illegal bribery scheme, to the extent the accounting standards for accrual of this loss were not met (they were), a company must alternatively provide footnote disclosure of the contingency if it is merely "more likely than not" that the contingency will ultimately result in a loss. The "more likely than not" threshold is defined as a greater than 50% likelihood – *i.e.*, that the probability that a loss "will occur is greater than the probability that it will not." IAS 37, ¶¶15, 23. The disclosure must include at least: (i) a brief description of the nature of the provision or contingent liability, including an expected timeline during which disbursement will be made to settle the obligation; and (ii) an indication of any uncertainties related to the value or amount of settlement of the liability, including the main assumptions adopted relating to future events. CPC 25, ¶¶84-85; IAS 37, ¶¶85-86.

101.    There can be little doubt that Odebrecht's massive bribery scheme presented a contingent liability that was known or knowable to defendants and certainly "more likely than not" given the escalating nature of the bribes, their size, the growing concern within the Bribe Department that Odebrecht faced financial suicide because of the bribes, and the Department of

Structured Operations' rapid departure from Brazil to admittedly escape Brazilian authorities, as alleged herein. Judge Woods in *DoubleLine* held that these same facts "trigger[ed] [defendants'] obligation to footnote the liability in any of the covered reporting periods." *DoubleLine*, 413 F. Supp. 3d at 208. Judge Woods held that, like here, "Plaintiffs did not need to plead that the investigation was likely to have revealed the scheme between 2009 and March 2012. Rather, Plaintiffs needed to allege facts sufficient to show that although the company believed exposure 'more likely than not,' CNO still failed to disclose the liability per GAAP." *Id.*

102.    The bribery and kickback scheme presented significant risks to defendant CNO, and thus to investors in the Notes. Defendant CNO (and defendant Odebrecht) faced a material risk and substantial threat to their very existence should the bribery and kickback scheme be publicly exposed. Mascarenhas repeatedly warned Marcelo Odebrecht of this risk, testifying that "[s]ince 2009, I alerted Marcelo Odebrecht that the volume of resources was growing brutally" and described the risk as "financial suicide." If the bribery and kickback scheme were publicly exposed, the foreseeable consequences and risks resulting from such exposure were obvious and included, *inter alia*: (i) immense penalties and fines; (ii) deteriorating liquidity; (iii) securities ratings agency downgrades; (iv) significant reputational harm or damage; and (v) failure to file required financial statements with regulators as required. Each and all of these factors would result in material additional costs and expenses to CNO.

103.    For each of the years from 2009 through 2015, it was "more likely than not" that the bribery and kickback scheme would be exposed, leading to significant and material additional expenses for CNO. For example, the likelihood of exposure of the bribery and kickback scheme is demonstrated by the sheer enormity and increasing nature of the bribes, as outlined in sworn testimony by Mascarenhas:

4812-1822-4322.v1

| Year | Bribes |
|------|--------|
| 2006 | $60 million |
| 2007 | $80 million |
| 2008 | $120 million |
| 2009 | $260 million |
| 2010 | $420 million |
| 2011 | $520 million |
| 2012 | $730 million |
| 2013 | $730 million |
| 2014 | $450 million |

104.    As noted in ¶¶95 and 100 above, CPC 25 and IAS 37 require qualitative disclosure of the contingency in the notes to the financial statements where a potential loss or expense related to the contingency was "more likely than not." The required disclosure includes a brief description of the nature of the contingent liability, the estimate of its financial effect, and an indication of any uncertainties related to value or timing of any anticipated disbursement to settle the claim. CNO violated Brazilian GAAP and IFRS by failing to disclose any information regarding the bribery scheme or its likely legal and associated potential financial consequences in any of its publicly disseminated interim and annual financial statement footnotes.

105.    Because of CNO's failure to make these disclosures, investors were completely blindsided when the exposure of the bribery and kickback scheme resulted in the termination of large contracts, hundreds of millions of dollars in fines by various governments, a $2.6 billion criminal penalty in the United States, and continued investigations.

### 3. CNO Improperly Failed to Separately Distinguish and Disclose Contract Revenue Obtained as a Result of Defendants' Massive Illegal Bribery Activity from Other Contract Revenue

106. Defendant CNO improperly failed to separately present or disclose the material amounts of foreign and domestic contract revenue it obtained as a result of its illegal corruption and bribery activities from its normal recurring contract revenue. As alleged herein, defendants found it necessary to provide material amounts of illegal bribes in order to secure many of the lucrative contracts Odebrecht and CNO were awarded. A probable consequence of the discovery of these bribes could (and did) lead to particular governments or governmental agencies restricting further contract work for Odebrecht and CNO.

107. Brazilian GAAP, including the CPC-00, *Conceptual Structure for the Preparation and Presentation of the Financial Statements*, states that it is common practice to present and disclose different types of revenue separately in order to assist investors in assessing the ability of a business to generate cash in the future and distinguish revenues that arise in the normal course of the entity's business from revenues stemming from contingent activities that may not be repeated on a regular basis.

108. As described herein, CNO derived a substantial portion of its revenue directly as a result of the bribery and kickback scheme with specific projects and contracts, including the revenue derived from those projects, tied to illegal bribery (*e.g.*, Olympic Village, Porto Maravilha, interoceanic highway, and CA-2 Highway). *See, e.g.*, ¶¶66-74. The following non-exhaustive examples reveal that a substantial amount of CNO's revenues were derived directly from bribes:

- In Colombia, Odebrecht paid $6.5 million to Morales to be awarded the Ruta del Sol II Project, with the contract signed in 2010, and Odebrecht and CNO realizing benefits of nearly $580 million (62% of the $935 million total). ¶74.

- In Venezuela, Odebrecht paid at least $142 million in bribes to high-ranking officials from 2011 to 2014, in order to obtain the contract for work on Caracas'

metro system and other projects, and in 2013, Odebrecht paid $35 million to Maduro "to continue enjoying its profitable contracts in his country" and was awarded more than $4 billion in public works projects. *Id.*

- In Mexico, Odebrecht paid $10 million to Austin, in exchange for being favored for the Miguel Hidalgo Refinery's earthworks contract, worth $115 million, and for Salamanca Refinery contracts. *Id.*

- In Guatemala, Odebrecht paid $17.9 million in bribes in exchange for the CA2 Occidente highway project, worth $300 million, awarded at the end of 2012. *Id.*

109. Odebrecht also admitted in the Plea Agreement that it realized the following benefits as a result of corrupt payments in other countries: (i) "more than $143 million as a result of [$29 million in] corrupt payments" "to government officials in Peru"; (ii) "more than $175 million as a result of [$59 million in] corrupt payments" "to government officials and intermediaries working on their behalf in Panama"; (iii) "more than $116 million as a result of [$33.5 million in] corrupt payments" "to government officials in Ecuador"; and (iv) "more than $163 million as a result of [$92 million in] corrupt payments" "to government officials and intermediaries working on their behalf in the Dominican Republic." ¶¶73-74.

110. Between 2009 and 2014, CNO reported revenue totaling approximately R$159 billion, or approximately US$60 billion.[62] The foregoing examples alone made up nearly 10% of CNO's reported revenue for this period of time. Defendants should have separately identified in the financial statements contained in each offering memoranda all revenue that had been secured through bribes for each of the several years reported in each offering memoranda. It would have been highly material to investors, analysts and ratings agencies in assessing CNO's ability to generate future cash flows to have understood that a material portion of the company's contract revenue had been secured through corruption and illegal bribes. As such, investors, analysts and

---

[62] Based on the exchange rate as of December 31, 2014.

ratings agencies would not necessarily have expected contract revenue levels obtained via fraudulent means to represent a reliable level of future revenue. By failing to separately classify or disclose contract revenues obtained via bribes and corruption, CNO violated Brazilian GAAP.

### 4. CNO Improperly Failed to Recognize, Classify or Adequately Disclose Material Amounts of Concealed Funds and Illegal Bribes

111.    Defendant CNO improperly failed to recognize, classify and adequately disclose material amounts of concealed, illegal expenses for the billions of dollars in illegal bribes and kickbacks that were, in effect, part of the cost required to obtain and generate reported revenues on particular material contracts. As alleged above at ¶¶58-65, defendants used a "shadow" accounting system in the Division of Structured Operations to pay the illegal kickbacks and bribes. By hiding these transactions in this second set of books, these expenses were kept completely off the accounting books, records and published financial statements of the company. As a result, defendant CNO materially understated its expenses and materially overstated its reported net income in its interim and annual financial statements during the years 2009-2014.

112.    One of the most basic accounting concepts, including the CPC's *Basic Conceptual Pronouncement* CPC 00, is that all of an entity's transactions must be accurately reflected in its accounting books and records in order for the financial statements to be complete, reliable and represent the transactions the entity's financial statements claim to represent. Accounting rules further prescribe how the recorded transactions are then classified in the financial statements.

113.    Under Brazilian GAAP and IFRS, expenses are typically recognized in the period that they are paid. However, exceptions are made in the case of long-term construction contracts, which are governed by IAS 11 and CPC 17, *Construction Contracts*. Under both IAS 11 and CPC 17, expenses that can be considered "contract costs," *i.e.*, those that relate directly to, or are

- 66 -

attributable to a specific contract (IAS 11, ¶16) are capitalized when incurred or paid, and then recognized ratably as expense along with the associated revenue, based upon the percentage of contract completion over the life of the contract. The types of expenses that are considered contract costs are those related to constructing the project, such as materials, equipment and labor actually used on the project. IAS 11, ¶17. Bribes to obtain contracts are not among the types of costs identified as contract costs as described by IAS 11, ¶¶16-17 and 21, and, being related to marketing or obtaining projects are appropriately considered a "Selling Cost" under IAS 11, ¶20. Under IAS 11, Selling Costs are not capitalized then expensed in subsequent periods. Instead, IAS 11 requires that selling costs be expensed in the period that they are paid.

114.    Regardless of whether a transaction (bribes and kickbacks in this instance) is considered a selling cost or a contract cost, the cost must be immediately recorded in the company's books when incurred, either as an expense, or as a capitalized contract cost to be recognized as an expense in subsequent periods during the contract. In this case, however, by keeping the bribes and kickbacks off book, defendant CNO improperly did neither. As such, the hundreds of millions in kickbacks and bribes were neither recognized in the period paid, nor recognized over the period of the contract.

115.    While costs that are directly incurred in securing a specific contract may be included as contract costs under IAS 11 if the costs are separately identifiable, reliably measurable and it is probable that the contract will be obtained, bribes do not meet these criteria. First, bribes are not recognized by the accounting literature as legitimate contract costs. *See, e.g.*, IAS 11, ¶¶16-17, 21. Second, Odebrecht purposely hid the existence of bribe payments, disregarding whether they could be identifiable or reliably measured. Third, such bribes were not always tied to a specific construction project, but were payments to political officials for their ongoing assistance

in procurement efforts.  For example, defendants paid a $35 million bribe to then-presidential candidate Nicolás Maduro in 2013 "to continue enjoying its profitable contracts" in Venezuela, and Odebrecht received more than $4 billion in contract revenue as a result.  And as alleged in ¶74, this arrangement was not unique to Venezuela.  They paid at least $213.5 million in bribes to government officials and intermediaries that brought in at least $597 million in benefits from public works contracts directly and admittedly secured as a result of the bribes.  Accordingly, Odebrecht's bribes and kickbacks are appropriately considered "selling costs," thus requiring recognition in CNO's financial statements as expense in the period in which they were paid.[63]

116.    Defendant CNO improperly failed to recognize or adequately disclose material amounts of such expenses that were admittedly "more than $788 million" and likely exceeded $3.3 billion in illegal bribes paid from 2009 through 2014 that were, in effect, part of the cost required to obtain and generate reported revenues on particular material contracts.  As Mascarenhas testified, the following total amounts of bribes were paid during each of the years listed below:

| Year | Bribes Paid |
|------|-------------|
| 2009 | $260 million |
| 2010 | $420 million |
| 2011 | $520 million |
| 2012 | $730 million |
| 2013 | $730 million |
| 2014 | $450 million |

117.    Additionally, the specific bribery payments identified above as having been paid to obtain contracts are appropriately considered expenses of CNO, and were required to be recognized as expenses on CNO's financial statements, which were incorporated into Odebrecht's

---

[63]  Regardless of whether these bribes were actually paid by CNO, Odebrecht or another Odebrecht-related entity, they are appropriately considered expenses of CNO, and thus were required to be recognized as an expense on CNO's financial statements.

financial statements. Below are non-exhaustive examples of public works contracts that Odebrecht and CNO obtained from these bribes, as alleged in ¶¶72-74:

- In Guatemala, Odebrecht paid $17.9 million in bribes in exchange for the CA2 Occidente highway project in Guatemala, a project worth $300 million. In order to obtain the contract for the rehabilitation and lane expansion of CA 2 Occidente, section Cocales -El Zarco- Coatepeque -Tecún Umán, which was awarded at the end of 2012, Odebrecht paid bribes to three individuals in Guatemala. Specifically, in 2013, Sinibaldi received $5.765 million, and Batres received $3.915 million. In 2014, Sinibaldi received $5.68 million, Batres received $790,000 and Baldizón received $360,000. And in 2015, Batres received $490,000, while Baldizón received $900,000. Odebrecht also admitted in the Plea Agreement that it "realized benefits of more than $34 million as a result of [$18 million in] corrupt payments" "to government officials in Guatemala in order to secure public works contracts."

- In Venezuela, Odebrecht paid at least $142 million in bribes to high-ranking officials from 2011 to 2014, in order to obtain the contract for work on Caracas' metro system and other projects. In 2013, Odebrecht paid $35 million to Maduro "to continue enjoying its profitable contracts in his country." And Odebrecht admitted in the Plea Agreement that "[i]n or about and between 2006 and 2015, Odebrecht made and caused to be made approximately $98 million in corrupt payments to government officials and intermediaries working on their behalf in Venezuela in order to obtain and retain public works contracts."

- In Peru, Odebrecht paid a total of $31 million to Toledo from 2006 until 2011 for the work on Sections 2 and 3 of Peru's interoceanic highway. Odebrecht also paid more than $4 million to Nava, including $3 million to ensure that Odebrecht would hold the contract to build the interoceanic highway. And Odebrecht paid bribes in relation to two other projects in Peru: Costa Verde – Callao, and Via de Evitamiento – Cusco, as well as over $24 million in bribes for the work on Line 1 of the Lima Metro. For the first section of Line 1, Odebrecht paid $6.9 million, with $1.4 million delivered to Jorge Cuba, and $400,000 each to Luyo and Chau. For the second section of Line 1, Odebrecht paid over $17 million, with Cuba receiving $5 million, Luyo receiving $1 million, Chau receiving $400,000 and Huerta also receiving $400,000. Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $143 million as a result of [$29 million in] corrupt payments" "to government officials in Peru."

- In Colombia, Odebrecht agreed in 2012 to pay $4.6 million to Bula to win the contract for the Ocaña-Gamarra section of the Ruta de Sol road project. To get the Ruta del Sol II contract, signed in 2010, Odebrecht paid $6.5 million to Morales. And Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $50 million as a result of [$11 million in] corrupt payments" "in Colombia in order to secure public works contracts."

- 69 -

- In Panama, Odebrecht paid $59 million in bribes within Panama between 2010 and 2014, including to relatives of former Panamanian president Ricardo Martinelli. Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $175 million as a result of [$59 million in] corrupt payments" "to government officials and intermediaries working on their behalf in Panama in order to secure, among other things, public works contracts."

- In Ecuador, Odebrecht paid Glas $14.1 million in bribes between 2012 and 2016, in exchange for contracts that included the Manduriacu and Toachi Pilatón hydroelectric plants, the Pacific Refinery, the Pascuales–Cuenca Polyduct, and the Trasvase Daule Vinces water supply project. Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $116 million as a result of [$33.5 million in] corrupt payments" "to government officials in Ecuador."

- In Mexico, Odebrecht paid $10 million, beginning in 2012, to Austin in exchange for being favored for the Miguel Hidalgo Refinery's earthworks contract, worth $115 million, and for Salamanca Refinery contracts. Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $39 million as a result of [$10.5 million in] corrupt payments" "to government officials in Mexico in order to secure public works contracts."

- In the Dominican Republic, Odebrecht paid bribes to Rondón at the rate of 3% of the contracts' cost, for contracts including the installation of the Hermanas Mirabal and Samaná aqueducts and Punta Catalina's thermoelectric plant. Odebrecht admitted in the Plea Agreement that it "realized benefits of more than $163 million as a result of [$92 million in] corrupt payments" "to government officials and intermediaries working on their behalf in the Dominican Republic."

118.    These unrecognized expenses related to bribes were plainly material to the reported financial condition of CNO, and would have been important to investors. By concealing these costs and keeping the funds to pay them off book, as alleged herein, defendant CNO materially understated its expenses and materially overstated its reported net income during the years 2009-2014.

119.    Given the materiality of these illegal expenses, Brazilian GAAP also required disclosure of the nature of such unrecorded and illegal expenses in the notes to the financial statements. Instead, CNO violated the provisions of Brazilian GAAP and IFRS including CPC 00,

17 and IAS 11 by concealing these funds and expenses "off book," and by failing to disclose the practice in the notes to the financial statements.

120.    Defendants' improper accounting and lack of disclosure described in ¶¶94-119 above caused CNO's consolidated financial statements from 2009 to 2016, and Odebrecht's financial disclosures, referenced below, to be false and misleading.

**F.    False Financial Statements Included in the 2012 7.125% Notes Offering Memorandum**

**1.    CNO's 2009 and 2010 Annual Consolidated Financial Statements**

121.    Defendant CNO's annual financial statements for the year ended December 31, 2010, originally dated March 2011, were included in the 7.125% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements reported revenues of more than $9.7 billion and net income of more than $734 million for the year ended December 31, 2010, and included a re-presentation of the 2009 annual financial statements for comparative purposes.

122.    The 2009 and 2010 reported financial statements were materially false and misleading when issued because, as described above at ¶¶94-119, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

4812-1822-4322.v1

### 2.    CNO's 2011 Annual Consolidated Financial Statements

123.    Defendant CNO's annual financial statements for the year ended December 31, 2011, originally dated March 6, 2012, were included in the 7.125% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements reported revenues of more than $11.4 billion and net income of more than $489 million for the year ended December 31, 2011. The 2011 annual financial statements also included a re-presentation of the 2010 annual financial statements for comparative purposes.

124.    These reported 2011 and 2010 annual financial statements were materially false and misleading when issued because, as described above at ¶¶94-119, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of  Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

### 3.    CNO's First Quarter 2012 Consolidated Interim Financial Statements

125.    Defendant CNO's interim quarterly consolidated financial statements for the three months ended March 31, 2012 were included in the 7.125% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements reported revenues of more than $2.9 billion and net income of more than $205 million for the quarter ended March 31, 2012.  The first

quarter 2012 quarterly financial statements also included a re-presentation of the first quarter 2011 financial statements for comparative purposes.

126.    These reported first quarter 2012 and 2011 interim quarterly financial statements were materially false and misleading when issued because, as described above at ¶¶94-119, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

G.    **False Financial Statements Included in Defendants' 2013 Offering Memoranda for the 4.375% Notes and 8.25% Notes**

1.    **CNO's 2010 and 2011 Annual Consolidated Financial Statements**

127.    Defendant CNO's annual financial statements for the years ended December 31, 2010 and 2011, described in ¶¶123-124 above, were also included in the 4.375% Notes and 8.25% Notes offering memoranda and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements were materially false and misleading when republished in the 4.375% Notes and 8.25% Notes offering memoranda for the same reasons set forth in ¶¶123-124 above.

2.    **CNO's 2012 Annual Consolidated Financial Statements**

128.    Defendant CNO's annual financial statements for the year ended December 31, 2012 were included in the 4.375% Notes and 8.25% Notes offering memoranda and made available

to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO. These financial statements reported revenues exceeding $14 billion for 2012, and net income of $457 million. The 2012 annual financial statements also included a re-presentation of the 2011 annual financial statements for comparative purposes.

129. These reported 2012 and 2011 annual financial statements were materially false and misleading when issued because, as described above at ¶¶94-119, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity, from other contract revenue, in violation of Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

### H.     False Financial Statements Included in Defendants' 2014 Offering Memorandum for the 5.25% Notes

#### 1.     CNO's 2011 and 2012 Annual Consolidated Financial Statements

130. Defendant CNO's annual financial statements for the years ended December 31, 2012 and 2011, described in ¶¶123-124 and 128-129 above, were also included in the 5.25% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO. These financial statements were materially false and misleading when republished in the 5.25% Notes offering memorandum for the same reasons set forth in ¶¶123-124 and 128-129 above.

4812-1822-4322.v1

### 2.    CNO's 2013 Annual Consolidated Financial Statements

131.    Defendant CNO's annual financial statements for the year ended December 31, 2013, originally dated February 28, 2014, were included in the 5.25% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO.  These financial statements reported revenues of more than $13.7 billion for the year, and net income of more than $723 million.  The 2013 annual financial statements also included a re-presentation of the 2012 annual financial statements for comparative purposes.

132.    These reported 2013 and 2012 annual financial statements were materially false and misleading when issued because, as described above at ¶¶94-119, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of  Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

### 3.    CNO's First Quarter 2014 Consolidated Interim Financial Statements

133.    CNO's financial statements for the three-month period ended March 31, 2014 were included in the 5.25% Notes offering memorandum and made available to plaintiff, investors, analysts and ratings agencies, including on the websites of defendants Odebrecht and CNO. CNO's March 31, 2014 financial statements reported revenues of more than $3.1 billion and net income of more than $302 million for the quarter ended March 31, 2014.  The first quarter 2014

- 75 -

quarterly financial statements also included a re-presentation of the first quarter 2013 financial statements for comparative purposes, which reported revenues of more than $2.8 billion and net income of more than $467 million for the quarter ended March 31, 2013.

134.    These first quarter 2014 and 2013 interim financial statements were materially false and misleading when issued because, as described above at ¶¶94-119, defendants: (i) improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, their ongoing illegal bribery scheme, in violation of Brazilian GAAP; (ii) improperly failed to separately distinguish and disclose contract revenue obtained as a result of their massive illegal bribery activity from other contract revenue, in violation of Brazilian GAAP; and (iii) improperly failed to recognize, classify or adequately disclose material amounts of concealed funds and illegal bribes that were, in effect, part of the cost required to obtain and generate reported revenues on contracts, in violation of Brazilian GAAP.

I.    **Defendant Odebrecht's False Financial Disclosures**

1.    **Odebrecht's 2012 Annual Report**

135.    Defendant Odebrecht made numerous disclosures of financial performance and data in its 2012 Annual Report, which was made available to plaintiff, investors, analysts and ratings agencies, including on defendant Odebrecht's website, in English.  For example, the Annual Report disclosed EBITDA (earnings before interest, taxes, depreciation and amortization) of nearly $3.8 billion in 2011.  The report also disclosed the following results for Odebrecht in 2011: gross revenue of over $37.8 billion; net profit of $24 million; total assets of over $51 billion; and nearly $9.6 billion in shareholder's equity.

136.    The statements referenced above in ¶135 were materially false and misleading when made because, as described above at ¶¶94-98, defendant Odebrecht improperly failed to

- 76 -

accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to defendants' ongoing illegal bribery scheme, when it consolidated CNO's false financial statements into its own consolidated financial statements, in violation of Brazilian GAAP and the CPC, and presented its own consolidated financial data based on the underlying false financial statements.

### 2.    Odebrecht's 2014 Annual Report and Press Release

137.    Defendant Odebrecht made numerous disclosures of financial data in its 2014 Annual Report, which was made available to plaintiff, investors, analysts and ratings agencies, including on Odebrecht's website, in English.  For example, these disclosures reported gross revenues of more than $24 billion for 2009, more than $32 billion for 2010, over $37 billion for 2011, nearly $41 billion for 2012 and over $41 billion for 2013.  The Annual Report also reported that, for 2013, Odebrecht had nearly $61 billion in assets, EBITDA of over $4.8 billion, net profit of $210 million and shareholder's equity of more than $7.8 billion.  The Annual Report includes a note stating that "[t]he numbers for 2012, 2011, 2010, and 2009 (restated) are in accordance with the standards of the Brazilian Financial Accounting Standards Board (CPC)."

138.    Defendant Odebrecht also disclosed financial data through a press release on April 24, 2014, entitled "Odebrecht S.A. revenue grows 16% to R$ 96.9 billion in 2013," which was made available to plaintiff, investors, analysts and ratings agencies, including on defendant Odebrecht's website, in English.  It stated in pertinent part:

> Odebrecht S.A., the holding company that controls the businesses and companies of the Odebrecht Organization, disclosed today its consolidated balance sheet for 2013.  Gross revenue stood at R$ 96.9 billion, increasing 16% from R$ 83.5 billion in 2012.  EBITDA (earnings before interest, taxes, depreciation and amortization) reached R$ 11.4 billion, up 41% from the previous year.  In 2013, the Odebrecht Organization companies paid R$ 4.9 billion in taxes.  The Organization also retained its position as the company that creates the most direct jobs in Brazil and abroad, with a total headcount of 175,000, 127,000 of which in Brazil.

- 77 -

Odebrecht S.A. recorded net income of R$ 490.7 million in 2013, reversing the R$ 1.5 billion loss recorded in 2012. This turnaround was achieved despite the R$ 1.3 billion loss incurred by Odebrecht Agroindustrial, which was severely affected by the crisis sweeping Brazil's ethanol industry.

139.    The statements referenced above in ¶¶137-138 were materially false and misleading when made because, as described above at ¶¶94-98, defendant Odebrecht improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences related to, defendants' ongoing illegal bribery scheme, in violation of Brazilian GAAP and the CPC, when it consolidated CNO's false financial statements into its own consolidated financial statements, and presented its own consolidated financial data based on the underlying false financial statements.

### 3.    Odebrecht's 2015 Annual Report

140.    Defendant Odebrecht made numerous disclosures of financial data in its 2015 Annual Report, which was made available to plaintiff, investors, analysts and ratings agencies, including on defendant Odebrecht's website, in English. For example, the Annual Report disclosed gross revenue of nearly $46 billion for 2014, and also reported that Odebrecht had EBITDA of over $6 billion, net profit of $211 million and shareholder's equity of more than $6.4 billion in 2014. The Annual Report also included EBITDA from 2010 to 2013, reporting EBITDA of over $3.7 billion in 2010, nearly $3.8 billion in 2011, over $3.9 billion in 2012 and over $4.8 billion in 2013. The Annual Report includes a note falsely stating that "[t]he figures for the years 2010, 2011 and 2012 (reproduced) are in accordance with the norms of The Committee on Accounting Statements (CPC)."

141.    The statements referenced above in ¶140 were materially false and misleading when made because, as described above at ¶¶94-98, defendant Odebrecht improperly failed to accrue a reserve for, or even disclose the clearly foreseeable legal exposure and consequences

related to, defendants' ongoing illegal bribery scheme, in violation of Brazilian GAAP and the CPC, when it consolidated CNO's false financial statements into its own consolidated financial statements, and presented its own consolidated financial data based on the underlying false financial statements.

**J.    Defendants' Repeated Denials and Fraudulent Concealment of Their Kickback and Bribery Scheme**

142.    The police investigations into political corruption and bribery that came to be known as Operation Car Wash initially focused on Brazil's semi-public oil company, Petrobras. As part of defendants' obstructionist activities to fraudulently conceal their role in the matters under investigation, as detailed in ¶¶75-76, defendants repeatedly denied in public statements any part in illegal activities or wrongdoing by their employees.  As a result, defendants continued to mislead plaintiff and other investors about the true nature and scope of defendants' illegal activities.

143.    On October 2, 2014, defendant Odebrecht issued a press release, which stated in pertinent part:

> Odebrecht vehemently denies having made any payment or deposit to any alleged account belonging to any officer or former officer of Petrobras.  Odebrecht has had service contracts with Petrobras for decades, all of which signed on in accordance with the public bidding law.

144.    The statement referenced above in ¶143 was materially false and misleading when made because, as described above at ¶¶57-76, Odebrecht had in fact made illegal payments to Petrobras officers and had signed numerous contracts that violated the law and rigged the public bidding process.

145.     On May 1, 2015, Odebrecht released a public letter signed by Marcelo Odebrecht (the former CEO of Odebrecht), in which Mr. Odebrecht responded to a news report based on a complaint filed by Brazil's Federal Public Prosecutor's Office.  According to Mr. Odebrecht:

> Because they have not managed to convict us in the courts, I get the distinct impression that they are trying to incriminate us in the media, constantly trying to tarnish our image in an attempt to implicate us in false accusations of corruption . . . .

146.     The statement referenced above in ¶145 was materially false and misleading when made because, as described above at ¶¶57-76, Odebrecht had participated in a massive scheme of corruption and bribery.

147.     On June 19, 2015, the same day Brazilian police arrested Marcelo Odebrecht, defendant CNO issued a statement calling related warrants "unnecessary," since "the company and its executives have always been available to the authorities to cooperate with the investigation since the beginning of the operation Lava Jato."   This press release was false and misleading because, as CNO was aware, defendants and their employees had not been cooperating with, and, in fact were seeking to obstruct, the investigation, including by: (i) directing employees to delete records that might reveal illegal activities and to move certain illicit operations overseas in order to evade detection; (ii) making multi-million dollar payments to a governmental official in Antigua in order to prevent documents that would prove Odebrecht's guilt from being provided to international authorities; and (iii) intentionally destroying encryption keys necessary to access evidence stored in defendants' email system.

148.     Three days later, on June 22, 2015, defendant Odebrecht issued a press release to "express[] its indignation" at the arrest of Marcelo Odebrecht and other executives, claiming that his arrest was "illegal" and "completely unnecessary":

The Odebrecht Group, for respecting for its Clients, Partners, Investors, Financial Institutions, Suppliers, Users of its Services, Friends and Team Members, hereby expresses its indignation at the arrest of five of its executives and the search and seizure warrants served last Friday (June 19) at some of our subsidiaries as part of the 14th stage of Operation Lava Jato ("Car Wash"; a Brazilian corruption scandal involving alleged payoffs and the state-owned oil giant Petrobras).

The court order approving the arrest of our executives and the search and seizure warrants demonstrates that, since the beginning of Lava Jato over a year ago, the Federal Police have not presented, as alleged in the court order, any new evidence that justifies the forceful measures taken, which ***were completely unnecessary and for that very reason, illegal***.

149.    The June 22, 2015 press release continued by claiming that the only information marshalled by authorities "reflects a clear misinterpretation of the facts," and provided a detailed refutation claiming the evidence showed innocent conduct.  The release also defended Odebrecht's internal investigation and cooperation with authorities, and cast the Company as the victim of overzealous prosecutors who had violated the law, stating in pertinent part:

Furthermore, the statement in the court order that Odebrecht Group companies did not conduct an internal investigation of the alleged irregularities ***is completely untrue***.  All of our companies have and apply a ***Code of Conduct and a Compliance System that are effective and widely publicized***, completely aligned with Brazilian and international anti-corruption legislation.  An example of this practice was Braskem´ [sic] publication of a Material Fact notice on April 2, 2015.

Regarding payments allegedly made by Constructora Internacional del Sur, Odebrecht reiterates that none of its subsidiaries have or have ever had any ties with or made any payment to that company.

Odebrecht denies having participated in any cartel.  ***There are no cartels in the contracting process, which is controlled entirely by the client***, as is the case with Petrobras, which has always set its own budgets and standards for technical-financial assessment and performance.

In addition, the ***Odebrecht Group never hindered the investigations in any way***.  To the contrary, its executives have always made themselves available to authorities to provide any clarifications.  In fact, four of the five arrested executives had traveled to the headquarters of the Federal Police in Brasília and provided testimony in the course of the Lava Jato investigations conducted by the Superior Court of Justice and the Federal Supreme Court.  They have also furnished all requested documents and formally offered to testify before the Federal Court in the

- 81 -

State of Paraná – *testimony that they were never invited to provide, but which certainly would have clarified all of the points raised*.

Although we are deeply perplexed and indignant regarding what has occurred, we will not stop fighting. Our business model, based on principles of delegation and decentralization, ensures that our 15 business areas and over 100 subsidiaries, are fully and independently led by our executives and their teams, and will continue to operate normally to fulfill our obligations, as we have always done in a manner as has been recognized during our more than 70-year history, half of which includes international operations.

This is our commitment to our Clients, Partners, Investors, Financial Institutions, Suppliers, the Users of our Services and the Communities in the 21 countries where we operate. We maintain our strong conviction that our more than 160,000 Members will remain even more united by our corporate culture and by the bonds of trust that unite us, maintaining their pride to be part of the Odebrecht Group.

Finally, at this time, we express our unrestricted solidarity and *support for the families of our executives who unjustly have lost their constitutional right to freedom*. We will continue to work together in defense of our Team Members, and will continue to be even more available to the authorities, cooperating fully so that all of these issues are clarified quickly, convinced that the truth will come out and that justice will prevail, because we believe that the recent events resulted from misinformation and misinterpretation.

(Emphasis in original.)

150.    These statements referenced above in ¶¶147-149 were materially false and misleading when made because defendants had, in fact: (i) attempted to impede the investigations, as detailed in ¶¶75-76; and (ii) conspired to rig the market for public works contracts and perpetrated a massive bribery and kickback scheme as a central component of their business, as detailed in ¶¶57-76.

151.    On June 24, 2015, defendant Odebrecht issued another press release to once again "express[] its indignation," this time claiming that its CEO Marcelo Odebrecht did not direct employees to delete records that might reveal Odebrecht's illegal activities:

Therefore there is nothing in Marcelo Odebrecht's note to suggest that any illegality has been committed. Besides being uncharacteristic of the executive, it would make no sense to suggest "destroying" (not the contents, as intended, but

- 82 -

literally, as interpreted the police authority) emails that were seized during the operation conducted in November 2014, which were widely investigated and made public. Destroying something that is already in the custody of the PF and Judge Sergio Moro makes no sense. In other words, the term "destroy" must have a different meaning.

Finally, Odebrecht regrets that an attempt was made to create a procedural issue regarding an expression that was clearly taken out of context. Through a petition and personal contact, the company's lawyers have attempted to show the police that it makes no sense to raise suspicions about the subject, but unfortunately they have opted to publicize it and lend a whiff of scandal to a note that merely contains a client's instructions to his lawyers – thereby violating the [confidential] relationship that the law guarantees to all Brazilian citizens.

152. Defendant Odebrecht issued a second press release on June 24, 2015, entitled "Note of Clarification," which maintained that Marcelo Odebrecht's arrest was "manifestly illegal" and that Odebrecht had not attempted to impede the ongoing investigations against it:

Odebrecht would like to clarify that there are false rumors circulating that its executives have threatened authorities and public officials, as well as the future of the Brazilian Republic, in response to the investigations of Operation Lava Jato ["Car Wash"; a Brazilian corruption scandal involving payoffs and the state-owned oil giant Petrobras].

It is **untrue**, for example, that the CEO of Odebrecht SA, Marcelo Odebrecht, linked the future "of the Republic" to the arrest warrant issued against him, a warrant this manifestly illegal.

Similarly, it is also a **complete fiction** that the Chairman of the Board of Directors of Odebrecht SA, Emílio Odebrecht, warned that more cells would be required to hold politicians whom he would denounce in Brazil and abroad.

The Odebrecht Group and its executives have never hindered the ongoing investigations in any way and have always been available to the authorities to provide information. Odebrecht remains at the authorities' disposal to help ensure that these matters are cleared up quickly, convinced that the truth will come out and that justice will prevail.

153. Similarly, on July 16, 2015, defendant Odebrecht issued a statement that Marcelo Odebrecht's attorneys had acted with "transparency" and in "good faith," and that the police interpretation of a note sent by Marcelo Odebrecht "is completely wrong." The next day, Odebrecht issued another press release stating: "Since the investigation involving Odebrecht began

- 83 -

in October of last year, the group's managers and employees have always put themselves at the authorities' disposal to shed light on the facts being investigated."

154.    On July 21, 2015, defendant Odebrecht issued a press release stating that the police's "distorted interpretations of [Marcelo Odebrecht's] personal notes . . . were taken out of context and are so anachronistic that they are completely illogical."   The release continued: "Odebrecht especially repudiates the intent of attributing to the CEO of its holding company alleged intentions inferred through speculative reasoning with the clear objective of extending his imprisonment, which, like that of the other executives who work or formerly worked at Odebrecht, is completely illegal and abusive."

155.    Also on July 21, 2015, *Reuters* published an article entitled "Peru sending prosecutors to Brazil as corruption probe goes regional," reporting that "Peruvian prosecutors [were] chasing allegations that surfaced in the local press last month, citing Brazilian police reports, of bribes paid by construction executives to inflate the cost of a highway linking Brazil's Amazon rainforest to Pacific ports."   While the Peruvian attorney general "declined to name suspects in the initial eight-month inquiry," "[t]he highway was built by several of Brazil's biggest construction firms, including local divisions of Odebrecht, Camargo Correa, Andrade Gutierrez and Queiroz Galvao."   The article reported statements made by Odebrecht:

> Odebrecht [and two of the other construction companies] denied in statements that they had any part in alleged corruption in Brazil or Peru.

> Odebrecht's Peruvian spokesman, Fernán Altuve, said the company "will let (investigators) turn the house upside down and check under every cushion if necessary, because it is sure the work was done correctly."

> Odebrecht added in its statement that bribery allegations for the Peruvian highway project were focused on a stretch of the route that the company did not take part in.

156.    On July 24, 2015, Odebrecht issued a press release once again claiming that Marcelo Odebrecht's detention was unjustified and illegal:

> Odebrecht considers that the charges filed today by the Federal Prosecution Office (MPF) of the state of Paraná mark the starting point of the work of the defense. Now the legal counsel can discover the allegations made against the executives under investigation and analyze the set of documents presented by the prosecution, which will finally enable the due exercise of the right to defense.

> However, the allegations made this afternoon by the MPF in such a way as to scandalously capture the media spotlight do not justify, under any circumstances, the continuation of the arbitrary and illegal detention of the chief executive officer of the Odebrecht Group, Marcelo Odebrecht, and of four former executives. Much less does it justify the surprising declaration of a new preventive detention, revoking the previous one, in a clear move to annul the effects of the petition for habeas corpus filed at the Superior Court of Justice (STJ).

157.    These statements referenced above in ¶¶151-156 were materially false and misleading when made because defendants had, in fact: (i) attempted to impede the investigations, as detailed in ¶¶75-76; and (ii) conspired to rig the market for public works contracts and perpetrated a massive bribery and kickback scheme as a central component of their business, as detailed in ¶¶57-76.

158.    On July 28, 2015, defendant Odebrecht issued a press release admitting that CNO's offices and the home of one of its executives had been searched by authorities, but falsely claimed that it "has never taken part in offering or paying kickbacks for contracts with any public or private client":

> Construtora Norberto Odebrecht clarifies that it was the target of a search and seizure procedure at its head offices in Rio de Janeiro this morning (Tuesday, July 28, 2015) and at the home of one of its executives, which was conducted coercively, in order to make a deposition at the Federal Police offices in Rio de Janeiro.

> All of our executives and the company have always been available to the authorities to provide clarification and present documents within the domain of Operation Lava Jato ["Car Wash"] investigations, with the measures adopted on this date being unjustifiable.

*CNO reaffirms that it has never taken part in offering or paying kickbacks for contracts with any public or private client*, which obviously includes Eletronuclear.  Therefore, it does not acknowledge the allegations made by a whistle blower as true, which were made in order to obtain his freedom, on account of a pre-trial detention, and does not have any commitment to the truth.

159.     On October 5, 2015, defendant Odebrecht issued a press release stating that internal emails released by police that had been portrayed in a negative light by news media in Brazil "are merely a record of the company's legitimate and natural institutional activities and its participation in debates on strategic projects for the country – in the countries in which it operates, especially as an investor."

160.     On October 30, 2015, defendant Odebrecht issued a press release maintaining that it was "absolutely clear" that Marcelo Odebrecht was innocent and that his imprisonment was "absolutely illegal," stating in pertinent part:

> Marcelo Odebrecht testified today to provide clarifications to the judge regarding accusations against him made by the Federal Prosecutor's Office of Paraná (MPF-PR).
>
> In a written statement to the judge, Marcelo vehemently refuted the allegations made by the prosecution.  After all the evidence and testimony were collected, it was absolutely clear that Marcelo had no involvement whatsoever in the facts stated by the prosecution.
>
> When asked by the Federal Prosecutor's Office and the judge in charge of the case, none of the "informants" and witnesses brought by the prosecution reported any participation by Marcelo in the alleged irregularities.
>
> Furthermore, Marcelo regretted the absolutely illegal imprisonment he has been subjected to for more than 130 days.  There are no subsisting grounds for this extreme measure restricting his freedom.
>
> In fact, all the allegations that served as grounds for Marcelo's arrest have already been disproved:
>
> •     An alleged deposit in Barusco's account, denied by the task force itself;
>
> •     An email between the company's executives, which was fully clarified in Pedro Barusco's testimony to the same judge yesterday;

- 86 -

- And the notes made by Marcelo for himself, which do not constitute a crime but are merely absolutely personal observations on matters that Marcelo learned about through the media.

As such, **we are confident of not only his acquittal in this criminal proceeding** but also the repeal of his detention through the writ of habeas corpus, which is awaiting the decision of the Superior Court of Justice.

161.    On November 13, 2015, defendant Odebrecht issued a press release consisting of a notice that it had published in various newspapers that day. This notice again forcefully maintained defendants' innocence:

**Odebrecht Notice**

Odebrecht voices its indignation with the undue exposure of its team members and those that maintain relations with the company due to the many leaks of documents, personal data and confidential information extracted from the investigation involving some of its executives or former executives.

During the course of this investigation, many of these incomplete documents, data and information, often lacking context, have been released to the media in a distorted and mystifying manner, confusing the public opinion, generating erroneous conclusions and raising unfounded suspicions of facts and people that have no relation to Operation Car Wash.

Recent news on donations by Construtora Norberto Odebrecht to Fundação iFHC is a clear example of this regrettable and abusive practice that has become a routine part of this investigation, despite formal complaints to competent authorities in an effort to stem their occurrence.

Reports from the investigation that were presented with the pretext of revealing suspicious acts are nothing more than bank extracts of donations by the Odebrecht group company to the Foundation in question in the form of institutional support.

The fact that Construtora Norberto Odebrecht provided support to Fundação iFHC, as well as other institutions in Brazil and overseas, is no secret, and is in fact a part of the institutional policy of the Odebrecht Group. **Both Construtora Norberto Odebrecht and the entities it supports always confirm these relations as a legitimate and common practice among dozens of other companies.**

Odebrecht deplores the illegitimate exposure to which it continues to be exposed and the inconveniences caused to people affected by these clearly illegal leaks, which have no other objective than to expose the Odebrecht group and its team members to public shaming, fostering an unfavorable public opinion of the

- 87 -

group, its executives and former executives currently under criminal investigation within Operation Car Wash.

Odebrecht hopes that level heads prevail in leading the investigation and the respect of the rights and guarantees of all citizens, including those under investigation, is unconditional.

162.    On December 10, 2015, Odebrecht issued a press release entitled "Marcelo Odebrecht formally resigns from Odebrecht S.A." This press release announced that Marcelo Odebrecht had formally resigned from his post as CEO of the Company, but continued to maintain his innocence:

After 6 months in detention and given the developments in his court case, Marcelo Odebrecht yesterday decided to formally resign from his post as President and CEO of Odebrecht S.A., as well as the chairmanship of Braskem, Odebrecht Oil & Gas, Odebrecht Real Estate Developments and Odebrecht Environmental.

The Board of Odebrecht S.A. has officialized the appointment of Newton de Souza, who will continue as President and CEO of Odebrecht S.A. and Chairman of the abovementioned companies.

Odebrecht believes that Marcelo's unjust and unnecessary preventive detention will be revoked, which will enable him to devote himself to his family and concentrate on his defense. *Odebrecht has full confidence that at the end of the current legal proceedings, Marcelo Odebrecht's innocence will be officially recognized*.

163.    The statements in ¶¶158-162 were materially false and misleading when made because defendants had, in fact, committed illegal acts, including: (i) attempting to impede the investigations, as detailed in ¶¶75-76; and (ii) conspiring to rig the market for public works contracts and perpetrating a massive bribery and kickback scheme as a central component of their business, as detailed in ¶¶57-76.

164.    Defendant Odebrecht's campaign of misinformation was successful in that it prolonged the concealment of its fraud and its role in the bribery and kickback scheme several months after the existence of Operation Car Wash and allegations of potential misconduct involving Odebrecht employees began to be publicly disclosed. Even fixed-income analysts who

- 88 -

specialized in evaluating the performance and risks associated with Odebrecht debt remained

misled by defendants' misrepresentations and denials. For example, on September 14, 2015, UBS

fixed-income analysts issued a research report on Odebrecht's debt entitled "Defusing concerns."

The report maintained a stable outlook on notes issued by the Company, such as the Notes, noting

that management was "refuting key concerns" and CNO continued to produce "[s]trong results."

## VIII.  SUBSEQUENT EVENTS AND DISCLOSURES CONFIRM
##        DEFENDANTS' FRAUDULENT SCHEME

165.    One of the foreseeable consequences of the uncovering of defendants' massive

bribery and kickback scheme was the cancellation or termination of many of the contracts they

had previously obtained. Following the exposure of the bribery and kickback scheme, numerous

material contracts were cancelled by governmental authorities, including the following:

- *The Ruta del Sol II Road Project*. In February 2017, the Colombian National Infrastructure Agency and the Ruta del Sol consortium (of which Odebrecht had a majority stake) reached agreement for cancelation of the Ruta del Sol II deal. An arbitral tribunal later found the contract and its accessory agreements and addendums to be null and void for illegal purposes and abuse of power;

- *Natural Gas Pipeline Contract in Peru*. On January 23, 2017, *The Wall Street Journal* reported that Peru will terminate its $7 billion contract with an Odebrecht-led consortium (the Southern Peruvian Gas Pipeline Consortium) to build a natural gas pipeline in Peru;

- *Bocas del Toro Hydroelectric Project in Panama*. In December 2016, the government of Panama announced that it would be cancelling the 2014 contract with Odebrecht for a hydroelectric project in the Bocas del Toro province, a contract valued at $1 billion; and

- *Pemex Refinery Contract*. On July 11, 2017, Mexican oil company PEMEX announced that it cancelled its $100 million contract with Odebrecht for work at a refinery.

166.    Another large expense faced by defendants following the exposure of the bribery

and kickback scheme was related to governmental investigations by numerous countries. In

addition to the expense of defending itself in these investigations, defendants have, to date, paid

hundreds of millions of dollars in fines resulting from governmental investigations beyond its guilty plea in the United States, including the following:

- **Guatemala**. Odebrecht agreed to pay $17.9 million in compensation to Guatemala for bribes paid for the CA2 Occidente highway project;

- **Dominican Republic**. Odebrecht agreed to pay the Dominican Republic a $184 million fine as part of its plea deal related to its bribery scheme; and

- **Panama**. Odebrecht agreed to pay $220 million in fines to Panama, including $100 million for using Panama's banking system for illicit activities.

167. On December 1, 2016, Odebrecht issued a press release entitled "Odebrecht Apologizes for its Mistakes," finally and belatedly admitting its misconduct and the falsity of its prior denials:

Odebrecht acknowledges its participation in illicit actions in its business activities.

It does not matter that we gave in to external pressure. Nor is it relevant that there are behaviors that the private and public sectors must resist and correct in their relationships.

What matters is that we acknowledge our involvement. We were complicit and did not fight these practices, as we should have.

This was a grave error. We violated our own principles and transgressed against the values of honesty and ethics.

We will not let this happen again.

Odebrecht apologizes, particularly for its failure not to have acted sooner.

Odebrecht's ability to manage and execute that is recognized by our clients, the competency and commitment of our professionals, and the quality of our products and services should have been the basis for avoiding these mistakes.

Odebrecht has learned from these mistakes and is evolving.

We are committed, with great conviction, to reform.

168. On December 21, 2016, defendant Odebrecht entered into the Plea Agreement. Pursuant to the Plea Agreement, Odebrecht: (i) pleaded guilty to violating the anti-bribery

- 90 -

provisions of the FCPA; (ii) agreed to an independent compliance monitor to oversee its operations; and (iii) agreed to pay a criminal penalty of $2.6 billion as part of the largest anti-bribery resolution in history.

169.    The Plea Agreement also included a 23-page "Statement of Facts" outlining the scope and nature of defendants' bribery and kickback scheme. Defendant Odebrecht stipulated and agreed that the entire Statement of Facts is true and accurate:

> The following Statement of Facts is incorporated by reference as part of the Plea Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Eastern District of New York (the "EDNY") and the defendant Odebrecht S.A. ***Odebrecht S.A. hereby agrees and stipulates that the following information is true and accurate***. Odebrecht S.A. admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.

170.    Defendant Odebrecht further agreed that it would not challenge any portion of the Statement of Facts in any public statement, including this or any other court proceedings:

> ***The Defendant expressly agrees that it shall not***, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant to ***make any public statement, in litigation or otherwise***, contradicting the acceptance of responsibility by the Defendant set forth above, or the facts described in the Information and the Statement of Facts. . . . The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the Statement of Facts ***provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts***.

171.    The Statement of Facts provided significant detailed information regarding defendants' bribery and kickback scheme. Specifically, defendants, together with their co-conspirators, knowingly and willfully conspired and agreed with others to provide hundreds of millions of dollars in illegal payments to political candidates and parties to secure an improper

advantage in order to obtain and retain business in various countries around the world, as alleged herein.[64]

172.    The Statement of Facts also described the lengths that defendants went to in order to try and hide their misconduct.  For example, after defendants became aware of the investigations being performed by Brazil, the United States and Switzerland, they sought to conceal or destroy evidence of their criminal activities, including by directing Odebrecht employees to delete records that might reveal illegal activities.

173.    Further, in January 2016, after Lava Jato and the investigations by the United States and Swiss authorities were well known to defendants, employees and/or agents of defendants intentionally destroyed physical encryption keys that were needed to access the MyWebDay system, which contained evidence relating to the bribery and kickback scheme.

174.    And as alleged above, an Odebrecht employee agreed to pay a multi-million dollar bribe to an Antiguan official in order to conceal evidence of the bribery scheme.

175.    Following revelations in the Plea Agreement that defendants' kickback and bribery scheme had extended across Odebrecht's business operations in several countries in Central and South America and Africa, authorities launched and/or intensified numerous investigations in those countries in early 2017.  By mid-2017, prominent politicians, including several former heads of state, were under investigation in connection with the corruption scandal, even as authorities in Brazil continued to broaden the corruption probe and make numerous high-profile arrests and indictments there.

---

[64]    SOF, ¶¶19-23.

176.    On September 14, 2017, the BBC published an exposé on the Odebrecht scandal entitled "Politicians worldwide suspected as bribery scandal unfolds."  According to the article, politicians under investigation or implicated in the scandal included almost a third of Brazil's government ministers, two ex-presidents of Peru, the current president of Venezuela, the president of Panama, the vice president of Ecuador, the prime minister of Antigua and Barbuda, and the former vice-minister of transport for Colombia, among many others.  The Company has also been forced to forfeit contracts in a number of countries, been barred from doing business in others, and has been asked to pay tens of millions of dollars in compensation.  In addition, the Company has lost more than half of its workforce and its revenues have plummeted by 35% since the scandal began.

## IX.    LOSS CAUSATION

177.    As detailed herein, defendants engaged in a scheme to deceive plaintiff and the market and a course of conduct that artificially inflated the value of the Notes and that enabled Odebrecht to pay rates to plaintiff for the Notes that were not commensurate with Odebrecht's and CNO's true risk.  As a result of the fraudulent conduct that defendants concealed, plaintiff is unable to sell its Notes at par and continues to receive interest at rates that do not adequately reflect Odebrecht's and CNO's true risk profile.

178.    Defendants Odebrecht's and CNO's reported financial results and future business prospects were based upon their illicit (and undisclosed) business plan of widespread bribery of public officials in exchange for lucrative public construction contracts.  Throughout the period during which plaintiff purchased its Notes, the prices of those Notes were artificially inflated as a result of defendants' materially false and misleading statements and omissions as alleged herein. Defendants' false and misleading statements and omissions had the intended effect and caused the

Notes to be valued at artificially inflated prices during the period in which plaintiff purchased the Notes and enabled Odebrecht and CNO to raise funds, including from plaintiff, at yields that were far below the companies' risk profile. Plaintiff would not have purchased the Notes, or at least not at the prices at which it paid, had defendants disclosed their bribery scheme and the effect of that scheme on their financial results. Plaintiff was unaware that defendants' representations identified above were false and misleading and that defendants omitted to disclose that their financial results were achieved through a widespread bribery scheme, and paid artificially inflated and unreasonable prices for the Notes that it purchased.

### A.    Corrective Disclosures

179.    A series of disclosures relating to defendants' bribery scheme demonstrate a causal link between defendants' fraudulent scheme and plaintiff's losses. Indeed, as the truth behind defendants' various false statements and material omissions was gradually revealed to the market in a series of corrective disclosures, the value of those Notes dropped to levels more commensurate with Odebrecht's and CNO's true risk profile. The following non-exhaustive examples show how the artificial inflation came out of the Notes as they dropped in value as the market learned about the truth behind and the sheer magnitude and breadth of defendants' fraudulent scheme:

(a)    <u>Disclosures Regarding International Bribery</u>. On February 23, 2016, news sources reported that investigators had evidence that defendants' bribery scheme not only reached the highest levels of power in Brazil, but also in other countries, as specific leaders on the national stage of Peru and Argentina were implicated. For example, in an article entitled "Brazil police probe possible Odebrecht bribes to Peru president," *Reuters* reported that Peruvian president Ollanta Humala was suspected of accepting bribes from Odebrecht, after documents seized from Marcelo Odebrecht cited "Program OH," containing the president's initials. *Reuters* also reported

that a Brazilian federal prosecutor announced that "investigators had evidence Odebrecht had bribed officials abroad, including a former transportation secretary in Argentina."

(b)    <u>Odebrecht Downgraded by Fitch</u>. On March 1, 2016, credit rating agency Fitch Ratings Inc. ("Fitch") downgraded Odebrecht debt, including the Notes, to BB from BBB- on a negative outlook, thereby allowing the market to assess its true market value. A press release issued by Fitch explaining the reasons for the downgrade stated that "Fitch believes the reputational damage from the Lava-Jato scandal" would "erode OEC's capacity to replace backlog." The release also stated that the reputational damage "has reduced Odebrecht group's ability to access debt and capital markets."

(c)    <u>Odebrecht's Cooperation with Prosecutors</u>. On March 22, 2016, Odebrecht confirmed that the Federal Police had "served arrest, detainment and search and seizure warrants in the offices and homes of Group Members in some Brazilian cities," and that Odebrecht had "given its full assistance to the ongoing investigations, and [was] cooperating by providing the information required." In another press release on March 22, 2016, Odebrecht stated that "[t]he evaluations and reflections made by our shareholders and executives have led Odebrecht to decide on definitive collaboration with Operation Lava Jato investigations."

(d)    <u>Odebrecht Downgraded by Fitch and Moody's</u>. On May 3, 2016, Fitch once again downgraded Odebrecht debt, including the Notes, to B from BB with a negative ratings watch, thereby allowing the market to further assess its true market value. Fitch's press release explaining the reasons for the downgrade stated that the ratings action "reflects the prolonged uncertainty of any potential impact on OEC's credit profile stemming from the investigations on the corruption scandal," and made note that the downgrade reflected "the increased risks and uncertainties" associated with the delayed publication of OEC's financial statements. Moody's

- 95 -

Investor Service ("Moody's") downgraded Odebrecht debt the same day, including the Notes, from Ba2 to B2. Moody's press release explaining the reasons for the downgrade stated that the ratings action "was prompted by increased credit risk and rising financial constraints for OEC as a result of the evolving corruption investigations in the country, with potential monetary fines and other business sanction affecting the Company's liquidity and operating sustainability."

180.    As a result of the market learning about defendants' bribery scheme and the magnitude and breadth of that scheme, the market prices for the Notes collapsed, falling by as much as 48% in less than three months. The market's devaluation of the Notes after the corrective disclosures came to light were a direct result of the true nature and extent of defendants' fraudulent misrepresentations and omissions being revealed publicly. The timing and magnitude of the market's reaction negates any inference that the losses suffered by plaintiff were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to defendants' fraudulent conduct. As a result of the fraudulent conduct that defendants concealed, plaintiff is unable to sell its Notes at par and continues to receive interest at rates that did not adequately reflect Odebrecht's and CNO's true risks.

### B.    Materialization of the Risk

181.    At the time of each of plaintiff's purchases, the price of the Odebrecht Finance Notes was artificially inflated as a result of: (i) defendants' undisclosed widespread bribery and kickback scheme which was unlawful, and hence inherently unstable; and (ii) defendant CNO's materially false financial statements.

182.    Defendants' false statements served to conceal the risks that the bribery and kickback scheme would be publicly exposed, as well as the risks related to defendant CNO's preparation and dissemination of false financial statements.

4812-1822-4322.v1

183.    It was foreseeable that the public exposure of the bribery and kickback scheme would lead to negative financial and legal consequences to defendants, including: (i) ratings agency downgrades; (ii) deteriorating liquidity; (iii) massive fines or penalties; (iv) reputational damage; and (v) the inability to complete and timely file required financial statements.  The materialization of any one or more of these factors would lead to a significant decline in the price of Odebrecht Finance Notes.

184.    The value of plaintiff's investments in Odebrecht Finance Notes was negatively impacted when the concealed risks materialized in at least the following respects:

      (a)    Ratings agency downgrades (¶179);

      (b)    Deteriorating liquidity (¶179, ratings agencies describing liquidity issues);

      (c)    Massive penalties or fines (¶168, Plea Agreement);

      (d)    Reputational damage (¶167, public apology); and

      (e)    Inability to complete and timely file required financial statements (¶179, delayed financial results).

## X.    RELIANCE

### A.    Plaintiff's Direct Reliance on Defendants' False and Misleading Statements

185.    Plaintiff's allegations regarding direct reliance relate only to its claims where reliance is an element of the claim and where the presumption of reliance is unavailable.

186.    Plaintiff purchased the Notes between June 2012 and February 2015.  At all times, plaintiff acted through its internal investment managers, who managed the investment portfolios. Throughout the time that plaintiff purchased the Notes, plaintiff undertook issuer-specific research to identify companies in which to invest.  As part of this research, plaintiff reviewed and analyzed issuers' businesses, financial statements and disclosures, including, but not limited to, the issuers'

- 97 -

balance sheets, income statements, assets, liabilities, earnings, profitability, risks, prospects and management. Plaintiff made its investment decisions based on this market research and analysis.

187.    Plaintiff employed its customary investment research and analysis in determining whether to invest in the Notes. This research and analysis included a review of the financial statements and/or disclosures of defendants Odebrecht and CNO, which were either included in the Offering Memoranda and/or made available by defendants in other public statements, including on the websites of Odebrecht and CNO. As part of this analysis, plaintiff directly relied upon the information made publicly available by defendants. In particular, in making the decision to purchase the Notes, plaintiff relied upon the financial information disclosed by defendant Odebrecht and on the financial statements included in defendant CNO's annual and quarterly financial filings for the years ended December 31, 2010, December 31, 2011, December 31, 2012, December 31, 2013 and December 31, 2014, including the Company's statements regarding its earnings, assets, liabilities, business and risks, among other statements.

188.    Plaintiff relied on defendants' statements as being materially complete and not omitting material information, including information regarding defendants' financial condition, compliance with applicable laws and regulations, and whether defendants' financial results were the product of legitimate business practices. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that defendants' statements, as detailed herein, were materially false and misleading and/or materially incomplete when deciding to purchase, sell or hold the Notes.

189.    Defendants' false and/or misleading statements had a material effect on plaintiff's investment in the Notes. These material misstatements caused plaintiff to purchase the Notes following defendants' issuance of the false and misleading statements complained of herein.

**B.      Plaintiff Is Entitled to a Presumption of Reliance Because Defendants Concealed Material Adverse Information**

190.    A presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding their business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' omissions set forth above, that requirement is satisfied here.

**XI.    OEC IS LIABLE AS CNO'S SUCCESSOR-IN-INTEREST**

191.    As detailed in ¶¶20-21, defendant OEC expressly became a guarantor of the Notes purchased by plaintiff and assumed the liabilities of defendant CNO under the offering memoranda of the Notes.  On this basis alone, OEC is liable as CNO's successor-in-interest.  OEC is also liable for CNO's fraudulent actions because the creation of OEC and the reorganization of Odebrecht's subsidiaries were nothing more than a name change and continuation of CNO's business.

192.    The creation of OEC, and its rise to power as the umbrella organization for all of Odebrecht's engineering and construction activities, was but a continuation of CNO's business. Just like CNO before it, OEC was created as a privately held company, wholly owned by Odebrecht.  OEC described its own birth in its 2016 Annual Report:

> Although the Group started its operations in the engineering and construction sector in the 1940s, Odebrecht Engineering & Construction S.A. was founded only on January 27, 2014.  Its corporate name was changed on February 2, 2015.  Today, OEC is a privately held entity, part of Odebrecht S.A., based in São Paulo.  OEC is an integral subsidiary of Odebrecht S.A., and on March 31, 2015 became the direct controller of Construtora Norberto Odebrecht S.A. (CNO)

and Odebrecht Engineering and Construction International (OECI), formerly known as Odebrecht Global S.A. (ODB Global).

193.    Despite admitting that OEC was founded in 2014, OEC's annual report, in fact, adopts the history of CNO for the description of its own historical background:

> Odebrecht Engineering and Construction (OEC) was founded in 1944 and since then has been recognized for its innovative use of advanced construction methods.  Its first project was the Itacaré Pier, in the South of Bahia.

> In the 1970s, OEC started its national expansion and delivered largescale projects.  Already during that period, the company celebrated more than 500 Contracts all over Brazil and worked to qualify for the application of special technologies such as the ones required for the construction of subway lines, nuclear plants, large airports, and bridges.  The main highlights from that time are the Antonio Carlos Jobim International Airport (Galeão) – RJ, the Federal University of Rio de Janeiro – RJ, the Colombo Salles Bridge – SC, the Deputado Darcy Castello de Mendonça Bridge (Third Bridge) – ES, and the renovation of the Amazonas Theatre – AM.  During that period, OEC started the expansion of its processes, its business diversification, and its internationalization.

> In 1981, OEC merged with the São Paulo company CBPO – Companhia Brasileira de Projetos e Obras, becoming one of the main construction companies in the country.  In 1986, the Técnica Nacional de Engenharia (TENENGE) was incorporated, increasing its ability to offer integrated engineering, construction, and industrial assembly services.

194.    OEC has also adopted CNO's financial position, including its assets.  According to a May 27, 2015 press release from Moody's, announcing that Moody's was assigning a credit rating to OEC for the first time while also withdrawing its rating of CNO, OEC's credit profile going forward would be "essentially mirroring CNO's."  The press release provided:

> The Baa3/Aa1.br issuer ratings assigned to OEC reflects the consolidated economic, financial and business profile of CNO up to March, 31, 2015, before the execution of a corporate reorganization strategy that will lead to the separation of the group's domestic and international businesses of engineering and construction. OEC is a newly created holding company, fully owned by Odebrecht S.A. (unrated), that will be consolidating CNO and virtually all of its former businesses, essentially mirroring CNO's previous credit profile.

195.    Similarly, on June 3, 2015, Fitch announced that it was withdrawing its ratings of CNO "as CNO is undergoing reorganization."  According to the announcement, Fitch was

- 100 -

beginning its coverage and rating of OEC, which "is now the holding company and 100% direct parent of CNO and Odebrecht Global S.A."  Throughout the press release, Fitch made clear that OEC was a continuation of CNO:

### KEY RATINGS DRIVERS

OEC's 'BBB' rating reflects its consolidated robust financial profile, strong and consistent track record of operations at CNO, as well as its leading position in the engineering and construction sector in Latin America.  The ratings also incorporate the resilience of CNO's margins, as demonstrated during the last quarters.  OEC's credit profile benefits from CNO's successful track record in raising funds to lengthen its comfortable debt amortization profile.  Fitch expects that OEC will continue to maintain a conservative capital structure and strong liquidity for the next few years.  On a standalone basis OEC does not have debt outstanding.

*        *        *

Robust Backlog and Resilient Margins

OEC benefits from CNO's successful track record in renewing its backlog which was robust at USD33.9 billion by the end of 2014, equivalent to 2.4 years of revenues.  OEC's backlog has moderate concentration; its 10 largest projects have accounted for 46% of its total backlog in the same period.

Fitch expects the company to sustain its consolidated EBITDA margin in the range of 9% to 10% during the next few years.  CNO's 2014 margins were robust at 10% and in line with the industry's average.  The company has demonstrated a resilience to cost pressure in Brazil, as it benefits from the geographical diversification of its contracts.

Reduced Net Leverage

OEC's adjusted net leverage should remain conservative and below 1.0x in the next few years.  CNO had a positive net cash position at the end of 2014 while its total adjusted leverage was 2.6x, in line with Fitch's expectations.  As of Dec. 31, 2014, CNO's total adjusted debt reached BRL8.5 billion, including BRL8.0 billion of off-balance-sheet guarantees, compared with adjusted debt of BRL8 billion, including the BRL7.4 billion of off-balance-sheet guarantees, in Dec. 31, 2013.  Off-balance-sheet debt increased due to the BRL depreciation in the period as most of it is USD-denominated.

*        *        *

- 101 -

LIQUIDITY

OEC is expected to sustain CNO's historically strong liquidity position and to benefits from a lengthened debt maturity profile.  As of Dec. 31, 2014, cash and equivalents of CNO were BRL11.8 billion, enough to cover its short-term adjusted debt of BRL340 million by 35x.  OEC's financial flexibility is enhanced by an unused USD1 billion standby credit facility and proven access to debt markets.

Fitch estimates OEC to sustain strong free cash flow (FCF) in the next few years, supported by the sound cash flow from operations (CFFO).  In 2014, CNO's CFFO of BRL6.1 billion covered capital expenditures of BRL1 billion, and dividends of BRL743 million leading to a positive FCF of BRL4.3 billion.

196.    Analysts also illustrated that OEC's finances were a mere continuation of CNO's.  According to a June 1, 2015 UBS analyst report, "[e]ffectively, OEC is what investors previously referred to as CNO" and was "previously known as CNO."  Analysts at UBS illustrated that OEC's results, credit ratings and management expectations were a continuation of CNO's:

OEC results are comparable to the previous CNO results, and the three credit rating agencies announced that the OEC rating is the same as that of CNO.  Management expects similar consolidated revenues in BRL terms for FY15 as FY14 (BRL32.5 bn) and stable EBITDA margin in the mid-to-high 9% range (implying 9.5-9.9% vs 9.7% FY14).

197.    Similarly, analysts at BTGPactual considered CNO and OEC to be one and the same, as illustrated by its reporting of each entity's financials.  In its June 1, 2015 report regarding Odebrecht E&C (*i.e.*, OEC), BTGPactual included figures for OEC's assets for 2011 through 2014.  The yearly figures listed for OEC for 2011 to 2013 were the same as those previously listed for CNO.  In addition, the June 1, 2015 report from BTGPactual listed three of the four Notes purchased by plaintiff as "Odebrecht E&C Corporate Bonds," listing the number outstanding, ratings, price and additional data for the 7.125% Notes, 5.25% Notes and 4.375% Notes bought by plaintiff.

## XII.    NO SAFE HARBOR

198.    The statutory safe harbor and the common law "bespeaks caution" doctrine provided for forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this complaint.  None of the specific statements pleaded herein were identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that any safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false.

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

199.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

200.    Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations of fact and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

201.    Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements made not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon plaintiff.

202.    Plaintiff acquired the Notes issued by Odebrecht Finance without knowledge that defendants had misstated or omitted material facts.  In acquiring the Notes, plaintiff relied directly or indirectly on the false and misleading statements and omissions made by defendants.

203.    Plaintiff would not have purchased the Notes issued by Odebrecht Finance at the prices it paid, or at all, if plaintiff had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and omissions.

204.    As a direct and proximate result of defendants' wrongful conduct as alleged herein, plaintiff suffered damages in connection with its purchases of the Notes.

205.    By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for violations of §10(b) of the Exchange Act and Rule 10b-5.

### COUNT II
### For Violation of §20(a) of the Exchange Act
### (Against Defendant Odebrecht)

206.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendant Odebrecht.

207.    Defendant Odebrecht was the corporate owner and parent of defendant CNO and had ultimate authority over its actions and those of its employees.  As such, defendant Odebrecht acted as a controlling person of defendant CNO and had the power and authority to cause CNO to engage in the wrongful conduct complained of herein.

208.    Defendant Odebrecht culpably participated in the misconduct as alleged herein.

209.     As a direct and proximate result of such conduct, defendant Odebrecht is liable pursuant to §20(a) of the Exchange Act.

## COUNT III
**For Violation of the Washington State Securities Act, RCW §§21.20.010 and 21.20.430(1)**
**(Against All Defendants)**

210.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

211.     As alleged herein, defendants are liable as sellers of the Notes because they substantially contributed to the sales of the Notes.  Defendant CNO was the guarantor of the Notes, and defendants Odebrecht and CNO were direct beneficiaries of the funds derived through the Notes.  Defendant Odebrecht created Odebrecht Finance for the purpose of the sales of the Notes.

212.     As alleged herein, defendants, directly or indirectly, in the State of Washington, employed devices, schemes or artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices or courses of business that operated as a fraud or deceit upon plaintiff.

213.     As alleged herein, defendants directly and indirectly employed and engaged in a scheme and artifice to defraud by participating in a continuous course of conduct to provide false information to plaintiff and to conceal from plaintiff material facts, as described herein.  Such misrepresentations and material omissions were made in connection with the sale of the Notes in the State of Washington.  Defendants engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

4812-1822-4322.v1

214.    None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the misrepresentations and omissions of material fact alleged herein were true and without omissions of any material fact and were not misleading.

215.    Plaintiff relies on the presumption of reliance to the extent available to it.  To the extent plaintiff's direct reliance is applicable to this claim, plaintiff reasonably relied on defendants' omissions and misstatements as detailed in ¶¶185-190.  Plaintiff and its agents did not know of the omissions and misstatements described above when plaintiff acquired the Notes, and they could not in the exercise of reasonable diligence have known of the actual facts.  Plaintiff and its agents relied upon, among other things, statements made by or authorized by defendants in the Offering Memoranda, which were incorporated into analyst reports and rating agency reports, and other statements made by defendants in making plaintiff's investment decisions.

216.    As a result of defendants' primary violations of RCW §21.20.010, each of them are liable to plaintiff, jointly and severally, for the relief specified in RCW §21.20.430(1), including rescission or damages, interest and attorneys' fees.

217.    By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for violations of RCW §21.20.010, for the relief specified in RCW §21.20.430(1).

**COUNT IV**
**For Violations of the Washington State Securities Act, RCW §§21.20.010 and 21.20.430(3)**
**(Against Defendant Odebrecht)**

218.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against defendant Odebrecht.

219.    Defendant Odebrecht was the corporate owner and parent of defendant CNO and had ultimate authority over its actions and those of its employees.  As such, defendant Odebrecht

- 106 -

acted as a controlling person of defendant CNO and had the power and authority to cause CNO to engage in the wrongful conduct complained of herein.

220.    Pursuant to RCW §21.20.430(3), and by virtue of its status as a control person, defendant Odebrecht is liable to plaintiff, jointly and severally with and to the same extent as CNO, for the relief specified in RCW §21.20.430(1), including rescission or damages, interest and attorneys' fees.

## COUNT V
### Fraud
### (Against All Defendants)

221.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is alleged against all defendants.

222.    Defendants made the false and misleading statements alleged herein, including omitting to provide information necessary to make their disclosures regarding defendants' financial results, business, operations, risks and prospects not misleading in light of the circumstances in which they were made.

223.    Defendants made these misrepresentations with the knowledge of the false and misleading nature of such statements.

224.    Defendants made these false statements with the intent to defraud.  Defendants fraudulently induced plaintiff and other investors to purchase the Notes by: (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaging in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff.

4812-1822-4322.v1

225.     Plaintiff justifiably relied on defendants' misrepresentations as detailed in ¶¶185-190.  Plaintiff purchased the Notes unaware of the falsity of defendants' representations and believed them to be true.  In reliance on defendants' representations, plaintiff was induced to and did act as herein alleged, including by purchasing the Notes.  Plaintiff's reliance on defendants' false and misleading representations was justified because of defendants' misrepresentations and active concealment of the truth.

226.     By operation of law as a successor to defendant CNO, defendant OEC is jointly and severally liable with its co-defendants for fraud.

227.     Plaintiff would not have purchased the Notes at the prices it paid, or at all, or would not have continued to hold the Notes, if it had been aware of the truth regarding defendants' false and misleading statements.

228.     As a direct and proximate result of defendants' intentional misrepresentations and active concealment, plaintiff suffered damages resulting from its reliance on defendants' false statements, misrepresentations and omissions.

229.     The wrongful acts of defendants were done maliciously, oppressively and fraudulently, and plaintiff is therefore entitled to punitive and exemplary damages in an amount to be ascertained according to proof that is appropriate to punish or set an example of defendants.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Awarding compensatory damages in favor of plaintiff against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     Rescission or a rescissory measure of damages;

C.      For punitive damages appropriate to punish or set an example of defendants;

D.      Awarding plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: July 9, 2020                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                       DOUGLAS R. BRITTON
                                       MATTHEW J. BALOTTA


                                       s/ DOUGLAS R. BRITTON
                                       DOUGLAS R. BRITTON

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101-8498
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)
                                       dougb@rgrdlaw.com
                                       mbalotta@rgrdlaw.com

                                       ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD
                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com
                                       drosenfeld@rgrdlaw.com

- 109 -

4812-1822-4322.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER C. GOLD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
cgold@rgrdlaw.com

Attorneys for Plaintiff

4812-1822-4322.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 9, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 9, 2020.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dougb@rgrdlaw.com

4812-1822-4322.v1

# Mailing Information for a Case 1:17-cv-08118-PGG Washington State Investment Board v. Odebrecht S.A. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew James Balotta**
  mbalotta@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Luke Ashe Barefoot**
  lbarefoot@cgsh.com,maofiling@cgsh.com,NY-OdebrechtTeamAll@cgsh.com

- **Douglas R. Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher Chagas Gold**
  cgold@rgrdlaw.com,CGold@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Victor L. Hou**
  vhou@cgsh.com,maofiling@cgsh.com

- **Thomas S Kessler**
  tkessler@cgsh.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)