UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WASHINGTON STATE INVESTMENT BOARD,<br><br>                    Plaintiff,<br><br>        - against -<br><br>ODEBRECHT S.A, CONSTRUTORA NORBERTO ODEBRECHT S.A., and ODEBRECHT ENGENHARIA E CONSTRUÇÃO S.A.,<br><br>                    Defendants. | **MEMORANDUM OPINION & ORDER**<br><br>17 Civ. 8118 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Washington State Investment Board alleges that Defendants Odebrecht S.A. ("Odebrecht"), Construtora Norberto Odebrecht S.A. ("Norberto"), and Odebrecht Engenharia e Construção S.A. ("Engenharia") engaged in and concealed a massive bribery scheme, and made material misstatements in connection with the sale of securities to Plaintiff. Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act, Rule 10b-5, and Washington and New York state law.

On May 20, 2020, this Court granted in part and denied in part Defendants' motion to dismiss the First Amended Complaint ("FAC"). See Washington State Inv. Bd. v. Odebrecht S.A. ("Odebrecht I"), 461 F. Supp. 3d 46 (S.D.N.Y. 2020). Plaintiff then filed the Second Amended Complaint ("SAC").

Defendants have now moved to dismiss the SAC in part, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). (Dkt. No. 87) For the reasons stated below, Defendants' motion will be granted in part and denied in part.

## BACKGROUND[1]

The background of this litigation is set forth in detail in <u>Odebrecht I</u>. <u>See</u> 461 F. Supp. 3d at 55-59.  A brief summary follows below.

## I.    PARTIES

Plaintiff Washington State Investment Board (the "Board") "is a state agency responsible for the prudent investment and management of public trust and public employee retirement funds."  (SAC (Dkt. No. 86) ¶ 45)

Defendant Odebrecht "is a holding company headquartered in Brazil that, through various subsidiaries and operating entities, conducts business in construction, engineering, infrastructure, chemicals, utilities and real estate . . . in Brazil and throughout 27 other countries, including the United States."  (<u>Id.</u> ¶ 46)

Defendant Norberto is "a wholly owned subsidiary of Defendant Odebrecht, primarily engaging in the construction of large-scale infrastructure and other public works projects" around the world.  (<u>Id.</u> ¶ 47)

On March 31, 2015, Odebrecht reorganized, and Defendant Engenharia "took over [Norberto's] role as the consolidator of Odebrecht's construction subsidiaries."  (<u>Id.</u> ¶ 48) Engenharia has since become "a guarantor of the [securities] bought by [P]laintiff."  (<u>Id.</u>)

## II.    FACTS

### A.    The Bribery Scheme

In 2006, Defendants created "a standalone division within [D]efendant [Norberto] called the Division of Structured Operations," which was utilized to conceal communications

---

[1]  The following facts are drawn from the Second Amended Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss.  <u>See</u> <u>Kassner v. 2nd Ave. Delicatessen, Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007).

and the movement of funds in furtherance of a massive international bribery scheme.  (Id. ¶ 58-65)  "The total amount of bribes paid through the Division of Structured Operations over a nine-year period was . . . $3.3 billion."  (Id. ¶ 65)  These bribes resulted in "at least $3.336 billion in ill-gotten benefits."  (Id. ¶ 57)

Odebrecht CEO Marcelo Odebrecht "dictated who participated in the scheme" and chose the head of the Department of Structured Operations, which was staffed in part by Odebrecht employees.  (Id. ¶¶ 25, 59)  The Department of Structured Operations "maintained a detailed 'shadow budget' through a computer system known as 'MyWebDay' that tracked payments, payment requests and other bribe-related information."  (Id. ¶ 60)

Over time, Hilberto Mascarenhas Alves da Silva Filho ("Mascarenhas") – the head of the Department of Structured Operations – became concerned that the steady expansion of the bribery scheme made detection likely.  He repeatedly expressed concern to Marcelo Odebrecht that the bribe amounts were "growing brutally" and that the bribery scheme was "suicide."  (Id. ¶ 96 (quotation marks omitted))  In 2014, Marcelo Odebrecht directed that the Department of Structured Operations be moved out of Brazil.  (Id. ¶ 97)

## B.    The Notes

During the bribery scheme, Defendants marketed notes to investors (the "Notes").  (Id. ¶ 1)  "The Notes include the following securities issued by defendant Odebrecht Finance and guaranteed by [Norberto]:  (i) 7.125% notes due 2042 (the '7.125% Notes'); (ii) 4.375% notes due 2025 (the '4.375% Notes'); (iii) 8.25% notes due 2018 (the '8.25% Notes'); and (iv) 5.25% notes due 2029 (the '5.25% Notes')."  Plaintiff purchased more than $100 million of the Notes between June 21, 2012 and February 4, 2015.  (Id. ¶¶ 1 & n.1, 51-54)

C.     **The Alleged Misstatements**

Plaintiff alleges that (1) the 2012, 2013, and 2014 offering memoranda Defendants used to sell the Notes; (2) the Norberto financial statements attached to the offering memoranda; and (3) Odebrecht's financial statements and press releases from 2012 to 2015 contain numerous misstatements, including that the Odebrecht companies "obtain[ed] contracts for new projects primarily through competitive bidding," and that Norberto and Odebrecht's financial statements were prepared "in accordance with accounting practices adopted in Brazil, or Brazilian [generally accepted accounting principles ('GAAP')]." (Id. ¶¶ 78-93, 121-61) According to Plaintiff, the Odebrecht companies obtained new contracts largely through bribery and not through competitive bidding, and concealed the bribery scheme in violation of both the "local accounting standards issued by the Brazilian Accounting Pronouncements Committee (Comitê de Pronunciamentos Contábeis) or the 'CPC'" and the corresponding "International Financial Reporting Standards ('IFRS') issued by the International Accounting Standards Board." (Id. ¶¶ 80, 88-89 & n.60)

D.     **Revelation of the Bribery Scheme and Plaintiff's Subsequent Losses**

"In or about 2014, Brazilian law enforcement authorities began an initially covert investigation into corruption related to [Brazilian state-owned energy company] Petrobras." The investigation was code-named "Lava Jato, or 'Operation Car Wash.'" (Id. ¶ 75) Operation Car Wash investigators eventually turned their attention to Odebrecht, and they arrested Marcelo Odebrecht on June 19, 2015. He "has [since] been convicted of corruption and money laundering and sentenced to more than 19 years in prison. . . . Other top Company officials have been similarly implicated and have agreed to cooperate in exchange for leniency. Odebrecht itself . . . pled guilty [on December 21, 2016 in the U.S. District Court for the Eastern District of New York] to violations of the antibribery provisions of the Foreign Corrupt Practices Act

('FCPA'), implicating its [Norberto] subsidiary as an instrumentality in the scheme, and agreeing to pay $2.6 billion in penalties." (Id. at 5 and ¶¶ 13-15)

Following the disclosure of Odebrecht's bribery scheme, ratings agencies downgraded Odebrecht's debt. (Id. ¶ 179)  As a result, the value of Plaintiff's Notes has declined precipitously, at one point falling by 48% in less than three months. (Id. ¶ 180) Plaintiff asserts that it is not able to sell its Notes at par or to obtain interest reflective of the Notes' true risk. (Id.)

## III.    **PROCEDURAL HISTORY**

The Complaint was filed on October 20, 2017, and the FAC was filed on February 1, 2018. (Dkt. Nos. 1, 35)

Defendants Norberto and Engenharia, along with former Defendant Odebrecht Finance Ltd., moved to dismiss the Amended Complaint on April 20, 2018. (Dkt. No. 47)  On May 20, 2020, this Court granted in part and denied in part Defendants' motion. Odebrecht I, 461 F. Supp. 3d 46.  As relevant here, this Court concluded that the FAC adequately pled (1) securities fraud under Federal law and Washington law with respect to Defendants' statements regarding "competitive bidding"; and (2) successor liability as to Defendant Engenharia. However, this Court granted the motion to dismiss as to (1) the FAC's allegations of securities fraud arising out of Defendants' statements regarding compliance with Brazilian GAAP; and (2) claims against Odebrecht Finance. See id., passim.

On June 26, 2020, following jurisdictional discovery, the parties entered into a stipulation providing that Odebrecht would not raise a defense of lack of personal jurisdiction. This Court so-ordered the parties' stipulation on June 29, 2020. (Dkt. Nos. 81-82)

In a July 7, 2020 stipulation, Defendants "consent[ed] to the filing of the SAC. . . . pursuant to Fed. R. Civ. P. 15(a)(2)."  (Dkt. No. 84 at 3) [2]  This Court so-ordered the stipulation on July 9, 2020, and Plaintiff filed the SAC that same day.  (Dkt. Nos. 85-86)

The SAC alleges – as against all Defendants – (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5; (2) violations of the Washington State Securities Act; and (3) common law fraud.  As against Odebrecht, the SAC alleges control person liability under Section 20(a) of the Exchange Act and under the Washington State Securities Act.  (SAC (Dkt. No. 86) ¶¶ 199-229)

On September 14, 2020, Defendants moved to dismiss (1) the SAC's Federal and state law claims to the extent that they are premised on Brazilian GAAP violations; (2) the SAC's Federal and state law control person liability claims against Odebrecht; and (3) all claims against Engenharia to the extent they are not premised on successor liability.  (Dkt. No. 87)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable

---

[2] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

   A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678.

   "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Moreover, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). A court may also consider "legally required public disclosure documents filed with the SEC." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

  **B.**  **Standards for Pleading Securities Fraud**

   "A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012). First, the complaint must satisfy Federal Rule of

Civil Procedure 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).  In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d at 383.

      The heightened pleading requirement under Rule 9(b) "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, 493 F.3d at 99 (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)).  Pursuant to Rule 9(b), a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach, 355 F.3d at 170 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

      Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976))).  "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative

evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing

inferences rationally drawn from the facts alleged.").  "A complaint will survive . . . only if a

reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." Id. at 324.

## II.    ANALYSIS

### A.    Whether *Odebrecht I* Precludes Further Amendment

Defendants argue that "Plaintiff's attempt to plead again claims that 'financial

statements and disclosures were false when issued' and 'in violation of Brazilian GAAP' should

be rejected[,] because Plaintiff is bound by the Court's prior motion to dismiss decision, [in

which the Court held] that the only actionable misstatements [alleged in] Plaintiff's First

Amended Complaint . . . were those premised on [Norberto]'s claim that it 'obtained contracts

through competitive bidding.'"  (Def. Br. (Dkt. No. 88) at 8 (quoting SAC (Dkt. No. 86) ¶ 88;

and Odebrecht I, 461 F. Supp. 3d at 72))

Defendants point out that (1) when they moved to dismiss the FAC, "they asked

the Court to dismiss Plaintiff's claims with prejudice"; and (2) "[w]hen the Court dismissed

Plaintiff's claims asserted in its First Amended Complaint for alleged misstatements premised on

GAAP violations, that dismissal was not stated to be 'without prejudice,' nor did the opinion

otherwise grant leave to replead those or any other dismissed claims, even though in its

opposition brief Plaintiff had requested leave to replead any claims found to be deficient."  (Id.

(quotations omitted))  Defendants further note that "'unless otherwise specified, a dismissal for

failure to state a claim under Rule 12(b)(6) is presumed to be both a judgment on the merits and

to be rendered with prejudice.'"  Because Odebrecht I is silent as to whether dismissal is with or

without prejudice, "the claims the Court sustained may move forward, and the ones it dismissed

were dismissed with prejudice."  (<u>Id.</u> at 9 (quoting <u>Read v. Corning Inc.</u>, 371 F. Supp. 3d 87, 90-91 (W.D.N.Y. 2019)))

Defendants do not acknowledge the effect of the July 7, 2020 stipulation, however, in which they "consent[ed] to the filing of the SAC . . . pursuant to Fed. R. Civ. P. 15(a)(2)."  (Dkt. No. 84 at 3)  If Defendants intended to argue that <u>Odebrecht I</u> bars Plaintiff from amending claims dismissed in that decision, they should not have consented to Plaintiff's filing of the SAC containing claims previously dismissed.  As it is, Defendants have waived their right to argue that previously dismissed claims were dismissed with prejudice.

**B.**  **<u>Federal Securities Law Claims</u>**

Defendants argue that, consistent with <u>Odebrecht I</u>, Plaintiff's Section 10(b) and Rule 10b-5 claims against Norberto and Odebrecht should be limited to claims against Norberto based on Norberto's statements about competitive bidding.  Defendants further contend that Plaintiff's control person claims against Odebrecht under Section 20(a) should be dismissed.

**1.**  **Whether the SAC Alleges Actionable Misstatements Due to Brazilian GAAP Violations**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  <u>ATSI Commc'ns</u>, 493 F.3d at 105 (citation omitted); <u>see</u> <u>also</u> <u>San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.</u>, 75 F.3d 801, 808 (2d Cir. 1996) ("To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury.").

As in the FAC, the SAC relies on the following statement by Norberto, which appears in the 2012, 2013, and 2014 offering memoranda, and in the quarterly and annual financial statements attached to those memoranda: "We prepare our consolidated financial statements in accordance with accounting practices adopted in Brazil, or Brazilian GAAP." (SAC (Dkt. No. 86) ¶ 88-91)  Plaintiff alleges that "[t]hese financial statements and disclosures were false when issued as they failed to properly account for or disclose the revenue, expenses, hidden assets, liabilities and ill-gotten gains directly arising from defendants' fraudulent bribery scheme in violation of Brazilian GAAP."  (Id. ¶ 88)

The SAC alleges that Norberto committed four separate Brazilian GAAP violations by failing to (1) "accrue a provision in its financial statements and disclosures . . . for the clearly foreseeable and estimable financial obligations arising from defendants' ongoing illegal bribery scheme, including the probable material financial disgorgements, penalties, fines and legal costs," in violation of CPC 25 and IAS 37; (2) "disclose as part of its financial disclosures" a "contingent liability" in connection with "the nature of defendants' illegal bribery scheme, along with the clearly foreseeable and estimable expected financial costs that would likely be incurred to settle the legal and financial consequences of this conduct," in violation of CPC 25 and IAS 37; (3) "separately present or disclose the material amounts of foreign and domestic contract revenue it obtained as a result of its illegal corruption and bribery activities from its normal recurring contract revenue," in violation of CPC 00; and (4) "recognize, classify, and adequately disclose material amounts of concealed, illegal expenses for the billions of dollars in illegal bribes and kickbacks that were, in effect, part of the cost required to obtain and generate reported revenues on particular material contracts," in violation of CPC 17 and IAS 11. (Id. ¶¶ 94-95, 99-107, 111, 113)

In <u>Odebrecht I</u>, this Court concluded that the FAC's claims based on Brazilian

GAAP violations were not actionable, and granted "Defendants' motion to dismiss . . . as to

alleged misstatements premised on GAAP violations."  <u>Odebrecht I</u>, 461 F. Supp. 3d at 69-72,

74.  In so ruling, the Court concluded, <u>inter alia</u>, that Plaintiff had not pled facts demonstrating

that a "present obligation" was "probable" as of March or June 2014.  <u>Id.</u> at 70 (quotations

omitted).

Discussed below are the SAC's new allegations regarding Norberto's alleged

Brazilian GAAP violations:

        **a.**      **<u>Provision Accrual</u>**

The SAC alleges that under Brazilian GAAP a "provision" – defined as a

"liabilit[y] [that] can only be measured using a high degree of estimation" – must

> be recognized by a charge against income when, after considering all the available
> evidence:  (i) it is probable that a present obligation for a past event or conduct
> exists; (ii) which will more likely than not require a future disbursement to settle
> the obligation; and (iii) a reasonable estimate of the required disbursement to
> settle the obligation can be made after weighing all possible outcomes or ranges
> of outcomes. . . . As with Brazilian GAAP, IFRS also requires an accrual of an
> expense related to the liability if the loss is "probable" and can be reasonably
> estimated.

(SAC (Dkt. No. 86) ¶ 95 (citing CPC 25 ¶¶ 12-19, 25, 36, 39; IAS 37 ¶ 10))

In <u>Odebrecht I</u>, this Court concluded that Plaintiff had not alleged facts

demonstrating that a loss was "probable," which is the trigger for requiring a party to accrue a

provision under CPC 25:

> Plaintiff further alleges that the "covert investigation into corruption related to
> Petrobras" began "[i]n or about 2014," after which Defendants "bec[ame] aware
> of these investigations" and engaged in certain obstructive activities.
>
> Plaintiff does not claim that Defendants were aware of this investigation by
> March 31, 2014, or even by June 27, 2014, however, when the 2014 offering
> memorandum was issued.  Indeed, Plaintiff acknowledges that the investigation
> that began in 2014 "did not initially focus on Odebrecht."  Accordingly, Plaintiff

12

has not pled facts demonstrating that a "present obligation" to disclose was
"probable" by March or June 2014.  Instead, Plaintiff merely cites the fact that in
late 2016, Odebrecht "pled guilty to the underlying [bribery] scheme [and
accordingly Defendants'] state of mind is not at issue."  Plaintiff's allegations are
not sufficient to meet the probability requirement under CPC 25.

Odebrecht I, 461 F. Supp. 3d at 70 (quoting FAC (Dkt. No. 35) ¶¶ 4, 48-50; Pltf. Opp. to First

Mot. to Dismiss (Dkt. No. 50) at 40)

> Plaintiff contends that the following new allegations in the SAC cure the defect

identified by this Court:

> [The SAC] details the amount of the bribes by year, revealing that those bribes
> increased exponentially from 2006 through 2012, it alleges that Marcelo
> Odebrecht was warned as early as 2009 that the bribe amounts were so high that
> they would be "[f]inancial suicide," and "that the volume of resources [devoted to
> bribery] was growing brutally," and it reveals that Marcelo Odebrecht instructed
> the Bribe Department to move out of Brazil after 2013 specifically to evade
> authorities.  These allegations demonstrate that it was probable that [Norberto]
> faced a present and foreseeable obligation for its bribery scheme when the
> [offering memoranda] were issued.

(Pltf. Opp. (Dkt. No. 92) at 18-19 (citing SAC (Dkt. No. 86) ¶¶ 65, 96-97) (footnote omitted))

> The Court addresses below the sufficiency of these new allegations.

### i.     Bribe Amounts

> The SAC alleges that the "amount of bribes paid through the Division of

Structured Operations [from 2006 to 2014] was a shocking $3.3 billion," and escalated year by

year as follows:

| Year | Bribes |
|------|--------|
| 2006 | $60 million |
| 2007 | $80 million |
| 2008 | $120 million |
| 2009 | $260 million |
| 2010 | $420 million |
| 2011 | $520 million |
| 2012 | $730 million |
| 2013 | $730 million |
| 2014 | $450 million |

(SAC (Dkt. No. 86) ¶¶ 65, 103)  Plaintiff contends that "the likelihood of exposure of the bribery and kickback scheme is demonstrated by the sheer enormity and increasing nature of the bribes." (Id. ¶ 103)

As Defendants point out, however, "Plaintiff offers no facts indicating that [the] alleged additional $2.512 billion in bribes over the $788 million in bribes alleged in the First Amended Complaint made discovery of the scheme materially more likely."  (Def. Br. (Dkt. No. 88) at 16)  Defendants contend that if "the sheer enormity" of the bribery scheme made a loss probable, this Court would have found in Odebrecht I that the FAC's allegations of $788 million in bribes were sufficient.  The Court agrees that Plaintiff has not explained why a $3.3 billion bribery scheme would likely be discovered, while a $788 million bribery scheme likely would not be discovered.

Plaintiff also does not explain why a bribery scheme is more likely to be detected where the bribes increase over time, as opposed to remaining constant.  The SAC's allegation that the "increasing nature of the bribes" "demonstrate[s]" an increased "likelihood of exposure of the bribery and kickback scheme" (SAC (Dkt. No. 86) ¶ 103) is conclusory, and Plaintiff cites no facts or case law supporting this proposition.

In sum, Plaintiff has not alleged facts demonstrating that the increasing bribe amounts required Defendants to accrue a provision.

ii.     **Warnings to Marcelo Odebrecht**

The SAC alleges that,

> by the time defendants issued the 2012 [offering memorandum], it was highly
> probable that future contingencies for such financial penalties would have a
> material adverse impact on [Norberto's] future results of operations and financial
> condition.  In fact, Mascarenhas testified that he repeatedly warned Marcelo
> Odebrecht that the bribe amounts had reached levels that would be "financial
> suicide," explaining that "[s]ince 2009 I alerted Marcelo (Odebrecht) that the
> volume of resources was growing brutally" while describing his reference to
> "suicide" as "[f]inancial suicide, suicide risk, suicide of security, suicide of
> everything."  Marcelo instructed him to continue even with these warnings – "I
> warned Marcelo several times how astronomical these sums were.  It had become
> a real suicide, <u>but his answer was to keep going</u>."

(SAC (Dkt. No. 86) ¶ 96 (quoting Mascarenhas's alleged testimony; emphasis in original))

The SAC's description of Mascarenhas's alleged testimony – although attributed

entirely to an October 2017 *Le Monde Diplomatique* article (<u>id.</u> ¶ 6 n.6) – is an amalgam of

excerpts from that article and an April 2017 <u>Newsroom Panama</u> article.  This Court takes judicial

notice of these two articles, which have been filed on the docket.  (Dkt. Nos. 106-2, 107-1)  <u>See</u>

<u>DiFolco</u>, 622 F.3d at 111 ("[A] district court may consider . . . documents incorporated by

reference in the complaint.").

The relevant passage of the October 2017 *Le Monde Diplomatique* article is as

follows:

> "I warned Marcelo about these huge amounts several times. I said it was suicide,
> but he told me to continue," Mascarenhas testified under a plea agreement.

(Anne Vigna, <u>Conglomerate That Paid Off A Government:  Brazil's Odebrecht Scandal</u>, Le

Monde Diplomatique (Oct. 1, 2017) (Dkt. No. 106-2) at 4)

The relevant passage of the April 2017 <u>Newsroom Panama</u> article is as follows:

> "Since 2009 I alerted Marcelo (Odebrecht) that the volume of resources was
> growing brutally," Mascarenhas recalled in his statement in the framework of a
> collaboration agreement with Justice, which also involved 76 other ex-directors of
> the company.

. . . .

The policy of bribes, which went from 60 million dollars destined in 2006 and grew progressively to the 730 million dollars of 2012 and 2013, got to be described by Mascarenhas as "suicide."

"Financial suicide, suicide risk, suicide of security, suicide of everything," he said.

(Panama Looms Large in Brazil Bribery Revelations, Newsroom Panama (Apr. 16, 2017) (Dkt. No. 107-1) at 3)

In sum, the SAC asserts that, "[s]ince 2009," Mascarenhas warned Marcelo Odebrecht both that (1) "the volume of resources [devoted to bribes] was growing brutally," and (2) the bribery scheme was "suicide."  (SAC (Dkt. No. 86) ¶ 96 (quotations omitted))  As discussed above, however, the reference to the increasing bribe amounts does not suffice to allege an obligation to accrue a provision.  As to Mascarenhas's warning to Marcelo Odebrecht that the bribery scheme was "suicide," the articles do not make clear when he conveyed that warning.  Accordingly, even assuming arguendo that such a warning would have put Marcelo Odebrecht on notice that a loss was "probable," there is no indication that any such warning occurred before the offering memoranda were issued.

For these reasons, the SAC's allegations about Mascarenhas's warnings to Marcelo Odebrecht do not demonstrate that Defendants were required to accrue a provision.

### iii.     Moving the Structured Operations Department Out of Brazil

The SAC alleges that,

after a second consecutive year of paying $730 million in bribes in 2013, Marcelo Odebrecht panicked.  He instructed Mascarenhas to move the Department of Structured Operations out of Brazil specifically to evade authorities, testifying himself that "'I think you all should go abroad to work because here, when you use the phone you will be scared, when you use the computer you will be afraid. You will be afraid your offices will be bugged . . . [a]nd you will fall asleep wondering whether the next day the police will come for you.'"

(SAC (Dkt. No. 86) at 97 (quoting Michael Smith et al., No One Has Ever Made a Corruption Machine Like This One, Bloomberg (the "Bloomberg Article") (June 8, 2017), available at https://www.bloomberg.com/news/features/2017-06-08/no-one-has-ever-made-a-corruptionmachine-like-this-one) (in turn quoting Marcelo Odebrecht's alleged testimony) (alterations in the SAC))  While the SAC does not allege when Marcelo Odebrecht directed that the Structured Operations Department be moved, the Bloomberg Article cited in the SAC states that this direction was given "[b]y mid-2014."  Bloomberg Article, supra.

Marcelo Odebrecht's alleged statements indicate that by mid-2014, he believed that members of the Structured Operations Group would become fearful of government investigation, and that that concern might interfere with their work and emotional well-being. The Bloomberg Article states – without factual support – that Marcelo Odebrecht "worried [that] his people might be next."  Neither the SAC nor the Bloomberg Article alleges when the Operation Car Wash investigators began to investigate Odebrecht, however.  And the SAC does not allege facts demonstrating that – when Marcelo Odebrecht directed that the Department of Structured Operations be moved out of Brazil – he and/or his employees believed that detection of the bribery scheme was probable.

Accordingly, the SAC's allegations concerning Marcelo Odebrecht's direction that the Department of Structured Operations be moved out of Brazil do not indicate that Defendants were required to accrue a provision under CPC 25.[3]

---

[3]  The SAC also alleges that Mascarenhas "testif[ied] that '[t]he more the [Division of Structured Operations] grew, the more worried Marcelo became' and explained that 'Marcelo insisted a lot, pressured the team to go very fast.  They went in a hurry.'"  (SAC (Dkt. No. 86) ¶ 97 (alterations in SAC) (quoting alleged testimony by Mascarenhas))  The context for these statements is not clear, and they do not appear in the Bloomberg Article that Plaintiff cites as their source.  (Id. ¶ 7 n.7)  In any event, the statements are vague and do not demonstrate that

iv.    **Plaintiff's Arguments**

Plaintiff complains that Defendants analyze the SAC's new allegations individually, "explaining factually why each on its own does not show that a loss was probable . . . . But . . . courts look at the allegations holistically, rather than in isolation, and . . . such factual arguments are not appropriate on a motion to dismiss."  (Pltf. Opp. (Dkt. No. 92) at 19) In support of this argument, Plaintiff cites DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A. ("DoubleLine II"), 413 F. Supp. 3d 187 (S.D.N.Y. 2019).

In DoubleLine II, a securities fraud case brought against the same defendants and premised on many of the same factual allegations, the court addressed a third amended complaint that added new allegations similar to the new allegations in the SAC.

The third amended complaint in DoubleLine II

> pleads that the amount of money paid in bribes increased sharply in the four years leading up to 2009, and remained high for the following five years.  In 2006, [Norberto] paid out $60 million in bribes.  In 2007, they paid $80 million.  In 2008, $120 million.  By 2009, [Norberto] paid $260 million in bribes.  From 2010 through 2014, it paid $420 million, $520 million, $730 million, $730 million, and $450 million respectively.  Such a "dramatically escalating scheme," Plaintiffs allege, could not indefinitely "evade the notice of regulators" and was " 'more likely than not' to be exposed."  Even [Odebrecht]'s head of Structured Operations seemed aware of the risk, warning Marcelo Odebrecht that by 2009 the bribes were "financial suicide" and posed extreme risk to the company.  By 2014, CEO Odebrecht was even asking members of the Structured Operations team to flee Brazil to avoid investigation.

DoubleLine II, 413 F. Supp. 3d at 208 (quoting DoubleLine II Third Amended Complaint).

Regarding the sufficiency of these allegations, the DoubleLine II court concludes that

> Plaintiffs did not need to plead that the investigation was likely to have revealed the scheme between 2009 and March 2012.  Rather, Plaintiffs needed to allege facts sufficient to show that although the company believed exposure "more likely than not," [Norberto] still failed to disclose the liability per GAAP.  Given these newly alleged

---

Marcelo Odebrecht or other relevant Odebrecht and Norberto managers believed that a loss was probable – as opposed to merely possible – at the time of the alleged misstatements.

facts, Plaintiffs adequately demonstrate that company officials thought the possibility of detection was more than remote by 2009, triggering their obligation to footnote the liability in any of the covered reporting periods.

Id.

The analysis in DoubleLine II is not persuasive here.  While the DoubleLine II court accepts at face value the allegation that "dramatically escalating bribes" present a much greater risk of exposure, for reasons discussed above, this assertion is not plausible.  Plaintiff has not explained why a $3.3 million bribery scheme presents a much greater risk of discovery than a $788 million bribery scheme.  Moreover, as discussed above, Mascarenhas's alleged warning to Marcelo Odebrecht "by 2009" that Defendants' bribes were "financial suicide" is not reflected in the sources on which the SAC relies.  Finally, in finding the allegations in DoubleLine II adequate, the court concluded that plaintiffs had "demonstrate[d] that company officials thought the possibility of detection was more than remote." DoubleLine II, 413 F. Supp. 3d at 208.  But the standard is not whether Odebrecht's managers thought that "the possibility of detection was more remote."  The standard for Defendants' disclosure obligations under Brazilian GAAP – as articulated by Plaintiff – is whether Odebrecht's managers had concluded that "it was 'more likely than not' that the bribery and kickback scheme would be exposed."  (SAC (Dkt. No. 86) ¶ 103)  For the reasons explained above, the new allegations in the SAC do not satisfy the "more likely than not" standard.

Plaintiff also incorrectly argues that the "more likely than not" inquiry is subject to an objective test:  "The pertinent inquiry is if and when it became probable that Defendants faced financial obligations and would 'more likely than not' be required to make a future disbursement because of the bribery scheme."  (Pltf. Opp. (Dkt. No. 92) at 20)  "The PSLRA requires plaintiffs to state with particularity[, however,] both the facts constituting the alleged

19

violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst, 425 U.S. at 194 & n.12).  If, at the time of the alleged misstatements, Marcelo Odebrecht and other senior managers within the Odebrecht companies did not believe that it was probable that an obligation existed with respect to the bribery scheme – such that Brazilian GAAP required the accrual of a provision – then the objective fact that such an accrual was required does not establish scienter as to the statement that Norberto "prepare[s] [its] consolidated financial statements in accordance with accounting practices adopted in Brazil, or Brazilian GAAP."  (SAC (Dkt. No. 86) ¶ 89)

Moreover, even assuming arguendo that Plaintiff need not plead when law enforcement detected the bribery scheme, the SAC does not plead facts demonstrating when the investigation into Odebrecht began or when it became probable that Odebrecht's bribery scheme would be detected.  See Odebrecht I, 461 F. Supp. 3d at 70 ("Plaintiff acknowledges that the investigation that began in 2014 'did not initially focus on Odebrecht.'  Accordingly, Plaintiff has not pled facts demonstrating that a 'present obligation' to disclose was 'probable' by March or June 2014.") (quoting FAC (Dkt. No. 35) ¶ 4).

\*       \*       \*       \*

The SAC does not allege facts demonstrating that, at the time of the alleged misstatements, "it [was] probable that a present obligation for a past event or conduct exist[ed]" in connection with Odebrecht's bribery scheme, "which [would] more likely than not require a future disbursement to settle the obligation" – or that Defendants believed that it was probable such an obligation existed – so as to require Defendants to accrue a provision under CPC 25 and/or IAS 37.  (SAC (Dkt. No. 86) ¶ 95)

b.      **Costs of a Contingent Liability**

Pursuant to CPC 25 and IAS 37, the SAC alleges that,

> to the extent the accounting standards for accrual of [a] loss [related to the bribery scheme] were not met[,] . . . [Defendants were obligated to] provide footnote disclosure of the contingency if it [was] "more likely than not" that the contingency [would] ultimately result in a loss.  The "more likely than not" threshold is defined as a greater than 50% likelihood – i.e., that the probability that a loss "will occur is great than the probability that it will not."

(SAC (Dkt. No. 86) ¶ 100 (citing IAS 37 ¶¶ 15, 23))

In Odebrecht I, this Court held that the FAC had not alleged an actionable misstatement based on a failure to disclose the cost of a contingent liability, because "[a]s . . . with . . . the accrual provision, . . . there is no such requirement where a plaintiff has not alleged that the investigation had begun at the time of the alleged misstatement." Odebrecht I, 461 F. Supp. 3d at 71 (citing Gusinsky v. Barclays PLC, 944 F.Supp.2d 279, 290-91 (S.D.N.Y. 2013) (noting that for a contingent liability, "[a]t most, the disclosure obligation would arise when an investigation into the conduct began"), vacated in part on other grounds sub nom. Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227 (2d Cir. 2014)).

Plaintiff argues that the SAC's new allegations discussed above address this deficiency:

> There can be little doubt that Odebrecht's massive bribery scheme presented a contingent liability that was known or knowable to defendants and certainly "more likely than not" given the escalating nature of the bribes, their size, the growing concern within the Bribe Department that Odebrecht faced financial suicide because of the bribes, and the Department of Structured Operations' rapid departure from Brazil to admittedly escape Brazilian authorities.

(SAC (Dkt. No. 86) ¶ 101)

As discussed above, however, the SAC's new allegations do not demonstrate that a law enforcement investigation of Odebrecht had begun at the time of the alleged

misstatements.  Nor do the new allegations demonstrate that, at the time of the alleged

misstatements, the makers of those statements believed that a loss was more likely than not.

Accordingly, the Court concludes – for essentially the same reasons set forth in

Odebrecht I – that Plaintiff has not alleged an actionable misstatement in connection with the

Brazilian GAAP requirement to disclose the cost of a contingent liability.

### c.      Contract Revenue

The SAC alleges that Norberto

> improperly failed to separately present or disclose the material amounts of foreign
> and domestic contract revenue it obtained as a result of its illegal corruption and
> bribery activities from its normal recurring contract revenue. . . . Brazilian GAAP,
> including . . . CPC 00, Conceptual Structure for the Preparation and Presentation
> of the Financial Statements, states that it is common practice to present and
> disclose different types of revenue separately in order to assist investors in
> assessing the ability of a business to generate cash in the future and distinguish
> revenues that arise in the normal course of the entity's business from revenues
> stemming from contingent activities that may not be repeated on a regular basis.

(SAC (Dkt. No. 86) ¶¶ 106-07)

In Odebrecht I, this Court found that the FAC "[did] not allege 'which illegally

obtained contract revenues were reported in [Norberto's] financial statements and the

corresponding bribe payments that should have been reported as expenses.'"  The Court

therefore "conclude[d] that Plaintiff ha[d] not pled sufficient facts to demonstrate that this

alleged GAAP violation [was] an actionable misstatement."  Odebrecht I, 461 F. Supp. 3d at 71-

72 (quoting DoubleLine Cap. LP v. Odebrecht Fin., Ltd. ("DoubleLine I"), 323 F. Supp. 3d 393,

447 (S.D.N.Y. 2018)).

In contrast to the FAC, the SAC cites (1) particular contracts procured through

bribery – including a $580 million contract for a Colombian project awarded in 2010, and a $300

million contract for a Guatemalan project awarded in 2012; (2) the total revenue by country for

corrupt contracts in Peru, Panama, Ecuador, and the Dominican Republic, as set forth in

Odebrecht's plea agreement with the U.S. Department of Justice; and (3) Norberto's reported

revenue from 2009 to 2014, which Plaintiff contends should have disclosed the revenues

obtained through bribery.  (SAC (Dkt. No. 86) at 108-10)  As Plaintiff points out, "DoubleLine II

. . . upheld allegations similar to Plaintiff's allegations here."  (Pltf. Opp. (Dkt. No. 92) at 24

(citing DoubleLine II, 413 F. Supp. 3d at 208-09) (emphasis in Pltf. Opp.))

        Defendants argue that, notwithstanding the SAC's new

> allegations regarding which revenues were improperly reported in which years[,] . . . . the SAC still fails to plead a Brazilian GAAP violation based on CPC 00 for the more basic reason that a failure to adhere to CPC 00 cannot render [Norberto's] financial statements actionable.  By its terms, CPC 00 establishes an encouraged practice and not a mandatory requirement for compliance with Brazilian GAAP.

> According to Plaintiff, "Brazilian GAAP, including the CPC-00 . . . states that it is common practice to present and disclose different types of revenue separately in order to assist investors."  Based on Plaintiff's own description of CPC-00, it does not allege that such separation of revenue sources is required, and that therefore failure to separately distinguish certain revenue sources cannot constitute a violation of Brazilian GAAP.  This reading of CPC 00 accords with Judge Woods' assessment in DoubleLine II, where he observed that, as in the SAC, DoubleLine's "description of CPC 00 suggests that distinguishing between normal revenue streams and revenue derived from contingent activities is a 'common practice' – permissive, not mandatory. . . ." Judge Woods. . . . [went on to find] that [d]efendants had not raised the permissive/mandatory argument [and] thus [he] was required to assume for purposes of the motion to dismiss before him that failure to follow CPC 00 was a Brazilian GAAP violation.

(Def. Br. (Dkt. No. 88) at 13-14 & n.4 (citing and quoting SAC (Dkt. No. 86) ¶¶ 106-10; quoting

DoubleLine II, 413 F. Supp. 3d at 208 n.2) (emphases in Def. Br.))

        The relevant passage of CPC 00, which is quoted in the SAC (Dkt. No. 86 ¶ 107),

reads as follows:

> Revenues and expenses can be presented in the income statement in different ways so that they provide information relevant to the decision-making process. For example, it is common practice to distinguish between revenues and expenses that arise in the course of the entity's usual activities and the others.  This distinction is made because the source of a revenue is relevant in assessing the entity's ability to generate cash or cash equivalents in the future; for example,

revenue from any contingent activities such as the sale of a long-term investment
is not usually repeated on a regular basis.  In this distinction, the nature of the
entity and its operations must be taken into account.  Items that result from the
ordinary activities of an entity may be unusual in other entities.

(CPC 00 (Dkt. No. 108-10) ¶ 72)

CPC 00 is not a mandatory provision.  While CPC 00 states that "it is common
practice to distinguish between revenues and expenses that arise in the course of the entity's
usual activities and the others," it does not state that such distinctions are required.

Harris v. AmTrust Fin. Servs., Inc., 135 F. Supp. 3d 155 (S.D.N.Y.
2015), aff'd, 649 F. App'x 7 (2d Cir. 2016) is instructive on this point.  In Harris, plaintiff Harris
alleged that when defendant AmTrust "eliminated intra-entity transactions between [its]
subsidiaries in Bermuda and Luxembourg (which GAAP required it to do), it 'improperly
reclassif[ied] or misclassif [ied] loss and loss adjustment expenses for the Luxembourg
subsidiaries' and caused them 'to appear on other, unrelated[] lines' in the consolidated financial
statement, thereby 'convert[ing] underwriting losses into non-underwriting losses.'"  Id. at 164
(quoting Harris, 14 Civ. 736 (VEC), Second Am. Cmplt. (Dkt. No. 39) ¶¶ 66, 138, 143) (brackets
in Harris).  Harris alleged that this "elimination" through consolidation was "a material violation
of GAAP and . . . caused [AmTrust's] financial statements to be materially false and
misleading."  Harris, 14 Civ. 736 (VEC), Second Am. Cmplt. (Dkt. No. 39) ¶ 143.  In support of
this argument, Harris cited the Statement of Financial Accounting Concepts No. 1, Objectives of
Financial Reporting by Business Enterprises ("CON 1"), for the propositions that (1) "'financial
statements are a central feature of financial reporting and are a principal means of
communicating accounting information to those outside an enterprise'"; and (2) "the primary
focus of financial reporting is information about an [e]nterprise's performance provided by

measures of earnings and its components rather than cash flows." <u>Id.</u> ¶ 144 (citing CON 1 ¶¶ 6, 42).

In finding plaintiff's allegations of GAAP violations insufficient, the <u>Harris</u> court noted that Harris did "not identify any specific provision of GAAP that AmTrust allegedly violated," and had "provide[d] no support for the notion that the way AmTrust classified its loss and loss adjustment expenses violated GAAP." <u>Harris</u>, 135 F. Supp. 3d at 171-72 & n.28.

Similarly here, Plaintiff's citation to CPC 00 for what is a "common practice" in presenting revenue and expenses in financial statements does not demonstrate that Defendants violated Brazilian GAAP.

In sum, the SAC does not allege an actionable misstatement in connection with Norberto's failure to distinguish contract revenue associated with bribes.[4]

### d.    <u>Contract Expenses</u>

The SAC alleges that,

[u]nder Brazilian GAAP and IFRS, expenses are typically recognized in the period that they are paid. . . . Bribes to obtain contracts are not among the types of costs identified as contract costs [that, as an exception to this general rule, can be recognized ratably as expenses along with the associated revenue over the life of the contract] as described by [CPC 17 and by] IAS 11, ¶¶ 16-17 and 21, and, being related to marketing or obtaining projects, are appropriately considered a "Selling Cost" under IAS 11 ¶ 20. Under IAS 11, Selling Costs are not capitalized and then expensed in subsequent periods. Instead, IAS 11 requires that selling costs be expensed in the period that they are paid.

Regardless of whether a transaction (bribes and kickbacks in this instance) is considered a selling cost or a contract cost, the cost must be immediately recorded

---

[4] <u>DoubleLine II</u> "notes that [p]laintiffs' description of CPC 00 suggests that distinguishing between normal revenue streams and revenue derived from contingent activities is a 'common practice' – permissive, not mandatory." The court went on to "assume[], without deciding, that violating CPC 00 constitutes a violation of Brazilian GAAP," but did so only "[b]ecause [d]efendants did not challenge [p]laintiffs' characterization of CPC 00." <u>DoubleLine II</u>, 413 F. Supp. 3d at 208 n.2. Here, by contrast, Defendants have "challenge[d] Plaintiff['s] characterization of CPC 00."

in the company's books when incurred, either as an expense, or as a capitalized contract cost to be recognized as an expense in subsequent periods during the contract. In this case, however, by keeping the bribes and kickbacks off book, [D]efendant [Norberto] improperly did neither. As such, the hundreds of millions in kickbacks and bribes were neither recognized in the period paid, nor recognized over the period of the contract.

(SAC (Dkt. No. 86) ¶¶ 113-14)

In Odebrecht I, this Court held that the FAC "[did] not allege which contracts were associated with which bribes," and therefore "conclude[d] that Plaintiff [had] not pled sufficient facts to demonstrate that this alleged GAAP violation [was] an actionable misstatement." Odebrecht I, 461 F. Supp. 3d at 72.

In the SAC, Plaintiff cites numerous contracts throughout Latin America that were awarded to Odebrecht because of specific bribes, with the bribe amount per contract ranging from $4.6 million to "at least $142 million." (SAC (Dkt. No. 86) ¶¶ 72-74, 117) These new factual allegations satisfy the particularized pleading standard under Rule 9(b) and the PSLRA. See DoubleLine II, 413 F. Supp. 3d at 209 ("[T]he third amended complaint identifies at least one $23 million payment in 2010 that [Norberto] made in 2010 to a specific individual to secure a construction contract for Brazil's Abreu e Lima Refinery. . . . Plaintiffs have met their burden under Rule 9(b) to particularly allege a violation.").

Defendants argue, however, that the SAC "remains deficient because it fails to allege that the costs of the bribes associated with the specific contracts that Plaintiff now identifies in SAC ¶ 117 were material to the disclosed selling costs of those particular contracts." (Def. Br. (Dkt. No. 88) at 21) But the SAC alleges that "[t]hese unrecognized expenses related to bribes were plainly material to the reported financial condition of [Norberto], and would have been important to investors," and that "[b]y concealing these costs and keeping the funds to pay them off book, as alleged herein, [Norberto] materially understated its expenses and materially

overstated its reported net income during the years 2009-2014." (SAC (Dkt. No. 86) ¶ 118)  And given that paragraph 117 of the SAC alleges nearly $280 million in bribes, "[a] substantial likelihood exists that a reasonable investor would view [these costs] as significant alterations of the 'total mix' of information made available" – i.e., material.  Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 93 (2d Cir. 2010) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988)).

Accordingly, Plaintiff has alleged an actionable misstatement in connection with Norberto's failure to disclose the cost of bribes.

*　　　*　　　*　　　*

Norberto's statement that it "prepare[d] [its] consolidated financial statements in accordance with accounting practices adopted in Brazil, or Brazilian GAAP" (SAC (Dkt. No. 86) ¶ 89) is an actionable misstatement to the extent that Norberto did not disclose the cost of bribes. The SAC's remaining allegations of Brazilian GAAP violations are insufficient.  Defendants' motion to partially dismiss the Section 10(b) claim against Norberto will therefore be denied to the extent that Norberto is alleged to have made misstatements by stating that it prepared its financial statements in accordance with Brazilian GAAP, when in fact it violated Brazilian GAAP by not disclosing the cost of bribes.  The motion will be granted with respect to Norberto's other alleged Brazilian GAAP violations.

### 2.    Plaintiff's Direct Claims Against Odebrecht

Defendants argue that Plaintiff's direct claims against Odebrecht under Section 10(b) and Rule 10b-5 and control person claims against Odebrecht under Section 20(a) should be dismissed.  (Def. Br. (Dkt. No. 88) at 22-24)

#### a.    Odebrecht's Direct Liability

Defendants argue that

27

> Plaintiff's only claim against Odebrecht arising from a Brazilian GAAP violation
> is that Odebrecht "violated Brazilian GAAP and the norms of the CPC" when it
> consolidated [Norberto]'s financial statements and did not accrue a provision in
> its financial statements and disclosures.  Because Odebrecht's alleged violation is
> premised upon [Norberto]'s alleged violation, the same arguments regarding
> accrual provision as stated above in connection with [Norberto]'s financial
> statements are incorporated and relied on with regard to Odebrecht.  To the extent
> such claims must be dismissed against [Norberto], they must also be dismissed as
> to Odebrecht.

(Def. Br. (Dkt. No. 88) at 22 (quoting SAC (Dkt. No. 86) ¶ 94))

As Plaintiff points out, however, the SAC alleges that "Odebrecht also made its own false and misleading statements as a primary violator, including by misrepresenting its own financial results." (Pltf. Opp. (Dkt. No. 92) at 29)  In particular, Odebrecht allegedly asserted that its financial data was presented "'in accordance with the standards of the Brazilian Financial Account Standards Board'" and/or "'in accordance with the norms of the [t]he Committee on Accounting Statements.'"  (SAC (Dkt. No. 86) ¶¶ 92, 137, 140 (quoting 2014 and 2015 Odebrecht Annual Reports))  For the reasons discussed above in connection with Norberto's financial statements, Odebrecht's claims of Brazilian GAAP compliance are actionable misstatements to the extent that Odebrecht did not disclose the cost of bribes.

Plaintiff also contends that Odebrecht made actionable misstatements by "covering up the bribery scheme by issuing public denials." (Pltf. Opp. (Dkt. No. 92) at 29)  While the SAC alleges several such denials, all but one denial was issued after Plaintiff's final purchase of notes on February 4, 2015.  (SAC (Dkt. No. 86) ¶ 143 (citing October 2, 2014 press release))  And Plaintiff does not allege that it relied on that denial – which was made in an October 2, 2014 press release – in purchasing the notes.  (Id. ¶ 187 (listing categories of documents on which Plaintiff relied, and not including press releases))  Accordingly, Plaintiff's direct claims against Odebrecht will be confined to alleged misstatements about compliance with Brazilian GAAP, given the failure to disclose bribes.

### b.      Odebrecht's Control Person Liability

#### i.      Legal Standard

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108. "While a plaintiff can satisfy the pleading requirement of control by alleging sufficient facts to state a plausible claim of control, the heightened pleading standards of Rule 9(b) and the PSLRA apply to the pleading of culpable participation." Friedman v. JP Morgan Chase & Co., 15-cv-5899 (JGK) 2016 WL 2903273, at *10 (S.D.N.Y. 2016) (citing Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 437-39 (S.D.N.Y. 2014)), aff'd, 689 F. App'x 39 (2d Cir. 2017).

#### ii.      Primary Violation

Here, as discussed above, the SAC plausibly alleges that Norberto committed a primary violation through its statements that it complied with Brazilian GAAP. In addition, Defendants do not dispute that the SAC alleges a primary violation with respect to Norberto's statements about competitive bidding. Therefore, Plaintiff has satisfied the first element of control person liability.

#### iii.      Control of the Primary Violator

"'Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" Friedman, 2016 WL 2903273, at *11 (quoting SEC v. First Jersey Sec., 101 F.3d 1450, 1472-73 (2d Cir. 1996)). "Determining whether an individual defendant is a 'controlling person' is 'a fact-intensive inquiry that generally should not be resolved on a motion to dismiss.'" In re

Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 669 (S.D.N.Y. 2017) (quoting In re

BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015)).

      Here, the SAC alleges that Norberto "is a wholly owned subsidiary of

[D]efendant Odebrecht." (SAC (Dkt. No. 86) ¶ 47) The SAC also alleges facts demonstrating

that Odebrecht controlled Norberto's actions with respect to the bribery scheme, including, inter

alia, that (1) the Department of Structured Operations within Norberto "'was created to allow

Odebrecht to make unrecorded payments'"; (2) "Odebrecht, through Marcelo Odebrecht, also

dictated who participated in the scheme" by selecting the individual who would lead the

Department of Structured Operations; (3) "there was a revolving door between Odebrecht and

the [Structured Operations Department] at [Norberto][,] . . . . [which] 'was supplemented, as

needed, by a collection of Odebrecht employees and contractors with special skills – the

accountant, for example, who set up the web of front companies, and the computer programmers

who designed and ran a secret messaging system'"; and (4) Odebrecht caused Norberto to make

wire transfers in furtherance of the bribery scheme. (Id. ¶ 23, 25, 34, 59 (quoting Odebrecht Plea

Agreement and Bloomberg Article))

      These allegations suffice to state a claim of control of the primary violator under

the applicable plausibility standard. See In re: EZCorp, Inc. Sec. Litigations, 181 F. Supp. 3d

197, 213 (S.D.N.Y. 2016) (holding that control person liability was adequately alleged as to a

shareholder and a company he controlled even though "[t]he only facts alleged to support the

claims [of control were the shareholder's] status as sole voting shareholder, the broad allegation

that he participated in the management and day-to-day operations of [defendant issuer], and the

consulting services that [a second company he controlled] rendered for [defendant issuer]")

(citing In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 641 (S.D.N.Y. 2008), abrogated on

<u>other grounds</u> by <u>Dekalb Cnty. Pension Fund v. Transocean Ltd.</u>, 817 F.3d 393 (2d Cir. 2016), <u>as amended</u> (Apr. 29, 2016)).

### iv.    <u>Culpable Participation</u>[5]

"'The weight of well-reasoned authority is that to withstand a motion to dismiss a section 20(a) controlling person liability claim, a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context.'" <u>Friedman</u>, 2016 WL 2903273, at \*10 (quoting <u>Edison Fund v. Cogent Inv. Strategies Fund., Ltd.</u>, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008)). "That standard is 'similar to the scienter requirement of Section 10(b), [in that it] requires plaintiffs to plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct.'" <u>In re Alstom SA</u>, 454 F. Supp. 2d 187, 209-10 (S.D.N.Y. 2006) (quoting <u>In re Global Crossing, Ltd. Sec. Litig.</u>, No. 02 Civ. 910, 2006 WL 1628469, at \*11 (S.D.N.Y. June 13, 2006)) (internal quotations omitted).

District courts in this Circuit differ as to whether culpable participation requires allegations of direct involvement in the misstatement, or merely allegations of involvement in corporate management and/or fraudulent activity that the misstatement conceals. <u>Compare</u> <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611, 663 (S.D.N.Y. 2007) ("[A] claim under § 20(a) requires culpable <u>participation</u> – that is, actual involvement in the making of the fraudulent statements by the putatively controlled entity.") (emphasis in original), <u>with</u> <u>Pfizer</u>, 584 F. Supp.

---

[5]  District courts in this Circuit have disagreed as to whether a Section 20(a) plaintiff must plead culpable participation. <u>See</u> <u>Special Situations Fund III</u>, 33 F. Supp. 3d at 437-38 (S.D.N.Y. 2014) (acknowledging split among district courts). This Court has previously held that such allegations are necessary, because "many . . . Second Circuit cases include this third requirement as an element of [a] [p]laintiff's <u>prima facie</u> case." <u>In re Cannavest Corp. Sec. Litig.</u>, 307 F. Supp. 3d 222, 256 (S.D.N.Y. 2018). The Court adheres to that view here.

2d at 641 ("Plaintiffs' allegations that [the individual defendants] participated directly in the day-to-day management of Pfizer and made strategic decisions is sufficient to meet Plaintiffs' pleading obligation as to culpable participation.") and In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 171 (S.D.N.Y. 2008) ("[W]ith respect to 'culpable participation,' the allegations of the Amended Complaint with respect to Dolan and Bodnar are also more than adequate to survive this motion.  Dolan is alleged to have actually made materially misleading statements knowing they were false, and Bodnar is alleged to have knowingly entered into the secret, unlawful, oral side agreements.") (see Pltf. Opp. (Dkt. No. 92) at 28).

In DoubleLine II, the court concluded that plaintiffs adequately alleged culpable participation by Odebrecht, noting that the third amended complaint alleged that

> [Odebrecht]'s Division of Structured Operations was established as the Odebrecht entities' "bribe department," managing the illicit payments to government officials, and concealing them from the reported financial reports of both [Norberto] and [Odebrecht].  The Division ensured that [Norberto]'s reported financials did not reveal the massive illicit payments that [Odebrecht] was making to politicians by entering all bribery transactions into a "shadow" accounting database rather than [Norberto] or [Odebrecht]'s regular accounting system.  This ensured that [Norberto]'s financial statements reflecting strong EBIDTA were materially false or misleading.  The head of Structured Operations reported to Marcelo Odebrecht, [Odebrecht]'s CEO, and provided periodic updates of the Division's work. . . . Plaintiffs have [thus] sufficiently pleaded that [Odebrecht] had both the ability to affect [Norberto]'s financial reports and that it took the opportunity to do so.

DoubleLine II, 413 F. Supp. 3d at 221.

Here, as in DoubleLine II, the SAC alleges that (1) "there was a revolving door between Odebrecht and the 'Department of Bribery' at Norberto"; and (2) "defendants maintained a detailed 'shadow budget' through a computer system known as 'MyWebDay' that tracked payments, payment requests and other bribe-related information."  (SAC (Dkt. No. 86) ¶¶ 59-60)  The SAC thus alleges that Odebrecht participated in maintaining a separate ledger for bribery revenue and expenses, with the intent and effect of preventing these data from appearing

in Norberto's financial statements.  Given <u>DoubleLine II</u>'s holding concerning culpable

participation and other case law holding that participation in the underlying fraud is sufficient,

Plaintiff's allegations suffice to state a claim of culpable participation at the motion to dismiss

stage.

In sum, the SAC pleads a primary violation, control of the primary violator, and

culpable participation.  Accordingly, Plaintiff has adequately alleged control person liability as to

Odebrecht.

*       *       *       *

Defendants' motion to dismiss the Section 10(b) and Rule 10b-5 direct claims

against Odebrecht will be denied with respect to Odebrecht's statements that it reported its

financial results in accordance with Brazilian GAAP,[6] but will be granted with respect to other

alleged misstatements by Odebrecht.  The motion to dismiss will be denied as to the Section

20(a) control person liability claim against Odebrecht.

**C.**     <u>**Plaintiff's State Law Claims**</u>

Defendants argue that (1) Plaintiff's state law claims should be limited to

statements involving "competitive bidding"; (2) certain state law claims against Odebrecht

should be dismissed; and (3) Engenharia should be liable only as a successor to Norberto.  (Def.

Br. (Dkt. No. 88) at 24-26)

**1.**     <u>**Washington State Securities Act Claims**</u>

Section 21.20.430(1) of the Washington State Securities Act imposes liability on

"[a]ny person who offers or sells a security in violation of any provisions of RCW 21.20.010

---

[6] Odebrecht's liability with respect to such statements will be limited to the same extent as Norberto's – <u>i.e.</u>, Odebrecht is liable for direct misstatements about Brazilian GAAP only to the extent it violated Brazilian GAAP by not accounting for bribes as contract expenses.

. . . ." Wash. Rev. Code Ann. § 21.20.430.  Section 21.20.010, in turn, makes it "unlawful for

any person, in connection with the offer, sale or purchase of any security, directly or indirectly

. . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary

in order to make the statements made, in the light of the circumstances under which they are

made, not misleading. . . ."  Wash. Rev. Code Ann. § 21.20.010.  The parties construe the

Section 21.20.010 standard as identical to the Section 10(b) standard for purposes of Defendants'

motion to dismiss.[7]  (Def. Br. (Dkt. No. 88) at 24; Pltf. Opp. (Dkt. No. 92) at 30)

**a.      Actionable Misstatements**

Defendants argue that – for the same reasons they cited in connection with

Plaintiff's Section 10(b) claims – Plaintiff's "Washington State law claims should also be limited

to alleged statements regarding 'competitive bidding,' and the claims should be dismissed as to

Odebrecht."  (Def. Br. (Dkt. No. 88) at 24-25)  Given this Court's finding that Plaintiff has stated

a claim under Section 10(b) for actionable misstatements by Norberto and Odebrecht regarding

compliance with Brazilian GAAP, however, Plaintiff's Washington State Securities Act claims

may proceed with respect to those same statements.

**b.      Odebrecht's Control Person Liability**

Defendants argue that Plaintiff's control person liability claim against Odebrecht

under the Washington State Securities Act should be dismissed for the same reasons as

Plaintiff's control person liability claim against Odebrecht under Section 20(a).  (Def. Br. (Dkt.

---

[7]  Defendants acknowledge that "the interpretation of the federal and state rules differ in that
RCW § 21.20.010 does not require reliance," but correctly assert that this difference "has no
bearing on the arguments here because reliance is not at issue in this motion."  (Def. Br. (Dkt.
No. 88) at 24 n.9 (citing Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, 194
Wash. 2d 253, 269-70 (2019)))

No. 88) at 25)  As discussed above, however, this Court finds that Plaintiff has stated a claim for control person liability against Odebrecht under Section 20(a).

Defendants also argue that "Plaintiff impermissibly (and inexplicably) brings claims against Odebrecht as a direct seller, pursuant to . . . § 21.20.010, in both Count III and Count IV, as a direct seller pursuant to . . . § 21.20.430(1) in Count III, and additionally as an entity that controls a seller or buyer,' pursuant to . . . § 21.20.430(3), in Count IV.  Odebrecht cannot be both a seller and a control person of a seller, in the same statute, and in two different statutes, all based on the same conduct." (Id. at 25-26)  As Plaintiff correctly points out, however, "Defendants offer no authority to support the contention that Odebrecht cannot be liable under each alleged provision of the Washington State Securities Act."  (Pltf. Opp. (Dkt. No. 92) at 31)  Nor have Defendants explained why Plaintiff cannot plead both theories in the alternative at the motion to dismiss stage.

For these reasons, Defendants' motion to dismiss the control person liability claims against Odebrecht under the Washington State Securities Act will be denied.

### c.   Engenharia's Liability

Defendants argue that "[a]ny claims against [Engenharia] for violations of the Washington State Securities Act included in Count III should not be as a direct seller, but limited solely to Plaintiff's allegation that [Engenharia] bears successor liability for actionable misstatements by [Norberto]." (Def. Br. (Dkt. No. 88) at 25)  Plaintiff does not dispute this aspect of Defendants' motion.  Accordingly, Engenharia's liability under the Washington State Securities Act will be limited to successor liability.[8]

---

[8]  Plaintiff's Section 10(b) and Rule 10b-5 claim against Engenharia is premised only on successor liability.  (SAC (Dkt. No. 86) ¶ 205)  Defendants have not moved to dismiss that claim.

### 2.      **Common Law Fraud**

"The required elements of a common-law fraud claim are 'a misrepresentation or

a material omission of fact which was false and known to be false by [the] defendant, made for

the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on

the misrepresentation or material omission, and injury.'" Ambac Assurance Corp. v.

Countrywide Home Loans, Inc., 31 N.Y.3d 569, 578-79 (2018) (quoting Pasternack v Laboratory

Corp. of Am. Holdings, 27 N.Y.3d 817, 827 (2016)) (brackets in Ambac).  For purposes of

Defendants' motion to dismiss, the parties construe this standard as identical to the Section 10(b)

standard.  (Def. Br. (Dkt. No. 88) at 26; Pltf. Opp. (Dkt. No. 92) at 31)

### a.      **Actionable Misstatements**

Defendants argue that – for the same reasons cited in connection with Plaintiff's

Section 10(b) claims – Norberto's liability "should be limited to alleged misstatements

concerning 'competitive bidding.'"  (Def. Br. (Dkt. No. 88) at 26)  Having held that Plaintiff has

stated a claim under Section 10(b) for actionable misstatements by Norberto regarding

compliance with Brazilian GAAP, Plaintiff's common law fraud claim may proceed with respect

to those same statements.

### b.      **Odebrecht's Liability**

Defendants argue that

> [e]ven if control person liability were sufficiently alleged under Exchange Act
> Section 20(a) as to Odebrecht, . . . there is no "control person" liability for
> common-law fraud.  Nor does the Second Amended Complaint actually premise
> its common-law claim against Odebrecht on any theory of control person liability.
> The common-law fraud claim against Odebrecht should therefore be dismissed.

(Def. Br. (Dkt. No. 88) at 26 (citations omitted))

As Plaintiff points out, however, the SAC "does not allege control person liability

against Odebrecht for common-law fraud."  (Pltf. Opp. (Dkt. No. 92) at 31; SAC (Dkt. No. 86)

¶¶ 221-29)  Moreover, as discussed above, the SAC states a claim for actionable misstatements that Odebrecht made directly.  Accordingly, as with the Section 10(b) direct liability claim against Odebrecht, the common law fraud claim against Odebrecht may proceed with respect to Odebrecht's alleged misstatements about compliance with Brazilian GAAP.

<strong>c.      Engenharia's Liability</strong>

Defendants argue that Engenharia's liability for common law fraud "should be limited to successor liability claims based on the same actionable misstatements by [Norberto]." (Def. Br. (Dkt. No. 88) at 26)  Plaintiff does not dispute this aspect of Defendants' motion. Accordingly, Engenharia's liability for common law fraud will be limited to successor liability.

**D.      Leave to Amend**

As Plaintiff has already amended once as of right, it may amend again "only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Although leave to amend should be "freely give[n] . . . when justice so requires," id., district courts "'ha[ve] broad discretion in determining whether to grant leave to amend.'"  United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 28 (2d Cir. 2016) (quoting Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000)).  Leave to amend may be denied on the basis of futility when the plaintiff has "presented no basis for the district court to believe [it] could allege facts withstanding a 12(b)(6) motion."  Sprague v. Salisbury Bank & Tr. Co., 969 F.3d 95, 101 (2d Cir. 2020) (quotation omitted).

Here, this Court has twice held that Plaintiff has failed to state a claim with respect to Brazilian GAAP violations stemming from Norberto and Odebrecht's failure to accrue a provision, disclose a contingent liability, and separately record revenue from contracts obtained through bribery.  Plaintiff has pled no facts suggesting that further amendment with respect to

- 4= clean

these purported Brazilian GAAP violations would survive a renewed motion to dismiss. Therefore, amendment would be futile, and further leave to amend will be denied.

## **CONCLUSION**

Defendants' partial motion to dismiss is granted in part and denied in part as set forth above.  The Clerk of Court is directed to terminate the motion (Dkt. No. 87).

The discovery stay is hereby lifted.  The Clerk of Court is directed to terminate Plaintiff's March 20, 2023 motion to partially lift the stay (Dkt. No. 100) as moot.

The parties will appear for an initial pretrial conference, pursuant to Rule 16 of the Federal Rules of Civil Procedure, on **August 17, 2023, at 11:15 a.m.** in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York.  The parties should consult this Court's individual rules of practice and submit a joint letter and proposed case management plan one week prior to the conference.

Dated:  New York, New York
      August 4, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge

38