USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 10/21/26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WASHINGTON STATE INVESTMENT BOARD,<br>Plaintiff,<br>-against-<br>ODEBRECHT S.A., et al.,<br>Defendants. | 17-CV-8118 (PGG) (BCM)<br>**OPINION AND ORDER** |

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Washington State Investment Board (WSIB) brought this securities fraud action against defendants Odebrecht S.A. (OSA), Construtora Norberto Odebrecht, S.A. (CNO), and Odebrecht Engenharia e Construção S.A. (OEC) (collectively Odebrecht) after sustaining losses on bonds issued by defendants' affiliate Odebrecht Finance, Ltd and originally guaranteed by CNO. The securities (Odebrecht Notes) dropped in value when Brazilian investigators uncovered that defendants were involved in a "massive widespread bribery scheme of historic proportions." Second Amended Complaint (SAC) (Dkt. 86) ¶ 57. WSIB alleges that from 2006 through 2014, defendants paid "$3.3 billion in bribes" to various government officials around the world, in order to secure numerous large-scale construction projects, but "failed to properly account for at least $3.36 billion in ill-gotten benefits," making their financial statements – upon which WSIB relied when it purchased the Odebrecht Notes – "false and misleading[.]" *Id.* Brazilian prosecutors, in collaboration with international partners, launched a large-scale bribery investigation in 2014, which remained active until approximately 2021 and resulted in guilty pleas in multiple jurisdictions, including the Eastern District of New York (EDNY), where Odebrecht admitted, in 2016, that it "paid $788 million in bribes" (a sum that plaintiff characterizes as "just the tip of the proverbial iceberg") to numerous government officials, "in connection with 100 projects in 12 countries." *Id.* ¶¶ 1, 12.

Now before the Court is defendants' motion (Dkt. 160) seeking a blanket protective order excusing them from producing any documents or information that they "previously produced to Brazilian prosecutors related to the bribery scheme underlying this litigation." Def. Mem. (Dkts. 163, 166) at 1. Defendants argue that they are prohibited from producing documents or answering any of plaintiff's long-pending interrogatories and requests for admission (RFAs) by the confidentiality provisions of the *Termo de Acordo de Leniência* (Leniency Agreement) that Odebrecht entered into in 2016 with the *Ministério Público Federal do Brasil* (MPF), and/or by various Brazilian court decisions interpreting the Leniency Agreement. *Id.* at 3-7.[1]

In opposition, plaintiff WSIB argues that the broad-brush protection defendants seek is unwarranted, and that they have failed to show that the specific discovery sought in this action is prohibited under Brazilian law. Pl. Opp. (Dkts. 169, 171) at 1. WSIB further contends that the policy goals animating the Leniency Agreement's confidentiality provisions are no longer served by prohibiting the discovery sought, because (1) the MPF's anti-corruption investigation has wound down, and (2) recent Brazilian judicial decisions have declared the evidence produced to the MPF "worthless" in light of revelations of widespread prosecutorial misconduct. *Id.* at 6. Lastly, plaintiff argues that even if the Leniency Agreement could be read as broadly as defendants contend, principles of comity weigh against shielding them from engaging in any meaningful discovery in this case. *See id.* at 11-25.

For the reasons that follow, defendants' motion will be denied.

[1] At defendants' request, the Leniency Agreement itself has been filed under seal, together with the Brazilian court decisions interpreting it, two related Brazilian court petitions, and some of the parties' expert reports. Other expert reports, and the parties' briefs, have been redacted to the extent they discuss the sealed materials. *See* 10/21/24 Order (Dkt. 167); 5/27/25 Order (Dkt. 181). In this Report and Recommendation, a double docket citation is provided where the referenced document was filed both under seal and (in redacted form) in public view.

## I. BACKGROUND

I assume familiarity with the facts underlying this case, which were described in detail by the Hon. Paul G. Gardephe, United States District Judge, in his decisions on defendants' successive motions to dismiss the First Amended Complaint (Dkt. 35) and the SAC. *See Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 56-57 (S.D.N.Y. 2020) (*Odebrecht I*); *Wash. State Inv. Bd. v. Odebrecht S.A.*, 2023 WL 5016787, at *1-2 (S.D.N.Y. Aug. 4, 2023) (*Odebrecht II*). In addition, the undersigned Magistrate Judge described the bribery scheme, the response by prosecutors in Brazil (and elsewhere), the Leniency Agreement, and some of the Brazilian court decisions interpreting it in connection with Odebrecht's successful motion, made in 2020, for a (significantly narrower) protective order in a similar securities fraud case brought by other investors in Odebrecht bonds. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 4596561, at *1-5 (S.D.N.Y. Oct. 6, 2021) (*DoubleLine*).[2]

In this Opinion and Order, I recount the relevant background facts only to the extent necessary to provide context for the motion now before me. I draw those facts from: (1) the SAC; (2) the declaration of defendants' attorney Maria E. Manghi in support of their motion for a protective order (Manghi Decl.) (Dkts. 161, 164) and accompanying exhibits, including three expert reports previously submitted by the same defendants in *DoubleLine*[3]; (3) the declaration of

[2] *DoubleLine* was docketed under seal, in unredacted form, on September 23, 2021. *See* Sealed Op. and Order, *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-04576 (S.D.N.Y. Sept. 23, 2021), Dkt. 190 (hereinafter *Sealed DoubleLine*). The same decision was then docketed in redacted form on October 6, 2021, *see id.*, Dkt. 194, and published in that form by Westlaw (and other services). In this Report and Recommendation, I cite to the Westlaw decision where possible, and to *Sealed DoubleLine* only when necessary to reference the non-public portions therein.

[3] These expert reports include two reports by the Brazilian law firm Barros Pimentel, Alcântara Gil & Rodriguez Advogados, *see* Manghi Decl. Ex. 13 (Barros Pimentel Op.) (Dkt. 161-13); *id.* Ex. 14 (Second Barros Pimentel Op.) (Dkt. 161-14), and the statement of Brazilian lawyer and law professor Marta Saad. *See id.* Ex. 15 (Saad Stmt.) (Dkt. 161-15).

defendants' expert, Rodrigo Führ de Oliveira (De Oliveira Decl.) (Dkts. 162, 165), a lawyer at the Brazilian law firm Mudrovitsch Advogados, which is "in charge of defending Odebrecht's interests before the Brazilian authorities" regarding the Leniency Agreement, *see* De Oliveira Decl. ¶ A; (4) the declaration of plaintiff's expert Dr. Fabio de Sa e Silva (De Sa e Silva Decl.) (Dkts. 170, 173), a Brazilian-trained lawyer and Professor of Brazilian Studies at the University of Oklahoma, *see* De Sa e Silva Decl. at 4, and accompanying exhibits; (5) the declaration of plaintiff's attorney Douglas R. Britton (Britton Decl.) (Dkt. 172) and accompanying exhibits; and (6) a second declaration of Rodrigo Führ de Oliveira, submitted with defendants' reply papers (De Oliveira Reply Decl.) (Dkts. 178, 179).

**A. Parties**

Defendant OSA is a Brazilian "holding company . . . that, through various subsidiaries and operating entities, conducts business in construction, engineering, infrastructure, chemicals, utilities and real estate businesses in Brazil and throughout 27 other countries, including the United States." SAC ¶ 46. Defendant CNO is "a wholly-owned subsidiary" of OSA, which "primarily engage[s] in the construction of large-scale infrastructure and other public works projects." *Id.* ¶ 47. At the time of the disputed events, "CNO was the largest construction and engineering business in Latin America, and one of the largest in the world." *Id.* In 2015, Odebrecht reorganized and "changed the name of its overall construction operations from CNO to OEC," after which CNO became "a subsidiary of OEC and [began] focus[ing] solely on projects within Brazil." *Id.* Prior to the reorganization, CNO was the guarantor of the notes purchased by plaintiff. *Id.* ¶¶ 1 n.1, 18, 211. Defendant OEC is also "a wholly-owned subsidiary" of OSA, as well as "the holding company for Odebrecht's engineering and construction operations worldwide." *Id.* ¶ 48. Defendant OEC was created on January 27, 2014 and "did not have its current name until February 2, 2015." *Id.* After the reorganization, OEC became the guarantor of the Odebrecht Notes. *Id.* ¶¶ 20, 48.

Plaintiff WSIB is a state agency responsible for managing public employee retirement funds. SAC ¶ 45. Between June 12, 2012 and February 4, 2015, WSIB purchased Odebrecht Notes "with a face value of over $100 million," through "four different note offerings," including both new issues and purchases on the secondary market. *Id.* ¶¶ 11, 51-56. WSIB made these purchases based "in large part" on Odebrecht's published financial results, *id.* ¶ 11, which "concealed the true nature of how [OSA] and CNO secured business." *Id.* ¶ 12. Thereafter, "as the truth behind defendants' various false statements and material omissions was gradually revealed to the market in a series of corrective disclosures," principally in 2016, the "artificial inflation came out of the Notes as they dropped in value." *Id.* ¶ 179.

**B. The Bribery Scheme and the *Lava Jato* Investigation**

In or around 2006, defendants "established a standalone division within CNO called the Division of Structured Operations" (Division), which plaintiff alleges "effectively functioned as a 'Department of Bribery'" for Odebrecht. SAC ¶ 58. Between 2006 and 2014, Odebrecht paid out bribes totaling $3.3 billion to corrupt business and government officials throughout the world. *Id.* ¶¶ 3, 57, 71. The Division was able to conceal the payments by omitting them from Odebrecht's publicly-available accounting records. *Id.* ¶¶ 60-61. Instead, it tracked these payments (and other bribe-related information) "through a computer system known as 'MyWebDay[.]'" *Id.* ¶ 60. In addition, for bribe-related communications, Odebrecht "utilized an entirely separate and off-book communication system called 'Drousys,'" which allowed employees to communicate with one another and with outside co-conspirators "through the use of secure emails and instant messages, utilizing code names and passwords." *Id.*

In or about 2014, Brazilian authorities began investigating suspected corruption within another Brazilian conglomerate, Petróleo Brazileiro S.A. (known as Petrobras), under the code name *Lava Jato* (Operation Carwash). SAC ¶ 75. That investigation, in turn, led authorities to

Odebrecht. *See id.* ¶¶ 13, 75. Upon becoming aware of *Lava Jato*, Odebrecht initially took steps to "conceal or destroy evidence of [its] criminal activities and hinder investigations," including by deleting records, bribing officials to prevent them from cooperating with investigators, and "making numerous false and misleading statements denying defendants' participation in the bribery and kickback scheme." *Id.* ¶ 76. In addition, Odebrecht instructed its employees in the Division to "mov[e] the operations outside of Brazil and relocat[e] its two principal officers to Florida." *Id.* Eventually, however, Odebrecht was "implicated in potential wrongdoing," and on June 19, 2015, its CEO, Marcelo Odebrecht, was arrested. *Id.* ¶ 13.

**C. The Leniency Agreement**

On December 1, 2016, Odebrecht and the MPF entered into the Leniency Agreement, *see* Manghi Decl. Ex. 1 (Leniency Ag.) (Dkt. 161-1), which was intended to: (1) "give effectiveness to the civil prosecution of other suspected natural and legal persons"; (2) "preserve [Odebrecht's] existence and the continuity of its activities;" (3) "ensur[e] the adequacy and effectiveness of [its] integrity practices"; and (4) "encourage [Odebrecht] to enter into . . . similar agreements" in other jurisdictions, "in order to promote the expansion of corruption investigations in Brazil and abroad." *Id.* at 1-2.[4] "[I]n exchange for immunity or exemption [from] certain sanctions," *see* Barros Pimentel Op. ¶ 10, the Leniency Agreement required Odebrecht to make various factual admissions related to the bribery scheme (which appear in annexes to the Agreement), provide relevant evidence to the MPF, reveal the identities and roles of collaborators in the scheme, and otherwise cooperate with the MPF in its anti-corruption investigation. Leniency Ag. at 4-5; Def.

[4] All of the Brazilian documents submitted to this Court by defendants are written in Portuguese and (except where otherwise noted) accompanied by certified English translations. Plaintiff has raised no objection to the authenticity of the documents or to the translations.

Mem. at 3.[5] In addition, Odebrecht was required to pay an "indemnifying fine" of R$ 3.8 billion, in installments, and submit to independent monitoring. *See* Leniency Ag. at 6, 7.

While the language of the Leniency Agreement (in translation) is often awkward and difficult to parse, the parties do not dispute that it contains "clear provisions" prohibiting both the MPF and Odebrecht itself from "granting third parties access to the evidence produced through it." De Sa e Silva Decl. at 7; *see* Barros Pimentel Op. ¶¶ 11-12; Saad Stmt. ¶¶ 21-22 & n.6. Moreover, the parties generally agree that "the main public interest protected" by the Leniency Agreement's secrecy provisions is to preserve "evidential leverage for other investigations," Saad Stmt. ¶ 21; *accord id.* ¶ 22 & n.6; De Sa e Silva Decl. at 10, 12, as well as to "help Odebrecht and its officers negotiate other deals and avoid 'double jeopardy.'" De Sa e Silva Decl. at 10; *accord* Barros Pimentel Op. ¶¶ 13-14.

However, the parties dispute the proper scope and interpretation of the secrecy provisions set forth in Clauses 11, 19, 20, and 21 of the Leniency Agreement. As translated into English, those clauses state, in relevant part:

> **Clause 11**. The content of this Leniency Agreement, including its respective annexes, of all statements and documents produced will be of restricted access until the moment of the presentation of precautionary measures, complaints and/or civil actions in relation to individuals or companies that may be revealed as responsible for civil or criminal offenses and unlawful acts due to the collaboration provided

[5] The Leniency Agreement was "part of a global agreement coordinated by the competent authorities of the Brazilian, American and Swiss jurisdictions[.]" Leniency Ag. at 7. As explained in *DoubleLine*, Odebrecht later entered into cooperation agreements with several other foreign authorities in connection with the bribery scheme, including the governments of Ecuador, Peru, the Dominican Republic, Mozambique, Switzerland, and the United States. *DoubleLine*, 2021 WL 4596561, at *3-5. On December 21, 2016, Odebrecht entered into a plea agreement with the United States in the Eastern District of New York, *see* SAC ¶¶ 168-172; Manghi Decl. Ex. 4 (EDNY Plea Ag.) (Dkt. 161-4), including an attached Statement of Facts (SOF) to which Odebrecht "agree[d] and stipulate[d]." EDNY Plea Ag. Att. B (ECF pp. 34-56).

for under this Leniency Agreement, subject to the provisions of Clauses 19, 20 and 21 and Appendix 2 of this Agreement.

***

**Clause 19**. The MPF undertakes to maintain secrecy, for a period of 6 (six) months from the signing of this Agreement, as to the attachments referring to the illicit practices object of this Agreement that directly involve foreign public agents . . . [Odebrecht] may motivatedly request the extension of the term provided for in this clause, and the MPF will have the discretion to evaluate.

**Single paragraph**. This clause and the following cover only information, statements and evidence that have been obtained as a result of this Agreement.

**Clause 20**. After the term provided for in Clause 19 has elapsed, to ensure the effectiveness of the protection of [Odebrecht] and Adherents in other countries, observing what is established in Clause 21, the [MPF] will plead with the respective competent Brazilian courts that . . . [they comply with certain restrictions on the sharing of] the attachments and evidence resulting from the Agreement . . . in the criminal proceedings proposed based on the elements resulting from this Agreement . . .

***

**Clause 21**. The [MPF] will only share with the competent foreign authorities the data, information, and evidence received through this Leniency Agreement, in compliance with the rule of Clause 19 above, . . .

a. if the Requesting State formally request the sharing of information for the purpose of a criminal investigation in that country . . . ;

b. in the case of a formal request to share information for the purpose of a criminal investigation in that country, . . . the [MPF] will restrict its use only and exclusively in relation to investigations, procedures, and criminal proceedings against third parties other than [Odebrecht], Adherents, and Representatives who have signed an autonomous and awarded collaboration agreement with the Public Prosecutor's Office. . . ; [and]

c. whenever possible, . . . the competent foreign authority will render a prior commitment to the Public Prosecutor's Office . . . to respect restrictions on the use of information and evidence. [However,]

§ 5. [Odebrecht] and companies of its economic group and Adherents are not bound by the obligation of secrecy with regard to the possible disclosure of unlawful facts to authorities or foreign public bodies with jurisdiction over such facts, especially for the purpose of entering into agreements similar to this instrument.

Leniency Ag. at 14, 18-20.[6]

Appendix 2 to the Leniency Agreement [redacted] *See* De Oliveira Decl. ¶ U (quoting Appendix 2).[7] [redacted] *Sealed DoubleLine* at 4-5.

**D. Initial Brazilian Court Decisions**

After the Leniency Agreement was signed on December 1, 2016, it was the subject of numerous Brazilian court decisions. First, on May 22, 2017, the 13th Federal Court of Curitiba (the Curitiba Court) [redacted] Manghi Decl. Ex. 6 (5/22/17 Curitiba Dec.) (Dkt. No. 161-6) at 3, 5. Of particular relevance here, [redacted] First, [redacted]

[6] The Leniency Agreement defines "Adherents" as a sub-category of "Representatives," which is defined as "agents, employees, administrators, officers and contracted third parties, including suppliers of goods and service providers . . . and shareholders of any of the companies in the economic group integrated by [Odebrecht]." Leniency Ag. at 2-3. Adherents are those Representatives who "express their intention to adhere" to the Agreement. *Id.* at 3.

[7] The copy of the Leniency Agreement provided to the Court by defendants does not include Appendix 2.

[redacted] *Id.* at 6. Second, [redacted] *Id.* Third, [redacted] *Id.* Therefore, [redacted] *Id.* Finally, [redacted]

Upon the expiration of the six-month period of presumptive secrecy prescribed in Clause 19, "members and former members of the Odebrecht Group" requested that the *Supremo Tribunal Federal* (STF), the highest federal court in Brazil, extend the period of "secrecy imposed on deposition [sic] linked to plea bargaining agreements" in order to "guarantee a favorable environment" for negotiating additional plea agreements with foreign authorities. Manghi Decl. Ex. 5 (5/30/17 STF Dec.) (Dkt. No. 161-5) at 1. In a decision issued on May 30, 2017, the STF agreed to extend the secrecy indefinitely in light of the "possibility of concrete damage to the negotiations that have been maintained with foreign authorities if the terms of deposition rendered in the respective plea bargaining agreements are made public." *Id.* at 2. However, the Court emphasized that, given the need to preserve the right of the accused to raise a "full defense," and considering the "exceptional nature of the restriction on the publication of the files," the duration

of secrecy "must be conditioned to the response of the foreign authorities as to the measures taken as a result of the receipt of the pertinent information elements." *Id.* Accordingly, the court "accept[ed] [Odebrecht's] request to keep under secrecy the terms of deposition rendered in the plea bargaining agreements . . . until further deliberation according to the content of the replies from the foreign authorities[.]" *Id.*

Approximately six months later, on December 19, 2017, the Curitiba Court [redacted] *Sealed DoubleLine* at 8. Among other things, the December 19, 2017 order [redacted] *Id.* [redacted] *Id.*[8]

E. The ***DoubleLine*** **Protective Order and Related Brazilian Proceedings**

In support of their motion for a broad protective order in this case, defendants rely heavily on *DoubleLine*. As defendants acknowledge, "[t]he protective order in *DoubleLine* pertained only to Drousys, as the [*DoubleLine*] Court was not presented with a motion seeking a broader

[8] In this action, defendants have attached a copy of the December 19, 2017 Curitiba Court decision to the Manghi Declaration as Ex. 7 (Dkt. 161-7), but do not provide an English translation, and do not discuss it in their moving brief. In *DoubleLine*, however, the same defendants provided a certified translation.

protective order to cover all documents produced under the Leniency Agreement." Def. Mem. at 6 n.3. Nonetheless, according to defendants, the Brazilian legal restrictions upon which the Court relied in *DoubleLine* "similarly apply to all evidence provided to the MPF under the Leniency Agreement, and the Court should extend its holding from *DoubleLine* accordingly." *Id.* at 13. Moreover, in defendants' view, the Leniency Agreement does not merely relieve them of any obligation to produce documents, depositions, or other *evidence* submitted to the MPF; it prohibits them from providing any "information" previously provided to the MPF, *id.* 16 n. 6, such that – for example – they need not answer interrogatories or requests for admission (RFAs) inquiring about *facts* that were previously disclosed to the MPF.[9]

Plaintiff, for its part, argues that "*DoubleLine* differed from the instant motion in material ways." Pl. Opp. at 1. Among other things, plaintiff notes, "Brazilian authorities expressed to the Court [in *DoubleLine*] their concern about production of the Drousys system," whereas "here, they have stayed silent" about the broader protective order sought. *Id.* Given the parties' disagreement about the reach of my decision in *DoubleLine*, it is worth recounting here what the issues were in *DoubleLine* and how they were resolved.

Plaintiffs DoubleLine Capital LP, DoubleLine Income Solutions Fund, and DoubleLine Funds Trust filed the *DoubleLine* case four months before WSIB filed the case at bar, but *DoubleLine* moved more quickly through two rounds of pleading motions and amendments. In the fall of 2020, the parties reached a discovery impasse regarding the impact of the Leniency Agreement and the judicial decisions described above on Odebrecht's discovery obligations,

[9] *See* Def. Reply at 3 (arguing that there is no difference between "documents and evidence" submitted to the MPF, on the one hand, and the underlying "facts," on the other hand, because, due to the passage of time, "[a]s a practical matter, Defendants cannot answer these questions without reference to documents that contain the information Plaintiff seeks, which are the very documents subject to the confidentiality restrictions").

particularly with respect to plaintiffs' request for a copy of the full contents of the Drousys and MyWebDay Systems. *See DoubleLine*, 2021 WL 4596561, at *1. Consequently, defendants moved for a protective order, arguing that they could not "produce documents or data *from Drousys or MyWebDay* because 'doing so would violate applicable foreign law, including Defendants' ongoing obligations to multiple foreign prosecutors and decisions of Brazilian courts.'" *Id.* (quoting defendants' moving brief) (all emphases added unless otherwise indicated).

In support of their protective order motion, defendants submitted the Leniency Agreement and the Brazilian decisions outlined above. They also submitted correspondence from the MPF, dated August 21, 2020, in which the MPF wrote: "We hereby confirm that *'Drousys' and 'Mywebday B' systems* were delivered to the MPF for custody in virtue of the Leniency Agreement signed with company Odebrecht S/A. The information and documents concerning *the systems* are kept confidentially and can only be accessed to support investigations conducted by competent authorities, including to avoid jeopardizing ongoing investigations, in Brazil and abroad." *DoubleLine,* 2021 WL 4596561, at *6. Additionally, defendants submitted a November 10, 2020 decision of the Curitiba Court [redacted] *Sealed DoubleLine* at 9; *see* Manghi Decl. Ex. 17 (11/10/20 Curitiba Court Dec.) (Dkt. 161-17) at 3.[10]

---

[10] [redacted]

In addition to these Brazilian court decisions, defendants submitted the two Barros Pimentel opinions and the Saad Statement (upon which they also rely in this action). These expert reports also focused largely (although not entirely) on Odebrecht's confidentiality obligations as to the Systems themselves. The *DoubleLine* plaintiffs did not submit any opposing expert evidence. *See DoubleLine*, 2021 WL 4596561, at *10.

After careful review of these materials, I concluded that plaintiffs' express demand that defendants produce "documents and data from the Drousys file system in this civil litigation" presented "a true conflict between domestic and foreign law." *DoubleLine*, 2021 WL 4596561, at *10. This conclusion was based largely on defendants' unrebutted expert opinions and [redacted] *Sealed DoubleLine* at 22 (quoting 11/10/20 Curitiba Court Dec. at 3).[11]

---

[redacted] *See* 11/10/20 Curitiba Court Dec. at 1-2. [redacted] Manghi Decl. Ex. 16 (Odebrecht Pet.) (Dkt. 161-16) at 4-5. [redacted] 11/10/20 Curitiba Court Dec. at 2; *see* Manghi Decl. Ex. 20 (MPF Response) (Dkt. 161-20) at 2. [redacted] MPF Response at 3. [redacted] *See* 11/10/20 Curitiba Court Dec. at 3.

[11] Although Odebrecht sought a protective order covering both Systems – Drousys and MyWebDay – I found the parties' dispute regarding MyWebDay to be "moot," because, among other things, it was undisputed that "the encryption keys needed to access the system [had] been [intentionally] destroyed," making it impossible for anyone to access. *DoubleLine*, 2021 WL 4596561, at *10. Odebrecht had already been sanctioned for the destruction of the encryption keys.

I then proceeded to a comity analysis, "governed by § 442(1)(c) of the Restatement (Third) of Foreign Relations Law," *DoubleLine*, 2021 WL 4596561, at *11, and concluded that most of the seven factors listed in § 442(1)(c) weighed in favor of granting the protective order as to the Drousys system. *Id.* at *11-14. Specifically, I found that while data from the Drousys system was undoubtedly relevant and potentially important to plaintiffs' claims, their discovery request was overbroad, in that it sought an entire multi-terabyte system rather than narrowly tailored information. *Id.* at *11-12. In addition, I noted that the Drousys system was physically located abroad, and that plaintiffs had yet to pursue alternative means – such as depositions, subpoenas, interrogatories, RFAs, or factual stipulations – to obtain comparable evidence. *Id.* at *12-13. I also found that requiring production of the Drousys system would undermine important Brazilian interests, as Brazilian authorities clearly "wish[ed] to keep the Drousys system out of private hands so long as their investigations continue," in order to preserve their leverage in those investigations and future prosecutions. *Id.* at *13; *Sealed DoubleLine* at 28. Additionally, I credited the opinions of defendants' experts that producing data from the Drousys system could expose Odebrecht to civil and criminal liabilities. *DoubleLine*, 2021 WL 4596561, at *13.

### F. Recent Developments and STF Decisions

*DoubleLine* was decided in 2021.[12] In the case at bar, plaintiff WSIB asserts (and defendants do not meaningfully contest) that Brazil's *Lava Jato* investigations and prosecutions have since ground to a halt. *See* Pl. Opp. at 6; De Sa e Silva Decl. Ex. 9 (Dkt. 170-9) at ECF p. 4 (Nov. 24, 2024 New York Times article describing the "broad unraveling of Operation Car Wash"

---

*See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 1191527, at *10 (S.D.N.Y. Mar. 30, 2021).

[12] The case has since been settled, by means of a stipulated judgment in the amount of $17,307,000. *See* Stip. Order and Final Judgment, *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-04576 (S.D.N.Y. Jan. 8, 2026), Dkt. 321.

over the past year, including decisions by the STF "tossing out key evidence, setting aside major convictions and suspending billions of dollars in fines").[13] The investigations came to an end amidst accusations of prosecutorial and judicial overreach and misconduct, including improper *ex parte* coordination between the MPF and the Curitiba Court judge overseeing the Leniency Agreement, improper mishandling of evidence, and improper withholding of evidence from targets of the investigation. *See* Def. Mem. at 8 (describing "irregularities in the *Lava Jato* investigation and the negotiation of the Leniency Agreement").

On June 28, 2021, after a long battle between the Curitiba Court and then-former Brazilian President Luiz Inácio Lula da Silva over access to evidence subject to the Leniency Agreement,[14] Brazil's highest court held that these irregularities so fundamentally tainted the "evidence obtained from the Leniency Agreement" that it could no longer be used against Lula (who, after his conviction was annulled, was once again elected President of Brazil). *See* Manghi Decl. Ex. 18 (6/28/21 STF Dec.) (Dkt. 161-18) at 206; De Sa e Silva Decl. at 16-18. In its decision, the STF reprimanded the Curitiba Court for withholding evidence subject to the Leniency Agreement from

[13] Public sources confirm the MPF formally shut down the *Lava Jato* operation in or around February 2021. *See, e.g.*, 14 Bus. & Com. Litig. Fed. Cts. § 156:42 (5th ed. 2022) (noting that "Brazil's Lava Jato investigations [] concluded in 2021"); Ricardo Brito & Gram Slattery, *After Seven Years, Brazil Shuts Down Car Wash Anti-Corruption Squad*, Reuters (Feb. 3, 2021), https://perma.cc/3T8A-X4Z7.

[14] Plaintiff's expert explains that Lula da Silva (popularly known as "Lula") was prosecuted – and convicted – on charges of "receiving bribes from Odebrecht," based on evidence that came in part from the Drousys and MyWebDay systems. De Sa e Silva Decl. at 16. However, "Lula's defense correctly argued that it could not mount an effective defense without access to the records on those systems." *Id.* The Curitiba Court initially denied the request (maintaining that no "third party" could be allowed access to the Systems), but "Lula's defense then appealed all the way to the Supreme Court, which finally ruled that he had the right to consult the systems." *Id.* On November 16, 2020, STF Justice Ricardo Lewandowski ordered the Curitiba Court to "immediately grant the defense access to the evidence and other data contained in the Leniency Agreement . . . that refer to the claimant [Lula] or concern him." *Id.*; *see* De Sa e Silva Decl. Ex. 6 (11/16/20 STF Dec.) (Dkt. 170-6) at ECF p. 9.

Lula's defense team for years, in violation of "countless" "unequivocal orders issued by [Brazil's] Supreme Court." 6/28/21 STF Dec. at 146, 149 (including, for example, the 11/16/20 STF Dec.). Based on these and other defects, the STF declared the entire criminal proceeding against Lula "irremediably null and void . . . from the moment [] filed," and found the evidence arising from the Leniency Agreement so lacking in "credibility" that it was declared "useless" for further criminal prosecution of Lula. *Id.* at 203-04, 206.

The STF's June 28, 2021 decision "spurred extensive follow-on litigation from [other] parties who had been affected by the evidence which the STF declared invalid." Def. Mem. at 8. In case after case, the STF applied the same prohibitions on the use of evidence obtained via the Leniency Agreement to targets of the investigation in Brazil and abroad, in both civil and criminal proceedings. *Id.* at 8-10; *see also* De Sa e Silva Decl. at 17 ("Decisions in this vein were initially issued to the benefit of individuals, including Mr. Lula da Silva, and then extended to all others."). As defendants explain, "[t]hese requests eventually became so numerous that, on September 6, 2023, the STF ordered that its prior decision invalidating the evidence provided by Defendants to the MPF" extended to "anyone subject to the STF's jurisdiction." Def. Mem. at 9; *see also* Pl. Opp. at 6 ("The STF found corruption between a Curitiba Court judge and the MPF, holding that *all* of the evidence obtained under the Leniency Agreement was *worthless* in Brazil, and thus any further prosecution of crimes using that evidence is prohibited.") (emphases in original); Manghi Decl. Ex. 3 (9/6/23 STF Dec.) (Dkt. 161-3) at 343-44 (declaring the "unreliability of the evidence obtained from the Leniency Agreement," and ordering Brazilian judges to evaluate, "in cases of any nature in which these pieces of evidence have been used . . . the need to close investigations or lawsuits[.]").

Most recently (as of December 24, 2024, the date of the de Sa e Silva Declaration) "the fines stipulated in the agreement have been deemed excessive . . . as a result, they are currently being reviewed and reduced (!) by the courts." De Sa e Silva Decl. at 19 (punctuation as in original;); *see also id.* Ex. 9 (Nov. 24, 2024 New York Times article reporting that STF Justice Jose Antonio Dias Toffoli "suspended a $2.5 billion fine against the company"). Neither party has provided the Court with a copy of the decision suspending the fine, or provided any further updates as to the status of the Leniency Agreement.

**G. Relevant Procedural History**

WSIB commenced this action on October 20, 2017, alleging violations of the federal and Washington State securities laws, as well as common law fraud claims. On August 4, 2023, after plaintiff amended its complaint twice, Judge Gardephe granted defendants' motion to dismiss the SAC in part and denied it in part. *Odebrecht II*, 2023 WL 5016787, at *20. As relevant here, the District Judge permitted WSIB to proceed on its federal and state securities fraud claims, as well as its common-law fraud claims, to the extent those claims are premised on plaintiff's allegations that (i) CNO made materially false statements (for which OSA is also liable under federal law as a "control person") when it claimed that it obtained contracts through competitive bidding, when in fact it obtained those contracts "largely through bribery," *id.* at *2; (ii) CNO and OSA made materially false statements when they represented that they prepared their financial statements in accordance with Brazil's Generally Accepted Accounting Practices (GAAP), "when in fact [they] violated Brazilian GAAP by not disclosing the cost of bribes," *id.* at *15; and (iii) OEC is liable for CNO's violations as its successor. *Id.* at *19. Additionally, the District Judge lifted the discovery stay previously imposed pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4. *id.* at *20, and referred the case to me for general pretrial management. *See* Dkt. 112.

On September 6, 2023, I issued a case management order that included a fact discovery deadline of September 6, 2024. *See* Dkt. 118 ¶ 3. On October 6, 2023, WSIB filed a pre-motion letter (Pl. 10/6/23 Letter) (Dkt. 121) proposing to shortcut discovery by applying offensive non-mutual collateral estoppel to certain facts that this Court had previously deemed established, as a discovery sanction, in *DoubleLine*.[15] In its letter, plaintiff advised the Court that defendants "have already refused to produce discovery relevant to their bribery scheme" based on the Leniency Agreement and Brazilian law. 10/6/23 Letter at 1 n.1. On November 7, 2023, the District Judge expanded my reference to include a report and recommendation on plaintiff's anticipated collateral estoppel motion. *See* Dkt. 129.

On November 29, 2023, WSIB filed a discovery letter-motion, explaining that it had served both interrogatories and requests for admission, but that it had become "clear through the meet-and-confer process that Defendants are unwilling to provide responses that comply with Federal Rules of Civil Procedure 33 and 36 due to purported obligations under foreign law." Pl. 11/29/23 Letter (Dkt. 134) at 1. WSIB attached defendants' responses and objections to its first set of interrogatories, *see* Def. Interrog. Responses (Dkt. 134-2), in which Odebrecht refused to answer any questions about the bribes to which it pled guilty in the EDNY.[16] WSIB also attached

[15] *See Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2022 WL 3029014 (S.D.N.Y. July 19, 2022) (ordering, as a discovery sanction pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii), that four facts be "taken as established for purposes of this action," namely: "(1) Defendants made all of the misrepresentations and omissions alleged in plaintiffs' Third Amended Complaint . . . concerning the Odebrecht Notes; (2) Those misrepresentations and omissions were material; (3) Defendants made those material misrepresentations and omissions with scienter; and (4) Defendant OEC is the successor of defendant CNO." *Id.* at *13.

[16] For example, Interrogatory 1 asked defendants to state, for each bribe admitted to in the EDNY Plea Agreement: "(a) date of payment; (b) amount; (c) entity making the payment; (d) ultimate intended recipient; (e) what contract(s) or other benefit you intended to obtain as a result of such bribe or payment, including approximate dollar value; and (f) what contract(s) or other benefit you did in fact receive as a result of such bribe or payment, including approximate dollar value." Def. Interrog. Responses at 6-7. Defendants refused to provide any of the requested information on

defendants' responses and objections to its first set of requests for admission (RFAs), *see* Def. RFA Responses (Dkt. 134-1), in which Odebrecht refused to admit or deny that it made any of the specific bribes underlying plaintiff's claims in this action.[17] Plaintiff asked the Court to "order Defendants to answer the Interrogatories and order that the [RFAs] are admitted under Fed. R. Civ. P. 36(a)(6)." Pl. 11/29/23 Letter at 1. On December 6, 2023, I denied the letter-motion, "without prejudice to renewal after resolution of plaintiff's upcoming motion for summary judgment," and stayed discovery pending the resolution of that motion. Dkt. 138.

On December 7, 2023, WSIB filed its collateral estoppel motion, in the form of a motion for partial summary judgment as to "the elements of falsity, materiality, and scienter." Dkt. 139. On July 10, 2024, I recommended that the motion be denied, principally on the ground that "the matters established in *DoubleLine* were not 'actually litigated.'" *Wash. State Inv. Bd. v. Odebrecht*

---

numerous grounds, including "insofar as it seeks information subject to confidentiality restrictions or other limitations on its dissemination, including, without limitation, those imposed by Brazilian authorities and/or other applicable authorities and insofar as it seeks information in violation of applicable Brazilian law or orders and/or Defendants' leniency agreements with Brazilian or other applicable authorities." *Id.* at 7. Defendants similarly objected to Interrogatory No. 2, which asked them to identify the Odebrecht employees described pseudonymously (as Odebrecht Employees 1-6) in the EDNY Plea Agreement. *Id.* at 8-9.

[17] For example, RFAs 1-4 asked defendants to "[a]dmit that Odebrecht paid bribes to Eduardo Paes in exchange for Odebrecht obtaining contracts relating to the 2016 Olympic Games in Brazil," that those bribes were paid in 2012, and that they totaled at least R$14 million. Def. RFA Responses at 5-7. Defendants refused to admit or deny any of those facts, principally on the ground that each RFA "seeks information subject to confidentiality restrictions or other limitations on its dissemination, including, without limitation, those imposed by Brazilian authorities and/or other applicable authorities and . . . seeks information in violation of applicable Brazilian law or orders and/or Defendants' leniency agreements with Brazilian or other applicable authorities." *Id.* at 5-8. Defendants similarly objected to RFAs No. 5-55, which asked comparable questions about other bribes. *See id.* at 8-53. The only facts they admitted (in response to some but not all RFAs) were those to which they had previously allocuted, often in very general terms, in the EDNY Plea Agreement. Thus, for example, when asked to admit that "Odebrecht paid bribes to Jorge Cuba for Odebrecht to obtain a contract for work on the first section of Line 1 of the Lima Metro Project in Peru," and that they totaled "at least $1.2 million," defendants admitted only that, "as reflected in the [EDNY Plea Agreement], Odebrecht and CNO paid bribes in relation to a government infrastructure project and government transportation project in Peru." *Id.* at 10-11.

*S.A.*, 2024 WL 3616422, at *1 (S.D.N.Y. July 10, 2024) (quoting *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79 (2d Cir. 2019)).

On July 31, 2024 (after the 14-day period for filing objections pursuant to Fed. R. Civ. P. 72(b) passed without any objections being filed),[18] I lifted the discovery stay imposed on December 6, 2023, and scheduled a conference "to discuss the most efficient means of resolving defendants' anticipated foreign law arguments." Dkt. 153. On August 7, 2024 (before the conference took place), the parties agreed that it would be most efficient for defendants to move for a protective order (rather than plaintiff moving to compel), and proposed a briefing schedule. *See* Dkt. 155. On August 9, 2024, I agreed to that course of action and adopted the parties' proposed briefing schedule. *See* Dkt. 156.

On September 25, 2024, the parties submitted a proposed scheduling order (Dkt. 157), which would again stay discovery, this time pending resolution of the protective order motion. Rather than adopt the parties' form of order, on October 3, 2024, I partially stayed discovery (as to "the elements of falsity, materiality, and scienter") pending the resolution of defendants' protective order motion, but permitted fact discovery to proceed "for all other purposes." Dkt. 158 at 1.

On October 11, 2024, defendants filed their protective order motion, supported by their memorandum of law, the Manghi Declaration (and its exhibits), and the de Oliveira Declaration. On December 12, 2024, plaintiff filed its opposition memorandum, the Britton Declaration (and its exhibits),[19] and the de Sa e Silva Declaration (and its exhibits). On January 17, 2025, defendants filed a reply brief (Def. Reply) (Dkt. 180), along with the de Oliveira Reply Declaration.

[18] The District Judge subsequently accepted my recommendation and denied plaintiff's partial summary judgment motion. *See* Dkt. 186.

[19] Britton attaches copies of plaintiff's RFAs, served on October 2, 2023 (Dkt. 172-1); plaintiff's interrogatories, served on August 25, 2023 (Dkt. 172-2), and plaintiff's requests for production of documents (RFPs), also served on August 25, 2023 (Dkt. 172-3).

That same day, in a joint status update letter, the parties advised that they had "exchanged discovery requests and responses relating to reliance, damages, and loss causation," and that plaintiff had begun to produce documents, but that defendants had not yet done so. Dkt. 176 at 1. The parties have not submitted any further updates.

### H. Defendants' Motion

In support of their protective order motion, defendants argue that the Leniency Agreement, together with the Brazilian court decisions discussed in *DoubleLine* and above, prohibit them from disclosing any "information" they "previously produced to Brazilian prosecutors related to the bribery scheme underlying this litigation." Def. Mem. at 1; *see also id.* at 16 n.6 ("For avoidance of doubt, Defendants seek a protective order against any requests, present or future, that might seek information provided to the MPF under the Leniency Agreement."). Defendants further contend that the more recent developments in Brazil, including the STF decisions "[n]ullif[ying]" the evidence obtained via the Leniency Agreement, "add[] an additional layer of restrictions on Defendants" because, according to them, "[a]s a practical matter, the invalidation of the evidence means that Defendants could not use or provide this information in any proceeding." *Id.* at 7-8. In short, defendants interpret the most recent STF decisions as rendering any evidence provided to Brazilian prosecutors under the Leniency Agreement "inadmissible," not only in Brazil but worldwide. *Id.* at 9-10. Finally, relying on this Court's analysis in *DoubleLine,* Odebrecht argues that principles of comity weigh in favor of granting the protective order. *See id.* at 15-22.

Plaintiff, for its part, argues that the relief that defendants seek is overbroad, in that they fail to reference any of plaintiff's actual discovery requests (which were propounded in the form of interrogatories or RFAs and seek facts, rather than documents or prior testimony), or explain how Brazilian law prohibits them from responding to those requests. Pl. Opp. at 2-4. Plaintiff further argues that, even if the Leniency Agreement and relevant Brazilian decisions restrict

defendants' ability to produce *evidence* previously provided to the MPF, defendants fail to explain or justify how that "could possibly create a conflict with Defendants' discovery obligations of providing *facts* in response to the Interrogatories and RFAs." *Id.* at 3. In any event, plaintiff contends, "the comity analysis weighs in favor of denying a protective order." *Id.* at 11.

In reply, defendants emphasize that – in their view – the terms of the Leniency Agreement and the STF's recent decisions nullifying the evidence arising from that agreement are two separate and independent grounds for finding a "true conflict" between Brazilian and U.S. law. Def. Reply at 2. Further, they argue, "there is no distinction" between requests that seek "documents or evidence" and those that "seek facts," because "[a]s a practical matter, Defendants cannot answer these questions without reference to documents that contain the information Plaintiff seek[s], which are the very documents subject to the confidentiality restrictions." Def. Reply at 3; *see also id.* at n.4 (claiming that it would not be possible "to provide facts contained in the documents without providing the documents themselves.").

## II. ANALYSIS

### A. Legal Standards

When a party to a lawsuit in the United States resists discovery based on the laws of a foreign nation, "a two-step process" is "trigger[ed]." *In re Terrorist Attacks on Sept. 11, 2001*, 2021 WL 5449825, at *10 (S.D.N.Y. Nov. 22, 2021). First, the Court "must determine if there is actually a conflict between the discovery sought and foreign law." *Id.* "A true conflict exists if 'compliance with the . . . laws of both countries would be impossible.'" *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 102 (2d Cir. 2019) (quoting *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1050 (2d Cir. 1996)).

At step one, where the asserted "obstacle" to the discovery sought "is foreign law, the burden of proving what that law is and demonstrating why it impedes production falls on the party

resisting discovery." *S.E.C. v. Gibraltar Glob. Sec., Inc.*, 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015); *see also BOC Aviation Ltd. v. AirBridgeCargo Airlines, LLC*, 2022 WL 17581775, at *15 (S.D.N.Y. Dec. 12, 2022) (the movant bears the burden "of establishing impossibility" of compliance with the laws of both countries) (collecting cases); *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 96 (S.D.N.Y. 2014) ("The party objecting to a discovery motion based on foreign law bears the burden of demonstrating that such law actually bars the production or testimony at issue.") (internal quotation marks and citation omitted). To satisfy this burden, the resisting party "must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Wultz*, 298 F.R.D. at 96 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). Among other things, that party must identify "the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Id.* (internal quotation marks and citation omitted). "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The Court's determination must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

While courts in the United States have "no legal obligation to give effect or deference to the orders or holdings of a court of a foreign country, absent a specific treaty or legislative rule," they may do so "on the basis of comity." *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 2009 WL 1055673, at *2 (S.D.N.Y. Apr. 17, 2009). Comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *In re Maxwell*, 93 F.3d at 1046 (quoting *Hilton v. Guyot*,

159 U.S. 113, 163-64 (1895)); *accord Exp.-Imp. Bank of U.S.*, 2009 WL 1055673, at *2; *see also Black's Law Dictionary* 324 (10th ed. 2014) (defining "comity" as "[a] practice among political entities (as countries, states, or courts of different jurisdictions), involving esp[ecially] mutual recognition of legislative, executive, and judicial acts").

Thus, at step two, if foreign law is found to conflict with domestic law, courts perform a comity analysis "to determine the weight to be given to the foreign jurisdiction's law." *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016) (internal quotation marks and citation omitted). "Conversely, in the absence of a 'true conflict,' a comity analysis is 'unnecessary.'" *Doubleline*, 2021 WL 4596561, at *9 (quoting *Gibraltar Glob. Sec.*, 2015 WL 1514746, at *4). To this end, the Second Circuit considers seven factors as part of a comity analysis, *see Doubleline*, 2021 WL 4596561, at *9, five of which are derived from § 442(1)(c) of the Restatement (Third) of Foreign Relations Law:

> (1) the importance to the investigation or litigation of the documents or other information requested;
>
> (2) the degree of specificity of the request;
>
> (3) whether the information originated in the United States;
>
> (4) the availability of alternative means of securing the information; and
>
> (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

*Doubleline*, 2021 WL 4596561, at *9; *Laydon*, 183 F. Supp. 3d at 419-20; *Wultz*, 298 F.R.D. at 96; *Royal Park Invs., SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2017 WL 7512815, at *10 (S.D.N.Y. Dec. 29, 2017). In addition, Courts in this Circuit consider two additional factors:

> (6) the hardship of compliance on the party or witness from whom discovery is sought; and
>
> (7) the good faith of the party resisting discovery.

*Doubleline*, 2021 WL 4596561, at *9; *Laydon*, 183 F. Supp. 3d at 420; *Wultz*, 298 F.R.D. at 96; *Royal Park Invs.*, 2017 WL 7512815, at *10. Finally, the court may also consider "whether the person resisting discovery is a party to the litigation," and whether the requirements of another country's privacy laws are "absolute." *Laydon*, 183 F. Supp. 3d at 420 (citing *Tansey v. Cochlear Ltd.*, 2014 WL 4676588, at *2 (E.D.N.Y. Sept. 18, 2014)).

**B. Defendants Fail to Demonstrate an Actual Conflict of Law**

Defendants are candid about the scope of the protective order they request. It would operate as an "ongoing injunction" to preclude "any requests, present or future, that *might* seek *information* provided to the MPF under the Leniency Agreement." Def. Mem. at 16 n.6. According to defendants, they need this level of protection because production in this forum of any "information" previously provided to the MPF would directly conflict with the confidentiality provisions of the Leniency Agreement – and, at least implicitly, with the STF's June 8, 2021 and September 6, 2023 decisions declaring the unreliability of such evidence and barring its further use by Brazilian prosecutors. *Id.* at 13-15; Def. Reply at 3-6. However, defendants have not met their burden of showing that Brazilian law imposes upon them the sweeping restrictions they claim.

**1. The Leniency Agreement**

Defendants rely primarily on the "clear and stringent confidentiality restrictions" set forth in the Leniency Agreement. Def. Reply at 3. In the view of Odebrecht's expert, Clauses 11, 19, 20, and 21 – which no Brazilian court has expressly rescinded or terminated – prohibit it from sharing any of the "Elements Arising from the Leniency Agreement," De Oliveira Decl. ¶ X, without "specific authorization from the MPF or the Judiciary of Brazil," *id.*, which WSIB has not obtained.

De Oliveira defines the phrase "Elements Arising from the Leniency Agreement" as "the Drousys and My Web Day systems" and "all *information*, deposition transcripts, written statements, and documents . . . under said Agreement." *Id.* ¶ A. However, the Leniency Agreement

itself does not use that phrase, and it is not obvious to this Court that its secrecy provisions prevent Odebrecht from revealing the *facts* of its misconduct (for example, whether it "paid bribes to Eduardo Paes in exchange for Odebrecht obtaining contracts relating to the 2016 Olympic Games in Brazil" in 2012, totaling "at least R$14 million," *see* Def. RFA Responses at 5-7). Clause 11, which first establishes the restrictions discussed at greater length in later clauses, restricts the "content of this Leniency Agreement," including "the respective *annexes*" and all "*statements* and *documents* produced" to the MPF, Leniency Ag. at 14, while Clause 19 requires the MPF to "maintain secrecy . . . as to the *attachments* referring to the illicit practices . . . that directly involve foreign public agents." *Id.* at 18.[20]

To be sure, the "single paragraph" at the end of Clause 20 states that Clauses 20 and 21 "cover only *information*, *statements* and *evidence* resulting from Agreement," Leniency Ag. at 18, which introduces some ambiguity as to this issue. But ambiguity is of limited assistance to Odebrecht, which bears the burden of demonstrating that foreign law "actually bars the production or testimony at issue." *Wultz*, 298 F.R.D. at 96.[21] I am therefore unconvinced that the Leniency

[20] In its moving brief, Odebrecht itself asserts that the Leniency Agreement prohibits it from producing "any *documents* previously produced to Brazilian prosecutors." Def. Mem. at 1-2; *see also id.* at 3 ("The Leniency Agreement also contains a number of key limitations on the accessibility of *documents* and *materials* provided to the MPF."); *id.* at 13 (the relevant confidentiality clauses "prevent production of not just the Systems, but all *documents* provided under the Leniency Agreement"); *id.* at 13-14 (arguing that although "later Brazilian decisions focused primarily on the Systems, . . . their policy rationales extend to *documents* produced to the MPF more generally"). Likewise, [redacted] 11/10/20 Curitiba Court Dec. at 2.

[21] In his reply declaration, de Oliveira argues that Brazilian law defines "evidence" broadly, to include, for example, a "confession," which is "considered a declaration in which the party admits the truth of a fact contrary to their interest and favorable to that of their adversary." De Oliveira Reply Decl. ¶ K n.1. Therefore, he concludes, the interrogatory responses and admissions that plaintiff seeks in this action would "constitute 'evidence' protected under the Leniency Agreement." *Id.* It is true, of course, that any interrogatory answers served by Odebrecht under

Agreement, by its terms, prohibits Odebrecht from providing substantive responses to plaintiff's interrogatories and RFAs.

As to the mechanics of the Leniency Agreement, de Oliveira opines that Clause 21 permits Odebrecht to share "Elements Arising from the Leniency Agreement" only when the following conditions are "cumulatively" met: (a) a "foreign State" must formally request "access to information in the context of a criminal investigation"; (b) if the MPF "responds positively to the request, it must restrict the use of the information provided to criminal proceedings against third parties"; and (c) the "foreign authority must, whenever possible, explicitly commit to respecting said restrictions of use." De Oliveira Decl. ¶ AA (citing Leniency Ag. at 19). "In addition to that," de Oliveira states, "any request for information must also be presented to the Curitiba Court." *Id.* De Oliveira's summary appears to track the text of Clause 21, summarized in Part I(C) above, which governs the procedures for the sharing of otherwise-confidential information with foreign authorities for purposes of criminal prosecutions outside of Brazil.[22] WSIB cannot, of course, meet the conditions set out in Clause 21, sections (a)-(c). The parties disagree, however, as to two additional points: the scope of the exception to the secrecy provisions, set forth in Clause 21 § 5; and whether the secrecy provisions were meant to apply in perpetuity, or only so long as necessary to protect ongoing investigations and prosecutions. I address each question in turn.

---

Fed. R. Civ. P. 33, and any admissions made by Odebrecht under Fed. R. Civ. P. 36, will be evidence. But that evidence – which does not currently exist – is "protected under the Leniency Agreement" only if the Leniency Agreement protects (that is, forbids Odebrecht from disclosing) the underlying *facts* about the bribes that it paid. Thus, de Oliveira's discussion of Brazilian evidentiary law begs the key question rather than answers it.

[22] Although the language of Clauses 19 through 21 (in translation) speaks only of the sharing of otherwise confidential information by the MPF, plaintiff's expert concedes that "[i]t is also understood that these prohibitions apply to Odebrecht." De Sa e Silva Decl. at 8.

Section 5, which appears at the end of Clause 21, states:

> [Odebrecht] and companies of its economic group and Adherents are not bound by the obligation of secrecy with regard to the possible disclosure of unlawful facts [sic] to authorities or foreign public bodies with jurisdiction over such facts, especially for the purpose of entering into agreements similar to this instrument.

Leniency Ag. at 20.[23] According to defendants' experts, this exception applies only when Odebrecht wishes to disclose "unlawful facts" to negotiate similar plea or leniency agreements with other governmental authorities. *See* De Oliveira Decl. ¶ Y; De Oliveira Reply Decl. ¶¶ G-H; Saad Stmt. ¶ 24 ("[T]he only exception to the obligation of secrecy of clause 11 is provided for in § 5 of Clause 21, which allows the company to use the information to negotiate agreements similar to the Leniency Agreement with foreign government authorities."). However, defendants do not offer any support for their interpretation beyond the *ipse dixit* of their experts. And plaintiff, for its part, offers an equally plausible interpretation: that the use of the word "especially" (*especialmente*) in § 5 indicates that the reference to sharing information with foreign authorities for the purposes of negotiating similar agreements is merely an example, not the "sole exception" to confidentiality. *See* De Sa e Silva Decl. at 8-9 (arguing that "especially" is different from "specifically"). Once again, therefore, I am unconvinced that defendants' interpretation is the correct one.

Plaintiff's expert points out that the Leniency Agreement's confidentiality provisions are designed to serve two primary policy concerns: (1) "to protect investigations [] conducted by Brazilian authorities – a fact that has been stressed in almost every document cited in the Defendants' memorandum"; and (2) "to help Odebrecht and its officers negotiate other deals and

---

[23] The Leniency Agreement uses the phrase *fatos ilícitos*, which most modern translation tools render into English (from Brazilian Portuguese) as "unlawful acts" (rather than "unlawful facts"). This Court is constrained, however, to accept the English translation provided by defendants and accepted by plaintiff.

avoid 'double jeopardy.'" De Sa e Silva Decl. at 10, 12. In broad terms, defendants agree. *See*, *e.g.*, Barros Pimentel Op. ¶ 14 ("lifting confidentiality could hamper lines of investigation or new agreements with foreign authorities"); Saad Stmt. ¶¶ 21-22 (explaining that the Systems required confidential treatment to preserve "evidential leverage for other investigations"). From this relatively uncontroversial premise, plaintiff argues that since all of the governmental investigations appear to have been concluded, at least with respect to "acts subject to Brazilian jurisdiction," De Sa e Silva Decl. at 12,[24] "there is no longer any reason for these restrictions to remain in place." *Id.*; *see also* Pl. Opp. at 5-6 (arguing that "the Leniency Agreement and [redacted]).

As an example, de Sa e Silva points out that when Brazilian prosecutors filed lawsuits against some of the Rio de Janeiro public officials involved in taking bribes in connection with the 2016 Olympics (including mayor Eduardo Paes), the "supporting admissions and evidence were then made public by Brazilian prosecutors." De Sa e Silva Decl. at 14 (displaying a screenshot from the videotaped deposition of Benedicto Barbosa da Silva Júnior, the former president of CNO, which was publicly released by the MPF); *see also id.* Ex. 3 (petition to initiate criminal proceedings against Paes and others, with attached documentary evidence); *id.* Ex. 4 (criminal complaint against Paes and others, with attached documentary evidence).[25] Under the circumstances, de Sa e Silva argues, "no reasons remain that could prevent Odebrecht from

[24] De Sa e Silva reads Clause 11 of the Leniency Agreement, which states that the content of its annexes, statements, and documents will be restricted "until the moment of the presentation of precautionary measures, complaints, and/or civil actions," as applying to proceedings in Brazil rather than those initiated by foreign governments. *See* De Sa e Silva Decl. at 7-8.

[25] Mr. Júnior's videotaped testimony can be viewed – among other places – on YouTube, where it was posted in 2017. *See Petição 6714 Benedicto Júnior – Eduardo Paes*, YouTube (April 17, 2017), https://perma.cc/K8L2-TP2P.

disclosing those same facts and evidence to a U.S. civil court in discovery." *Id.* at 14. And yet, as noted above, Odebrecht has flatly refused to respond to plaintiff's RFAs 1-4, which ask about bribes to Paes in relation to the 2016 Olympics, on the ground that each such RFA "seeks information subject to confidentiality restrictions or other limitations on its dissemination, including, without limitation, those imposed by Brazilian authorities and/or other applicable authorities and . . . seeks information in violation of applicable Brazilian law or orders and/or Defendants' leniency agreements with Brazilian or other applicable authorities." Def. RFA Responses at 5-7.

In response, defendants' expert states – in a single conclusory sentence – that "Odebrecht continues to receive and respond to requests for information and evidence from the MPF and other Brazilian authorities in connection with the alleged illicit acts committed internationally." De Oliveira Reply Decl. ¶ M. But he provides no factual or evidentiary support for this claim, much less "information of sufficient particularity and specificity" to support his conclusion as to defendants' continuing secrecy obligations under Brazilian law. *See Wultz*, 298 F.R.D. at 96. Moreover, Brazil's highest court appears to disagree. *See* 9/6/23 STF Dec. at 220 (claimant was entitled to "all the data and information contained in the case file and its annexes or attachments, except for those involving ongoing proceedings, which, it should be emphasized, *no longer exist*."). Defendants' showing is thus clearly "inadequate to carry [their] burden of establishing impossibility of compliance" with the laws of Brazil and the United States, which is "a threshold requirement for invoking international comity." *BOC Aviation Ltd.*, 2022 WL 17581775, at *15 (cleaned up).

Additionally, defendants point out that when the STP declared the evidence obtained via the Leniency Agreement "useless," it did not "[redacted]

[redacted] and the Leniency Agreement itself[.]" Def. Mem. at 10; *see also* Def. Reply at 3 (noting that the Brazilian courts have not expressly "lift[ed] the confidentiality restrictions imposed by the Leniency Agreement"). True enough. [redacted] 5/22/17 Curitiba Dec. at 6. Moreover, while Clause 11 § 1 permits the MPF to "request the court to lift the confidentiality of the records" if and when it "understands" that the restrictions "are no longer necessary for investigations," *see* Leniency Ag. at 14, it is not clear from the language of Clause 11 that a formal court order is required if – as plaintiff contends – all of the "acts subject to Brazilian jurisdiction . . . have been fully investigated by the MPF," and all of the resulting "precautionary measures, complaints, and/or civil actions" have been filed. De Sa e Silva Decl. at 12. In any event, Odebrecht has no incentive to request that those restrictions be lifted, and – in contrast to its conduct in *DoubleLine* – conspicuously refrained, in this case, from seeking a statement from the MPF supporting its position or a Brazilian court ruling clarifying whether and to what extent the Leniency Agreement impacts its ability to answer WSIB's civil discovery demands in this action.[26] For this reason as well, I am not persuaded that Odebrecht is prohibited by the Leniency Agreement

[26] In their reply brief, defendants argue that they should not be critiqued for failing to obtain a statement of support from the MPF or a ruling from Brazilian courts because plaintiff likewise is proceeding without "support from the MPF" or guidance from a Brazilian court. Def. Reply at 4. However, WSIB is neither a party to the Leniency Agreement nor at any risk of legal repercussions under it. Moreover, WSIB does not have the burden of persuading this Court that its interpretation of the Leniency Agreement is correct. That is defendants' job. Consequently, defendants' decision *not* to seek support from the MPF or the Brazilian courts raises the question as to whether they are confident of the position they have presented to this Court.

from responding to "any requests, present or future, that might seek information provided to the MPF under the Leniency Agreement." Def. Mem. at 16 n.6.

### 2. STF's Nullification of All Evidence

Nor am I persuaded that the STF's June 28, 2021 and September 6, 2023 decisions impose "an additional layer of restrictions on Defendants, making [it] even clearer that Defendants cannot produce the materials Plaintiff requests without violating Brazilian law." Def. Mem. at 7. Both of the STF decisions arose out of complaints by third-party targets of *Lava Jato*-related prosecutions that they were unfairly *denied* access to the evidence collected pursuant to the Leniency Agreement. *See* 6/28/21 STF Dec. at 145-49; 9/6/23 STF Dec. at 205-14. Both decisions criticized the MPF and the Curitiba Court for not making all relevant evidence available to them for purposes of defending themselves. *See* 6/28/21 STF Dec. at 149-53; 9/6/23 STF Dec. at 215-20, 278. And both decisions concluded by declaring that, because of improper collusion between the MPF and the Curitiba Court and mishandling of evidentiary materials, the evidence obtained pursuant to the Leniency Agreement lacks "credibility," 6/28/21 STF Dec. at 204, is "useless," *id.* at 206, and is "unreliabl[e]." 9/6/23 STF Dec. at 343. Moreover, in the 2023 decision, Justice Toffoli extended the court's prior orders "definitively and with *erga omnes* effects," declaring the "unreliability of the evidence obtained from the Leniency Agreement . . . in any scope or degree of jurisdiction," 9/6/23 STF Dec. at 343; that is, unusable against "anyone subject to the STF's jurisdiction." Def. Mem. at 9. Justice Toffoli then left it to the judges presiding over the cases "in which these pieces of evidence have been used" to determine whether any other evidence was tainted, "as well as the need to close investigations or lawsuits." 9/6/23 STF Dec. at 343-44.

As Odebrecht admits, *see* Def. Reply at 6, neither of the STF decisions upon which it relies discusses its continuing secrecy obligations, if any, under the Leniency Agreement. Nonetheless, it asserts, "the invalidation of the evidence means that Defendants could not use or provide this

information in any proceeding," Def. Mem. at 8, whether in Brazil or abroad, because it is "entirely inadmissible." *Id.* at 10. Odebrecht then reasons that since the evidence cannot be used in any court, it also cannot be produced in discovery in this action without violating Brazilian law. *Id.* at 10-11 (explaining that it is defendants' "understanding" that they are now subject to "additional and broad obligations not to share for purposes of other proceedings any information previously produced under the Leniency Agreement"); Def. Reply at 6 ("[T]here is no need to impose secrecy obligations on evidence that is the subject of a categorical bar and cannot be used.").

These arguments fail for three reasons. First, the STF did not purport to make evidence derived from the Leniency Agreement "inadmissible" outside of Brazil. *See* De Oliveira Decl. ¶ L n.5 (explaining that the phrase "in any scope or degree of jurisdiction" refers to "the various levels of the Brazilian judiciary system"); Def. Reply at 5 (admitting that the STF decisions apply only "within the Brazilian judiciary," but adding that this is "beside the point").[27]

Second, the question before this Court is not admissibility but discoverability; specifically, the discoverability of facts concerning the bribes that Odebrecht paid in order to generate the revenue and profits it reported to its United States investors. While excoriating the Curitaba Court, the MPF, and (to some extent) Odebrecht itself – for the manner in which they gathered, maintained, and used evidence obtained pursuant to the Leniency Agreement – the STF was also careful to note that the Agreement arose out of an "investigation into illegal acts that had actually been committed, investigated, and sanctioned[.]" 9/6/23 STF Dec. at 343. Nothing in the two STF

[27] In any event, "it is well settled that the admissibility of evidence in a United States court rests on United States, not foreign, law." *United States v. Umeh*, 646 F. App'x 96, 100 (2d Cir. 2016) (summary order); *see also United States v. Rommy*, 506 F.3d 108, 129 (2d Cir. 2007) ("The admissibility of evidence in a United States court depends solely on compliance with United States law.") (collecting cases).

decisions highlighted by defendants suggests that the Brazilian court intended to shield Odebrecht itself from the ordinary civil repercussions of those "illegal acts."

Third, the clear intent of the STF decisions was to remedy prosecutorial and judicial misconduct *by Brazilian prosecutors and Curitiba Court judges* concerning the evidence obtained through the Leniency Agreement, which – in Justice Toffoli's view – worked an injustice upon Lula and other prosecutorial targets. *See* 9/6/23 STF Dec. at 341-42 (describing Lula's imprisonment as "one of the biggest miscarriages of justice in the country's history"). American investors in Odebrecht's bonds, such as WSIB, played no role in that miscarriage of justice and committed no misconduct in connection with the gathering, handling, or use of the evidence obtained via the Leniency Agreement. Thus, not only does defendants' interpretation of the STF decisions "stretch [them] beyond their plain terms," Pl. Opp. at 9; defendants ask this Court to accept that a series of court decisions intended to rebuke Brazilian prosecutors and judges also ruled – *sub silentio* – that Odebrecht is required to stonewall ordinary civil discovery in the United States, including discovery asking it directly for information about the bribes it paid. I do not find defendants' logic compelling.

**3. Lack of Specificity and Particularity**

Finally, I briefly address plaintiff's argument that defendants cannot meet their burden of establishing a "true conflict" with Brazilian law because they refuse to specify which of plaintiff's discovery requests would require the disclosure of "evidence produced as a result" of the Leniency Agreement or "are an integral part of the [A]greement." Pl. Opp. at 2, 5. Plaintiff is correct that defendants make no effort to identify any particular interrogatory, RFA, or document request that in their view would require them to violate Brazilian law. Instead, defendants request the broadest possible "ongoing injunction," to shield them from responding to "any requests, present or future, that *might* seek information provided to the MPF under the Leniency Agreement." Def. Mem. at

16 n.6. Moreover, they have made it clear that – in their view – all of plaintiff's discovery requests concerning specific bribes would "seek information provided to the MPF under the Leniency Agreement" and therefore could not be answered. *See* Def. Reply at 3 (explaining that since plaintiff seeks "detailed information about events that occurred over a decade ago from individuals who have long left the company," defendants cannot, "as a practical matter," "answer these questions without reference to documents that contain the information Plaintiff seeks, which are the very documents subject to the confidentiality restrictions").[28]

Recognizing that the problem defendants describe is not limited to a small handful of discovery requests (or a small handful of facts) I nonetheless agree with plaintiff that defendants have not adequately complied with the well-settled rule that a party seeking a protective order based on foreign law "must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Wultz*, 298 F.R.D. at 96 (internal quotation marks and citations omitted); *see also In re Ascentra Holdings, Inc.*, 657 B.R. 339, 358-59 (Bankr. S.D.N.Y. 2023) (movant failed to meet its burden where it did "not argue that the requested deposition itself would violate any [foreign] law, but only that 'many of the Deposition Topics relate to information 'that is protected by [foreign] law."). Defendants may be correct that they need not "march through Plaintiff's dozens of requests to note which may seek documents previously produced to the MPF." Def. Reply at 2. But they do not even "march through" a single request, or explain how it is that they cannot (for example) admit specific facts concerning bribes paid to Mr. Paes in connection with the 2016 Olympics, notwithstanding that Mr. Júnior's testimony as to those facts has been publicly available

[28] Defendants do not support this factual assertion – that all of Odebrecht's knowledge regarding individual bribes was possessed by "individuals who have long left the company" – with any declaration or other admissible evidence.

since 2017. For this reason as well, I conclude that defendants "have not met their burden for both showing that comity is warranted and that compliance with [the laws of both countries] would be impossible." *BOC Aviation Ltd.*, 2022 WL 17581775, at *16; *Wultz*, 298 F.R.D. at 96.

**C. Comity Analysis**

Because I find no true conflict between Brazilian law, on the one hand, and plaintiff's discovery obligations in this case, on the other hand, there is no need for a comity analysis. *See Yukos Capital S.A.R.L. v. Samaraneftegaz*, 592 Fed. App'x 28, 29 (2d Cir. 2015) (summary order) (quoting *In re Maxwell*, 93 F.3d at 1049) ("International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction."); *accord Gibraltar Glob. Sec.*, 2015 WL 1514746, at *4. However, were a comity analysis required, it would not change my conclusion that the blanket protective order sought by Odebrecht is not justified in this case.

**1. Importance of the Discovery Requested**

The first factor – the importance of the information sought to the litigation – weighs heavily against granting defendants' motion. The information that plaintiff seeks is clearly both relevant to its claims and important to its liability case, as is evident from Judge Gardephe's decisions on defendants' successive motions to dismiss. In the first round of motion practice, the District Judge dismissed plaintiff's claims that Odebrecht violated Brazilian GAAP, in part because plaintiff failed to allege facts demonstrating "which contracts were associated with which bribes." *Odebrecht I*, 461 F. Supp. 3d at 72. To overcome that deficiency, the SAC describes numerous contracts that were awarded to Odebrecht because of specific bribes, sets forth the bribe amount per contract, *see* SAC ¶¶ 69, 72-74, 117, and alleges that because of the figures involved, "[t]hese unrecognized expenses related to bribes were plainly material to the reported financial condition of [Odebrecht], and would have been important to investors," such that "[b]y concealing these

costs and keeping the funds to pay them off book . . . [Odebrecht] materially understated its expenses and materially overstated its reported net income during the years 2009-2014." *Id.* ¶ 118.

The District Judge found these new factual allegations sufficient to remedy the deficiencies in the prior pleading, and held that "given that paragraph 117 of the SAC alleges nearly $280 million in bribes, a substantial likelihood exists that a reasonable investor would view these costs as significant alterations of the total mix of information made available." *Odebrecht II*, 2023 WL 5016787, at *14 (cleaned up). Thus, not only is the requested discovery relevant to plaintiff's claims; it goes directly to plaintiff's key factual allegations – including which contracts were associated with which specific bribes, in what amounts – without which the SAC likely would not have survived defendants' motion to dismiss.

**2. The Degree of Specificity of the Requests**

The second factor – the degree of specificity of the discovery requests – also weighs against defendants. In *DoubleLine*, this Court held that plaintiff's document production requests were not "narrowly tailored" because, "rather than narrowly focus their requests on the factual issues they are concerned about proving . . . [plaintiffs] asked for what is effectively the entire Drousys system," consisting of terabytes of data. *Doubleline*, 2021 WL 4596561, at *12. Here, by contrast, plaintiff's requests focus directly on "the factual issues [it is] concerned about proving," *id.*, and seek "specific, discrete source[s] of information," *see Gucci Am., Inc. v. Curveal Fashion*, 2010 WL 808639, at *3 (S.D.N.Y. Mar. 8, 2010) (quoting *Reino De Espana v. Am. Bureau of Shipping*, 2005 WL 1813017, at *9 (S.D.N.Y. Aug. 1, 2005)), such as the identities of key Odebrecht personnel involved in the underlying bribery allegations and the dates, amounts, and recipients of specific bribes.

### 3. Whether the Information Originated in the United States

Given the breadth of the protective order defendants request, and their failure to specify what categories of information and documents they seek to protect, the third factor – whether the information originated in the United States – is difficult for the Court to evaluate. However, in contrast to *DoubleLine*, where it was undisputed that the Drousys system was hosted on servers abroad, here it is clear that at least some of the information originated inside of the United States. *See* Pl. Opp. at 14 (noting that "Odebrecht used the U.S. banking system for purposes of paying bribes," its "bribe department operated exclusively in the United States," and "individuals involved in the bribery scheme operated in the United States").

Odebrecht does not dispute that much of the requested information originated in the United States. Instead, it contends only that such information is *now* located on "servers . . . outside of the United States." Def. Reply at 8. For purposes of a comity analysis, however, the pertinent question is not where the data may currently be accessed, but where the data "originated." *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 42 (E.D.N.Y. 2007) (quoting Restatement (Third) of Foreign Relations Law § 442 (1987)). Thus, although there is a slim record on this point, in light of defendants' failure to rebut plaintiff's contention that much of the requested information *originated* in the United States, this factor also weighs against issuing a protective order.

### 4. Availability of Alternative Means of Securing the Information

The fourth factor – the availability of alternative means of securing the information – further weighs against defendants. Defendants argue that their prior admissions as to the bribery scheme – as set forth in the Statement of Facts incorporated into the EDNY Plea Agreement – are sufficient for plaintiff to prosecute its claims. Def. Mem. at 17-18. However, this argument is clearly belied by Judge Gardephe's decisions on defendants' motions to dismiss, which required WSIB to plead, in detail, "which contracts were associated with which bribes." *Odebrecht I*, 461

F. Supp. 3d at 72. The EDNY Plea Agreement does not provide that information. Nor, for that matter, does it admit to the "$3.3 billion in bribes," SAC ¶ 57, that Odebrecht allegedly paid to various government officials around the world from 2006 through 2014. Thus, defendants' formal admissions, whether in the Leniency Agreement or in the EDNY Plea Agreement, are clearly insufficient as a source of the necessary evidence.

Next, defendants argue that plaintiff has not yet attempted to seek the underlying information about the bribes from sources other than defendants themselves, such as third-party witnesses (*e.g.*, the recipients of the bribes) or "Brazilian authorities." Def. Mem. at 17. Plaintiff responds, plausibly, that no third party is likely to cooperate, as anyone with the requisite knowledge "will be highly motivated to not incriminate themselves" or may have concerns about breaching their own plea agreements. Pl. Opp. at 15. Nor can WSIB reasonably hope to obtain the necessary factual information (much less in a form binding on defendants) from Brazilian authorities. As plaintiff points out, defendants' own expert has opined that "WSIB *cannot* directly request the [evidence] from the MPF or the Curitiba Court," and that even other governments have been unsuccessful in requesting the information, including through letters rogatory. *Id.* at 16 (citing De Oliveira Decl. ¶¶ P, BB). I therefore conclude that it would be difficult for plaintiff to obtain the requested information from sources other than defendants themselves.

**5. Respective Interests of the United States and Brazil**

The fifth factor, which goes to the heart of the international comity concerns underlying the doctrine, *see, e.g.*, *Owen v. Elastos Found.*, 343 F.R.D. 268, 288 (S.D.N.Y. 2023) (noting this factor is "the most important" and "carries the greatest weight") (citations omitted), also weighs against defendants. Courts in this Circuit have "repeatedly recognized that the United States has an 'obvious interest' in having its own procedural rules applied to discovery." *Laydon*, 183 F. Supp. 3d at 423 (quoting *Tansey*, 2014 WL 4676588 at *4). The United States also has a strong interest

in "the protection of investors" and "efficiency, competition, and capital formation." 15 U.S.C. § 77b(b); *see also Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) ("The United States has a strong national interest in the enforcement of its securities fraud laws[.]") (colleting cases). Both of those interests are implicated where, as here, foreign issuers have targeted United States investors.

Conversely, defendants have not carried their burden of demonstrating that Brazil has a strong interest in the continuing secrecy of the sought-after evidence. As explained above, it is clear from the Leniency Agreement itself, and the judicial decisions interpreting and applying it, that Brazilian authorities intended to keep the evidence underlying the agreement confidential only as long as necessary to avoid jeopardizing ongoing investigations. Defendants do not seriously dispute that those investigations have now run their course and that, in any case, the underlying evidence has been declared "worthless" for further prosecutorial purposes in Brazil, thus weakening the case (if there is one) for continued secrecy. Here too, the Court finds it significant that defendants have submitted no statement from Brazilian authorities attesting to Brazil's continued interests in the maintenance of secrecy. Accordingly, this factor weighs against defendants' request for a protective order.

**6. Hardship of Compliance**

Defendants have offered no persuasive evidence that responding to plaintiff's discovery requests – particularly its RFAs and interrogatories – would trigger civil or criminal liability. Again, defendants rely heavily on this Court's opinion in *DoubleLine*, which concluded, based largely on the unrebutted reports of Odebrecht's Brazilian law experts, that "producing the Drousys system to plaintiffs in this action" would likely have significant legal repercussions for Odebrecht. 2021 WL 4596561, at *13.

But plaintiff is correct that "[t]he potential hardship in *DoubleLine* was far more concrete considering that the discovery at issue [there] was the Drousys system, which was explicitly the subject matter of the relevant Brazilian court decisions and MPF ongoing investigations." Pl. Opp. at 22-23. Here, in contrast, defendants have not shown that any penalty is likely to flow from their sharing of *facts* previously shared with the MPF. Indeed, defendants are unable to cite to a single instance in which a party was sanctioned for disclosing information subject to the Leniency Agreement, or for obeying the discovery orders of a United States court. As defendants' own expert acknowledges, "the STF has not yet explicitly stated [that disclosure] would be considered a crime." De Oliveira Decl. ¶ Q. Moreover, plaintiff's expert points out that, under the Brazilian Criminal Code, no liability can attach to one who acts "in strict compliance with a legal duty," such as an order from this Court. De Sa e Silva Decl. at 18-19. Accordingly, this factor also weighs in favor of production.

**7. Good Faith of Party Resisting Discovery**

The seventh and last factor – the good faith of the party resisting discovery – is at best neutral. It is true that defendants have been forthright, throughout this action, about their aggressive interpretation of the Leniency Agreement and related Brazilian court decisions, which in their view essentially exempt them from the ordinary discovery responsibilities of a securities fraud defendant with respect to major elements of the plaintiff's liability case. On the other hand, defendants have made no effort to identify (even in broad terms) the categories of documents and information they seek to withhold. Nor, insofar as the record reflects, have they made any effort to obtain whatever permissions they believe they would need from Brazilian authorities in order to safely honor their discovery obligations in this case without running afoul of the Leniency Agreement.

Accordingly, the seventh factor adds little to the required balancing test. On the whole, I find that even if Odebrecht had demonstrated that Brazilian law prohibited it from responding to plaintiff's written discovery requests, the scales would tip against granting the protective order that defendants seek.

## III. CONCLUSION

For the reasons stated above, defendants' motion (Dkt. 160) for a protective order "against any requests, present or future, that might seek information provided to the MPF under the Leniency Agreement," Def. Mem. at 16, is DENIED.

**The Clerk of Court is respectfully directed to file this Opinion and Order under seal.** The Court will share this Opinion and Order with the parties' counsel via the email addresses found on the docket. By separate order, the Court will give the parties an opportunity to submit proposed redactions before this Opinion and Order is filed in public view.

Dated: New York, New York
September 30, 2026

**SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**